IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARIA SUAREZ,<br><br>        Plaintiff,<br><br>v.<br><br>SOUTHERN GLAZER'S WINE AND SPIRITS OF NEW YORK, LLC,<br><br>        Defendant. | Case No. 2:19-cv-07271-GRB-LGD |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Anjanette Cabrera
Timothy Barbetta
Constangy, Brooks, Smith & Prophete LLP
175 Pearl Street, Suite C-402
Brooklyn, New York 11201
Telephone: (646) 341-6536
E-mail: acabrera@constangy.com
E-mail: tbarbetta@constangy.com
**ATTORNEYS FOR DEFENDANT**

**Background on SGWS**

1. Southern Glazer's Wine and Spirits, LLC is a wholesale distributor of spirits, beer, wine, and related products. Southern Glazer's Wine and Spirits, LLC is headquartered in Miami, Florida, and maintains two primary distribution warehouses in New York: one in Syosset and another upstate in Syracuse. *See* Declaration of Elizabeth Toohig ("Toohig" Decl.), ¶ 2.

2. On July 1, 2016, Southern Wine & Spirits of America, Inc. and Glazer's Inc. completed a transaction to form Southern Glazer's Wine and Spirits, LLC. *See* Toohig Decl., ¶ 3.

3. Southern Glazer's Wine and Spirits, LLC is the parent company of Defendant Southern Glazer's Wine and Spirits of New York, LLC (hereinafter "SGWS"). *See* Toohig Decl., ¶ 4.

4. SGWS is an equal opportunity employer and takes discrimination and retaliation, and allegations thereof, seriously. SGWS maintains policies prohibiting discrimination and retaliation in employment. *See* Employee Handbook (attached as Exhibit 1 to the Declaration of Anjanette Cabrera ("Cabrera Decl.")).

**Background on Suarez's Employment with SGWS**

5. Plaintiff Maria Suarez ("Suarez") began working for SGWS in December 2004 as an administrative assistant in the payroll department. *See* Deposition Transcript of Maria Suarez ("Suarez Dep.") at 17:10-21 (attached as Exhibit 19 to Cabrera Decl.).

6. In 2007, Suarez was promoted to Inventory Supervisor, later retitled Inventory Control Manager, in the company's Syosset warehouse. *See* Personnel Action Notice dated October 10, 2007 (attached as Exhibit 2 to the Cabrera Decl.); and Suarez Dep. at 21:13-19 (attached as Exhibit 19 to Cabrera Decl.).

1

7. She initially supervised one Inventory Control ("IC") Clerk,[1] Josianne Sajous ("Sajous"). In January 2008, two additional IC Clerks joined the department, and Suarez hired an IC Clerk in February 2009. Since that time, Suarez supervised between three and four full-time IC Clerks while in the position of Inventory Supervisor/IC Manager and continuing in her new role as WMI Administrator (explained further below). *See* Suarez Dep. at 22:11-17; 26:5-10; 28:7-20 (attached as Exhibit 19 to Cabrera Decl.); Deposition Transcript of Roy Kohn ("Kohn Dep.") at 30:17-20 (attached as Exhibit 14 to Cabrera Decl.); and Deposition Transcript of Barry Finkelstein ("Finkelstein Dep.") at 14:9-23 (attached as Exhibit 18 to Cabrera Decl.).

8. Throughout her tenure supervising the IC department, Suarez's manager, John Wilkinson ("Wilkinson"),[2] rated Suarez as only an average "Performer" in her performance reviews. *See* Performance Evaluations (attached as Exhibit 3 to the Cabrera Decl.).

9. Wilkinson acknowledged Suarez's work ethic, but noted areas for improvement. In particular, Wilkinson said Suarez needed to improve her communication skills and ability to collaborate with other departments in the company and other functions in the warehouse; to keep an open mind and be able to recognize the limits of her knowledge and identify when to ask for help, rather than allowing her ego or stubbornness to get in the way of efficiency and success; to improve her problem-solving skills; and to take more personal accountability for errors made by her and her team. *See* Performance Evaluations (attached as Exhibit 3 to the Cabrera Decl.).

---

[1] IC Clerks may also be referred to as cycle counters.

[2] Wilkinson passed away in or around 2019. *See* Roy Dep. at 176:16-17 (attached as Exhibit 14 to the Cabrera Decl.).

10. Despite identifying these issues and working with Suarez to improve them, year after year, the same concerns were raised with Suarez in her evaluations. *See* Performance Evaluations (attached as Exhibit 3 to the Cabrera Decl.).

11. Suarez admittedly never disputed her performance evaluations. *See* Suarez Dep. at 42:13-17 (attached as Exhibit 19 to Cabrera Decl.).

**SGWS' Implementation of WMI Program**

12. In early 2016, SGWS began implementing a new warehouse management system in the Syosset distribution warehouse. The system, Warehouse Management Information ("WMI"), had been implemented in several other warehouse locations by SGWS, including in Syracuse. *See* Deposition Transcript of Kevin Randall ("Randall Dep.") at 41:17-24 (attached as Exhibit 15 to Cabrera Decl.).

13. On March 3, 2016, Suarez voluntarily applied for the WMI Administrator position, which was offered to her on May 4 and which she started on May 9. *See* WMI Administrator Offer History and Offer Letter (attached as Exhibit 4 to the Cabrera Decl.); and WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.).

14. The WMI Administrator's job functions were critical to SGWS' business because without proper inventory the company could not supply to its customers and upside-down inventory would negatively affect the company's financials. *See* Randall Dep. at 80:14-81:9 (attached as Exhibit 15 to Cabrera Decl.).

15. Kevin Randall ("Randall") was the hiring manager for the WMI Administrator position that was offered to Suarez. *See* SGWS' Responses to Plaintiff's First Set of

Interrogatories, at Response No. 11 (attached as Exhibit 13 to the Cabrera Decl.); and Randall Dep. at 62:4-6 (attached as Exhibit 15 to the Cabrera Decl.).

16. Randall selected Suarez for this position because she "was [the] best fit for the inventory control counting piece where she had been placed." *See* Randall Dep. at 62:7-25; 63:2-8 (attached as Exhibit 15 to the Cabrera Decl.). Randall believed Suarez "was the most qualified person for this job" because "[s]he worked in the warehouse every day alongside of all of those people and her team and nothing in this new [WMI] world was going to change. That was all going to stay the same. It was just how [SGWS] reported to accounting and to corporate in [its] results…" *See* Randall Dep. at 82:19-83:7 (attached as Exhibit 15 to the Cabrera Decl.).

17. In this new position, not only did Suarez enjoy an increased salary of $75,000, she also increased her supervisory responsibilities when an additional IC Clerk was hired and added to her team at her request. *See* WMI Administrator Offer History and Offer Letter (attached as Exhibit 4 to the Cabrera Decl.); and Kohn Dep. at 90:13-15 (attached as Exhibit 14 to Cabrera Decl.) (stating that "[w]ith the [WMI] role came a pay increase; it came with more responsibility. She was given an additional cycle counter…").

18. Suarez continued to report to the same manager, Wilkinson, and perform the same duties as in her prior position. *See* WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.); Randall Dep. at 38:11-25 (attached as Exhibit 15 to Cabrera Decl.); Suarez Dep. at 66:6-8 (attached as Exhibit 19 to Cabrera Decl.) (admitting that Wilkinson remained her manager); and Kohn Dep. at 89:7-11 (attached as Exhibit 14 to the Cabrera Decl.) ("The tasks involved in this WMI role were identical [to the former Inventory Control Manager

4

role] with the exception of the scanning versus the manual application of the perpetual inventory from the past").

19. The only duty that changed for Suarez and the rest of the IC department was that they were no longer required to manually count inventory due to the introduction of the WMI electronic scanner guns, which made the IC process much more efficient. *See* WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.); and Kohn Dep. at 92:2-7 (attached as Exhibit 14 to the Cabrera Decl.) ("The WMI administrator role differed from her pre WMI administrator role mainly by the manner in which she worked and her inventory control department worked. They no longer worked with a manual system with pencil and paper. They worked with computers.").

20. Suarez continued to direct the work of the IC clerks. *See* Kohn Dep. at 58:14-18 (attached as Exhibit 14 to the Cabrera Decl.) ("[Suarez] assigned work to the cycle counters while she was the warehouse inventory manager in a manual system and after she became the WMI administrator. It was [Suarez'] job to assign work to the counters."); *see also* Suarez Dep. at 74:15-5 (attached as Exhibit 19 to Cabrera Decl.) (admitting that she made the decision to direct the IC Clerks' work while employed as the WMI Administrator); Deposition Transcript of Melissa Johnson ("Johnson Dep.") at 8:19-23 (attached as Exhibit 16 to Cabrera Decl.) (duties of the WMI Administrator were "[t]o ensure that the system was correct at all times and to direct the cycle counters to their job duties each day."); and WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.) (stating that the WMI Administrator is to "Provide Leadership...").

5

21. Suarez also applied for a position as WMI Inventory Control Manager. SGWS hired Tonisha Durant ("Durant") for the WMI Inventory Control Manager position on May 4, 2016. *See* WMI Inventory Control Manager History (attached as Exhibit 12 to the Cabrera Decl.). Randall selected Durant for this position because it was within the accounting department and Durant's previous position was also in the accounting department. Durant was the best fit and most qualified for this position. *See* Randall Dep. at 62:7-63:8 (attached as Exhibit 15 to the Cabrera Decl.). Durant's role "did not change. Her role came from the accounting [department] where she used to work and she applied to this position to become the Inventory Control Manager. She is the communicator between the accounting and the warehouse. She remained that constant." *See* Randall Dep. at 75:9-19 (attached as Exhibit 15 to the Cabrera Decl.).

**Suarez' Job Duties and Responsibilities**

22. Suarez was classified as an exempt employee. *See* Randall Dep. at 68:23-25 (attached as Exhibit 15 to the Cabrera Decl.).

23. During the relevant time period, Suarez' salary was as follows:
   a. 2011: Supervisor, Inventory Control ($61,305)
   b. 2012: Inventory Control Manager ($63,385)
   c. 2013: Inventory Control Manager ($66,555)
   d. 2014: Inventory Control Manager ($68,635)
   e. 2015: Inventory Control Manager ($70,715)
   f. 2016: Inventory Control Manager ($72,130) → WMI Administrator ($75,000)
   g. 2017: WMI Administrator ($75,000)

*See* Payroll Records (attached as Exhibit 23 to the Cabrera Decl.).

6

24. As WMI Administrator, Suarez was responsible for configuring, operating, overseeing, and analyzing the WMI to achieve project objectives; ensuring smooth start-up and transition by providing leadership and training to IC clerks; and driving the WMI application process. *See* WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.).

25. After the transition to the WMI, Suarez was still responsible for directing the work of the IC clerks. *See* WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.); and Randall Dep. at 63:9-24 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 30:14-17 (attached as Exhibit 14 to the Cabrera Decl.) ("Don't be misled by the title of [WMI] administrator. The inventory control clerks reported through [Suarez]. Her voice was heard when she talked about them.").

26. As WMI Administrator, Suarez continued to have influence on evaluating how IC clerks performed their jobs and decisions on changes in their status. The only thing that changed from her prior job as Inventory Control Manager was the use of the WMI. *See* Randall Dep. at 63:9-24 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 34:14-18; 36:15-23; 37:2-5 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "managed the inventory control department, a recognized department. Her voice was heard and respected if she made recommendations for discipline and this group of inventory and cycle counters reported to her. She was responsible for them" and Suarez "asked for an additional cycle counter at one point" approximately one year to 18 months prior to her department (Fall 2016), and "Wilkinson agreed to hire an additional cycle counter.").

27. Suarez continued to have supervisory authority over the IC clerks until she separated from SGWS. *See* Randall Dep. at 67:24-68:3 (attached as Exhibit 15 to the Cabrera Decl.).

28. Per the job description for the WMI Administrator position, Suarez had discretion over her responsibilities of strategy, execution, and building capabilities. For instance, with respect to strategy, Suarez had discretion over identifying operational opportunities to improve organizational efficiencies. *See* WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.).

29. Suarez exercised discretion and independent judgment over her strategy, execution, and building capabilities responsibilities as WMI Administrator. For example, with respect to execution, Suarez had discretion and independent judgment over implementing operations to ensure continuous improvement measures and initiatives. *See* Kohn Dep. at 95:4-96:7 (attached as Exhibit 14 to the Cabrera Decl.) (explaining Suarez's discretion with regard to different variances with the WMI program): and Finkelstein Dep. at 41-44; 47:6-15 (attached as Exhibit 18 to Cabrera Decl.) (explaining WMI Administrator's responsibilities regarding analyzing inventory reports).

30. Suarez performed under only general supervision from Wilkinson her duties in the IC department. Those duties involved specialized training, experience, and knowledge of physical inventory and inventory control. That was even more so true with the WMI system. *See* Kohn Dep. at 95:4-96:7; 96:15-20 (attached as Exhibit 14 to the Cabrera Decl.) ("I know that when we talk about her role as WMI administrator, I think people hear the word administrator. Perhaps you

hear administrator as something less than in the management ranks, but it is not. It is someone that is administering the inventory and its value.").

31. Suarez was not performing manual work. Her work was clerical in nature. *See* WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.); Kohn Dep. at 34:22-23 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "was more clerical, less physical in her function."); and Randall Dep.at 100:4-101:8 (attached as Exhibit 15 to Cabrera Decl.) (stating that Suarez could not perform manual work because this was a unionize work-force and nonunion workers were prohibited from performing manual tasks).

32. Suarez never disputed her job duties or responsibilities as WMI Administrator during her tenure with SGWS. *See* Johnson Dep. at 79:16-20 (attached as Exhibit 16 to Cabrera Decl.); and Deposition Transcript of Tonisha Durant ("Durant Dep.") at 52:2-9 (attached as Exhibit 17 to Cabrera Decl.) (Q: "In the meetings that you had with [Wilkinson] and [Suarez], the one-on-one meetings that you were asked about, did [Suarez] ever say these tasks are not in my job description?" A: "No." Q: "Did she ever say to [Wilkinson], Hey, you took away my direct report, so I can't get all of this done?" A: "No."); and Suarez Dep. at 74:15-5 (attached as Exhibit 19 to Cabrera Decl.) (Suarez admitting that she directed the IC Clerks' work while employed as the WMI Administrator).

**SGWS Implements Extensive WMI Training at Syosset Warehouse**

33. To ensure a smooth transition to WMI and to set employees like Suarez up for success, SGWS brought in multiple personnel from other locations where WMI had been implemented to help train Syosset personnel on the WMI system. *See* Kohn Dep. at 29:3-7 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "was given an extraordinary amount of

9

attention to help her get through her learning curve and try to find a place that was going to make her more functional for the company."); and Johnson Dep. at 14:1-16:25 (attached as Exhibit 16 to Cabrera Decl.) (Melissa Johnson assisted with the initial WMI Training which was called "Go Live" and was done by the WMI Implementation Team in July 2016).

34.  Unfortunately, Suarez rejected the assistance provided by the multiple WMI subject matter experts the company brought in to assist with the training of and transition to the new system, and the performance concerns identified by Wilkinson over the years only worsened once Suarez took the role of WMI Administrator. *See* Kohn Dep. at 29:7-9 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "was belligerent and being quite obstinate in taking advice from the experts in the company.").

35.  During WMI training, Suarez spent very little time with the training team, and when she did, she was obstinate. *See* August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.).

36.  This continued lack of cooperation and Suarez's poor attitude led to numerous follow-up sessions with multiple trainers, including Melissa Johnson ("Johnson") from upstate New York.[3] *See* Johnson Dep. at 37:4-11 (attached as Exhibit 16 to Cabrera Decl.) (Suarez "came to the Syracuse facility to shadow [Johnson] for three days").

37.  Johnson noticed that Suarez needed "more knowledge of the [WMI] system" so she "created a daily/weekly report of what needed to be done each day and each week." *See* Johnson

---

[3] At her deposition, Suarez spoke favorably about Johnson. *See* Suarez Deposition at 52:5-7 (attached as Exhibit 19 to the Cabrera Decl.) ("Q. And how did you feel about Melissa as a trainer? A. Oh, she is excellent."). This supports SGWS' claim that it provided Suarez the appropriate level of training on the WMI system and that it wanted Suarez to succeed on the transition to this system.

Dep. at 40:23-41:8 (attached as Exhibit 16 to Cabrera Decl.); and Daily/Weekly Task Report (attached as Exhibit 22 to the Cabrera Decl.).

38. However, Suarez still could not understand the WMI system, so Johnson returned to train Suarez in Syosset on two more occasions for one week at a time, in October 2016 and January 2017, respectively. *See* Johnson Dep. at 45:12-22 (attached as Exhibit 16 to Cabrera Decl.).

39. But Suarez began making significant, costly errors almost immediately. For instance, she made negative adjustments to inventory without verifying or researching discrepancies and without communicating the discrepancies to others. *See* Kohn Dep. at 104:15-18 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "wrote off things and did not communicate them well in excess of $500. There was one particular day she wrote off $1,700,000 and didn't tell anyone and left it alone.").

40. This had a significant impact on the warehouse's financials and required extensive mitigation efforts by other employees. *See* Kohn Dep. at 104:19-23 (attached as Exhibit 14 to the Cabrera Decl.).

41. After several significant errors by Suarez, and after several meetings between Wilkinson and Suarez, Wilkinson and Vice President of Human Resources Elizabeth Toohig ("Toohig") issued Suarez a WMI Administrator Performance Expectations Memo in September 2016 to counsel her on the issues that had been identified and to offer additional support and training. *See* September 2016 WMI Administrator Performance Expectations Memo (attached as Exhibit 6 to the Cabrera Decl.).

11

42. To facilitate Suarez's verification of inventory discrepancies and communication of the same, Wilkinson moved Suarez to an office located on the warehouse floor to be closer to the inventory and her team. This office was also used by warehouse managers who needed to have the same type of oversight during their shifts. *See* Randall Dep. at 69:21-70:18 (attached as Exhibit 15 to the Cabrera Decl.).

43. But Suarez continued to reject the guidance and instructions from her managers and the employees who successfully manage WMI in other SGWS locations. She continued to make errors that were costly to the company and increased the workload of multiple employees in the IC department and other warehouse functions. Due to her continued and increased performance deficiencies, the company placed Suarez on a performance improvement plan ("PIP") in January 2017. *See* January 2017 Performance Improvement Plan (attached as Exhibit 7 to the Cabrera Decl.); and January 2017 Email (attached as Exhibit 28 to the Cabrera Decl.).

44. Despite the additional training and coaching, Suarez continued to make similar errors throughout 2017, resulting in a Final Written Warning in December 2017. *See* 2016 and 2017 Performance Reviews (attached as Exhibit 8 to the Cabrera Decl.); and January 2017 Written Warning and December 2017 Final Written Warning (attached as Exhibit 9 to the Cabrera Decl.); and March 2017 Email (attached as Exhibit 21 to the Cabrera Decl.).

45. Before and after issuing the PIPs and warnings to Suarez, Toohig conducted an independent investigation into Suarez' performance, including all attending performance meetings between Wilkinson and Suarez, editing the PIPs, and being included on all emails regarding Suarez' performance. *See* Toohig Decl., ¶ 13; and Toohig Emails (attached as Exhibit 29 to the Cabrera Decl.).

46. Toohig also had conversations with Johnson about Suarez' performance and Suarez' continued need for training on the WMI system. *See* Toohig Decl., ¶ 14.

47. Toohig conducted this independent investigation to make her own determination regarding the expectations and whether Suarez' performance issues were significant enough to place her on a PIP. *See* Toohig Decl., ¶ 15.

48. Toohig reviewed all employment issues related to Suarez to ensure that she was being treated fairly, that there was no disparate treatment, and to make sure that Suarez was being held to an appropriate standard that correlated with her job duties and responsibilities as the WMI Administrator. *See* Toohig Decl., ¶ 16. Toohig sought to ensure that there were no external factors influencing employment decisions regarding Suarez. *See* Toohig Decl., ¶ 17.

49. Based on Suarez' continued performance issues during the relevant time period, which were documented on numerous occasions, Toohig believed the PIP and employment decisions made regarding Suarez were in line with the needs of the business. *See* Toohig Decl., ¶ 18.

**SGWS Undergoes Reduction in Force in New York**

50. In early 2018, SGWS began a national initiative to reduce operating costs by increasing efficiency, eliminating positions, and streamlining its processes. *See* SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera Decl.); Randall Dep. at 51:25-52:5 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 141:8-16 (attached as Exhibit 14 to the Cabrera Decl.).

51. In April 2018, 26 employees in New York were selected for lay-off as part of the program. *See* NY RIF List (attached as Exhibit 10 to the Cabrera Decl.).

13

52. 5 out of the 26 employees were part of the operations group. *See* Kohn Dep. at 141:16-17 (attached as Exhibit 14 to the Cabrera Decl.).

53. The selection criteria for the state-wide reduction in force program included job performance, position elimination, ability to perform the tasks required of those still employed, and suitability for the positions remaining after the reorganization. *See* SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera Decl.); Randall Dep. at 59:6-11 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 141:8-142:11 (attached as Exhibit 14 to the Cabrera Decl.).

54. The reduction of the 5 operations employees was primarily led by Kevin Randall ("Randall"), but he received input from others, including Roy Kohn, then Vice President of Operations of New York, Toohig, and Wilkinson. *See* SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 15 (attached as Exhibit 13 to the Cabrera Decl.); Randall Dep. At 64:24-65:2 (attached as Exhibit 15 to the Cabrera Decl.); and Deposition Transcript of Elizabeth Toohig ("Toohig Dep.") at 21:21-25; 31:2-25 (attached as Exhibit 24 to Cabrera Decl.) (The reduction in force "was an intense process, lots of meetings, lots of conversations. We [SGWS] don't take eliminating peoples' roles lightly. It was a lot of conversations.").

55. Suarez was among those selected for the program based on the foregoing criteria. *See* SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera Decl.); and Randall Dep. at 59:6-11; 64:13-23 (attached as Exhibit 15 to the Cabrera Decl.). Randall also relied upon input from Wilkinson. *See* Randall Dep. at 65:19-23 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 156:18-25-7 (attached as Exhibit 14 to the Cabrera Decl.).

56. In terms of job performance, Suarez had chronic performance issues including errors with cycle counting and failure to communicate those errors, and these issues were documented over and over again. *See* January 2017 Performance Improvement Plan (attached as Exhibit 7 to the Cabrera Decl.); 2016 and 2017 Performance Reviews (attached as Exhibit 8 to the Cabrera Decl.); January 2017 Written Warning and December 2017 Final Written Warning (attached as Exhibit 9 to the Cabrera Decl.) and Toohig Emails (attached as Exhibit 29 to the Cabrera Decl.).

57. She was also obstinate during the WMI training and transition process, which likewise was well documented. *See* August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.); Kohn Dep. at 142:7-11 (attached as Exhibit 14 to the Cabrera Decl.) (discussing Suarez' "belligerent difficult attitude with the 40 folks who came to help with the Go Live process."); and Toohig Emails (attached as Exhibit 29 to the Cabrera Decl.).

58. In terms of position elimination, SGWS found that there were overlapping job functions between the WMI Administrator position (occupied by Suarez) and the WMI Inventory Control Manager position (occupied by Durant) and it decided to eliminate the former position. The remaining duties were assigned to Finkelstein. *See* SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response Nos. 4 and 5 (attached as Exhibit 13 to the Cabrera Decl.); Kohn Dep. at 142:2-6 (attached as Exhibit 14 to the Cabrera Decl.) ("Suarez' work went to Tonisha Durant and Barry Finkelstein. It [her position] was not backfilled."); and Toohig Dep. at 31:13-20 (attached as Exhibit 24 to Cabrera Decl.) (reviewing "the job descriptions, where the job responsibilities, whether or not they were going to be reassigned to someone else, or whether they were actually being eliminated and no longer necessary.").

59. SGWS terminated Suarez's employment and eliminated her position, effective April 6, 2018. *See* Termination Letter (attached as Exhibit 11 to the Cabrera Decl.); and SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera Decl.).

60. SGWS offered Suarez a severance package, but she declined. *See* Suarez Dep. at 150:17-21 (attached as Exhibit 19 to Cabrera Decl.).

**Classification of Employees at Syosset Warehouse**

61. In May 2013, Suarez directed a question to Wilkinson about whether the female IC clerks had been improperly classified as clerical employees instead of warehouse employees. Wilkinson escalated Suarez' question to former Associate Director of Human Resources Dina Wald Margolis ("Wald Margolis"). *See* Toohig Dep. at 43:2-44:25 (attached as Exhibit 24 to Cabrera Decl.); and Dina Wald Margolis's Deposition Testimony ("Wald Margolis Dep.") at 34:2-45:25 (attached as Exhibit 27 to the Cabrera Decl.).

62. Given Suarez's managerial authority over the IC Clerks, it was "a legitimate question to ask" and "there was nothing inappropriate" about Suarez's question about employee classification. *See* Toohig Dep. at 45:17-22 (attached as Exhibit 24 to Cabrera Decl.).

63. In fact, it was Suarez's "responsibility" to "identify[] an issue." *See* Toohig Dep. at 120:3-11 (attached as Exhibit 24 to Cabrera Decl.).

64. SGWS investigated the classification and determined that "it had been a clerical error." *See* Toohig Dep. at 46:2-9 (attached as Exhibit 24 to Cabrera Decl.); and Wald Margolis Dep. at 63:21-24 (attached as Exhibit 27 to the Cabrera Decl.) (Wald Margolis did a thorough investigation into Suarez's question).

16

65. SGWS immediately corrected the clerical issue in the system and all of the IC Clerks were classified the same way. *See* Toohig Dep. at 120:8-15 (attached as Exhibit 24 to Cabrera Decl.).

66. In connection with these issues, Sajous filed a charge with the Equal Employment Opportunity Commission in 2013. After the EEOC dismissed Sajous' charge based on a no-probable cause finding, Sajous filed a lawsuit in January 2015 alleging gender discrimination and violations of the Equal Pay Act. *See Sajous v. Southern Wine & Spirits of New York, Inc.*, 15-cv-03270-JS-ARL (E.D.N.Y.).

67. In October 2016—one month after Suarez received the WMI Administrator Performance Expectations Memo—she provided a deposition in the Sajous litigation. *See* Suarez' Deposition Testimony in Sajous Matter (attached as Exhibit 25 to the Cabrera Decl.); and September 2016 WMI Administrator Performance Expectations Memo (attached as Exhibit 6 to the Cabrera Decl.).

68. Suarez testified that it was her personal opinion—not the company's position—that the IC Clerks she supervised should be classified as warehouse workers and that she held this opinion simply because "they work in the warehouse." When Suarez was asked if she believed the Union's reason for denying the IC Clerks the warehouse classification was because they were women, Suarez responded "I wouldn't know." She confirmed in the Sajous deposition that she never participated in any discussions about the reasoning for her department's classification as clerical rather than warehouse and that she never even asked anyone the reason for the classification. *See* Suarez' Deposition Testimony in Sajous Matter at 19:24-20:23, 46:4-9, 51:2-6, 61:16-62:25 (attached as Exhibit 25 to the Cabrera Decl.).

69. Suarez also confirmed that the IC department employees were not the only SGWS employees who worked in the warehouse who were classified as clerical rather than warehouse employees, and that some of those other employees were men). *See* Suarez' Deposition Testimony in Sajous Matter at 19:24-20:23, 46:4-9, 51:2-6, 61:16-62:25 (attached as Exhibit 25 to the Cabrera Decl.).

70. Suarez' testimony was not damaging to SGWS. *See* Toohig Dep. at 120:3-11 (attached as Exhibit 24 to Cabrera Decl.) (Q: "Do you believe that [Suarez] was retaliated against because the women in her department sued the company?" A: "No." Q: "What is that opinion based upon?" A: "I believe [Suarez] did her responsibility by identifying an issues that we [SGWS] immediately corrected. I don't believe it was [Suarez] fault that [the IC Clerks] sed the company."); and Wald Margolis Dep. at 76:13-77:11 (attached as Exhibit 27 to the Cabrera Decl.) (Q: "Did you believe that [Suarez] was to blame for these women believing they were discriminated against?" A: "No." Q: "And do you think that [Suarez] was responsible for the fact that these women made claims of discrimination against [SGWS]?" A: "No, I don't.").

Dated: January 3, 2023

                                          Respectfully submitted,

                                    By:  */s/ Anjanette Cabrera*
                                          Anjanette Cabrera
                                          Timothy Barbetta
                                          Constangy, Brooks, Smith & Prophete LLP
                                          175 Pearl Street, Suite C-402
                                          Brooklyn, New York 11201
                                          Telephone: (646) 341-6536
                                          E-mail: acabrera@constangy.com
                                          E-mail: tbarbetta@constangy.com
                                          **ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I, Anjanette Cabrera, certify that the **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was filed on January 3, 2023, using the Court's Electronic Case Filing (ECF) system, which will send notice of the filing to Plaintiff's attorney:

> Steven John Moser
> Moser Law Firm, PC
> 3 School Street, Suite 207B
> Glen Cove, New York 11542
> Telephone: (516) 671-1150
> E-mail: smoser@moseremploymentlaw.com
> **ATTORNEY FOR PLAINTIFF**

*/s/ Anjanette Cabrera*
Anjanette Cabrera