## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
MARIA SUAREZ,

      Plaintiff,

   -against-    Index No:
          19-cv-07271(GRB)(SIL)


SOUTHERN GLAZER'S WINE AND SPIRITS OF
NEW YORK, LLC,

      Defendant.
-------------------------------------------------x
    VIDEOCONFERENCE EXAMINATION BEFORE TRIAL of
the Defendant, SOUTHERN GLAZER'S WINE AND SPIRITS OF
NEW YORK, LLC, taken by the Plaintiff, pursuant to
Court Order, held on November 22, 2022, at
9:53 a.m., before a Notary Public of the State of
New York.

***************************************************

## Page 2

1
2   A P P E A R A N C E S :
3   MOSER LAW FIRM, P.C.
      Attorneys for Plaintiff
4      5 East Main Street
      Huntington, New York 11743
5
   BY: STEVEN MOSER, ESQ.
6
7
8
   COSTANGY, BROOKS, SMITH & PROPHETE, LLP
9      Attorneys for Defendant
      175 Pearl Street
10     Brooklyn, New York  11201
11  BY: ANJANETTE CABRERA, ESQ.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2    S T I P U L A T I O N S
3
4     IT IS HEREBY STIPULATED AND   AGREED by and
5  between the   attorneys for the respective
6  parties herein, that filing, sealing and
7  certification be and the same are hereby waived.
8     IT IS FURTHER STIPULATED AND  AGREED that all
9  objections, except as to the form of the question
10  shall be reserved to the time of the trial.
11    IT IS FURTHER STIPULATED AND  AGREED that the
12  within   deposition may be signed and sworn to
13  before any officer   authorized to administer an
14  oath, with the same force and  effect as if signed
15  and  sworn to before The Court.
16
17
18
19
20
21
22
23
24
25

## Page 4

1
2     IT IS HEREBY STIPULATED AND AGREED by and between
3  counsel for all parties present that pursuant to
4  CPLR Section 3113(d), this deposition is to be
5  conducted by videoconference, that the court
6  reporter, all counsel, and the witness are all in
7  separate remote locations and participating via
8  videoconference (LegalView/Zoom) meeting under the
9  control of Lexitas Court Reporting Services, that
10  the officer administering the oath to the witness
11  need not be in the place of the deposition and the
12  witness shall be sworn in remotely by the court
13  reporter after confirming the witness's identity
14  that this videoconference will not be recorded in
15  any manner and that any recording without the
16  express written consent of all parties shall be
17  considered unauthorized, in violation of the law,
18  and shall not be used for any purpose in this
19  litigation or otherwise.
20    IT IS FURTHER STIPULATED that exhibits may be
21  marked by the attorney presenting the exhibit to
22  witness, and that a copy of any exhibit presented to
23  a witness shall be Emailed to or otherwise in
24  possession of all counsel prior to any questioning
25  of a witness regarding the exhibit in question.  All

November 22, 2022

## Page 5

1
2  parties shall bear their own costs in the conduct of
3  this deposition by videoconference, notwithstanding
4  the obligation by CPLR to supply a copy of the
5  transcript to the deposed party by the taking party
6  in civil litigation matters.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 6

1
2  R O Y   K O H N, the witness herein, having been
3  first duly sworn by a Notary Public of the State of
4  New York, was examined and testified as follows:
5  EXAMINATION BY
6  MR. MOSER:
7   Q. State your name for the record, please.
8   A. Roy Kohn.
9   Q. State your address for the record, please.
10   A. 313 Underhill Boulevard, Syosset, New York
11  11791.
12   Q. Good morning, Mr. Kohn.  My name is Steve
13  Moser.  I am an attorney.  I represent Maria Suarez
14  in a case that she is bringing against Southern
15  Glazer's Wine and Spirits.  I am going to have some
16  questions for you today.  If you don't understand a
17  question of mine, please let me know, and I will
18  repeat it or rephrase it as many times as necessary;
19  is that fair?
20   A. Yes, sir.
21   Q. If for some reason you don't understand a
22  question of mine, don't answer it.  Do you
23  understand that as well?
24   A. Yes, I do.
25   Q. Are you under the influence of any narcotics

## Page 7

R. KOHN

1
2  or medications, which would affect your ability to
3  testify truthfully and accurately today?
4   A. I am not.
5   Q. Can you think of any reason you would not be
6  able to give truthful and accurate testimony today?
7   A. No.
8   Q. Are you employed by Southern Glazer's Wine
9  and Spirits?
10   A. I am.
11   Q. How long have you been employed by them?
12   A. Approximately 15 years.
13   Q. What is your current role?
14   A. Vice president of operations for the
15  northeast.
16   Q. What geographic region encompasses the
17  northeast?
18   A. New York; Maryland; Washington, D.C.;
19  Delaware; Pennsylvania; Maine; Vermont; and New
20  Hampshire.
21   Q. How long have you had this role?
22   A. Two years.
23   Q. Do you maintain an office at 313 Underhill
24  Boulevard in Syosset?
25   A. Yes.

## Page 8

R. KOHN

1
2   Q. What was your title before?
3   A. Vice president of operations for New York
4  State.
5   Q. What geographic location does that include?
6   A. New York State.
7   Q. Were you responsible in any way for
8  supervising or managing any operations in northern
9  New Jersey?
10   A. Yes.
11   Q. What locations in New Jersey were you
12  responsible for?
13   A. Linden, New Jersey.
14   Q. Was that when you were the VP of Operations
15  for New York State?
16   A. That is correct.
17   Q. Can you tell me the date on which you became
18  the VP of northeast operations?
19   A. It was in February of 2000.
20   Q. So you became a VP of operations for New York
21  State in February 2000, correct?
22   A. No.  I became VP for operations for New York
23  State in December 2007.  I held that role for 13 or
24  so years and for the last two years held the
25  regional role.

2  (Pages 5 to 8)

November 22, 2022

Page 9

R. KOHN

1
2    Q.  When you became the VP of operations for New
3   York State in December 2007, where was your office?
4    A.  At 313 Underhill Boulevard in Syosset.
5    Q.  Did that remain your office for the entire
6   time you were the VP of operations for the state of
7   New York?
8    A.  That was one of my offices.
9    Q.  What other offices did you have?
10   A.  I had an office in Syracuse, New York.  If
11  you would like the address, it is 3063 Court Street,
12  Syracuse.
13   Q.  How did you divide your time as VP of
14  operations between 313 Underhill in Syosset and your
15  office in Syracuse?
16   A.  I went where the work necessitated.
17   Q.  Can you approximate for me what percentage of
18  your time you spent in Syracuse versus Syosset?
19   A.  Roughly one week a month in Syracuse,
20  three weeks a month in Syosset.
21   Q.  Is your permanent residence on Long Island?
22   A.  No, it is not.
23   Q.  Where is your permanent residence?
24   A.  Today, Manhattan.
25   Q.  Did you ever have a residence in upstate New

Page 10

R. KOHN

1
2   York, a permanent residence?
3    A.  No.
4    Q.  Has your permanent residence always been in
5   the New York metropolitan area?
6    A.  Yes.
7    Q.  Could you describe for me what your duties
8   were as VP of operations for New York State?
9    A.  I was responsible for, in a nutshell,
10  everything except sales, which would include
11  warehouse, delivery, occupancy, all of the
12  administrative back of the house departments in all
13  the facilities within the state.
14   Q.  How many individuals worked underneath you?
15   A.  At the time I was the VP of operations for
16  New York State?
17   Q.  Correct.
18   A.  In total 800 at the time.
19   Q.  What was the lowest number of people that
20  were under you when you were VP of operations as
21  opposed to the lowest?
22   A.  800 was probably the low average, and it
23  probably grew to just under 1,000 for VP of
24  operations in New York State.
25   Q.  As VP of operations for New York State, did

Page 11

R. KOHN

1
2   you have access to financial information of Southern
3   Glazer's Wine and Spirits?
4    A.  Yes.
5    Q.  Were you able to review their profit and loss
6   statements?
7    A.  Yes.
8    Q.  Do they maintain a profit and loss statement
9   for the State of New York as if it was an
10  independent entity?
11   A.  There are two separate companies in New York,
12  Southern Wine and Spirits or Southern Glazer's Wine
13  and Spirits of Metropolitan New York and Southern
14  Glazer's Wine and Spirits of Upstate New York.
15  There were financial statements for both companies.
16   Q.  Those financial statements would have
17  included all the regular financial things such as
18  statement of cash flows, profit and loss statements,
19  assets and liabilities.
20   A.  Typically, yes, but our financial packages
21  did not include assets and liabilities.  It did not
22  include a balance sheet.
23   Q.  Who did you report to as VP of operations in
24  New York State?
25   A.  In 2007?

Page 12

R. KOHN

1
2    Q.  Yes.  When you first started.
3    A.  Larry Goodrich.  Lawrence Goodrich was the
4   general manager of New York State.
5    Q.  For how long was he your manager?
6    A.  Roughly ten years.
7    Q.  Who was your manager after Larry Goodrich?
8    A.  When Larry retired, he was replaced by Martin
9   Crane who became my manager.
10   Q.  Martin Crane's title was also GM of New York
11  State?
12   A.  Yes.  Executive vice president general
13  manager.
14   Q.  Who did Larry Goodrich report to?
15   A.  To our corporate office in Miami.
16   Q.  What individual did he report to?
17   A.  I believe it was Brad Vassar.
18   Q.  Who is Brad Vassar?
19   A.  He was the chief operating officer who has
20  since retired.
21   Q.  We have been referring to Southern Glazer's
22  Wine and Spirits, but it has not always been known
23  as Southern Glazer's Wine and Spirits, correct?
24   A.  Correct.
25   Q.  For some period of time, it was Southern Wine

3  (Pages 9 to 12)

Page 13

```
 1              R. KOHN
 2  and Spirits?
 3     A.  Correct, sir.
 4     Q.  If I refer to both Southern Wine and Spirits
 5  and Southern Glazer's Wine and Spirits as Southern
 6  for the rest of the deposition, can I do that so we
 7  can simplify it?
 8     A.  Of course.
 9     Q.  Is Southern privately owned?
10     A.  Yes.
11     Q.  By whom?
12     A.  Several families.
13     Q.  Which families?
14     A.  The Chaplain family, the Glazer family, the
15  Becker family, and I am unsure of anyone else.
16     Q.  That is today, correct?
17     A.  That is correct.
18     Q.  Who was Southern Glazer's Wine and Spirits
19  owned by?
20     A.  The same list of owners with the exception of
21  the Glazer family.
22     Q.  So the Chaplain family and the Becker family?
23     A.  Yes, and perhaps others that I am not aware
24  of.
25     Q.  Was the Chaplain family the majority
```

Page 14

```
 1              R. KOHN
 2  shareholders?
 3     A.  I believe so.
 4     Q.  Were the Chaplains and the Beckers part of
 5  the same family or were they actually different
 6  families?
 7     A.  I don't know.
 8     Q.  Who was the CEO of Southern in 2007?
 9     A.  I believe it was Brad Vassar.
10     Q.  As VP of operations for the state of New
11  York, did you have to meet with the owners of the
12  company?
13     A.  I met them, yes.
14     Q.  On how many different occasions?
15     A.  A handful.
16     Q.  Where did you meet them?
17     A.  Most likely at a corporate meeting.
18     Q.  Here or in Florida?
19     A.  I think both.
20     Q.  Did your duties remain more or less the same
21  for the entire time you were VP of operations for
22  the state of New York?
23     A.  Generally the same, yes.
24     Q.  How many people directly reported to you
25  while you were the VP of operations of New York
```

Page 15

```
 1              R. KOHN
 2  State?
 3     A.  Seven or eight.
 4        (Whereupon, Organizational Chart January
 5     2016 was marked as Plaintiff's Exhibit 19,
 6     for identification, as of this date.)
 7        (Whereupon, Organizational Chart October
 8     2016 was marked as Plaintiff's Exhibit 20,
 9     for identification, as of this date.)
10        (Whereupon, Organizational Chart January
11     2017 was marked as Plaintiff's Exhibit 21,
12     for identification, as of this date.)
13        (Whereupon, Operations Organization Chart
14     was marked as Plaintiff's Exhibit 22, for
15     identification, as of this date.)
16        (Whereupon, Organization Chart August
17     2018 was marked as Plaintiff's Exhibit 23,
18     for identification, as of this date.)
19     Q.  Do you understand you are here today to
20  testify based upon certain specified topics?
21     A.  Yes.
22     Q.  Was one of those topics, to your knowledge,
23  the production of documents that Southern made in
24  this case?
25     A.  Yes.
```

Page 16

```
 1              R. KOHN
 2     Q.  I am going to show you Plaintiff's
 3  Exhibit 19, which has a Bates stamp in the lower
 4  right-hand corner SGWS001197 to SWGS001122.  I would
 5  like you to take a couple of minutes to review it.
 6     A.  I have reviewed it.
 7     Q.  This may sound a little bit fundamental, but
 8  not everybody knows, but what is an organizational
 9  chart?
10     A.  It is typically a visual that determines the
11  hierarchy of an organization.
12     Q.  Is that what this particular document is?
13     A.  Yes.
14     Q.  Does it show the relationship between
15  employees at the New York operations division in
16  January 2016?
17     A.  Yes.
18     Q.  Is it true and accurate?
19     A.  In my moment reviewing it, yes, it appears to
20  be true and accurate.
21     Q.  Did this document exist or was it created by
22  Southern in response to our request?
23     A.  No.  It certainly existed.
24     Q.  Is it important to have these current?
25     A.  That is typically an internal document.
```

4 (Pages 13 to 16)

Page 17

```
                    R. KOHN
 1
 2        Q.  Is there any reason to believe that this
 3    document is not true and accurate or does not truly
 4    and accurately depict the relationship between
 5    employees?
 6        A.  No.
 7        Q.  If you turn to SGWS001108.
 8        A.  Yes.
 9        Q.  This shows that in January 2016 you were the
10    VP of operations for New York State, correct?
11        A.  Yes.
12        Q.  The line going down where it says here
13    Nanette Ellia, executive administrative assistant,
14    what does that mean when you have that horizontal
15    line there?
16        A.  Nanette is my executive assistant.
17        Q.  Does she help you manage the managers or
18    assist you in your duties?
19        A.  She assists me administratively.
20        Q.  In terms of an organizational chart, the
21    people on the bottom report to the people on top?
22        A.  Correct.  It is a hierarchy.
23        Q.  Kevin Randall was the vice president for
24    Metro New York in January 2016, correct?
25        A.  Yes.
```

Page 18

```
                    R. KOHN
 1
 2        Q.  For how long had Kevin Randall been the VP of
 3    operations in Metropolitan New York?
 4        A.  I think he has been the vice president of
 5    operations for roughly eight years.
 6        Q.  So that is approximately going back to 2014?
 7        A.  Approximately, yes.
 8            MR. MOSER:  Off the record.
 9            (Whereupon, a discussion was held off the
10        record.)
11        Q.  Have you had the opportunity to completely
12    review Plaintiff's Exhibit 19?
13        A.  This is the original document you gave me
14    before the brief break?
15        Q.  Yes.
16        A.  Yes.
17        Q.  Does that fairly and accurately depict the
18    individuals employed by Southern as of January 2016?
19        A.  Yes.
20        Q.  Does it fairly and accurately depict the
21    titles that these individuals had as of
22    January 2016?
23        A.  Let me review each title.  Yes.  They all
24    look correct.
25        Q.  Does this document fairly and accurately
```

Page 19

```
                    R. KOHN
 1
 2    depict the relationship between employees that
 3    existed as of January 2016?
 4        A.  Would you point me to a specific page or
 5    would you like me to go through the whole document
 6    again?
 7        Q.  For this question I will target certain pages
 8    so we don't cover the same material.
 9        A.  Thank you.
10        Q.  I would like to draw your attention to pages
11    1108, 1109, 1117 and 1119?
12        A.  Okay.
13        Q.  For those specific four pages, do these pages
14    fairly and accurately depict the relationship
15    between employees that existed as of January 2016?
16            MS. CABRERA:  Objection.
17            You are free to answer the question.
18            I just want to be clear that this is
19        beyond the scope of the 30(b)(6) notice.  The
20        30(b)(6) notice indicated you wanted to ask
21        questions regarding how these documents
22        produced.  There is nothing in the notice
23        that talks about confirming reporting
24        relations.  So again, the witness is free to
25        answer the question, but he is doing so as a
```

Page 20

```
                    R. KOHN
 1
 2        fact witness and not as a 30(b)(6).
 3        A.  Yes.  The relationships on 1108, 1109, 1117,
 4    and 1119 appear to be correct.
 5        Q.  Let's turn to Plaintiff's Exhibit 20 for
 6    identification.
 7            Have you had the opportunity to review that
 8    document?
 9        A.  Yes.
10        Q.  I will draw your attention specifically to
11    several pages of this document.  I would like you to
12    look at 1151, 1152, 1160, and 1162.
13        A.  Yes.  The relationships on 1151, 1152, 1160,
14    and 1162 appear to be accurate.
15        Q.  I will have a series of questions regarding
16    these four pages.
17            Do these four pages fairly and accurately
18    show the individuals employed by Southern in
19    October 2016?
20            MS. CABRERA:  I am going to make the same
21        objection.  This goes beyond the scope of the
22        30(b)(6) notice.  The witness is free to
23        answer as a fact witness.
24        A.  Yes.  These appear to be correct.
25        Q.  Do they fairly and accurately depict these
```

November 22, 2022

---

Page 21

```
 1                R. KOHN
 2   individuals' titles as well?
 3       A.  Where the titles are present, they appear to
 4   be correct.
 5       Q.  So I am going to show you another document
 6   that has been marked as Plaintiff's Exhibit 21, and
 7   I am going to draw your attention to four pages of
 8   this document.  I am going to have the same question
 9   with regard to those four pages.  The question is
10   whether or not those pages fairly and accurately
11   depict the employees of Southern, their titles, and
12   their relationships as of the date of this
13   organization chart?  I will give you the four pages.
14   They are 1124, 1125, 1133 and 1135.
15           MS. CABRERA:  I am going to note the same
16       objection.  This goes beyond the notice.  The
17       witness is free to answer as a fact witness,
18       but not as a 30(b)(6) witness.
19       A.  Can you repeat the question.
20       Q.  Do these four pages fairly and accurately
21   depict the individuals employed, their titles, and
22   their relationships as of the date of this
23   organizational chart?
24       A.  You are asking me about titles of individuals
25   from five plus years ago.
```

---

Page 22

```
 1                R. KOHN
 2       Q.  I understand.
 3       A.  They appear to be correct.
 4       Q.  Do you have any reason to believe they are
 5   not accurate?
 6       A.  But you are asking me to verify titles in
 7   excess of five years ago.
 8       Q.  I understand, but how about with individuals
 9   employed and their relationships?  Does it fairly
10   and accurately depict the individuals and their
11   relationships?
12       A.  Again, I will preface that this is in excess
13   of five years ago, but their relationships do look
14   correct.
15       Q.  I am going to show you what was marked as
16   Plaintiff's Exhibit 22 for identification, and I
17   would like to draw your attention to three pages of
18   this document.  They are 1084, 1085 and 1094.
19       A.  The last number is 1094?
20       Q.  Correct.
21       A.  Is that the final page of the document?  It
22   is just over font.
23       Q.  Yes, it is the final page.
24       A.  Thank you.
25       Q.  Just let me know when you are finished
```

---

Page 23

```
 1                R. KOHN
 2   reviewing.
 3       A.  Was that a hint that I am taking too long?
 4       Q.  No.  You can take as much time as you like.
 5       A.  I believe this is accurate.
 6       Q.  So do these three pages, 1084, 1085 and 1094.
 7   Fairly accurately depict the employees that worked,
 8   their titles, and their relationships as of
 9   April 2018?
10       A.  Again, I will preface by saying this is four
11   and a half years ago, and yes.
12       Q.  I am going to show you the last
13   organizational chart, thankfully, plaintiff's
14   Exhibit 23 for identification.  I would like to draw
15   your attention to two pages of this document.  They
16   are 1096 and 1103.
17       A.  May I refer back to the last document?
18       Q.  Of course you may.
19       A.  This one just looks a little bit cleaned up
20   versus the prior one, versus 1094.
21       Q.  You are referring to 1103?
22       A.  Yes.  1103 and 1094.
23       Q.  When you say 1103 is cleaned up, can you be
24   more specific.
25       A.  There are many more boxes on 1094 than 1103.
```

---

Page 24

```
 1                R. KOHN
 2       Q.  Do you know why that is?
 3       A.  It appears 1094 is more detailed, including
 4   clerical employees, extra steadies, drivers,
 5   casuals, receiving clerks, steady drivers.
 6       Q.  So you pointed out that the 1103 does not
 7   include low level employees; is that fair to say?
 8       A.  I believe 1103 is a more top-line view
 9   excluding some hourly workforce positions.  I see
10   some supervisors omitted.  It looks like it is
11   focused on the manager/director level than below.
12       Q.  So you are talking about 1103, correct?
13       A.  Yes.
14       Q.  So other than that, when we look at 1096 and
15   1103, do they fairly and accurately depict the
16   individuals employed, their titles and relationships
17   as of October 2016?
18       A.  I think you said 1096 and 1103.  It is 1094
19   and 1103.
20       Q.  No, no.  I am talking about 1096, which is
21   the first page I drew your attention to of
22   Exhibit 23.
23           So other than the differences that you have
24   observed and pointed out between 1094 and 1103,
25   other than those differences, do 1096 and 1103
```

---

6 (Pages 21 to 24)

Page 25

```
 1              R. KOHN
 2   fairly and accurately depict the individuals
 3   employed, their titles, and their relationships as
 4   of October 2016?
 5        MS. CABRERA:  Objection.  Exhibit 23 is
 6        August 2018.
 7        MR. MOSER:  I apologize.  Let me withdraw
 8        the question.
 9    Q.  Other than the differences that you have
10   pointed out between 1094 and 1103, do pages 1096 and
11   1103 fairly and accurately depict the individuals
12   employed, their titles, and their relationships as
13   of August 2018?
14    A.  I will again preface this by saying this is
15   in excess of four years ago, but yes, they look
16   correct.
17    Q.  Do you know why hourly employees and
18   supervisors were excluded from 1103?
19    A.  No, I do not.  I started this conversation by
20   saying it appeared that the document was cleaned up.
21    Q.  Should there be an organizational chart that
22   shows all of the relationships included hourly
23   employees?
24    A.  Depends on what the organizational chart will
25   be used for.
```

Page 26

```
 1              R. KOHN
 2    Q.  But did Southern maintain organizational
 3   charts showing the relationships between all
 4   employees?
 5    A.  I don't believe so.
 6    Q.  Do you know why 1103 appears to be cleaned
 7   up?
 8    A.  No.
 9    Q.  Do you know if there was a title called
10   inventory control clerk or cycle counter in
11   August 2018 in the Syosset warehouse?
12    A.  I believe there was.
13    Q.  Those individuals, who did they report to in
14   August 2018?
15    A.  Likely to Barry Finkelstein.
16    Q.  Why would that have been Barry Finkelstein or
17   what leads you to believe it was Barry Finkelstein?
18    A.  I believe when Ms. Suarez was released from
19   the company, her duties were split between Tonisha
20   Durant and Barry Finkelstein.
21        MR. MOSER:  I know this is beyond the
22        topic.  I know this is whether he has
23        personal knowledge of this.
24    Q.  Do you know whether Barry Finkelstein was
25   assisting Maria in the performance of her duties at
```

Page 27

```
 1              R. KOHN
 2   any time before she was let go?
 3    A.  Can you elaborate on assisting her in her
 4   duties.
 5    Q.  Well, did he help her in any way, to your
 6   knowledge?
 7    A.  I am sure he did.
 8    Q.  Do you have any specific knowledge of the
 9   ways in which he helped her?
10    A.  Through me preparing for today's deposition,
11   I saw a lot of emails, I looked at a lot of
12   documents and Maria's performance degraded over
13   time, and because Barry was a support person in the
14   facility with a manager title, I am sure he assisted
15   Maria in her duties.
16    Q.  Why do you believe it was Barry Finkelstein
17   versus someone else who stepped in to help Maria
18   before she was finally let go?
19    A.  I believe many people assisted Maria.  You
20   asked me specifically if I believe Barry did.  I
21   think there were many more people than Barry that
22   supported Maria.
23    Q.  Do you have knowledge of the specific ways in
24   which Barry helped Maria before she was finally let
25   go?
```

Page 28

```
 1              R. KOHN
 2        THE WITNESS:  Am I the company witness at
 3        this point or am I Roy?
 4        MS. CABRERA:  No.  You are Roy.
 5    Q.  Based upon your personal knowledge.
 6    A.  Maria's performance was degrading.  She had a
 7   longstanding performance problem; and people went
 8   out of their way to try to help her regain her
 9   footing, maintain her position, and correct a lot of
10   ineffectiveness, poor performance and financial
11   losses that she was creating for the organization.
12   So this was a transition from a manual inventory
13   system to a more fully automated scanning system.
14   There were not just people from Syosset and New York
15   State on site.  There were people from all over
16   America to support the transformation of the
17   perpetual inventory from being processed manually to
18   being more mechanized and automated.  Any time a
19   facility goes live with a new system, whether it be
20   a conveyer system, a sortation system, a WMI system,
21   a warehouse management system.  Any new type of
22   software the company's experts come to the site to
23   lend a hand to help take away the learning curve, to
24   train on-site people and to prepare the local group
25   to exist without them.  I would say during the time
```

7 (Pages 25 to 28)

Page 29

```
              R. KOHN
 1
 2    that these experts from America from Southern in
 3    America came on site, Maria was given an
 4    extraordinary amount of attention to help her get
 5    through her learning curve and try to find a place
 6    that was going to make her more functional for the
 7    company as opposed to someone who was belligerent
 8    and being quite obstinate in taking advice from the
 9    experts in the company. So I would say there were a
10    lot of people outside of Barry Finkelstein that
11    supported Maria Suarez.
12        Q. I thank you for you that, but specifically
13    with regard to Barry Finkelstein, do you know what
14    ways in which Barry Finkelstein supported Maria in
15    her role before she was finally let go?
16        A. Specifically, I wasn't with the two of them
17    when he was working with her, but Barry Finkelstein
18    was one of the on-site experts, and Maria's
19    performance was degrading. So it behooved Barry
20    Finkelstein and the company to get Maria up to
21    speed. Specifics to what he did to sit with her to
22    train her on the scanning or the processes and
23    procedures, I can't speak to, but Maria had more
24    attention provided by this group of people than
25    anyone would have ever anticipated.
```

Page 30

```
              R. KOHN
 1
 2        Q. So did Barry Finkelstein have disciplinary
 3    authority of inventory control clerks before Maria
 4    left the company?
 5        A. Barry Finkelstein was a manager for the
 6    company. He would surely have disciplinary
 7    authority over people in the inventory control
 8    sector.
 9        Q. Was Maria a manager?
10        A. At what point in time?
11        Q. At any point in time.
12        A. Maria applied for the WMI administrator role
13    in 2016. She was awarded the role. She was
14    qualified for the role. Don't be misled by the
15    title of administrator. The inventory control
16    clerks reported through her. Her voice was heard
17    when she talked about them. Yes, she had authority
18    over that group of people, and I think at the height
19    she had four or five inventory clerks reporting to
20    her.
21        Q. So when she became the WMI administrator,
22    although not having the formal title of manager, in
23    your opinion she was a manager?
24        A. She had supervisory authority over the people
25    that reported to her. The inventory clerks, surely.
```

Page 31

```
              R. KOHN
 1
 2        Q. What is the difference before a supervisor
 3    and a manager?
 4        A. I'm not sure of the question you are asking.
 5    I know what I heard, but I'm not sure what you are
 6    asking.
 7        Q. You talked before about there are managers,
 8    there are supervisors, and I am just wondering if
 9    there is a difference between a manager and
10    supervisor at Southern and if so, what that
11    difference is?
12        A. There are managers and supervisors of people,
13    and there are managers and supervisors of processes.
14        Q. Is there any difference between a manager and
15    a supervisor?
16        A. Yes.
17        Q. Managers and supervisors of people, let's
18    say, what is the difference between a manager and
19    supervisor of people?
20        A. A manager may be responsible for more people
21    or more critical processes.
22        Q. Are there any other differences between
23    managers and supervisors?
24        A. I am sure there are many.
25        Q. Do you know an individual by the name of
```

Page 32

```
              R. KOHN
 1
 2    Peter Lazar?
 3        A. I do.
 4        Q. Who is Peter Lazar?
 5        A. Peter, I believe, today is the mid-shift
 6    manager in the Syosset returns dock.
 7        Q. When was Mr. Lazar hired?
 8        A. Maybe five years ago.
 9        Q. Would that have been in 2016?
10        A. This is Roy answering?
11        Q. Yes.
12        A. I do not know. Roughly five years ago.
13        Q. Who was he hired to replace? Again, this is
14    if you know.
15        A. I think he was not hired to replace anyone.
16    I believe he was hired to bolster the organization
17    and bring in additional management.
18        Q. Do you know what title he was hired into?
19        A. I believe it was mid-shift manager or
20    mid-shift warehouse manager.
21        Q. Did anyone besides Maria have disciplinary
22    authority over inventory control clerks, otherwise
23    known as cycle counters, before she left the
24    company?
25        A. I am sure anyone in a managerial position, a
```

8 (Pages 29 to 32)

November 22, 2022

Page 33

R. KOHN
1
2   position of authority, would have disciplinary
3   opportunities with the inventory control clerks or
4   cycle counters.
5       Q.  Was she considered their direct manager for
6   the purposes of discipline before she left the
7   company?
8       A.  Yes.  I think she would recommend discipline
9   to her manager, John Wilkinson.
10      Q.  So she would recommend something to John
11  Wilkinson.
12          Could she take any steps herself to monitor
13  an employee's performance or to discipline them?
14          MS. CABRERA:  Objection to the form of
15      the question.
16          You can answer.
17      A.  Would you repeat that?
18      Q.  Before Maria left the company when she was
19  the WMI administrator, she would make
20  recommendations to John Wilkinson about discipline,
21  correct?
22      A.  Yes.  I think most people make
23  recommendations upstream.
24      Q.  Did she have the authority to discipline any
25  of the inventory control clerks without

Page 34

R. KOHN
1
2   Mr. Wilkinson's approval?
3       A.  I think in today's environment or in the
4   environment during 2018-ish, I think all of us
5   discussed disciplinary opportunities and actions
6   with our superiors in conjunction with HR.
7       Q.  So do you know whether Maria Suarez was
8   considered an exempt employee?  By exempt employee I
9   mean someone who was not paid overtime.
10      A.  Yes.  She was not paid overtime.
11      Q.  Do you know what factors can be considered in
12  determining whether or not a person is exempt for
13  overtime?
14      A.  She managed the inventory control department,
15  a recognized department.  Her voice was heard and
16  respected if she made recommendations for discipline
17  and this group of inventory and cycle counters
18  reported to her.  She was responsible for them.
19      Q.  So do you know what factors can be considered
20  in determining whether an individual is an exempt
21  executive?
22      A.  I believe I named a few.  I believe she also
23  was more clerical, less physical in her functioning.
24      Q.  I just want to go through now the factors
25  that you believe can be considered in determining

Page 35

R. KOHN
1
2   whether or not she was an exempt executive?
3       A.  Can I refer to my notes?
4       Q.  Of course you can.
5           MS. CABRERA:  And you can look at
6       whatever he looks at, obviously.  Just for
7       the record we are now officially in 30(b)(6)
8       territory.
9           MR. MOSER:  Yes.
10      A.  As I mentioned a few moments ago Maria's
11  duties, her primary duty was managing the inventory
12  control department.  She customarily directed the
13  work of the inventory control counters.
14      Q.  Are you referring to notes that you referred
15  to in preparing for today's deposition?
16      A.  Yes.
17      Q.  May I see those?
18      A.  Absolutely.
19      Q.  After Maria became WMI administrator, did she
20  have the authority to hire or fire any employees
21  without approval?
22      A.  Very few people in the organization had or
23  have the authority to fire employees without
24  approval.
25      Q.  Was she one of those individuals?

Page 36

R. KOHN
1
2       A.  No, but her voice carried a particular
3   weight.
4       Q.  What weight did it carry?
5       A.  If Maria made recommendations on someone's
6   performance to her manager, her manager considered
7   it.
8       Q.  How do you know that?
9       A.  That is the way the organization works.
10      Q.  Other than the fact that that is how the
11  organization works, do you have any other reason to
12  believe John Wilkinson was listening to her?
13      A.  Yes.  John Wilkinson supported Maria more
14  than anyone else in the organization.
15      Q.  Other than the fact that John Wilkinson
16  supported Maria more than anyone else in the
17  organization and other than this is the way things
18  are generally done, is there any other reason you
19  believe John Wilkinson was taking her
20  recommendations to hire and fire people seriously?
21      A.  Absolutely.  When she asked for an additional
22  cycle counter at one point in time, John Wilkinson
23  agreed to hiring an additional cycle counter.
24      Q.  When was that?
25      A.  Sometime during her tenure.

9  (Pages 33 to 36)

Page 37

```
1                    R. KOHN
2     Q.  Do you recall when?
3     A.  To give you an exact date, I have to refer to
4  additional documents.  I would say sometime within
5  her last year to 18 months of employment.
6     Q.  How do you know she asked for an additional
7  cycle counter?
8     A.  I believe it is in the documentation.
9     Q.  Can you please identify where in the
10  documentation it is?
11        MS. CABRERA:  Off the record.
12        (Whereupon, a discussion was held off the
13     record.)
14        (Whereupon, Notes were marked as
15     Plaintiff's Exhibit 24, for identification,
16     as of this date.)
17        (Whereupon, Notes were marked as
18     Plaintiff's Exhibit 25, for identification,
19     as of this date.)
20        (Whereupon, Email chain was marked as
21     Plaintiff's Exhibit 26, for identification,
22     as of this date.)
23     Q.  So I am going to show you what was marked as
24  Plaintiff's Exhibit 26 for identification.
25        Is that the email that suggests that Maria
```

Page 38

```
1                    R. KOHN
2  could ask for additional cycle counters?
3     A.  Yes.  This is one of them.
4     Q.  Are there any other documents that show
5  whether or not she would ask for cycle counters?
6     A.  I believe there was a conversation in
7  September 2016 that resulted in a list of discussion
8  points as well, but this one clearly says there was
9  a need for another cycle counter.
10     Q.  Are there any other documents that showed she
11  had the ability to ask for additional cycle counters
12  to be hired other than this document?
13     A.  I think the purpose of this document was to
14  answer a question was her voice heard and did she
15  have authority to promote hiring or termination of
16  other employees, and I think this corresponds with
17  that conversation showing she met with her boss, she
18  expressed the need for an additional cycle counter,
19  and Mr. Wilkinson heard that request and went to HR
20  and went forward with it.
21     Q.  Are there any other documents which suggest
22  she had a voice in asking for additional cycle
23  counters to be hired, other than this particular
24  document?
25     A.  There may be, but this is the one we have in
```

Page 39

```
1                    R. KOHN
2  front of us right now.
3     Q.  When you say there may be, do you know of any
4  other documents or the existence of any other
5  documents that would show she had a voice in whether
6  or not new cycle counters were hired?
7     A.  At this point in time, I am aware of this
8  document before us.
9     Q.  As you sit here today, are you aware of any
10  other document that exists that would suggest
11  Maria --
12     A.  I don't think any other documents are
13  required.  I think this document shows her voice was
14  heard from her manager, and her manager and human
15  resources listened to what Maria said and went
16  forward with her recommendation.
17     Q.  Other than this document, are you aware of
18  any other documents that would suggest she had a
19  voice in whether or not cycle counters were hired?
20     A.  Can we look for the September 2016 counseling
21  memo?
22        MS. CABRERA:  Is that what you are saying
23     you need to refresh your recollection?
24        THE WITNESS:  Yes.  I believe it was
25     called WMI Administrator Expectation
```

Page 40

```
1                    R. KOHN
2  Counseling Session.
3     A.  That would be the only other document I would
4  anticipate had the request for a cycle counter or
5  additional support.
6        MR. MOSER:  I believe I found it.  2027,
7     2028, and 2029.  It may exist in another
8     form.  I am going to show the witness what is
9     on my screen.  We will deem it marked as
10     Plaintiff's Exhibit 27.
11     Q.  Perhaps that is what you are talking about.
12  Please feel free to scroll up and down.  Why don't
13  you read the document beginning on page 2027.
14     A.  Okay.  So this document does not ask for
15  another cycle counter, but it does direct her to --
16  that she is responsible for the work assignments, to
17  give work assignments and direction to all the cycle
18  counters, all disciplinary issues, forward them to
19  the day shift manager.  This is what we all will all
20  do, go to our next level manager with discipline.
21     Q.  You are reading from SGWS2028, correct?
22     A.  Yes.
23        MR. MOSER:  Can we stipulate for the
24     record we will mark the Performance
25     Improvement Plan dated September 22, 2016,
```

10  (Pages 37 to 40)

November 22, 2022

Page 41

R. KOHN

1
2   which begins on SGWS2027 and ends on SGWS2029
3   as Exhibit 27.
4       MS. CABRERA:  So stipulated.
5       (Whereupon, Performance Improvement Plan
6       9/22/16 was deemed marked as Plaintiff's
7       Exhibit 27, for identification, as of this
8       date.)
9   Q.  So I am going to read this into the record.
10  It lists under Responsibilities, As the WMI
11  administrator, you are responsible for work
12  assignment and direction to all cycle counters.  All
13  disciplinary issues need to be addressed to the day
14  shift warehouse manager.
15       Who was the day shift manager?  Was that
16  Barry Finkelstein?
17  A.  I believe so, yes.
18  Q.  Why would she be addressing disciplinary
19  issues with Barry Finkelstein?
20  A.  What was the date of the memo?
21  Q.  The date of the memo is September 22, 2016.
22  A.  To express her opinion on the individuals
23  that she thought required progressive discipline.
24  Q.  Was she their manager?
25  A.  She was there superior for sure.

Page 42

R. KOHN

1
2   Q.  Was she their manager?
3   A.  She was the WMI administrator.
4   Q.  Did she have managerial authority over the
5   inventory control clerks?
6   A.  She was their superior, yes.
7   Q.  Why would she have to go to someone else for
8   discipline of employees who worked under her?
9   A.  I think I said earlier we all do that.  If I
10  was going to discipline one of my direct reports, I
11  would bring it uphill to my manager.
12  Q.  That would be voluntary, correct?  That is
13  something voluntary you do?
14  A.  No.  We involve our managers and human
15  resources in all labor issues.
16  Q.  It says here all disciplinary issues need to
17  be addressed to the dayshift warehouse manager.  It
18  does not mention human resource, right?  It just
19  says any disciplinary issues need to be addressed by
20  the day shift warehouse manager, which was Barry
21  Finkelstein.  Why?
22  A.  Well, that is John's report.
23  Q.  Correct.
24  A.  I am sure John wanted the day shift manager,
25  the person responsible for the facility during that

Page 43

R. KOHN

1
2   time frame, to be aware of what was happening in his
3   example facility.
4   Q.  So did Maria report to Barry Finkelstein?
5   A.  No.  Maria reported to John Wilkinson.
6   Q.  So Barry Finkelstein was at her level in the
7   overall structure?
8   A.  No.  Barry Finkelstein had a more elevated
9   position of responsibility for the entire shift.
10  Q.  But she did not report to Barry Finkelstein?
11  A.  Correct.  She reported to John Wilkinson.
12  Q.  It is just that individuals who worked for
13  her, she would have to go to Barry Finkelstein to
14  address disciplinary issues?
15  A.  Late 2016 Maria's performance was degrading
16  to the point where she was put on the pit in January
17  of '17.  When someone's performance is degrading,
18  you want to make sure that you listen to their
19  recommendations because you want to have that
20  checked by someone else in the facility.  This
21  individual, Barry Finkelstein, was the day manager.
22  Q.  Who made the decision to direct Maria to
23  address any disciplinary issues with Barry
24  Finkelstein?
25  A.  You just read a memo from John Wilkinson.

Page 44

R. KOHN

1
2   Q.  Yes, but that is not my question.
3       My question is:  Who made this decision?
4   A.  When you operate a facility 24 hours a day,
5   five to seven days a week, whoever is the highest
6   person in charge on that shift needs to be aware of
7   what is going on during that shift.  If there was
8   discipline on a different shift, the facility
9   manager of that shift would be informed of something
10  that happened on his or her shift.
11  Q.  Who made the decision, and I will read this
12  in again, who made the decision that all
13  disciplinary issues need to be addressed by Barry
14  Finkelstein when it comes to cycle counters?
15  A.  Can I see the phrase?
16  Q.  Sure.
17  A.  By Barry or --
18  Q.  Well, we established it is the mid-shift
19  manager.  You testified that is Barry Finkelstein,
20  so my question is:  Who made that decision?
21  A.  Well, first, let me correct that.  I think
22  what you read was, As the WMI administrator, you are
23  responsible for work assignments and direction to
24  all cycle counters.  I believe you said, all
25  disciplinary issues need to be addressed by the day

Page 45

R. KOHN

1
2  shift manager.  It says to the day shift manager,
3  addressed to the day shift manager, letting the
4  person in charge know what is going on during the
5  period of time the facility is under that
6  individual's control.
7      Q.  So for you there is a difference by and to?
8  If someone had used the word by versus to, they
9  would signify something different?
10     A.  Of course.
11     Q.  If we used the word by, what would that
12  signify to you?
13     A.  That is not what it says.
14     Q.  I know.
15     A.  If it said by the day shift manager, the
16  connotation would be the manager is making the
17  decision.  If it says to the day shift manager, the
18  connotation is you are reporting something, you are
19  going to discuss it, there is going to be a
20  collaborative interactive process, and you are going
21  to come out with a result.  The letter says to the
22  day shift manager.  That is my understanding.
23     Q.  Who made the decision that all disciplinary
24  issues needed to be addressed to the day shift
25  warehouse manager?

Page 46

R. KOHN

1
2      A.  If the letter was authored by John Wilkinson,
3  I would say John Wilkinson and Beth Toohig, the vice
4  president of human resources.
5      Q.  Do you know why?
6      A.  I think this was an expectation memo.  It was
7  clarifying duties, roles, responsibilities; and I
8  think if the manager and the vice president of human
9  resources could help clarify something, that could
10 only benefit the employee.
11         MR. MOSER:  Can you read back my
12     question, please.
13         (Whereupon, the record was read by the
14     reporter.)
15     Q.  Other than what you have stated, is there any
16 other reason why John Wilkinson and perhaps Beth
17 Toohig decided that with regard to Maria all
18 disciplinary issues need to be addressed to the day
19 shift warehouse manager, who at the time was Barry
20 Finkelstein?
21     A.  Other than what I have already stated?
22     Q.  Yes.
23     A.  I would assume, I believe, that this was one
24 of the low points in Maria's performance and as she
25 was going through her day-to-day activities, the

Page 47

R. KOHN

1
2  company through her manager John Wilkinson and
3  through HR Beth Toohig, they wanted to make sure if
4  she was going to recommend something or bring
5  something forward, it was done properly.
6      Q.  Was there any documentation of her
7  mismanagement of any employees?
8          MS. CABRERA:  Objection.
9          You can answer.
10     A.  Not that I am aware of.
11     Q.  Were the cycle counters made aware that
12 disciplinary issues needed to be addressed to Barry
13 Finkelstein?
14     A.  I'm not sure that is relevant.
15         MR. MOSER:  Read back the question.
16         (Whereupon, the record was read by the
17     reporter.)
18         MS. CABRERA:  I am going to note my
19     objection on the record, that that question
20     is beyond the 30(b)(6) notice.  So the
21     witness can answer as a fact witness, but not
22     as the corporate rep.
23     A.  Considering that I would not know whether the
24 inventory control clerks, cycle counters, were made
25 aware that Maria was asked to discuss discipline

Page 48

R. KOHN

1
2  with the shift manager.
3      Q.  So do you know, as you sit here today,
4  whether or not the cycle counters were made aware
5  that all disciplinary issues needed to be addressed
6  to the day shift manager?
7      A.  I believe I just answered that.
8      Q.  So are you aware whether or not the cycle
9  counters were made aware that all disciplinary
10 issues needed to be addressed to the day shift
11 warehouse manager who was Barry Finkelstein?
12     A.  No.  I am not aware.  I believe I said that
13 several times.
14         MR. MOSER:  Let's mark this email chain
15     as Plaintiff's Exhibit 28 and the Response as
16     Exhibit 29.
17         (Whereupon, Email chain was marked as
18     Plaintiff's Exhibit 28, for identification,
19     as of this date.)
20         (Whereupon, Response was marked as
21     Plaintiff's Exhibit 29, for identification,
22     as of this date.)
23         MR. MOSER:  For the record I am showing
24     witness and counsel what has been marked as
25     Plaintiff's Exhibit 28 for identification.

12  (Pages 45 to 48)

November 22, 2022

Page 49

R. KOHN

1
2    A. Okay.
3    Q. Have you seen this document before today?
4    A. My name is on it from August 2016.
5    Q. Is this an email chain, an internal email
6    chain, at Southern?
7    A. Yes.
8    Q. Now, when we go to the second page, that says
9    2258?
10   A. Yes.
11   Q. Correct me if I'm wrong, this is from Barry
12   Finkelstein. This is an email from Barry
13   Finkelstein to Kevin Randall CCing John Wilkinson
14   and Maria Suarez saying the four inventory team
15   members just informed that they are going to HR now.
16   They did not share the reason with me.
17       Do you know why the team members were
18   informing Barry Finkelstein that they were going to
19   HR?
20   A. If I read further, I can decipher that, but
21   the memo is not just to Kevin Randall.  It is also
22   to Elizabeth Toohig.  You omitted her name.
23   Q. Understood.  Yes.
24   A. When I read the chain it appears that if they
25   have a desk in the warehouse, they want to be

Page 50

R. KOHN

1
2    considered warehouse workers with a 40-hour week as
3    opposed to clerical workers with a 35-hour week.
4    Q. It says here in the middle of page 2257,
5    correct me if I'm wrong, this is an email from
6    Elizabeth Toohig to you?
7    A. You cannot decipher that by the email.  It
8    could be to everyone on the email.
9    Q. Well, I am not saying it is only to you, but
10   was this email sent to you?
11   A. It appears that way, yes.
12   Q. Because you responded to it, correct?
13   A. Yes.
14   Q. Elizabeth Toohig advised you if we look at
15   number 2, no one knows who they report to?
16   A. In the email before that when I asked Ms.
17   Toohig what this as about, she came back with five
18   bullet points.  So she is restating what they said.
19   Q. She is saying they don't know who they report
20   to, correct?
21   A. That is what this says, correct.
22   Q. Did you provide any clarification as in your
23   response as to who these individual control clerks
24   report to?
25   A. I think this is a chain that describes

Page 51

R. KOHN

1
2    employees wanting to go to HR to talk to the HR lead
3    all while 40 people from across the country are
4    there to train them.  One of the bullet points says,
5    Not sure what to do each day and no one is training
6    them.  Now, I was there.  Kevin Randall was there.
7    Beth Toohig was there.  John Wilkinson was there.
8    Barry Finkelstein was there and 40 people that were
9    the top of their grade, top of their class, came to
10   this facility from across America to train them.  So
11   buried in these five bullet points is surely a
12   little confusion.  If one employee does not want to
13   work from 9:00 to 5:00 and another one says they
14   don't know what to do each day, no one is training
15   them, no one knows who they report to or if they
16   have a desk in the warehouse, they should be
17   considered 40-hour workers, i.e., warehouse
18   employees and they feel harassed.  That was
19   something the group brought to HR.
20   Q. Do you know why Barry Finkelstein was the one
21   who advised HR and everyone else about the fact they
22   were going there?
23   A. No, I do not.
24   Q. Did he have disciplinary authority over the
25   inventory control clerks at the time he sent this

Page 52

R. KOHN

1
2    email?
3    A. No.  This appears they went to him and said
4    we would like to go to HR.  It doesn't point to
5    authority over anyone.  This points to he ran the
6    shift.  They went to the shift manager and said we
7    would like to go to HR.  They didn't share the
8    reason with me.
9    Q. Do you know why they went to Barry
10   Finkelstein with this?
11   A. No, no.  Maybe Maria was not in the building.
12   It is very unclear.  This is a snapshot in time.
13   Q. So was Maria supposed to be in the building
14   on August 3, 2016, at 10:33 a.m.?
15       MS. CABRERA:  Objection.
16       You can answer.
17   A. Today we would have no idea of knowing
18   whether Maria was in the building on August 3, 2016,
19   at 10:33 a.m.
20   Q. Did you clarify in response to this email
21   from Beth Toohig who the four inventory team members
22   reported to?
23   A. It was very clear at this time and before,
24   and for a period of time after this, the inventory
25   control clerks reported to Maria Suarez.  It is

13  (Pages 49 to 52)

Page 53

R. KOHN

1    R. KOHN
2    abundantly and profoundly clear.  Everyone knew they
3    reported to Maria Suarez.
4        Q.  Except for the inventory clerks themselves?
5        A.  I disagree with that.
6        Q.  So you think there were making that up?
7        A.  No.  I think there were 40 people in the
8    building trying to get people schooled and trained
9    on an new system, and each of those 40 people may
10   have been communicating with the inventory control
11   clerks, with other people, with management, with
12   Maria all the way up the chain, and maybe they
13   didn't know who to listen to in regards to those 40
14   people, not on a daily basis with their direct
15   report of Maria Suarez.
16       Q.  On August 4, 2016, there were 40 visits in
17   the building?
18       A.  Absolutely.  I think I spoke earlier.  Any
19   time there is a Go Live situation, whether it be
20   software, hardware, sortation, conveyer, the company
21   brings in the experts from across the county to come
22   in and train people, to shorten the learning curve,
23   and to get the local site up and running as quickly
24   as possible and to diminish the disruption to the
25   marketplace.  We don't want our customers to suffer

Page 54

R. KOHN

1    R. KOHN
2    if we are going to go through a software transition.
3    So if one of the statements was they don't know who
4    they report to, it might be because there were a lot
5    of people there all teaching them something at the
6    same time.
7        Q.  So it is just coincidence that Barry
8    Finkelstein, who had disciplinary authority over the
9    inventory team members in late 2016, advised HR that
10   they were actually going to HR?
11           MS. CABRERA:  Objection.
12           You can answer.
13       A.  It appears that Barry notified his manager
14   Kevin Randall and Beth Toohig, the VP of HR, that
15   the cycle counters were coming now.  So he followed
16   the chain of command and told his manager and
17   included HR because apparently they were on the way.
18   They didn't share the reason.
19       Q.  Now, what are the steps for disciplining a
20   union employee, let's say, someone who is a member
21   of Local 1, at the Syosset facility?
22           MS. CABRERA:  I just want to note my
23           objection.  This is beyond the 30(b)(6)
24           notice.  So the witness can testify as a fact
25           witness.

Page 55

R. KOHN

1    R. KOHN
2        A.  There is prescribed progressive discipline
3    for different tracks.  There would be a track for
4    attendance, there could be a track for work rule
5    violations, and there are violations that could skip
6    steps of progressive discipline.  There are
7    violations that are cause for immediate termination.
8           MR. MOSER:  We will take a break.
9           (Whereupon, a recess was taken at this
10          time.)
11          MR. MOSER:  For the record we marked
12          Plaintiff's Exhibits 24 and 25.
13       Q.  Can you tell me what these are?
14       A.  These were notes I reviewed with counsel
15   about the factual basis for the defendant's
16   assertion that the plaintiff was exempt.
17       Q.  Did you review any other documents regarding
18   Southern's assertion that the plaintiff was exempt?
19       A.  No.
20       Q.  When a manager issues a written warning to an
21   employee, is the manager supposed to sign it?
22       A.  I think it depends on the form.  If it comes
23   out in a printed document, it is always good
24   practice for the manager and the employee to sign
25   the form.

Page 56

R. KOHN

1    R. KOHN
2        Q.  Now, if we go back to the last exhibit, which
3    is Exhibit 28, does it look like the inventory
4    department is doing their job?
5        A.  I don't think that can be deciphered from
6    this particular document.
7        Q.  I am going to read the first couple of
8    sentences.  Their direction is very clear.  They are
9    to reconcile WMI to Sapphire daily.  They are doing
10   very little.  In three hours yesterday, Justin
11   counted two items then went to his office.
12          So from that you cannot determine whether or
13   not they were doing their jobs?
14       A.  I apologize.  I thought when you asked were
15   they doing their job, were they doing their job by
16   notifying someone they wanted to go to HR.  No.
17   Absolutely.  And for me to respond to this email at
18   9:00 at night -- oh, 8:00 in the morning.  I think
19   word for word the direction is clear, they are doing
20   very little.  In three hours if someone counted two
21   items, that is an issue.  That is clearly an issue.
22       Q.  Did the inventory department continue to have
23   performance issues for some period of time after the
24   implementation of WMI?
25       A.  When you say inventory department, do you

14 (Pages 53 to 56)

November 22, 2022

Page 57

R. KOHN

1
2    mean the counters?
3        Q.  Yes.  The cycle counters.
4        A.  I think this is extreme.  I think two items
5    in three hours is extreme.
6        Q.  I know this is an extreme example, but after
7    this did they continue to have performance issues,
8    the cycle counters?
9        A.  For some time, yes.
10       Q.  Are there any documents -- I know we have
11   other documents actually describing Maria's role --
12   are there any documents which shows that she
13   actually counseled one of the inventory control
14   clerks?
15       A.  That the company counseled or I counseled.
16       Q.  Are there any documents that show that Maria
17   counseled one of the inventory control clerks?
18       A.  I have not seen any in preparing for
19   deposition.
20       Q.  Are there any documents in existence which
21   show Maria counseled any of the inventory control
22   clerks during the period of time she was the WMI
23   administrator?
24       A.  I have not seen any in preparing for the
25   deposition.

Page 58

R. KOHN

1
2        Q.  Do you know whether any exist?
3        A.  I have not seen any in preparing for the
4    deposition.
5        Q.  Do you know if any exist?
6        A.  I would not know.  I have not seen any in
7    preparing for the deposition.
8        Q.  Are there any documents that show that she
9    was actually assigning them the work.  I am not
10   talking about second-hand documents, which relay the
11   fact that she should be assigning work.  I mean,
12   documents which actually show that she was assigning
13   work to the cycle counters?
14       A.  Maria assigned work to the cycle counters
15   while she was the warehouse inventory manager in a
16   manual system and after she became the WMI
17   administrator.  It was her job to assign work to the
18   counters.
19       Q.  Are there any documents that actually show,
20   Listen, I am telling Maria, I am telling you,
21   Justin, to do this?  Anything that shows she gave
22   direction to Justin Vey?
23       A.  As their superior, their manager, she
24   assigned work to them on a daily basis.  It may have
25   been a form that said go count these items.  It may

Page 59

R. KOHN

1
2    have been asked why something was not reconciled.
3    On a daily basis, it was Maria's goal to balance the
4    inventory between Sapphire and WMI.  She had a staff
5    that did that work.  She assigned the tasks required
6    to get that completed.
7        Q.  Are there any documents which actually show
8    her actually assigning work to these individuals?
9        A.  Daily work product?
10       Q.  Where are those records?
11       A.  No.  I am asking.  You are looking for daily
12   work product?
13       Q.  I am looking for any document which actually
14   shows that she assigned work?
15       A.  You are asking for a document that would have
16   likely been discarded by the counter after they
17   completed the assignment.
18       Q.  So after the counter discarded the
19   assignment, there would be no record that Maria had
20   assigned the work to them?
21       A.  Each day Maria had a group of tasks that
22   needed to be completed.  From the time inventory
23   came into the building, it had to be received
24   properly.  When it was transferred around the
25   building, it had to be transferred properly from and

Page 60

R. KOHN

1
2    to locations.  When orders were consolidated at
3    night, inventory needed to be transferred to the
4    pick lines to be shipped.  If orders were delivered
5    and they came back from the return stock, inventory
6    would have to be transferred back into a location.
7    All of that was handled by Maria and her team.  So
8    if there are thousands of transactions a day, it
9    would be very unlikely that someone would have a
10   piece of paper from five years ago that pointed to
11   what their tasks were for that particular day or
12   hour or shift.
13           MR. MOSER:  Can you read back the
14       question, please.
15           (Whereupon, the record was read by the
16       reporter.)
17       A.  Well, I can give you an example.  Pre-WMI,
18   during physical inventories, people went out and
19   counted locations manually pre-WMI.  Maria would
20   give dock count sheets to cycle counters that would
21   go out and count that location or a series or
22   locations.  It is improbable that those documents
23   have been maintained for five or six years.  You are
24   asking for pieces of paper that are daily work
25   product, and that would not be saved under any

15 (Pages 57 to 60)

November 22, 2022

Page 61

R. KOHN

1   R. KOHN
2   circumstances.  Maria directed the work force on a
3   daily basis, assigned all of their work from the
4   moment they came in until the moment they left.
5   What was not completed stayed in the queue so Maria
6   can assign the leftover work and any new work the
7   following morning.
8        Q.  So once the cycle counters discarded the
9   paperwork that was given to them, would there be any
10  record that Maria had actually delegated them work?
11       A.  Forgive me, but I believe you are insinuating
12  Maria did not assign them work.
13       Q.  No.  I am asking a question, whether you take
14  that to mean something else, I am asking a very
15  simple question.
16           My simple question is:  Once those cycle
17  counters discarded the piece of paper, was there any
18  direct evidence that Maria had delegated work to
19  them?
20           MS. CABRERA:  Objection.  I'm sorry.
21       Before you kept saying if there were any
22       documents.  Now you are saying is there
23       direct evidence.
24           MR. MOSER:  Okay.
25       Q.  Once they discarded these assignments that

Page 62

1   R. KOHN
2   were given to them, were there any documents which
3   would show that she had, in fact, assigned them
4   work?
5        A.  Every one has a boss.  If my boss gave me a
6   directive to do something and I completed the
7   assignment, I would not keep a journal or a log or
8   that directive on a piece of paper for some future
9   time.  If Maria told the cycle counters to complete
10  a task and they were directed to complete the task,
11  their role and their job was to go complete that
12  task.  There would not be a need to document that or
13  save that for some future point in time.
14       Q.  Have you reviewed all the documents that were
15  provided by Southern, generally?
16       A.  Yes.
17       Q.  Did you ever see any document showing that
18  Maria in any way was exercising authority over the
19  cycling counters?
20           MS. CABRERA:  Objection.  Again, this is
21       beyond the 30(b)(6) notice.  So the witness
22       can answer it as a fact witness but not in
23       connection with his preparation or any of the
24       topics for the 30(b)(6) as this is not one of
25       the topics.

Page 63

R. KOHN

1   R. KOHN
2        A.  Maria was responsible for the cycle counters.
3   The cycle counters reported to Maria.  Maria
4   assigned them work and they completed the work that
5   she assigned to them.
6        Q.  Is there any record of the actual work she
7   assigned to them as the WMI administrator?
8        A.  When she was the WMI administrator everything
9   was scanned.  If they went to the cycle counter
10  location or a series of locations, they would have
11  scanned into that location, entered the count,
12  closed out the location and their quotes,
13  fingerprints would have been attached to that
14  reconciled item.  So as they were directed to
15  complete work, yes.  Systematically, every move they
16  made, everything that was touched, everything that
17  was transferred, everything that moved forward,
18  would have had a fingerprint of the cycle counters.
19       Q.  Would it have a fingerprint showing that
20  Maria had given them the work to do?
21       A.  No, but they would not have had the work on
22  their own.  The work would not have mysteriously
23  appeared for them.  They would have had to have been
24  assigned the work.
25       Q.  Is there any record other than the fact that

Page 64

1   R. KOHN
2   work was actually done?  You are saying that the
3   fact that they actually did work is evidence that
4   Maria was directing it.  Are there any documents,
5   which would show that Maria was the one who told
6   them to do it or directed them to do it?
7        A.  Maria was their superior.  She assigned them
8   the work.
9        Q.  Are there any documents which would show
10  Maria was the one actually telling these individuals
11  to do this or giving them instructions?
12       A.  Direction from the WMI administrator to the
13  cycle counters wouldn't have come in a document.
14       Q.  So there would be no document?
15       A.  There would be no document.
16       Q.  So there are no documents which actually
17  document Maria was assigning work to the cycle
18  counters?
19       A.  Maria was assigning work to the cycle
20  counters.
21       Q.  Well, I know she was, but there are no
22  documents that actually show the specific work that
23  she was assigning them?
24       A.  Maria had a list of tasks that needed to get
25  completed each day.  They didn't get completed on

16 (Pages 61 to 64)

November 22, 2022

Page 65

R. KOHN

1    their own.  The cycle counters didn't decide they
2    were going to jump in and do things without being
3    told.  I am glad you said that you agree Maria
4    assigned the tasks.
5    Q.  No.  A agreeing to that is what you said.
6    A.  Oh, that is not what I heard.
7    Q.  Oh, I am agreeing that you said she assigned
8    the tasks.
9         What I am trying to get at is:  Are there any
10   documents which show that she was giving them work
11   to do?
12   A.  It would not be something that would be
13   documented for future use.
14   Q.  There's no documents showing whether or not
15   she counseled any of the employees?
16        MS. CABRERA:  Objection.
17   Q.  Are there any documents that show that she
18   counseled any employee during the time period she
19   was WMI administrator?
20   A.  I am not aware of any.  However, she could
21   have done that with the HR group, with her manager.
22   Q.  So she could have done it that way, but are
23   there any documents which show that she was involved
24   in the counseling of any of the members of the

Page 66

R. KOHN

1    inventory control department during the time was she
2    WMI administrator?
3    A.  Not that I have seen in preparing for today's
4    deposition.
5    Q.  Do you know whether those documents ever
6    existed?
7    A.  I have not seen any in preparing for today's
8    deposition.
9    Q.  Do you know whether those documents exist?
10   A.  No.  I have not seen any.
11   Q.  So is there any document which shows that
12   Maria was involved in the discipline of any employee
13   during the time she was WMI administrator?
14        MS. CABRERA:  Objection.
15   A.  I am not aware.
16   Q.  So does her job description say she had
17   supervisory authority over the inventory control
18   clerks or cycle counters, as they are called?
19   A.  I believe it says, yes, that she assigned
20   them work.
21   Q.  I am going to show you what was previously
22   marked as Plaintiff's Exhibit 3 for identification.
23   A.  Yes.
24   Q.  Is this the job description for the WMI

Page 67

R. KOHN

1    administrator position that Maria was given?
2    A.  It appears so, yes.
3    Q.  Do you see on here where it says she has
4    authority over cycle counters or inventory control
5    clerks?
6    A.  I see it says candidate will assist, operate,
7    train, oversee and analyze the functions to achieve
8    objectives, ensure smooth startup and transition by
9    leadership and training.  I see it says assist in
10   the development of warehouse process, provide
11   leadership direction to the team, provide training
12   for the employees, implement operation continuous
13   improvements measurements and initiatives, organize
14   and manage work effectively and efficiently amongst
15   her team members, support and train internal
16   customers, that's her team, provide leadership and
17   management, develop and encourage excellence within
18   the team, train and develop a high performing team,
19   manage to get work done and develop others,
20   adherence to performance management objectives,
21   ability to build a high performing team, ability to
22   accept and lead change, ability to influence others.
23   These are all attributes of a leader or a manager,
24   people that lead other people, that are responsible

Page 68

R. KOHN

1    for other people, and in the hierarchy, the
2    inventory control clerks reported to Maria Suarez.
3    Q.  So we have the hierarchy and that was
4    prepared by Southern, correct?
5    A.  If that's a question, yes.
6    Q.  Who determined the hours of work of the
7    inventory control team?
8    A.  The counters.  The counters can only work
9    effectively during non-production times.  When the
10   company goes into production, we are actually
11   picking and shipping cases.  It is ineffective to
12   cycle count.  So the hours by default would be more
13   daytime hours than anything else.
14   Q.  If any one of the cycle counters had to work
15   overtime or after their scheduled time of work, who
16   told them, and I am talking about the time period
17   Maria was WMI administrator?
18   A.  Maria would have conveyed they needed to work
19   additional time.
20   Q.  So Maria had the authority to tell them to
21   work overtime?
22   A.  Yes.  She might have discussed it with John
23   Wilkinson because when we go back to an earlier
24   document 2257 that we discussed, we did have a cycle

17 (Pages 65 to 68)

Page 69

R. KOHN

1
2  counter that counted two items in three hours, which
3  is a blatant disregard for anything.  So if that
4  continued or that was prevalent, that is going to be
5  highlighted to management, and although Maria would
6  have said we need you to count more, management,
7  quote/unquote, might have interceded and said, We
8  need more hours.  We need different hours.  We need
9  weekend hours.
10     Q.  Who would have been the one to decide whether
11  these individuals would have to work weekend hours
12  or extra hours?
13     A.  It would have been a conversation between
14  Maria and, likely, John Wilkinson, her manager.
15     Q.  Are there any documents which show that Maria
16  directed these employees to work extra hours while
17  she was WMI administrator?
18     A.  I don't know if those items would be
19  documented.  It would be more of a conversation.
20     Q.  Are there any documents that you are aware of
21  that she directed cycle counters to work extra hours
22  or weekends while she was WMI administrator?
23     A.  I don't think that would be something that
24  was reduced to writing.
25     Q.  So those records would not exist?

Page 70

R. KOHN

1
2     A.  They were most likely conversational.  There
3  would be no need to write an email or a letter to
4  one of your reports to say, I need you to work
5  overtime.  These were union employees that would
6  have been asked to work as directed.
7     Q.  Would Maria have to get approval from payroll
8  in order to direct employees to work overtime?
9     A.  From payroll, no.  From her manager, perhaps.
10     Q.  Could she on her own direct these employees
11  to work 80-hour weeks?
12     A.  I think 80 hours is extreme.
13     Q.  On her own could she have assigned these
14  individuals to work 80 hours a workweek and leave
15  Southern with the bill?
16     A.  As I said earlier, we all have a boss, and it
17  is quite regular to popularize those concepts with
18  your boss.  So if she wanted to work her crew of
19  inventory counters 80 hours a week, she would likely
20  have discussed it with her boss.
21     Q.  Are there any emails between Maria and
22  anything at Southern in which she asked permission
23  to assign extra hours?
24     A.  It likely would have been conversational.
25  She saw her boss every day, John Wilkinson.  She

Page 71

R. KOHN

1
2  likely could have said, John, I need to work the
3  crew this weekend or tonight or tomorrow.
4     Q.  You were not there for those conversations?
5     A.  No.
6     Q.  So you don't know if those conversations even
7  happened?
8     A.  Correct, but I also know those conversations
9  must have happened, but because they are not reduced
10  to writing you want to suggest that they didn't
11  exist.
12     Q.  I am not suggesting one way or the other.  I
13  am just trying to get an answer as to whether there
14  is any documentation, emails, anything showing that
15  Maria was directing cycle counters to work extra
16  hours?
17     A.  It would not be probable that a manager of
18  people would email them to request them to work
19  overtime.  It would not be likely there would be a
20  documentation.  If the union cycle counters were
21  asked to work overtime, they were asked to work
22  overtime.  If they were mandated to work overtime,
23  they were mandated to work overtime.
24     Q.  My question is a little bit broader.  Are
25  there any emails between Maria an anyone at Southern

Page 72

R. KOHN

1
2  documenting her ability to ask cycle counters to
3  work extra hours or weekends?
4     A.  I am not aware of any emails.
5     Q.  Did she ever ask John Wilkinson in writing
6  for approval to schedule extra hours or weekends for
7  cycle counters?
8     A.  It is possible.
9     Q.  Where are those records?  I know it is
10  possible --
11     A.  You asked a hypothetical question, and I am
12  giving an answer of it is possible that she asked
13  John Wilkinson to allow the cycle counters to work
14  additional hours.
15     Q.  Where would those records exist?
16     A.  You asked for a data pull of emails.
17  Southern had an Ediscovery team that provided you
18  with emails from a group of people.  I would suggest
19  they would in that data dump.
20     Q.  So if there were any instances in which Maria
21  had communicated with John Wilkinson regarding the
22  supervision of her team, those would have been
23  produced?
24     A.  If they met the criteria of what you request,
25  yes.

18 (Pages 69 to 72)

Page 73

R. KOHN

1
2     Q.  Did she communicate at all with John
3  Wilkinson about the management or supervision of her
4  team in writing?
5     A.  She could have.  Again, I think that is a
6  hypothetical question.
7     Q.  Southern is the one that is claiming she had
8  this authority.  My question is:  Are there any
9  documents in terms of written communications between
10  her and John Wilkinson showing she had this
11  authority?
12     A.  The authority to work her group overtime?
13     Q.  Correct.
14     A.  I don't think she needed a document to have
15  her associates work overtime.
16        MR. MOSER:  Can you read back the
17     question.
18        (Whereupon, the record was read by the
19     reporter.)
20     Q.  Are there any documents that would show that
21  she actually was assigning extra hours of work or
22  weekend work to her staff?
23     A.  There could be.
24     Q.  Well --
25     A.  In the course of a normal day's business, and

Page 74

R. KOHN

1
2  I will give a for example, if one of the cycle
3  counters didn't come in on a particular day, the
4  rest of them may not have been able to finish the
5  required tasks.  Maria may have said, I need the
6  rest of you to work overtime to cover for the person
7  that is not here.
8     Q.  Okay.  But --
9     A.  And if we were going to prepare for a
10  physical inventory and we needed to get the facility
11  prepared, she might have said, I need you to work
12  additional hours.  If she shared that with her boss
13  verbally or in writing, this is a close group of
14  people that work together every day.  It would be
15  unlikely for Maria to have to go to John Wilkinson
16  on an everyday basis and ask to allow her group to
17  work overtime.  Did she go to him on occasion, that
18  is probable as well, as a notification, as a
19  conversation because she had a manager and the cycle
20  counters have managers and I have a manager.
21     Q.  I am not talking about what you believe
22  happened, okay?  I am asking whether there are any
23  documents that show Maria was involved in the
24  assignment of extra hours or weekends to inventory
25  clerks while she was the WMI administrator?

Page 75

R. KOHN

1
2     A.  You asked me to look at the job description,
3  and I think the job description points to Maria
4  managed the group of people.
5     Q.  Other than that job description, is there any
6  other documentation which would show she was
7  assigning extra hours or weekends or had the
8  authority to assign extra hours or weekends to cycle
9  counters?
10     A.  I have not seen any documents preparing for
11  the deposition, but I don't think a document is
12  required for Maria to complete the tasks that were
13  given to her when she took the job.
14     Q.  So you can simply say what she was doing, and
15  that is good enough?
16        MS. CABRERA:  Objection.
17     A.  Maria was their manager.
18     Q.  When someone wanted to take a day off, a
19  personal day, they had to get their manager's
20  approval, right?
21     A.  The union requirements are you give a certain
22  amount of notice.
23     Q.  The cycle counters, did they ever take a day
24  off while Maria was the WMI administrator?
25     A.  I am sure.

Page 76

R. KOHN

1
2     Q.  Who did they give notice to?
3     A.  Likely to Maria.
4     Q.  Did they give notice in writing?  They were
5  required to give it in writing, weren't they?
6        MS. CABRERA:  Objection.  Are you going
7     to ask a question?
8     Q.  Were they required to give it in writing?
9     A.  No.  I believe they are required to give
10  48-hour notice for a PTO day or to schedule a
11  vacation.
12     Q.  Would the manager's responsibility be to
13  advise payroll that that individual was taking paid
14  time off?
15     A.  Sure.
16     Q.  Are there any emails between Maria and anyone
17  at Southern regarding any PTO days that were taken
18  by any cycle counters during the period of time she
19  was the WMI administrator?
20     A.  Were there emails from Maria to whom?
21     Q.  To anyone at Southern.
22     A.  I don't think it would come in the form of an
23  email.
24     Q.  What would it come in the form of?
25     A.  A personnel action form.  An absenteeism

19 (Pages 73 to 76)

Page 77

R. KOHN

1
2  form. It could have been a form that Maria filled
3  out or the cycle counter filled out. That was
4  passed on to payroll either directly or through
5  shift manager.
6      Q. Are there any emails between Maria and anyone
7  at Southern regarding PTO days taken by cycle
8  counters during the time period she was the WMI
9  administrator?
10     A. I don't think they would come in the form of
11 an email.
12     Q. So you don't think any such email exists?
13     A. If an employee wanted a day off, they would
14 tell their boss. They would likely fill out a form,
15 or the boss would fill out the form, and it would go
16 to payroll. There would not be an email. There
17 could be.
18     Q. Did the boss have to sign the form?
19     A. No. I believe the employee signs the form.
20     Q. And the supervisor does not sign the form?
21     A. I think it has to be approved.
22     Q. It has to be approved by the supervisor,
23 correct?
24     A. By their report, yes.
25     Q. It also has to be approved by payroll,

Page 78

R. KOHN

1
2  correct?
3      A. Approved by payroll, no. Payroll is the
4  department who pays people.
5      Q. Who approved the request for PTO days for
6  cycle counters who took days off during the period
7  that Maria was WMI administrator?
8      A. Likely Maria. It could have been John
9  Wilkinson in her absence. If we were preparing for
10 visitors or a cleanup or a scrubbing, that's the
11 period before an inventory or if there were other
12 people out, it might have went to a different level
13 of management.
14     Q. Do you know whether Maria approved any PTO
15 days for cycle counters during the period of time
16 she was WMI administrator?
17     A. I would assume so, yes.
18     Q. I don't want you to assume. I am asking you,
19 if you know?
20     A. Personally, I don't know. Her position was a
21 functional one where she had reports, and I would
22 assume she --
23     Q. It is unlikely that a group of four employees
24 would not take a PTO day off in a year or a two,
25 correct?

Page 79

R. KOHN

1
2      A. That is correct.
3      Q. Where are the requests for PTO days that she
4  approved?
5      A. They would not be saved. You are talking
6  about something that occurred five years ago?
7      Q. Yes.
8      A. There would not be a requirement to save
9  those forms.
10     Q. When someone takes vacation, do they also
11 need approval from their manager?
12     A. Yes.
13     Q. Was Maria involved in the approval of
14 vacation time for cycle counters?
15     A. I am sure she was.
16     Q. Was any of that involvement documented in any
17 way?
18     A. They would have been on the same attendance
19 forms that PTO time would have been on.
20     Q. Would any of those documents have been saved?
21     A. No. It is very unlikely they would be saved
22 this many years later.
23     Q. So we have Maria's job description in front
24 of us, correct?
25     A. Yes.

Page 80

R. KOHN

1
2      Q. And we have Exhibit 28, correct? Are there
3  any documents which you can think of that actually
4  exist today, which show that she was managing her
5  staff, and I say firsthand documents, documents that
6  were generated at the time which she would have
7  created or someone else at Southern would have
8  created showing that she was actually exercising
9  this authority at the time?
10     A. The nature of Maria's job required her to
11 assign work and hold the inventory control
12 clerks/cycle counter accountable for certain tasks.
13 I don't have those documents today, five years
14 later. You asked for daily worksheets, transfer
15 documents. Those wouldn't exist. Maria assigned
16 work to a group of people. She ran the functional
17 department, the WMI department. It is very clear
18 that Maria assigned work and managed this group of
19 people on a daily basis.
20     Q. Clear based upon on what?
21     A. Clear based on that was her job description
22 and her role and other people did not assign work,
23 did not do Maria's job for her. She was the person
24 that spoke to her group of people, to her cycle
25 counters.

20 (Pages 77 to 80)

November 22, 2022

| Page 81 | Page 83 |
|---|---|

**Page 81**

R. KOHN

1
2    Q.  We have her job description.  What about
3    documents other than the job description?  Are there
4    any other documents that show or document the work
5    that she was doing as a manager?
6    A.  Yeah.  I think in her corrective action, I
7    think there were a litany of items that she was held
8    accountable for, that she was reminded were her
9    tasks and they were all supporting the fact that she
10   managed this group of people.
11   Q.  Are there any documents which show her actual
12   exercising managerial authority over this group of
13   people?
14   A.  You wrote down no.  Does that mean you are
15   anticipating I am going to answer no.
16        MS. CABRERA:  Just answer the question.
17   A.  I am not aware of any documents.
18   Q.  Southern has the burden of proof with regard
19   to this issue.  They are the ones that have to
20   approve that Maria was an exempt manager.
21        MS. CABRERA:  Is that question?  Are you
22   making a statement?  Documents are not the
23   only way to prove something, right?  That is
24   not the only form of evidence that there is
25   if we are going to have this discussion on

**Page 82**

R. KOHN

1
2    the record right now in front of the witness
3    right now if you want to go there.
4    Q.  So how would Maria assign work in WMI to the
5    cycle counters?
6    A.  Every day there would be a number of tasks
7    that had to completed.
8    Q.  Would she assign it in the computer or would
9    she hand them documents?  How would she do it?
10   A.  It could be both.
11   Q.  When we look at Plaintiff's Exhibit 3, do you
12   recognize that document?  I know you reviewed it
13   earlier, but the first page it appears to be
14   something that was generated by a computer.  I am
15   asking if you recognize that document?
16   A.  Yes.  I recognize the entire document.
17   Q.  What is on this first page?  What does that
18   show?
19   A.  A chronological listing of a requisition that
20   was posted and eventually filled.
21   Q.  Is this an electronic recording of the hiring
22   process?
23   A.  Yes.  I think this is called Taleo.  It might
24   go by some other names.  But, yes, it eases the
25   flow, the responsibility flow rather than sending 12

**Page 83**

R. KOHN

1
2    emails.  To have a portal where people can go and
3    approve positions.
4    Q.  Would an individual's manager have to approve
5    them for hiring before they were hired?
6    A.  Could you repeat that?
7    Q.  Would a perspective applicant's manager have
8    to approve their hiring before they were hired?
9    A.  Depending on the position, sure.  As I said
10   earlier, we all have a boss.  If I wanted to hire a
11   subordinate, I would likely tell my boss what I was
12   doing.
13   Q.  But the subordinate has to work with their
14   manager, right, and be able to take direction from
15   their manager?
16   A.  Yeah.
17   Q.  So the manager in the whole hiring process
18   actually interviews that perspective employee; is
19   that fair to say?
20   A.  I'm not sure what you are saying the manager?
21   Which person is that?
22   Q.  The person they report to.  Their direct
23   report?
24        MS. CABRERA:  Objection.
25   A.  I am not clear on the question.  If I wanted

**Page 84**

R. KOHN

1
2    to hire a subordinate, you are asking me would my
3    boss have to interview them?
4    Q.  No.  Would you have to interview them?
5    A.  Sometimes, yes.  Sometimes, no.
6    Q.  Would you have to approve them?
7    A.  They are going to report to me?
8    Q.  Yes.
9    A.  Sometimes, yes.  Sometimes, no.  Depending on
10   the role.
11   Q.  So other people can hire individuals who will
12   work for you and report to you without your
13   approval?
14   A.  No.  I am going to put this in my tense
15   because I don't understand when you are saying the
16   word manager.  If I wanted to hire someone, I could
17   go to my HR department and say I would like X, find
18   me this candidate.  You are asking me would I have
19   to approve that?
20   Q.  No.  Would you have to approve the hiring of
21   the individual who is ultimately selected to work
22   for you?
23   A.  Again, it depends.  It does depend.  If I
24   needed to go hire an accountant, I am not qualified
25   to hire an accountant.  If I asked my HR department

21  (Pages 81 to 84)

Page 85

R. KOHN

1
2  or a corporate recruiter to hire me an accountant, I
3  would not really need to approve that or bless that
4  because that is not my skill set.
5      Q. On this, your approval was required for
6  hiring Maria as WMI administrator, correct?
7      A. Sure, as was my superior Larry Goodrich; as
8  was HR, Beth Toohig; as was Kevin Randall, my
9  subordinate.
10     Q. Did she report to John Wilkinson?
11     A. Did who report to John Wilkinson.  I'm sorry?
12     Q. Did Maria report to John Wilkinson?
13     A. Yes.
14     Q. Is there a particular reason why his approval
15  was not requested?
16     A. Kevin owns the financials for Metro New York.
17  I own them for New York.  Beth Toohig managed head
18  count.  Larry Goodrich was the executive VP general
19  manager, the equivalent of a state president.  So
20  from Kevin up there was an approval process.  This
21  does not say why Maria or John are not listed on
22  this paper.  I do not see anything by their names
23  not appearing here.
24     Q. Are there any documents that would show that
25  Maria interviewed any perspective candidates for the

Page 86

R. KOHN

1
2  time period she was WMI administrator?
3      A. Are there documents?  Beth Toohig was the HR
4  VP at the time.  I would say if Maria was part of
5  the interview process, she did it in conjunction
6  with HR or with Dina.
7      Q. Are there any documents that would show that
8  Maria was part of the interview process for any
9  employee during the period of time she was WMI
10  administrator?
11     A. Again, I don't know if documents would be
12  preserved.  If Maria wanted to hire a cycle counter
13  and interviewed the cycle counter with HR or with
14  John or with Kevin or any combination, I don't think
15  there would be a document that says I participated
16  in that interview.
17     Q. So her involvement in the entire process
18  would be undocumented?
19         MS. CABRERA:  Objection.
20     A. As was John Wilkinson's.  His name is also
21  omitted from this.  They surely could have been
22  involved in the process.  This is only recording
23  likely the financial portion of this, who owns the
24  budget.
25     Q. I am not talking about this specific

Page 87

R. KOHN

1
2  document.  I am talking about any document.
3         MS. CABRERA:  Well, objection.  You have
4  asked about this document and then you have
5  also asked about in general the process, so
6  that is why I am objecting.
7         MR. MOSER:  Well, he is making reference
8  to sometimes an individual --
9         MS. CABRERA:  Well, he is making the
10  comparison because you are drawing the
11  comparison.
12     Q. Are you saying that John Wilkinson was
13  involved in the hiring of Maria for the WMI
14  administrator but his involvement was not
15  documented?
16     A. That's possible.  You are looking at a
17  hierarchy of approvals in a portal.  This does not
18  say who interviewed them.  This also doesn't say who
19  didn't interview.  This is approving head count and
20  the financial ramifications of hiring someone from
21  HR to the site leader Kevin Randall.  I am his
22  superior.  Beth Toohig was Dina's superior, and
23  Larry Goodrich was the equivalent of the state
24  president.
25     Q. Did John Wilkinson weigh in at all on whether

Page 88

R. KOHN

1
2  Maria was suitable for this position?
3      A. For the WMI administrator role?
4      Q. Correct.
5      A. Yes.  Kevin selected Maria.  She was
6  qualified for the role.  She interviewed for the
7  role.  Kevin spoke to John, and Maria was hired.
8      Q. What about documents showing that
9  behind-the-scenes process of considering Maria for
10  this position?  Are there any documents that show
11  communications between anyone at Southern regarding
12  why Maria was considered for this position or why
13  Maria was hired for this position?
14     A. Maria applied for the role and she was hired.
15  I believe there were 12 people that applied for the
16  role.  More than ten.  Maria applied for the role.
17  She wasn't selected.  The company didn't say, You
18  win.  She applied for the job and she was selected.
19  She would report in the new role to head sale
20  manager, John Wilkinson.  Most all of her duties
21  would be consistent with what they were in the
22  manual environment with the exception of the
23  scanning, the actual software that we call the WMI,
24  the warehouse management integration system.
25     Q. Are there any documents showing the reasons

Page 89

```
 1              R. KOHN
 2   why Maria was selected for this position?
 3       A.  I don't think there would need to be
 4   documents.  There were a handful, a dozen people
 5   that applied.  She applied and she was selected
 6   because the new role, the WMI administrator, again,
 7   reported to John Wilkinson, her common boss.  The
 8   tasks involved in this WMI role were identical with
 9   the exception of the scanning versus the manual
10   application of the perpetual inventory from the
11   past.
12       Q.  My question is not whether there would need
13   to be documents.
14          My question is:  Are there any documents
15   which show the reasons why Maria was selected for
16   the WMI administrator position?
17       A.  I could give you all the reasons I believe
18   she was selected, including she applies for the
19   role.  I wouldn't think there would be something in
20   writing after the fact, with 10 or 12 applicants.  I
21   think John or Kevin Randall sat with HR or Dina
22   Margolis and said of the 12 people, this is who we
23   would like to offer the position to.  It would be
24   unlikely there would be a matrix up.
25       Q.  So there is not a single document that would
```

Page 90

```
 1              R. KOHN
 2   have been generated regarding the reasons why Maria
 3   was selected for this position?
 4       A.  There could have been a document.  You are
 5   asking me if there is a single document.  I am not
 6   aware of any documents that compared the highlights
 7   or the pros and cons of the 12 applicants and why
 8   Maria was chosen.  Maria had the equivalent role in
 9   our manual system.  When we transferred the
10   warehouse from a manual operation to an operation
11   that included WMI and scanning, Maria would have
12   been the incumbent, the natural fit.  She applied
13   for the role and she was given the role.  With the
14   role came a pay increase; it came with more
15   responsibility.  She was given an additional cycle
16   counter, I think, at the time.  She asked that the
17   department be increased, and there was a cycle
18   counter added as soon as she took the role, and it
19   made sense for Maria to slide into that role.  You
20   are asking for is there a document that says that.
21   I don't think there was one required.
22       Q.  Or that one was actually created?
23       A.  I can't speak to if one was actually created.
24       Q.  How about whether one exists today?
25       A.  I am not aware a document that exists that
```

Page 91

```
 1              R. KOHN
 2   compares the 10 or 12 applicants highlighting why
 3   Maria got the role.
 4       Q.  Or explaining in any other way why Maria was
 5   ultimately selected for this role?
 6       A.  Only that what I just stated.  That it was a
 7   common manager, she was the incumbent in the manual
 8   system, that this position would have common duties
 9   with the exception of the scanning.
10       Q.  Well, these are the reasons why you are
11   saying why she was given this role.
12          My question is whether there were any
13   documents showing the reasons why she was given this
14   role?
15       A.  I don't know if there are any documents that
16   exist, but she applied for a role and was given a
17   promotion.  This was not degrading her salary.  This
18   was not limiting her upward mobility.  This was a
19   promotion that got her more money and more
20   responsibility.  This was a positive.  It was a good
21   thing for Maria.
22       Q.  So although her role remained the same, you
23   believe that her job description, which is on
24   Plaintiff's 3, accurately describes her role as WMI
25   administrator?
```

Page 92

```
 1              R. KOHN
 2       A.  The WMI administrator role differed from her
 3   pre WMI administrator role mainly by the manner in
 4   which she worked and her inventory control
 5   department worked.  They no longer worked with a
 6   manual system with pencil and paper.  They worked
 7   with computers.
 8       Q.  Who interviewed the cycle counter that was
 9   hired?
10       A.  I would say Maria, John, perhaps Kevin
11   Randall.
12       Q.  When you say you would say, do you know who
13   interviewed the cycle counter?
14       A.  No.  I would assume, I believe it would be
15   Maria, John, and Kevin Randall.  The cycle counter
16   positions, the inventory control positions are
17   critical to the company.  They safeguard the
18   inventory.  If our perpetual inventory is incorrect
19   or off, we will not only disappoint our customers
20   and may not have the goods they want when they order
21   it, but there is a financial ramification to not
22   being able to locate inventory --
23       Q.  As you sit here today, do you know whether
24   Maria interviewed that cycle counter that was hired?
25       A.  Next time I will pause when I answer a
```

23  (Pages 89 to 92)

Page 93

```
            R. KOHN
1
2    question so you will allow me to finish.  No, I do
3    not know if Maria interviewed the cycle counter.  I
4    would assume Maria, John, and Kevin Randall talked
5    to the cycle counter.
6       Q.  Did Maria review the qualifications of the
7    cycle counter?
8       A.  Again, I would assume that Maria, John, and
9    Kevin Randall interviewed, reviewed the
10   qualifications and chose the cycle counters when
11   they were hired.
12      Q.  Did she have any contribution or say whenever
13   a cycle counter was hired?
14      A.  I would, again, assume say the three of them.
15   Perhaps with HR if Dina Margolis or Beth Toohig was
16   involved.  I am sure they all collaborated on who
17   the best individual would be as a candidate and
18   on-boarded those people?
19      Q.  Would there be any documents showing she was
20   involved in this process at all?
21      A.  I wouldn't think there would be documents
22   that any of the people I named were part of the
23   process.
24      Q.  So you would hire a cycle counter and Kevin
25   Randall, John Wilkinson, and Maria's involvement
```

Page 94

```
            R. KOHN
1
2    would not be documented in any way in the hiring of
3    this individual.
4       A.  No.  I believe that the inventory control
5    cycle counters would be interviewed by management.
6    Management would include Maria, John Wilkinson, HR,
7    Kevin.  This was a union position.  We would find
8    the best fit for the organization, and I would not
9    think that would be documented.
10          MR. MOSER:  I need a two-minute break.
11          (Whereupon, a recess was taken at this
12          time.)
13      Q.  So let's wrap up on the exemption so that we
14   can move on.
15          So you are aware that Southern is claiming
16   that Maria was an exempt managerial employee and
17   that she was an exempt administrative employee,
18   correct?
19      A.  Yes.
20      Q.  So I am going to ask it again so we don't
21   leave anything out.
22          Can you please list for me all the reasons
23   why Maria was an exempt managerial employee?
24      A.  May I refer back to our prior exhibit?
25      Q.  Of course you can.  We have Plaintiff's
```

Page 95

```
            R. KOHN
1
2    Exhibits 24 and 25.  It is actually out of order but
3    that is fine.
4       A.  Maria's primary duties included the exercise
5    of discretion and independent judgment with
6    reference to matters of significance, which would be
7    the inventory, controlling the inventory, managing
8    and monitoring the inventory, safeguarding the
9    company, and identifying any theft of pilferage.
10   Maria's primary duty was to manage the department,
11   commonly known as the inventory control function.
12   Maria customarily and regularly directed work of the
13   inventory control cycle counters, and Maria's voice
14   was given particular weight regarding hiring or
15   firing or disciplining her workers.
16      Q.  What kind of discretion did Maria have in the
17   performance of the duties?
18      A.  During standard cycle counters, to use that
19   as an example, there are different variances that
20   the WMI administrator would run down.  If your loss
21   of a particular item is over X, you should
22   investigate it.  So with 17,000 items in the
23   facility, each one of them being in several
24   locations, she had leverage to adjust any location
25   by, I believe, it was $500.  So go ahead and make
```

Page 96

```
            R. KOHN
1
2    the adjustment if it is up to $500 and move on.
3    Anything over the $500 historically and routinely is
4    something you would bring to your manager, and, to
5    that point, anything under $500 she would have the
6    ability to write off in totality.  That's a great
7    responsibility.
8       Q.  Are there any other reasons other than the
9    ones you listed why Maria was considered an exempt
10   administrative or managerial employee?
11      A.  I can attach her functions to Melissa Decker
12   Johnson's functions in Upstate New York who held the
13   same role who had the same exempt status.
14      Q.  Are there any other reasons?
15      A.  I know that when we talk about her role as
16   WMI administrator, I think people hear the word
17   administrator.  Perhaps you hear administrator as
18   something less than in the management ranks, but it
19   is not.  It is someone that is administering the
20   inventory and its value.  So whether you want to
21   refer to Maria as a member of management or as a WMI
22   administrator, that would clearly cross the exempt
23   line for me.
24      Q.  Who is Cory Cooper?
25      A.  Cory Cooper was the one-time East Coast vice
```

24  (Pages 93 to 96)

Page 97

```
 1            R. KOHN
 2   president of human resources.  He was Beth Toohig's
 3   manager and again, Beth Toohig was the vice
 4   president of human resources for New York State.  So
 5   Cory was the next level up in human resources.
 6        Q.  He was down in Florida?
 7        A.  Yes.
 8        Q.  Florida is where the main offices of Southern
 9   are located?
10        A.  The main office is in Florida in Miami.  Cory
11   was in Miramar, Florida, outside of Fort Lauderdale
12   in a different campus, not in the corporate office.
13        Q.  Who did Cory report to?
14        A.  At what time period?
15        Q.  Let's take the period Maria was WMI
16   administrator?
17        A.  That was either Michael Head or Terry Arnold.
18        Q.  Who was Michael Head?
19        A.  They held the same position.  Mr. Head
20   retired.  He was the national vice president or
21   senior vice president of human resources and
22   Mr. Head was replaced with Terry Arnold.
23        Q.  Who did Mr. Head and Mr. Arnold report to?
24        A.  I believe to Lee Hagar.
25        Q.  Who is Lee Hagar?
```

Page 98

```
 1            R. KOHN
 2        A.  The chief administrator officer and I believe
 3   corporate secretary.
 4        Q.  Who did Mr. Hagar report to?
 5        A.  You are going up a lot of levels now.
 6        Q.  I know.
 7        A.  I believe he reported to the board or
 8   ownership.
 9        Q.  I am going to show what was previously marked
10   as Plaintiff's Exhibit 2 for identification.
11             Have you ever seen that document before
12   today?
13        A.  I have.
14        Q.  Do you know what this document is?
15        A.  I think this was a cheat sheet that Melissa
16   Decker Johnson put together for Maria as part of
17   critical things that need to be done during
18   the transition from the manual perpetual inventory
19   method to a scanning method with the frequency for
20   most of them.  Like, if you don't do anything else,
21   make sure you do these.
22        Q.  Were any of these duties listed on Maria's
23   job description?
24        A.  Yes.  It was all part of managing the
25   inventory.
```

Page 99

```
 1            R. KOHN
 2        Q.  Were any of these specific tasks listed in
 3   the job description?
 4        A.  I think it is nomenclature.  I think when you
 5   look at reconciling receivings or task management,
 6   that is inventory control.
 7        Q.  So it is a different way of saying the same
 8   thing?
 9        A.  Yes.
10        Q.  I am going to show you what was marked as
11   Plaintiff's Exhibit 4 for identification.
12             Have you seen this document before today?
13        A.  No.
14        Q.  I would like you to take a moment to look at
15   it?
16        A.  Okay.
17        Q.  So do you know if that was attached to the
18   September 2, 2016, WMI Administrator Performance
19   Expectations memo?  I am going to show you on my
20   laptop so you can actually see it.  I am going to
21   show you the memo itself, which begins at SGSW1145.
22        A.  Okay.
23        Q.  Do you know if Plaintiff's Exhibit 4 was
24   provided to Maria with the memo dated September 2,
25   2016?
```

Page 100

```
 1            R. KOHN
 2        A.  It is attached to this document.  The letter
 3   that he and Maria signed said, "I am including a
 4   copy of your job description and the cycle count
 5   daily procedure that Steve outlined to everyone last
 6   week for your review."  Since they both signed it, I
 7   would believe it must have been attached.
 8             MR. MOSER:  We need to stipulate again,
 9   because I don't have a copy of this.  When I
10   say I don't have a copy of this, I don't
11   believe I have a copy of the memo dated
12   September 2, 2016, which is Bate stamped
13   14415 to 14416.  Can we stipulate this will
14   be marked Plaintiff's Exhibit 30 for
15   identification?
16             MS. CABRERA:  Yes.
17             (Whereupon, Memo was deemed marked as
18        Plaintiff's Exhibit 30, for identification,
19        as of this date.)
20        Q.  14415 and 14416, does this describe Maria's
21   role as WMI administrator?
22        A.  I think it's laying out the expectations of
23   asking for help, of offering support, and putting
24   guardrails around the number of 500.  I was correct
25   defining any large adjustments to bring that
```

25  (Pages 97 to 100)

November 22, 2022

Page 101

R. KOHN

1
2 forward.  I don't think it goes into every
3 expectation.  To me it appears to be more of a
4 counseling and coaching letter that's put out there
5 to help her realize she does have support, to give
6 her direction and to give her guardrails to protect
7 the process.
8    Q.  Was she expected to perform the duties that
9 are listed on Plaintiff's Exhibit 4, which was
10 attached to the September 2nd memo?
11    A.  No.  It refers to Steve.  I believe it is
12 Steve Fendley.  This was put together to help her
13 similar to what Melissa Decker Johnson put together
14 on Exhibit 2, direction and coaching, counseling,
15 again to put her on the right track, to make sure
16 she touches what is important.  This document,
17 Exhibit 4, looks like the things that cycle counters
18 really need to complete.  So on top it talks about
19 running the ZY report.  I noticed that on things she
20 needed to do and running CSI reports.  That is the
21 general equalization between Sapphire and WMI.  It
22 appears that you run these reports, you do this type
23 of work, and then you can assign work out to the
24 cycle counters, and it gives smart direction.  If
25 production is still running, as I said earlier, it

Page 102

R. KOHN

1
2 is almost futile to count at night or while there is
3 production because it is hard to count something
4 when things are moving.  So it provides advice and
5 maybe a bit of coaching.  What makes sense.  What to
6 do three times a week or two times a week.  What do
7 you do if something is missing.  General advice from
8 Steve Fendley who was one of the 40 people came on
9 site who is an Upstate New York employee who has
10 always been part of the startup teams.  Coming from
11 him and Exhibit 2 coming from Melissa Decker
12 Johnson.  If I were the person that these were given
13 to, I would take great attention to both of these
14 because they are coming from two experts both within
15 the state of New York, both who are at the top of
16 their performance curve.
17    Q.  This Exhibit 4 was given to Maria in a memo
18 entitled WMI Administrator Performance Expectations,
19 correct?
20    A.  Yes.
21    Q.  Was she expected to do everything on this
22 cycle counting daily procedure?  Was this part of
23 the performance expectations?
24    A.  No.  These are assignments for her staff, for
25 her cycle counters.

Page 103

R. KOHN

1
2    Q.  In the middle here, those are assignments for
3 her staff, right?
4    A.  Yes.
5    Q.  What about on top?
6    A.  Absolutely.  Run a report, do your XY report.
7 Find the discrepancies, match Sapphire to WMI, and
8 then assign work so that people can go and clean up
9 everything that you run.  Then at the bottom of that
10 memo, it says when things settle down and they kind
11 of get over that learning curve, you know, different
12 things to look to and look towards.
13    Q.  I would like to draw your attention to
14 Exhibit 4 again.
15       Are these instructions that she should follow
16 or that her staff should follow?
17    A.  Again, this is what her staff should do.  If
18 production is still running, your staff should work
19 on these things.  If production is complete, they
20 should work on this stuff.
21    Q.  It is telling her how she should assign the
22 work; is that fair to say?
23    A.  Yes.  This is experts coming from different
24 parts of the country telling her, You are in
25 trouble, you are failing, your performance is

Page 104

R. KOHN

1
2 degrading.  Focusing on these things is a must in
3 Plaintiff's 2, and run these reports, reconcile the
4 inventory, assign the work this way, not as her
5 manager telling her what to do, but as her partners,
6 as her cohorts, people that are on her extended team
7 coming in to say, We are here to help you.  Here is
8 our advice from the management point of view and
9 from the direct your people to do this point of
10 view, and they are even recommending that the
11 administrator should reconcile behind counters
12 during the day that if a cycle counter comes across
13 a gigantic issue, remember you have a $500 cutoff in
14 authority, and many times I have seen during the
15 prep for the deposition, Maria wrote off things and
16 did not communicate them well in excess of $500.
17 There was one particular day she wrote off
18 $1,700,000 and didn't tell anyone and left it alone.
19 I discovered it that one particular weekend.  I
20 believe it was a Thursday or Friday, and I was in
21 the building on Saturday and Sunday with the
22 remaining inventory control staff right sizing and
23 reversing the $1,700,000 dollar write-off.  So when
24 these folks in this particular occurrence and
25 Plaintiff's 4, this is direction to say, Hey, Maria,

26 (Pages 101 to 104)

November 22, 2022

Page 105

R. KOHN

1      R. KOHN
2    I am your equal somewhere else.  Follow these rules.
3    This makes sense.  This is not saying I am your boss
4    and I am telling you what to do and I am telling you
5    how to direct work.  That is not what this is.  This
6    a friend from another location saying, I am here to
7    help bail you out.
8        Q.  I am going to draw your attention to the memo
9    again, and I would like you to look at the
10   acknowledgement, which is below the horizontal line
11   that is on page 2.  I would like you to read that to
12   yourself.
13       A.  I will read it aloud.  I have reviewed the
14   above and the performance expectations for a WMI
15   administrator and acknowledge my role and
16   responsibilities.  I further understand that failure
17   to follow directives may lead to disciplinary action
18   up to and including termination.
19       Q.  That was presented to Maria by John
20   Wilkinson?
21       A.  Yes.
22       Q.  This was signed by Maria and John Wilkinson,
23   correct?
24       A.  Correct.
25       Q.  When was Go Live?

Page 106

R. KOHN

1      R. KOHN
2        A.  The summer of '16.
3        Q.  July or August?
4        A.  I would have to check some documents to be
5    sure.
6        Q.  Let me see if I can refresh your recollection
7    another way to make it a little easier.
8        A.  Thank you.
9        Q.  So I will quote from the testimony of Melissa
10   Johnson.  I will see if this refreshes your
11   recollection or if you agree with this.
12       "QUESTION:  When did you next meet her?
13       "ANSWER:  I saw her the week of Go Live?
14       "QUESTION:  When was that, approximately?
15       "ANSWER:  I believe July of 2016?"
16   Does that make sense?
17       A.  It was during the summer of 2016.  I would
18   have to look at some documents to try to figure out
19   the Go Live date.  There was a period of time
20   leading up to Go Live where there were trainers
21   there and preparatory issues.  You can imagine in a
22   large facility going from a manual process to an
23   automated process was luminous.  That is why the 40
24   people were there.  So Maria and Melissa could have
25   spent time before the Go Live, surely before the Go

Page 107

R. KOHN

1      R. KOHN
2    Live, and then afterwards, but I would say the
3    summer of '16, and if we need an exact date, we will
4    get one.
5        Q.  When Maria was the inventory control manager,
6    did she have authority to approve any variances in
7    inventory?
8        A.  Yes.
9        Q.  Was there any limit on amount she could
10   approve on variances in inventory when she was the
11   inventory control manager before she became WMI
12   administrator?
13       A.  I do recall during inventories it was a $500
14   threshold.  So I would say the $500 was consistent.
15   That is standard.  That is not just a New York
16   phenomenon.  That is what we ask of the person
17   controlling the books.
18       Q.  Do you know, as you sit here today, whether
19   she was able to approve variances in excess of
20   $5,000 or up to $5,000 before she became the WMI
21   administrator?
22       A.  As opposed to the $500 that I stated?
23       Q.  Correct.
24       A.  That could have occurred.
25       Q.  So your belief that she only had up to $500

Page 108

R. KOHN

1      R. KOHN
2    in variances approval as inventory control manager
3    was based upon your experience in other areas or
4    other facilities?
5        A.  The $500 is standardized across the WMI
6    administrator role.  You are asking the inventory
7    manager role in a manual nonautomated environment.
8    Was it possible she approved write-offs up to 5,000?
9    I think in a manual environment, things were
10   probably harder to track and run down, one of the
11   reasons the company surely wanted to be automated
12   with scanners.  So, of course, it was possible that
13   she wrote off $5,000.  A moment ago I mentioned that
14   she wrote off 1.7 million.
15       Q.  I am talking about not whether she wrote it
16   off.  I am talking about the authority that she had
17   to write off.
18       Did she have authority to write off variance
19   in inventory of up to $5,000 when she was the
20   inventory control manager?
21       A.  If her boss gave her the authority, if John
22   Wilkinson gave her the 5,000 number, then yes.
23       Q.  Do you know if she had authority in excess of
24   $5,000 given to her by John Wilkinson?
25       A.  I would not know.

27 (Pages 105 to 108)

November 22, 2022

Page 109

R. KOHN

1
2    Q. Plaintiff's Exhibit 4, there is one line here
3    that says, The administrator needs to reconcile
4    behind them throughout the day.
5        That was referring to the cycle counters?
6    A. Yes.
7    Q. How would Maria do that?
8    A. This is advice and this is coaching because
9    there are bundles of emails, volumes of emails that
10   show Maria accepted cycle counts that could have
11   been incorrect and were incorrect from her desk.
12   Never walked out on the floor.  Never took a look at
13   it.  Never said or took the matter uphill to her
14   managers and said this is wrong.  She memorialized a
15   bad count.  So this suggests that after the cycle
16   counters count everything systematically in the
17   computer, if you see something that is way off base,
18   that's well outside the norm, that exceeds your
19   guardrail or your authority, take a walk on the
20   floor and take a look at it, put eyes on it, get out
21   there before you validate something and say yes.  We
22   are short or worse case yes, we over and we inflate
23   our inventory.  Go out there and take a look.  Walk
24   behind them.  Them would be the cycle inventory
25   control counters.

Page 110

R. KOHN

1
2        MR. MOSER:  Can you repeat my question,
3    please.
4        (Whereupon, the record was read by the
5    reporter.)
6    Q. How would Maria reconcile behind the cycle
7    counters?
8    A. Walking out there, not sitting at her desk
9    erroneously memorializing bad counts.  The
10   suggestion is, the advice is, the coaching is, when
11   you see something wrong, go take a walk out there on
12   the floor because you cannot fix it from behind a
13   desk.
14   Q. In her prior role, could she fix things from
15   behind a desk?
16   A. No.
17   Q. Did she have a desk in her prior role?
18   A. Yes.
19   Q. Did she have a desk when she was the WMI
20   administrator?
21   A. Yes.
22   Q. Where was that desk located?
23   A. In the warehouse building.  The 345 Underhill
24   Boulevard facility.
25   Q. Where specifically in the building was it

Page 111

R. KOHN

1
2    located?
3    A. Adjacent to the warehouse.
4    Q. Was that an office that was within the
5    warehouse itself or distinct and separate and apart?
6    A. At what point in time?
7    Q. When she first became WMI administrator?
8    A. She was inside what I would refer to as the
9    office environment adjacent to the warehouse, and
10   she was eventually moved into the manager's office
11   of the warehouse putting her more in touch with what
12   was happening on the floor because Maria did not
13   like to go out on the floor.
14   Q. I don't know how familiar you are with the
15   WMI administrator system.  Unfortunately, through
16   testimony I am painfully aware of it, but I don't
17   want to put words in your mouth.
18       If there was a particular variance at a
19   location, meaning the amount that the cycle counter
20   counted as being in that location was in excess of
21   $250, would that count automatically be rejected by
22   the system?
23   A. No.  It would go into what I would call a
24   maintenance queue where someone would have the
25   availability, the opportunity to go in and check

Page 112

R. KOHN

1
2    that.
3    Q. How would the individual check that?
4    A. Walk out there and, you know, in WMI terms,
5    put you eyes on it.  Take a look at it.
6    Q. Was that Maria's job?
7    A. No.  It was her job to assign the work, to
8    look at variances, to make sure our WMI inventory
9    matched our Sapphire system of record and at the end
10   of each day to have them as close as possible to the
11   same number.  If that meant walking out to a
12   location because something seemed erroneous, then
13   the task was to walk out to that location and put
14   her eyes on it.
15   Q. When WMI was first implemented, how many
16   locations were being counted per day?
17   A. It varies.  Again, cycle counters or guests
18   from other parts of the country could not really go
19   into the system during production, so cycle counts
20   only occurred postproduction, and, naturally, when
21   you put a new system on production lengthened a
22   little bit as people got used to the scanning.  So
23   there was a shortened window of cycle counting, and
24   there was a prescribed number of items that should
25   be counted a day, whether they were aisles in the

28  (Pages 109 to 112)

Page 113

R. KOHN

1
2   warehouse, bulk locations, pick modules.  I think on
3   of the memos we read together earlier on Exhibit 4,
4   it gave a schedule on what made sense what to count
5   two or three times a week.
6       Q.  How many square feet was the Syosset office
7   at the time of Go Live?  Was it 375,000 square feet,
8   approximately?
9       A.  Yes.
10      Q.  Just to put that into perspective, that is
11  about six and a half football fields, right?
12      A.  Okay.
13      Q.  Not all of the locations are at ground level,
14  are they?
15      A.  That is correct.
16      Q.  What percentage of the locations are above
17  ground level?
18      A.  Roughly half.
19      Q.  When we talk about a location, it is a
20  physical location in the warehouse, correct?
21      A.  Yes.
22      Q.  That is actually a rack?
23      A.  It could be, not always, but it could be.
24      Q.  In the main part of the warehouse, is it
25  usually a rack, a storage rack?

Page 114

R. KOHN

1
2       A.  There are different configurations.  Racking
3   is one of them.
4       Q.  How many locations high is the highest part
5   of the warehouse?
6       A.  Four or five locations high.
7       Q.  How high off the floor is the highest part of
8   the warehouse, approximately?
9       A.  The highest product or the roof?
10      Q.  The highest product?
11      A.  20 something feet, 25 feet.
12      Q.  How many locations are in the warehouse?
13      A.  If you include the bottle locations, tens of
14  thousands.
15      Q.  And under WMI, did each location have to be
16  counted within a certain window of time?
17      A.  It is preferable that if there is a short
18  shipment of a miss pick, the administrator would
19  direct someone to go there and say, We shipped the
20  wrong product.  Go check that location.  That would
21  be an exception check.  Normally, on Exhibit 4 you
22  want to count pick lines a few times a week.  You
23  want to count the racks a couple of times a week.
24  Ideally, you would count the warehouse; ideally,
25  four times a year.

Page 115

R. KOHN

1
2       Q.  Is it fair to say for the purposes of
3   inventorying that it was good practice to count each
4   location in this warehouse one per quarter, at least
5   once per quarter?
6       A.  That would be good practice.  Some locations,
7   like pick lines, should be counted several times a
8   week.
9       Q.  Would Maria be responsible for checking the
10  pick lines as well if for some reason there was a
11  variance on the pick lines?
12      A.  As details in Exhibit 4?
13      Q.  Yes.
14      A.  Go out there and put eyes on it, sure.  If
15  something was gravely out of balance, yes.
16      Q.  Correct me if I'm wrong, but my understanding
17  of this is that even if she finds a discrepancy, she
18  is only allowed to approve a variance of up to $500;
19  is that correct or incorrect?
20      A.  Yes.  That is good practice.  $500 in an
21  automated WMI system is the standard.
22      Q.  So how many counts were being put into the
23  que by WMI when it was first implemented?  In other
24  words, how many times was a cycle counter going to a
25  location and the system is showing that the variance

Page 116

R. KOHN

1
2   is greater than $250?
3       A.  At startup?
4       Q.  Yes.
5       A.  It would be quite often.
6       Q.  Then what was Maria's role after it is put
7   into the queue because the variance was in excess of
8   $250?
9       A.  I said $500.  You are saying $250.
10      Q.  Okay.  So let's not go to the specific
11  amount.
12          Is it your understanding that the system
13  would re-queue, when I say re-queue, ask you to
14  recount a particular location if there was a
15  variance in excess of $250?  I am not talking about
16  this particular exhibit when we take about Exhibit 4
17  or Exhibit 30.  I am talking about the way WMI
18  worked.
19          Did it work that if a cycle counter went to
20  a location, if the count and the variance was in
21  excess of $250, that it would automatically be
22  re-queued for recounting?
23      A.  Yes.
24      Q.  Did Maria have any role in that at all, the
25  recounting?

29  (Pages 113 to 116)

Page 117

R. KOHN

1
2  A. Physically recounting?
3  Q. Correct.
4  A. No.  She would assign the work to be
5  recounted.  The solution there is go make the
6  adjustment and fix it and you won't have to go back
7  there again.
8  Q. Let's say she assigned a particular cycle
9  counter to recount a location and the system kicks
10  it back again because it is in excess of $250.
11  Was she expected to get eyes on the
12  merchandise then?
13  A. If there was a repetitive problem, it would
14  surely make sense to go take a walk and take a look
15  at it or dispatch another cycle counter to go count
16  it.
17  Q. Well, let's say the first cycle is performed
18  by one cycle counter, the second cycle is performed
19  by another cycle counter and the variance is still
20  in excess of $250, was she supposed to go out on the
21  floor and actually get eyes on the merchandise at
22  that point?
23  A. Yes.  It was her job to right size the
24  inventory and to manage the process, and if that
25  meant getting up out of her desk and walking onto

Page 118

R. KOHN

1
2  the floor, that is a reasonable ask.
3  Q. Do you know how many locations were showing
4  up with a variance in excess of 250 when WMI was
5  first implemented on a daily basis?
6  A. No.
7  Q. Do you know how many locations in the
8  warehouse on a daily basis were being rejected a
9  second time because the variance was in excess of
10  $250?
11  A. Today, no.
12  Q. At the time the system was implemented, it
13  would have recorded who did the initial count?
14  A. Yes.
15  Q. It would have recorded who did the recount?
16  A. Yes.
17  Q. It would show how many locations were counted
18  twice and still showed a variance in excess of $250?
19  A. It would have shown each count.
20  Q. It would have shown each count, and it would
21  have known the variance was in excess of $250?
22  A. That would have been the default, but yes, it
23  would show each count.
24  Q. When Maria entered a count using her RF gun,
25  would that also register in the system?

Page 119

R. KOHN

1
2  A. I believe so, yes.
3  Q. Does Southern have any records showing the
4  number of locations counted by any cycle counters
5  during the time period Maria was WMI administrator?
6  A. I wouldn't think the log would extend five
7  plus years.
8  Q. Does Southern have any documents showing the
9  number of locations that were counted by Maria on a
10  daily basis when she was WMI administrator?
11  A. I don't think documents would exist from five
12  or six years ago.
13  Q. Do you have any idea how much time it would
14  have taken to get eyes on each location that had
15  been rejected twice because of a variance in excess
16  of $250 when Maria became the WMI administrator?
17  A. I would think after Go Live there would be
18  much more time spent.  I think if you asked me today
19  the amount of times someone has to back and check
20  something, it would be minimal.
21  Q. But at the beginning of Go Live, it was much
22  higher?  Is it fair to say that?
23  A. Yes.
24  Q. Do you have any idea how long it would take
25  Maria to get eyes on each location that had been

Page 120

R. KOHN

1
2  twice rejected because of the variance?
3  A. I would say more than the norm, but when
4  there is a startup for a Go Live, that is the
5  expectation.  It is all hands on deck, and surely it
6  was more time than it would be post Go Live.
7  Q. But you don't know, for instance, whether the
8  cycle counters were counting 100 locations a day
9  each or 150 locations a day each?
10  A. No, but there is reference to Plaintiff's 28
11  on August 4, 2016, that shows we had a cycle counter
12  count two items in three hours.  That is absurd.
13  Q. Is Mr. Vey still employed by Southern?
14  A. Yes.
15  Q. It's good to be human.
16  Now, do you know whether the number of
17  locations where the count had been rejected twice
18  when Maria became the WMI administrator was more
19  than 100 locations day?
20  A. I don't know the number, but I would say that
21  would have been the high point post Go Live.
22  Q. What about for the months following Go Live?
23  A. I think Maria had some performance issues.
24  Maria had performance issues many years throughout
25  her tenure at Southern.  It started well before the

30 (Pages 117 to 120)

Page 121

R. KOHN

1  WMI Go Live.  I think the WMI Go Live highlighted
2  some deficiencies in Maria's work.  So to suggest
3  the inventory immediately got better after Go Live
4  would be less that factual because Maria's
5  performance suffered throughout 2016 and 2017.
6     Q.  In the months immediately following Go Live,
7  how many locations per day did she need to get eyes
8  on to do her job?  Was it more or less than 100?
9     A.  We don't have that record today from five
10  plus years ago to determine what that figure is.
11     Q.  The cycle counters, is it fair to say that
12  discipline over the cycle counters went through
13  Barry Finkelstein once Maria became the WMI
14  administrator?
15     A.  No.
16     Q.  At some point did discipline over the
17  Southern counters go through Barry Finkelstein when
18  Maria was the WMI administrator?
19     A.  No.  I think discipline over the cycle
20  counters went to Barry Finkelstein after Maria
21  Suarez was no longer with the organization.
22     Q.  Just to clarify, at all times during her
23  employment with Southern, Maria had both supervisory
24  and disciplinary authority of the inventory control

Page 122

R. KOHN

1  team?
2     A.  I think we talked about this earlier.  Barry
3  Finkelstein was the shift manager.  It's like the
4  captain of a boat.  You let the captain know what
5  goes on on the boat, and Barry Finkelstein was the
6  highest ranking person on during days at the
7  facility.  So Maria would have conferred with him,
8  discussed with him the same way John Wilkinson would
9  have went to Kevin Randall.  It is a courtesy and it
10  is a respect issue to let other people know what is
11  going on with the workforce.
12     Q.  Did Maria have disciplinary authority over
13  the members of the inventory control team when she
14  worked at Southern?
15     A.  Can you elaborate on disciplinary authority.
16     Q.  Well, it is a term that I didn't use.  It's a
17  term I asked another witness, and it is referred to
18  in one of these documents that discipline goes to
19  Barry Finkelstein.
20     So what does Southern mean by discipline?
21     A.  I think we also talked earlier that human
22  resources is part of most disciplinary meetings and
23  functions, has been, and if Maria wanted to
24  discipline an inventory control clerk, she would

Page 123

R. KOHN

1  have went to a manager.  It could have been Barry.
2  It could have been John Wilkinson.  It could have
3  been Dina.  It could have been Beth Toohig.  They
4  would talk about a situation and discipline would
5  have been the result.
6     Q.  Did she have to go through Barry Finkelstein,
7  John Wilkinson, or anyone else to issue discipline
8  before she became the WMI administrator?
9     A.  Everyone goes through someone else including
10  me.
11     Q.  What does it mean when a manager who has
12  disciplinary authority versus a manager who does not
13  have discipline authority?
14     A.  Are you suggesting the differences is
15  terminating, hiring and firing?
16     Q.  No.  It is simply a question.
17        MS. CABRERA:  Just answer the question.
18     A.  If someone has discipline authority, they can
19  recommend or impose discipline on their subordinate.
20     Q.  What about a manager who does not have
21  discipline authority?
22     A.  I think just by the suggestive nature of a
23  manager they have disciplinary authority.  If you
24  are a manager, you are managing people or processes.

Page 124

R. KOHN

1  You have some form of disciplinary authority over
2  others beneath you.
3     Q.  Was there ever a time that Maria was a
4  supervisor of the inventory control team but did not
5  have discipline authority over them?
6     A.  There could have been.  They were unionized
7  counters, and because they were unionized counters,
8  it would be obvious that she would have to go to
9  someone else before imposing discipline or before
10  triggering some kind of discipline.  We have a
11  relationship with the union, and we would not have
12  someone doing something outside the scope of what we
13  would we want.  They would be working with a manager
14  or human resources.
15     Q.  So did the nature of Maria's discipline
16  authority over the inventory department, did that
17  change at all in any way from the time her
18  department went union until she separated from
19  employment?
20     A.  As Maria's performance declined in 2016
21  throughout 2017, I think Maria had more support from
22  other people, namely, John Wilkinson, and probably
23  coached her through any kind of exchange with the
24  union staff, and maybe his involvement overshadowed

31  (Pages 121 to 124)

November 22, 2022

Page 125

R. KOHN

1
2  her authority because again there is volumes of data
3  and emails showing her performance declining, and I
4  think John Wilkinson was probably more interested in
5  getting her through this eminent crisis, having her
6  maintain her position than giving her the authority
7  to recommend or impose discipline.
8      Q.  And how did it change in 2016 to 2017?
9      A.  I'm not sure what the question is.  How did
10 it change?
11     Q.  How did the nature of her disciplinary
12 authority change in 2016 to 2017 when she was
13 getting more support from John?
14     A.  I am suggesting that Maria was failing badly,
15 poorly.  She was put on a performance improvement
16 plan in January 2017.  She had her expectation
17 meeting three months prior in September 2016, and
18 she was failing, across the board failing.  It got
19 to the point I am suggesting that John absorbed some
20 of her other duties like imposing discipline on the
21 union staff because at that time she was probably
22 seen as not capable of doing it.
23     Q.  Can you list for me all the reasons why Maria
24 was selected to be the WMI administrator?
25     A.  I think we covered this.  She applied for the

Page 126

R. KOHN

1
2  role.  The manager was the same in the new role.
3  The WMI administrator reported to John Wilkinson.
4  So she would have had a common manager.  She had the
5  qualifications to take on that new role.  She was
6  what I would refer to as the incumbent in the manual
7  processing of the perpetual inventory, and the only
8  change would have been we went from a manual
9  environment to a more automated systematic
10 environment, and Maria would have been the natural
11 fit; and since she applied, it made sense to award
12 her that role, which was a promotion with an
13 expanded responsibility and expanded staff.
14     Q.  If she had not applied for that position,
15 what would have happened?
16     A.  The old position went away.  There would have
17 been no role.
18     Q.  So was it fair to say her position was
19 eliminated?
20     A.  No.  The new position was upgraded and she
21 applied for a new role and she received a promotion
22 with a pay increase and more responsibility.
23     Q.  However, her old role as inventory control
24 manager, is it fair to say that that particular
25 position was eliminated?

Page 127

R. KOHN

1
2      A.  Yes.
3      Q.  So her choices were either apply for the new
4  role or separate from employment or find another
5  location within the company?
6          MS. CABRERA:  Objection to the form of
7      the question.
8          You can answer.
9      A.  The company posts jobs routinely.  Maria
10 volunteered a posting for WMI administrator.  She
11 was awarded that job with a promotion and expanded
12 responsibility and increased compensation.  It was a
13 good thing for Maria to get that role.
14     Q.  I can see what a good thing for her it was.
15         MS. CABRERA:  Objection.
16     Q.  Did she volunteer to apply or was she told to
17 volunteer to apply?
18     A.  When people post for a job, it does not say I
19 was told to apply for a job or I volunteered for
20 this position.
21     Q.  So no one ever told her to apply for this
22 job?
23     A.  I would not know that.
24     Q.  No one told her that her job was going to be
25 eliminated?

Page 128

R. KOHN

1
2      A.  I would not know that.
3      Q.  There had been litigation by certain women in
4  the inventory control department against Southern,
5  correct?
6      A.  Yes.
7      Q.  Those consisted of federal lawsuits, correct?
8      A.  Yes.
9      Q.  Did Maria have any role in these women coming
10 to believe that they had a grievance with Southern?
11     A.  Could you repeat that.
12         MR. MOSER:  Can you read that back,
13     please.
14         (Whereupon, the record was read by the
15     reporter.)
16     A.  I don't believe so.
17     Q.  Did she ever arrange for any meetings between
18 her staff and human resources?
19     A.  Personally, I do not know, but when we talked
20 about Exhibit 28 earlier where the inventory control
21 clerks went to Barry Finkelstein wanting to go to
22 HR, I am assuming that must be a similar situation.
23     Q.  Did Maria ever indicate to Southern that she
24 believed that the individuals in her department were
25 classified differently based upon sex?

32  (Pages 125 to 128)

Page 129

R. KOHN

1
2    A. I think I saw your document in preparing for
3  the deposition where Maria was asked did the union
4  feel that way and her answer was I wouldn't know.
5    Q. So at any time did Maria ever inform anyone
6  at Southern that she believed that her department
7  was classified differently based upon sex?
8    A. Not that I am aware of, but again, the
9  department was a union department.  The jobs are in
10  the collective bargaining agreement.  The collective
11  bargaining agreement prescribes their clerical jobs,
12  which is not non warehouse work.  I know that
13  Exhibit 28 points to the desire of the inventory
14  team to be paid as warehouse workers, not as
15  clerical.  So it sounds like a common theme, but the
16  company and the union engage in collective
17  bargaining, and collective bargaining is just that.
18  It is that bargaining between the union and the
19  company where individual agreements are prohibited.
20  So if the cycle counter or inventory control clerks
21  desired to change their classification or to have
22  conversations with other employees about testing the
23  water to see if there was an appetite to change
24  their classification, that would be a prohibited
25  event because they are a part of a collective

Page 130

R. KOHN

1
2  bargaining unit, which clearly states the cycle
3  counters are clerical by classification.
4    Q. The collective bargaining agreement says that
5  cycle counters are clerical?
6    A. Yes.
7    Q. When was the collective bargaining agreement
8  changed?
9    A. I think the cycle counters were listed as
10  clerical after the cycle counters sued the union and
11  the cycle counters were always clerical by
12  classification.  I think on advice of counsel, union
13  counsel, it was inserted into the collective
14  bargaining agreement to protect the union moving
15  forward because it needed to be expressly written
16  that the cycle counters were clerical by
17  classification, not warehouse by classification.
18    Q. So just to clarify, after the cycle counters
19  sued the company and union for sex discrimination,
20  the collective bargaining agreement was changed to
21  protect the union, and it specifically states now
22  that cycle counters are not warehouse employees;
23  they are clerical employees?
24    A. I think that is close.  I think the
25  collective bargaining wasn't changed.  It was

Page 131

R. KOHN

1
2  clarified.  The cycle counters were and remain
3  clerical in nature from the time they were in the
4  union, which I think was 2007 or 2008.  Back at that
5  point, they were clerical, and that is based on a
6  35-hour workweek with a certain pay structure.  As
7  opposed to warehouse workers, which are a 40-hour
8  workweek with a different pay grade.
9    Q. I don't want to get into this too much, but
10  we will delve into it slightly.
11    That collective bargaining agreement you are
12  referring, does it describe the duties of a clerical
13  employee?
14    A. Duties, no.  I believe it calls out the
15  title, talks to work hours, shifts.
16    Q. Does that collective bargaining agreement
17  describe the duties of a warehouse employee?
18    A. No.  It calls out pay ranges,
19  classifications, shifts, start times, hours.
20    Q. It simply states that clerical workers are
21  workers that work a 35-hour workweek and
22  warehousemen are workers that work a 40-hour
23  workweek, correct?
24    A. That is part of what it says, yes.
25    Q. Who decided who worked the 35-hour workweek?

Page 132

R. KOHN

1
2    A. Could you clarify the question?  I'm not sure
3  what you mean.
4    Q. How did you decide who was going to work a
5  35-hour workweek and who is going to work a 40-hour
6  workweek?
7    A. Warehouse workers worked a 40-hour workweek.
8  Clerical employees, whether they are in the office
9  or the warehouse that are clerical in nature, work
10  35 hours a week.  The 35-hour-a-week employees
11  benefited greatly when raises came around.  I will
12  give you an example.  If a warehouse person received
13  a dollar an hour increase $40 a week, it came out to
14  be a dollar an hour.  If a 35-hour-a-week employee
15  received a dollar, it came out to be a dollar and 12
16  and a half cents as opposed to the dollar.  So
17  across the board when the company agreed to certain
18  union demands, they were carried equally against the
19  clerical and the warehouse staff benefitting the
20  clerical staff.
21    Q. Before the clerical staff were included in
22  the collective bargaining agreement, how long was
23  their workweek?
24    A. The clerical staff was always included in the
25  collective bargaining agreement.

33  (Pages 129 to 132)

Page 133

R. KOHN

1
2    Q. Before the inventory control department was
3    included in the collective bargaining agreement, how
4    long was their workweek?
5    A. I would suppose prior to them going into the
6    union in 2007 or 2008, they probably worked 40 hours
7    a week.
8    Q. So there were employees who worked a 40-hour
9    workweek, who were told you are working a 35-hour
10   workweek, correct?
11   A. They joined the union. They were part of a
12   collective bargaining agreement. Their work was set
13   for them based on a union contract.
14   Q. Who decided who was going to work 35 hours
15   and who was going to work 40 hours?
16   A. Warehouse workers work 40 hours. Clerical
17   workers work 35 hours.
18   Q. Who decides if an employee is going to work
19   35 or is going to work 40. Once these new
20   individuals became part of the union, who decided
21   who was going to be a 35-hour-workweek employee and
22   who was going to a 40-hour-workweek employee?
23   A. After they became part of the union, they
24   would have all worked 35 hours a week.
25   Q. At the time they went union, the company and

Page 134

R. KOHN

1
2    the union decided they would all have the clerical
3    classification; is that fair to say?
4    A. Yes.
5    Q. You are aware that Southern has never hired a
6    female into the warehouse classified position for
7    the past 10 years; is that fair to say?
8    MS. CABRERA: Objection.
9    A. I can answer that. People are hired after
10   they apply for positions. If no females apply for a
11   warehouse position, they could not have been
12   selected. I think I can answer your next question
13   without you asking it. I won't. I will let you ask
14   it.
15   Q. How do you know that any woman didn't apply
16   for the warehouse position? How do you know there
17   were no female applicants?
18   A. I think our human resource came out with that
19   data in a previous litigation or claim. Anyone
20   hired into the warehouse to start on the nights. So
21   regardless of who applies, man or woman, they must
22   start at night.
23   Q. Are you aware that Beth Toohig testified that
24   the women who applied for the warehouse
25   classification were disqualified because they didn't

Page 135

R. KOHN

1
2    have warehouse experience?
3    MS. CABRERA: Objection.
4    A. No, I am not aware of that. I am aware that
5    one of the cycle counters at one point applied for a
6    warehouse role and withdrew her application once she
7    knew she had to work nights according to the union
8    contract.
9    Q. The union contract says they have to work
10   nights?
11   A. Absolutely. Seniority prevails at all time.
12   Q. That is not my question about seniority.
13   My question is: Does the collective
14   bargaining agreement say that new employees have to
15   throw cases at night?
16   A. The collective bargaining agreement people
17   bid by position. The favorable position is to be on
18   days. The least favorable is to work at night. New
19   people end up working at night. That is where you
20   start. If a new person started on a different
21   shirt, somebody with more seniority would have claim
22   for that role because they were bypassed.
23   Q. Are you aware that prior warehouse experience
24   is actually not a qualification, a requirement to
25   get a warehouse classified position?

Page 136

R. KOHN

1
2    A. That is something I have never heard before.
3    Q. Does Southern take claims of discrimination
4    seriously?
5    A. Yes.
6    Q. Do they take steps to prevent discrimination
7    in any form?
8    A. Absolutely.
9    Q. Do they take steps to prevent discrimination
10   on the basis of sex?
11   A. Yes.
12   Q. What about in terms of retaliation?
13   A. Of course.
14   Q. Are you familiar with what was alleged in the
15   Fajous litigation?
16   MS. CABRERA: Objection. You are getting
17   very close to a topic that we got a
18   protective order. So you are teetering. I
19   am also going to say you spent about 15, 20
20   minutes discussing a collective bargaining
21   agreement that is not part of this case,
22   talking about claims that are not part of
23   this case, and we are five hours into this
24   deposition, and that is what we are wasting
25   time on. You can continue.

34 (Pages 133 to 136)

Page 137

R. KOHN

1
2    A. I am not familiar today with all the
3    specifics of the Fajous case.
4    Q. Are you specific with the generalities of it?
5    A. Please refresh me.
6    Q. The generalities are the inventory control
7    clerks spent time on the warehouse floor. They
8    moved up to five cases per location. They wore
9    harnesses. They used cherry pickers. They were
10   exposed to the same risks as the warehousemen. They
11   did counting, which is something similar to what the
12   checkers did, and they alleged they were doing
13   similar work to many warehousemen but were not
14   getting classified in the contract as warehousemen
15   and were not receiving warehouse pay. That is a
16   summary of that.
17   A. Okay.
18   Q. Following that litigation, the first question
19   is: Do you think that Southern has the capacity to
20   be honest with itself regarding whether it is
21   discriminating or retaliating against employees?
22   MS. CABRERA: Objection.
23   Answer the question.
24   A. That is, forgive me, absurd. Southern
25   employs almost 25,000 people. Southern has family

Page 138

R. KOHN

1
2    values, and it goes out of its way to protect its
3    employees at all times. So yes, Southern has the
4    ability to be honest with themselves.
5    Q. That is regardless of whether it is a claim
6    for equal pay or sex discrimination as alleged by
7    the women who worked for Maria or whether it is
8    Maria's actual claim of retaliation; is that fair to
9    say?
10   A. Southern investigates all claims.
11   Q. And comes to a conclusion not based upon what
12   is in Southern's best interest but what is in the
13   best of Southern's employees?
14   A. Southern always does the right thing.
15   Q. And the right thing would be what is in the
16   best interest of the employees; is that fair to say?
17   A. Southern always does the right thing. I'm
18   not sure of where you are going. If you are
19   referring to a prior case or these four people or
20   current or past lawsuits or claims, Southern and
21   Union 1 operate under a collective bargaining
22   agreement. We are bound by the terms of the
23   agreement. Our employees waive the right to
24   individual agreements. When they sign the card and
25   join the union, they are part of a collective

Page 139

R. KOHN

1
2    bargaining agreement. They know what their position
3    is, what their pay scale is, what their hours of
4    operations are, what the opportunities for
5    advancements are. Any one of these inventory
6    control cycle counter individuals could have gone
7    into the warehouse, progressed up through the ranks
8    like any other individual that was hired there.
9    They opted not to and they could have, and the
10   one person I am aware of who put their name in for a
11   warehouse position withdrew their name.
12   Q. I am going to show a document that was
13   previously marked Exhibit 17.
14   Have you ever seen that document before
15   today?
16   MS. CABRERA: I am going to note my
17   objection. I objected to 17 when it was
18   first given to a prior witness. I will renew
19   that objection. This is not a document that
20   has been exchanged in this case. This is a
21   document from a prior case that plaintiff
22   counsel continues to try and ask questions
23   about, but it is not a document in this case,
24   and we will move to strike this and any
25   documents presented to witnesses that have

Page 140

R. KOHN

1
2    not been exchanged in discovery before August
3    of this year.
4    You can answer whatever questions he
5    asks.
6    A. No. The document is not familiar to me.
7    Q. Who is Justin Vey?
8    A. Cycle counter inventory control clerk.
9    Q. What is this document?
10   A. It is titled New Hire Notice.
11   Q. According to this document, what is Mr. Vey's
12   title?
13   A. Warehousemen Night.
14   Q. Do you know why it says that?
15   A. It must be an error because Justin Vey was
16   hired on days as a cycle counter.
17   Q. So this was simply a clerical error?
18   A. There is no other explanation for Mr. Vey
19   being titled a warehouse person at night?
20   Q. None?
21   A. I don't believe Mr. Vey ever worked at night.
22   Q. Do you recognize the signature in the lower
23   left-hand corner?
24   A. I am trying to figure out who that is. It
25   says human resources but I don't know.

35 (Pages 137 to 140)

Page 141

R. KOHN

1
2     Q. Do you know if it is Greg Rizzly?
3     A. Well, Rizzly L-Y, and this doesn't. I don't
4  know.
5     Q. So can you list for me all of the reasons why
6  Maria was selected for elimination as part of the
7  statewide reduction enforce program?
8     A. Yes. In early 2018 Southern went through a
9  process of looking at internal controls,
10  streamlining operations, eliminating positions under
11  the guise of protecting the company from expenses,
12  scaling back a bit. There were a couple of criteria
13  used when we looked at the employees and the
14  positions that could have been eliminated, and there
15  were 26 positions in New York State that were
16  eliminated in April-ish of 2018. Five of them came
17  from the operations group, and the positions that
18  were looked for were ones that could be eliminated
19  where the work could go to other employees without
20  the need to backfill that role. Ultimately saving
21  money for that position. Another criteria was job
22  performance. Who is good at their job, who is poor
23  at their job, who could do different work if they
24  were to absorb other people's roles, and the WMI
25  administrator role was a good candidate for job

Page 142

R. KOHN

1
2  elimination and, ultimately, the role was
3  eliminated, and this was Maria Suarez's role. Her
4  work went to Tonisha Durant and to Barry
5  Finkelstein. It was not backfilled, and since her
6  job performance was degrading and suffering, got
7  through a very difficult 2017. On a performance
8  improvement plan considering her belligerent
9  difficult attitude with the 40 folks who came to
10  help with the Go Live process, her role was one that
11  was chosen to eliminate.
12     Q. Are there any other reasons why she was
13  selected for elimination?
14     A. It was jobs that could be eliminated with the
15  work absorbed by other employees and with a look at
16  performance.
17     Q. Now, did you receive any instructions
18  regarding the implementation of this elimination
19  program from any one of your managers?
20     A. No. There was notification that New York was
21  slated to reduce 26 roles.
22     Q. How many roles were there in the State of New
23  York to select from?
24     A. Roughly 1500.
25     Q. The instructions that you received were

Page 143

R. KOHN

1
2  simply to eliminate 26 people?
3     A. In an effort to streamline the company to
4  increase efficiencies and to eliminate expense, the
5  request was to consolidate and fold 26 roles.
6     Q. Was the specific instruction simply to
7  eliminate 26 roles?
8        MS. CABRERA: Objection.
9        You can answer.
10     A. Yes. To work with human resources and the
11  legal team, identify 26 roles that could be
12  collapsed and do it correctly.
13     Q. When were you notified of the requirement
14  that you eliminate 26 roles?
15     A. It was in early 2018.
16     Q. How much time were you given to eliminate
17  these individuals?
18     A. I think the people that were identified and
19  were terminated in April, April 6th
20  or April 8th, so it would have probably been
21  90 days.
22     Q. Did you receive a list of individuals to let
23  go?
24     A. I'm not sure. I don't understand the
25  question.

Page 144

R. KOHN

1
2     Q. Were the 26 people chosen for you?
3     A. The 26 people were chosen. The 26 positions
4  were identified that could be closed. The operation
5  staff that I am responsible for had five of those 26
6  positions.
7     Q. Were the specific positions that would be
8  eliminated relayed to you?
9     A. Yes.
10     Q. Was Maria's position one of those positions?
11     A. Yes.
12     Q. Are there any documents which show the
13  considerations that went into selecting Maria's
14  position for elimination?
15     A. I don't believe so. I think the
16  corresponding managing staff identified people
17  within their organization, and in this case Kevin
18  Randall identified five people in Metropolitan New
19  York.
20     Q. Just so we are clear, the instructions that
21  you got from the higher ups, were the specific roles
22  that should be eliminated communicated to you?
23     A. No.
24     Q. They were not?
25        MS. CABRERA: Objection. Are you asking

36 (Pages 141 to 144)

Page 145

R. KOHN

1
2    a question?  Are you having a conversation?
3    What are you doing here?
4    A.  Are you asking if we were told who to
5    eliminate?
6    Q.  Yes.
7    A.  No.
8    Q.  Were you told which roles to eliminate?
9    A.  No.
10   Q.  Were you told which positions to eliminate?
11   A.  No.
12   Q.  So you were just told eliminate 26 people,
13   any 26 people; is that fair to say?
14       MS. CABRERA:  Objection to the form of
15   the question.
16       MR. MOSER:  I am trying to understand.
17   A.  No.  I tried this once.  I will try it again.
18   The company was going through a cost savings
19   initiative.  It was trying to streamline operations.
20   It was trying to become more efficient and better
21   managed and run.  The company did calculations and
22   came up with the number of 26 roles to eliminate in
23   New York.  Of the 26 roles, five happened to be in
24   operations.  After looking at roles that could be
25   collapsed, with a couple of criteria, what could be

Page 146

R. KOHN

1
2    collapsed that had work that could be distributed to
3    other employees and not have that vacated role
4    backfilled considering job performance go through
5    your list of people and come up with in New York 26
6    roles.  In operations, five were determined to be
7    viable.
8    Q.  Did corporate also tell you what percentage
9    should be in operations versus other areas or no?
10   A.  No.  Everyone went through their group of
11   people, looked at roles that could be collapsed
12   where the work could be distributed to other
13   employees considering job performance.
14   Q.  What was the net income from New York
15   operations in 2017?
16   A.  I am not comfortable disclosing that.
17   Q.  Well, if there is a cost-saving measure --
18   A.  Are you asking how much money the company
19   made in 2017 or what shedding 26 roles saved the
20   company?
21   Q.  No.  I am asking you how much net income the
22   company earned from New York operations in 2017.  If
23   you want, we can mark this portion of the transcript
24   confidential.
25       MS. CABRERA:  It is also not part of the

Page 147

R. KOHN

1
2    30(b)(6), so you can testify as Roy as a fact
3    witness, if you know, but you are not
4    testifying to that as a --
5       MR. MOSER:  He can say he doesn't know.
6    That is fine.
7    A.  I am not comfortable putting on the record
8    what the company made in any period of time.
9    Q.  I know you are not comfortable.
10       How much money did the company earn net
11   income in 2017?
12   A.  I don't know today.
13   Q.  You have no idea?
14   A.  No.  Today I don't know.
15   Q.  Today you don't know?
16   A.  Yes.
17   Q.  Can you say whether it was more or less than
18   a hundred million dollars?
19   A.  Significantly less.
20   Q.  Was it more or less than fifty million
21   dollars?
22   A.  I am not going to play the guessing game.  I
23   am not comfortable with this conversation.
24   Q.  Why are you not comfortable with it?  What
25   about the net income from a company --

Page 148

R. KOHN

1
2    A.  This is a family owned company.  If it was a
3    Fortune 500 company, you can go online and find that
4    out.  This is a family owned company that is owned
5    by individuals, and they don't disclose that type of
6    information.
7    Q.  Is it fair to say there was an profit from
8    New York operations in 2017?
9    A.  It is marginal.  It is nothing that you are
10   imagining.  You came out with a hundred million
11   dollars and fifty million dollars.  It is nowhere at
12   all in that realm.
13   Q.  Well, what it is then?
14   A.  I just told you I am uncomfortable and I do
15   not know the number today.
16   Q.  What was the total payroll paid to the
17   1800 individuals?
18   A.  I said 1500.
19   Q.  What was the total payroll for the 1500?
20   A.  I don't know the number today.  I can
21   approximate a number for you, but I don't know the
22   number today.
23   Q.  What is your best approximation?
24   A.  $150 million.
25   Q.  How much money was saved by the 26 layoffs on

37  (Pages 145 to 148)

Page 149

R. KOHN

1              R. KOHN
2  an annual basis?
3     A.  Five or six million.
4     Q.  Now, how much money did Southern save from
5  eliminating Maria on a yearly basis?
6     A.  An all-in number with benefits SUDA, FEUDA,
7  taxes, workers' compensation, health care, 401K,
8  $125,000.
9     Q.  Now, what analysis, if any, was done with
10  regard to the capacity to reduce the work force in
11  New York by 26 before you received those
12  instructions?
13        MS. CABRERA:  Objection.
14     A.  I'm not sure of the form of the question.  I
15  think you are asking were we targeting a number.
16     Q.  Well, how did Southern come up with the
17  number of 26?
18     A.  Southern was looking to save a certain amount
19  of money in New York.  This was an initiative to
20  save money.
21     Q.  I understand that.
22     How did they come up with the number of 26?
23     A.  My assumption is they took an average rate,
24  an all-in rate, to come up with an all-in figure and
25  my estimate of the all-in figure number was five to

Page 150

R. KOHN

1              R. KOHN
2  six million dollars.
3     Q.  What was the impetus behind this initiative
4  to save money?
5     A.  To save money.
6     Q.  Would that increase the profits?
7     A.  When companies are left unchecked for long
8  periods of time, employment always grows, and every
9  once in a while, companies need to look at
10  themselves and scale back or cut back; and as I
11  stated, in early 2018 the company came up with an
12  initiative to streamline itself to increase
13  productivity in avenue of expense reduction.
14     Q.  Do you have any knowledge of what went into
15  arriving at that specific number of 26?
16     A.  No, other than the company was targeting
17  savings.
18     Q.  Did they tell you salary ranges of the
19  individuals who had to be let go?
20     A.  No.
21     Q.  They just said eliminate 26?
22     A.  Yes.
23     Q.  In terms of being a manager, was Maria one of
24  the more highly paid managers?
25     A.  No.

Page 151

R. KOHN

1              R. KOHN
2     Q.  Was she one of the lowest paid managers?
3     A.  No.
4     Q.  So when you actually went to select the
5  individuals, did you go for the maximum savings to
6  the company?  Was that a factor?
7        MS. CABRERA:  Objection.
8        You can answer.
9     A.  I did not select the individuals.
10     Q.  When the individuals were selected, was the
11  total savings to the company a factor?
12     A.  There were a couple of criteria used to
13  select the individuals.  One was, can we live
14  without that position?  Could we take a position,
15  collapse it, save that money, and give that work to
16  other employees without skipping a beat?  That was
17  the driver.  Was there something we could eliminate
18  and give the work to other people?  The secondary
19  criteria was job performance.
20     Q.  But the total amount to be saved, in other
21  words, the individual's total income that would have
22  been saved was not a factor; is that correct?
23        MS. CABRERA:  Objection.
24        Answer it again.
25     A.  The company was looking to eliminate a

Page 152

R. KOHN

1              R. KOHN
2  certain number of people to save money to reduce its
3  expenses.  There were people on the list that made
4  significantly more money than Ms. Suarez, and there
5  were people on the list that made less money than
6  Ms. Suarez.  Her position was ideal for
7  consolidation because the work that was being done
8  was able to go to two other individuals that picked
9  up the work seamlessly, transparently, and the fact
10  that Maria's job performance was highlighted during
11  the past 18 months before that in '16 and all
12  throughout '17 made that decision simpler.
13     Q.  So at the time that Maria separated from
14  employment, what was Barry Finkelstein's job title?
15     A.  I believe he was the day manager.
16     Q.  Did Maria separate from employment in
17  April 2008?
18     A.  I believe it was April of 2018.
19     Q.  I'm sorry.  Did I say 2008?
20     A.  Yes.
21     Q.  I apologize.
22     According to SGWS1094, which is Plaintiff's
23  Exhibit 22, who is the day manager?
24     A.  Barry Finkelstein.
25     Q.  Where do you see that?

Page 153

R. KOHN

1
2     A.  Here (indicating).  Barry Finkelstein,
3  manager.
4     Q.  Who reports to Barry Finkelstein according to
5  this?
6     A.  The people below him.
7     Q.  Jerry Danzi reports to Barry Finkelstein?
8     A.  Yes.
9     Q.  Peter Lazar reports to Barry Finkelstein?
10    A.  Yes.  Peter Lazar took this open box that
11  said manager.  Earlier I said Pete Lazar was hired
12  to go into the mid-shift manager role when you asked
13  what he was.
14    Q.  Before Barry Finkelstein was a manager, did
15  he manage Gary Moncho as well?
16    A.  Barry Finkelstein was a long-time employee,
17  an institution there.  Gary Moncho was brand new.
18  Pete Lazar was brand new.  Jerry Danzi was managing
19  the docks, so yes, it is very conceivable that the
20  new employees reported through the institution
21  manager.
22    Q.  There is a horizontal line between Barry
23  Finkelstein and it is small, but it is still
24  horizontal.  Do you see that?
25    A.  Yes, I do.

Page 154

R. KOHN

1
2     Q.  According to this document, does Peter Lazar
3  report to Barry Finkelstein?
4     A.  Can I see the August 2018 document?
5     Q.  Sure.  Absolutely.
6        MR. MOSER:  Just for the record, what is
7     Bates marked SGWS 001103 as well as SGWS
8     001094.
9     Q.  My question was:  According to Exhibit 22,
10  does anyone report directly to Barry Finkelstein?
11    A.  Are you asking me if this horizontal line is
12  valid or --
13    Q.  I am asking you --
14    A.  Easy, easy.
15    Q.  Well, I don't know why there is so much
16  thinking involved.
17        MS. CABRERA:  Excuse me.  Because there
18     is a deposition transcript being taken.  That
19     is why there is so much thinking involved.
20     He is not just going to give you answers that
21     you want.  That is why there is so much
22     thinking going on.  I want that on the
23     record.
24    Q.  Exhibit 22, does anybody report directly to
25  Barry Finkelstein?

Page 155

R. KOHN

1
2     A.  No.  This document, it looks like Barry
3  Finkelstein shouldn't have a little line here.
4     Q.  So according to this document itself, nobody
5  reports to Barry Finkelstein; is that fair to say?
6     A.  No.  I am suggesting that Barry Finkelstein
7  should not have a horizontal line here, and if this
8  document has something that has no indication of
9  what happens in this real world.  This is an
10  organizational chart.
11    Q.  What about Exhibit 23?  According to this
12  document, does anyone report to Barry Finkelstein?
13    A.  Barry Finkelstein was the day manager.  Barry
14  Finkelstein was responsible for these people
15  (indicating).
16    Q.  According to the document, I am not talking
17  about what your understanding is.
18        My question is:  According to this document,
19  does anyone report to Barry Finkelstein?
20    A.  This is the document that I called out before
21  as appearing to be cleaned up with positions removed
22  from it and underneath Barry Finkelstein on this
23  document could have the cycle counters because after
24  Maria left, Barry Finkelstein absorbed the cycle
25  counters, and Tonisha absorbed the administrative

Page 156

R. KOHN

1
2  portion of the vacated role.
3     Q.  Was there a period of time Barry Finkelstein
4  worked without a title?
5     A.  I am not really sure what the question means.
6  Everyone has a position and a role.
7     Q.  Was Peter Lazar hired to replace Barry
8  Finkelstein?
9     A.  No.  Peter Lazar was hired to be the
10  mid-shift manager to bolster the management team and
11  to provide 24-hour coverage with Barry Finkelstein
12  on days, Pete Lazar on mids, and Gary Moncho on
13  nights.
14        THE COURT REPORTER:  Can we take a break?
15        MR. MOSER:  Sure.
16        (Whereupon, a recess was taken at this
17     time.)
18    Q.  So who was involved in the selection of Maria
19  Suarez as one of the individuals who would separate
20  from employment in early 2018?
21    A.  Kevin Randall.
22    Q.  Did he make proposals to you?
23    A.  No.  He met with human resources.  He spoke
24  to John Wilkinson and came up with a group of people
25  that included Maria.

November 22, 2022

| | |
|---|---|
| Page 157 | Page 159 |

**Page 157**

R. KOHN

1
2    Q. When was Peter Lazar hired?
3    A. I thought it was about five years ago. I
4    believe I said that earlier.
5    Q. I am going to show you what was marked
6    Plaintiff Exhibit 21 for identification. By looking
7    at this document, can you tell me whether or not
8    Peter Lazar was employed as of January 2017?
9    A. No. It does not appear so.
10    Q. Can you approximate for me when he was hired?
11    A. I thought roughly five years ago. This is
12    2017, so maybe it was six years ago.
13    Q. I am going to show you Plaintiff's Exhibit 22
14    on the last page. According to this document, Peter
15    Lazar is a mid-shift manager, correct?
16    A. Yes.
17    Q. So that means he would have been hired
18    sometime between January 2017 and April 2018; is
19    that fair to say?
20    A. Yes.
21    Q. How many managers were hired at the Syosset
22    facility in 2017?
23    A. I believe Pete Lazar, and I thought at the
24    same time Pete Lazar was hired, Carlos Linez was
25    roughly that same time. I was looking to see if he

**Page 158**

R. KOHN

1
2    is on the older one here. I think they were hired
3    roughly the same time. I don't see Linez, so he
4    must have come in after Lazar.
5    Q. What about Sean Kelly? Was he also hired
6    between January of 2017 and April 2018?
7    A. Sean Kelly has been a long-time employee of
8    Southern held numerous jobs in Upstate New York, in
9    Metro New York, and now he is the operations leader
10    in Katy, Texas. So he came up through the ranks,
11    and I think his title there was technology manager.
12    Q. Was that position addressed?
13    A. Yeah. Sean Kelly, I could run through his
14    résumé in my head for you. He started in Upstate
15    New York as a router, went to customer service, went
16    to purchasing, went to logistics, moved down to
17    Metro New York with a full knowledge of the back of
18    the house, ran logistics in Metro New York. He
19    became our customer service manager in Metro New
20    York, came into the warehouse to handle special
21    projects and the title of technology manager that
22    would make sense coming in after January 1 before
23    '18 to be part of WMI, and you can see his reports
24    there are WMI trainees.
25    Q. So if we look at January 2017 and

**Page 159**

R. KOHN

1
2    January 2018, has the total number of managers gone
3    up or down?
4    A. We would have to count them. I think it
5    stayed about the same.
6    Q. So you added more manager between
7    January 2017 and April 2018 at some point in time,
8    correct?
9    A. No. I said I believe they stayed about the
10    same.
11    Q. But this document April 2018, this is after
12    this reduction in force, correct?
13    A. Yes.
14    Q. So how many managers were eliminated as part
15    of the reduction in force?
16    A. There were five individuals from the
17    operations that were eliminated.
18    Q. Were they all managers?
19    A. They were supervisors and managers, one
20    router.
21    Q. So before those five positions were
22    eliminated, those five managerial positions were
23    eliminated, you actually had five more managers than
24    you had in January 2017; is that fair to say?
25    A. No. They are a different level of people.

**Page 160**

R. KOHN

1
2    You pointed out Sean Kelly; that's a technology
3    manager. You can see by sometime after January 2017
4    and this report of April 2018, there is a technology
5    manager to support the new efforts that the company
6    went towards with progressively managing with
7    systems versus doing things manually, and earlier I
8    did say Pete Lazar came in to bolster the
9    organization to have more management present. A
10    different type of employee, yes.
11    Q. So the number of managers you had after the
12    layoff in April 2018 was roughly the same as it had
13    been in January 2017?
14    A. It appears that way, yes. It is close.
15    Q. So for some reason just in terms of numbers,
16    I am not talking about where they fall in the
17    organizational chart but in terms of numbers in
18    between January 2017 and April 2018, just before the
19    layoff, five managers had been added to the staff in
20    that time period?
21    A. No. I do not know it is five. I said there
22    were approximately the same number.
23    Q. Approximately?
24    A. Five people were reduced as part of the
25    reduction in force. They were not all managers.

40 (Pages 157 to 160)

Page 161

R. KOHN

1
2  The company went through an exercise to identify
3  opportunities to drive cost out of the system by
4  streamlining, by upgrading processes, and by
5  upgrading people and by identifying positions that
6  could be closed, the company was successful in doing
7  that. The company did consider job performance, and
8  in the case of Ms. Suarez, I am sorry to say, she
9  had horrible performance documented over a decade,
10 and John Wilkinson desperately tried to help her and
11 save her. She was not saved. By fast-forwarding 16
12 months and trying to say you let five people go, but
13 you hired five others. That is not what this
14 reflects. This reflects a bolstering of the
15 organization to run leaner, faster, more productive
16 with more talented individuals. I mentioned we
17 hired Pete Lazar as a person to bolster the mid
18 shift. The role wasn't there. I mentioned Sean
19 Kelly was a technological genius who has since been
20 promoted to run one of our largest distributions in
21 Texas.
22      These were people that came up through the
23 ranks or were brought in from the outside to make
24 the organization stronger. That in conjunction with
25 closing out some roles that were duplicative or

Page 162

R. KOHN

1
2  unnecessary made the organization stronger and made
3  the exercise of eliminating those positions a
4  success.
5      Q. So having hired additional staff in 2017 made
6  it possible to reduce the staff in 2018; is that
7  fair to say?
8      A. I don't know when we talked about when these
9  people were hired, and these people, like Mr. Kelly,
10 was already an employee of the company. He was not
11 hired.
12     Q. I am talking about the specific facility, the
13 Syosset facility?
14     A. He was in Syosset.
15     Q. He was not in Syosset as of January 2017?
16     A. No. Sean Kelly was in Syosset for a decade
17 and a half in New York.
18     Q. Was he as of January 2017 in Syosset?
19     A. He was in a different org chart.
20     Q. Where was he?
21     A. Mr. Kelly ran the back of the house
22 departments and the position before he became the
23 manager of technology, he came out of being customer
24 service manager and on assignment to the warehouse
25 running special projects helping foster transition

Page 163

R. KOHN

1
2  from the manual system to the automated system.
3      Q. When was Sean Kelly brought on?
4      A. When was he brought onto the org chart?
5      Q. When was he brought under Kevin Randall's
6  direction?
7      A. Sometime around here.
8      Q. When you say around here, you mean
9  January 2017?
10     A. Yes. He was in Syosset. He was in New York
11 for 15 years. He started in Upstate New York and
12 let me just say for half of that time. For the
13 second half of that time he was in Metro New York.
14 He ran through a gamut of positions in Metropolitan
15 New York, gained an enormous amount of knowledge,
16 wanted to go into the technology area, which put him
17 on Kevin's work chart. He was already doing special
18 projects in Metropolitan New York and sat up there
19 in a role in a created position post the transition.
20     Q. When did John Wilkinson pass? I don't
21 remember.
22     A. I don't know the date.
23     Q. When we look at April 2018 in this
24 organizational chart, does this show who was chosen
25 for elimination?

Page 164

R. KOHN

1
2      A. I am not understanding does it show.
3      Q. I will ask a better question. You have here
4  supervisor inven control.
5      Was that Maria's job?
6      A. It seems that way, yes.
7      Q. That was her job, right? And her name was
8  deleted simply when she was taken off of the chart;
9  is that fair to say?
10     A. It appears that way.
11     Q. Can you see there are some other blanks here
12 right above supervisor inven control. There is
13 another box that just says manager, but there is no
14 name.
15     Was this another individual let go?
16     A. No. I think that was the box created for
17 Pete Lazar.
18     Q. What about the supervisor that is on the
19 lower right-hand side of the page, where it says
20 supervisor, and there is no name above it.
21     Do you know who that pertained to?
22     A. I would assume that was an eliminated
23 position.
24     Q. So in total how many managers were eliminated
25 as part of the five that were selected?

41 (Pages 161 to 164)

November 22, 2022

Page 165

R. KOHN
1
2      A. I would say no managers were eliminated.
3      Q. How many supervisors were eliminated as part
4  of the five?
5      A. Five.
6      Q. Did Maria ever hold the title of inventory
7  control manager?
8      A. Before WMI administrator I believe her title
9  was warehouse inventory control manager. I think it
10  has a warehouse in front of it.
11      Q. Were there any documents generated regarding
12  the selection of Maria as one of the individuals to
13  be eliminated?
14      A. Not that I have seen. I know that Kevin met
15  with human resources and John to talk about the
16  positions that could be collapsed.
17      Q. So it was all verbal?
18      A. It could have been in writing with human
19  resources. I haven't see anything.
20      Q. If there were any writings regarding Maria's
21  selection actually considering her for elimination,
22  where would they be?
23      A. At this point from four plus years ago, four
24  and a half years ago, I would not know.
25      Q. Is it fair to say you took this charge of

Page 166

R. KOHN
1
2  eliminating a certain number of people very
3  seriously?
4      A. Yes. The company took it very seriously.
5      Q. Is it fair to say Kevin Randall took it very
6  seriously as well?
7      A. Yes.
8      Q. As you sit here today, are there any
9  documents that you are aware of which show how
10  Southern selected the five individuals that were let
11  go in operations?
12      A. I believe I stated Kevin met with human
13  resources. That would have been Beth Toohig, the
14  vice president of human resources. There would have
15  been a vetting of the people, the individuals, the
16  positions. The company does not take these lightly.
17  I am sure internal counsel Lauren Moody was involved
18  in it. Are there documents resulting from those
19  conversations and meetings? There could be. I am
20  not in possession of any documents.
21      Q. I am going to show you what was marked as
22  Plaintiff's Exhibit 29 for identification?
23      A. Yes.
24      Q. Have you seen this document before today?
25      A. No.

Page 167

R. KOHN
1
2      Q. Just so I am clear, it is titled Defendant's
3  Responses to Plaintiff's Consolidated Request For
4  Production of Documents. These are Southern
5  responses for my request for documents. If you turn
6  to 19, the question is: We asked for all documents
7  concerning the decision to terminate the plaintiff,
8  and the response is an objection, and then subject
9  to and without waiving those objections, Southern
10  references their entire document production, which
11  is pages 1 to 2686 of SGWS's original document
12  production. I will also further say to you that
13  Southern has indicated that they are not withholding
14  any documents concerning the decision to terminate
15  the plaintiff.
16      Based upon that, do you believe that any
17  documents exist concerning the decision to terminate
18  Maria?
19      MS. CABRERA: Objection.
20      A. Again, I have not seen this document before.
21  It appears that Southern classifying this request to
22  be duplicative and references 2686 pages.
23      Q. I will share with you I have gone over each
24  page, unfortunately. As far as I can tell, there
25  are no documents in there which show the actual

Page 168

R. KOHN
1
2  consideration of the reasons why Maria was
3  terminated. There are documented performance issues
4  and things like that, but regarding the actual
5  decision, there are no documents in there.
6      MS. CABRERA: Objection.
7      Q. So is it fair to say all of the documents
8  that existed regarding the decision to terminate
9  Maria are located somewhere in these 2,686 pages?
10      A. That is the way I read this, yes.
11      Q. If a document is not in those 2,686 pages, it
12  does not exist, correct?
13      MS. CABRERA: Objection.
14      A. I didn't see the 2,686 pages.
15      Q. Okay. I got you.
16      Now, with regard to request 21, I will read
17  it into the record. We asked for all communications
18  concerning the employment decisions made with
19  respect to the plaintiff for the period from
20  January 1, 2014, to the present. Again, Southern
21  states some objections but then references the
22  entire document response. Do you see that?
23      A. I do see the request and the response?
24      Q. Is it fair to say that all communications
25  about the decision to select Maria as part of the

42  (Pages 165 to 168)

Page 169

R. KOHN

1
2  reduction in force would be somewhere in SGWS 1 to
3  2686?
4     A. It says again the request is duplicated, and
5  I do see part of their response says that you are
6  seeking documents that are not irrelevant, that are
7  vague and ambiguous and unduly burdensome.
8        (Whereupon, Email Chain was marked as
9        Plaintiff's Exhibit 31, for identification,
10       as of this date.)
11    Q. I am going to show you what was marked as
12  Exhibit 31 for identification. I don't expect you
13  to be familiar with the document. I am just going
14  to read this into the record. I write to Anjanette
15  and Tim, Please confirm that defendant's responses
16  to the consolidated request for production of
17  documents numbered 1, 2, 3, 7, 8, 9, 12, 13, 14, 17,
18  18, 19, 20, and 22 are amended so that the following
19  language is inserted at the end of each response.
20  "Defendant is not withholding documents responsive
21  to this request." And then the response from Angie,
22  Yes, that is correct. So according to Southern, no
23  documents have been withheld.
24        Does that mean that other than what was in
25  SGWS 1 to 2686, there are no communications

Page 170

R. KOHN

1
2  concerning the employment decisions made with
3  respect to Maria for the period from January 1,
4  2014, to the present?
5     A. Yes. That makes sense.
6     Q. Does that also mean that all documents
7  concerning the decision to terminate Maria would be
8  found somewhere in that document production?
9     A. Yes.
10    Q. No other documents exist concerning the
11  decision to terminate Maria?
12    A. Yes.
13    Q. So that would mean all of the communications
14  regarding the decision to terminate Maria were
15  verbal?
16       MS. CABRERA: Objection.
17    A. I think it means it was part of the 2,686
18  documents.
19    Q. And if they are not part of the 2,686
20  documents, they would be verbal?
21       MS. CABRERA: Objection.
22    Q. Is that fair to say?
23       MS. CABRERA: Same objection.
24    A. It seems so, yes.
25    Q. Now, Southern also responds, if we turn to

Page 171

R. KOHN

1
2  23, we ask for all documents concerning the hours
3  worked by the plaintiff for the period of January 1,
4  2016, until the plaintiff's last date of employment;
5  and all documents which defendant contends shows
6  that she did not work overtime during this period.
7  There are objections and then it says here, Subject
8  to and without waiving these objections, Southern
9  Glazer's Wine and Spirits does not possess documents
10  in response to this request.
11       Does that mean that Southern has no documents
12  concerning the hours worked by Maria during this
13  period of time?
14    A. Of being a salaried employee?
15    Q. Correct.
16    A. I work an enormous amount of hours, and
17  Southern gives me credit for working about 40 a
18  week. Salaried employees, the company does not
19  record hours.
20    Q. As a manager, was she required to work
21  overtime?
22    A. Sometimes. Sure. She was part of Go Live.
23    Q. Other than Go Live, was she required to work
24  overtime?
25    A. I think every manager nowadays. Everyone in

Page 172

R. KOHN

1
2  an authoritative position needs to do what they need
3  to do, and if that includes working some overtime,
4  yes.
5     Q. Is there anything at Southern called an
6  investigative file?
7     A. I am not familiar with that phrase.
8     Q. Does Southern's human resource department
9  have investigative files on employees?
10    A. I am sure they maintain investigation notes,
11  documents, files.
12    Q. For what purposes?
13    A. In a hypothetical situation, if an employee
14  went to human resources with an allegation and the
15  department performed an investigation, they would
16  likely write a report or file a report somewhere.
17    Q. Did Maria submit her records of her hours
18  worked to John Wilkinson?
19    A. Not to my knowledge. It would not be
20  required unless he asked for them for some specific
21  reason or she wanted to volunteer the hours she was
22  working.
23    Q. I am showing you Plaintiff's Exhibit 12 for
24  identification. It was previously marked. I would
25  like you to read the letter portion of it, which is

43 (Pages 169 to 172)

November 22, 2022

Page 173

R. KOHN

1  R. KOHN
2  from SGWS 2601 to 2607 to yourself.
3      My question for you at the end of this to
4  keep in mind while you are reading it is whether any
5  of the facts that are stated in that appear to be
6  incorrect or flawed?
7      A.  I have completed reading the document.
8      Q.  Does anything in this document appear to be
9  incorrect?  Anything stand out as incorrect?
10     A.  No.
11     Q.  Did you ever personally meet with Maria?
12     A.  Sure.  I have known Maria for many years that
13  she worked there.
14     Q.  How many times did you meet with Maria
15  personally?
16     A.  Alone?
17     Q.  Yes.
18     A.  Probably never.
19     Q.  How many times did you meet with Maria with
20  other people?
21     A.  Probably at inventory reconciliation meetings
22  when the process was manual.  Post inventory the
23  group would get together, whether it was Gregg
24  Rizzly at the time who was replaced by Kevin
25  Randall, the accounting team, the inventory team,

Page 174

R. KOHN

1  R. KOHN
2  Maria.  If I was in the building.  I might have went
3  over.  A big conference room type of meeting
4  reviewing where the inventories ended, maybe large
5  discrepancies, a chance for people to say, Oh, I
6  know that is over or short, this truckload came in
7  late or this truckload didn't come in.  A handsful
8  of times I probably attended those inventory
9  meetings while the company operated a manual
10  process.
11     Q.  In reaching your opinions about the way Maria
12  was doing her job, are you relying on communications
13  from other individuals and documents that you
14  reviewed or are you relying on your personal
15  observations of her or both?
16     A.  Because I have only met with her a handful of
17  times, I have seen her in those inventory meetings
18  and she was standoffish.  You know, when someone
19  would say she was belligerent or ignorant or
20  wouldn't pay attention or would walk away from them,
21  I would believe that because I saw that type of
22  behavior in the small amount of times I was with
23  her.
24     Q.  So when you were with her, you observed that
25  she was standoffish and belligerent?

Page 175

R. KOHN

1  R. KOHN
2      A.  Yes.
3      Q.  Other than being standoffish and belligerent,
4  your opinion regarding her performance is based upon
5  your personal observation or information from others
6  and documents you reviewed?
7      A.  Information from others and documents I
8  reviewed.  She reported to John Wilkinson who
9  reported to Kevin Randall who reported to me, and I
10  had no direct supervision over Maria.  I would not
11  have any direct supervision of her.  She was several
12  layers below.
13     Q.  You can't have time to supervise everyone?
14  That is, frankly, not your job, is it?
15     A.  Correct.
16         MR. MOSER:  We are going to have to
17     stipulate this one as well.  It is marked
18     SGWS 2351, and we are going to stipulate that
19     this is Exhibit 32 for identification.
20         (Whereupon, Email was deemed marked as
21     Plaintiff's Exhibit 32, for identification,
22     as of this date.)
23     Q.  So have you ever seen this document before
24  today?
25     A.  No.

Page 176

R. KOHN

1  R. KOHN
2      Q.  What is this?
3      A.  It is an email between Maria Suarez, John
4  Wilkinson, and Kevin Randall.
5      Q.  Were you CC'd on this at all?
6      A.  No.  It doesn't appear to include me.
7      Q.  When John Wilkinson unfortunately passed,
8  were his emails retained?
9      A.  Yes.  They would have went to his manager,
10  which would have been Kevin Randall.
11     Q.  How long are those emails kept for?
12     A.  Depending on the person's position and the
13  retention policy, it could vary.
14     Q.  Do you know for Mr. Randall what the
15  retention policy was?
16     A.  Maybe a year.  I think John Wilkinson passed
17  away in, I believe, it was 2019.  I am embarrassed I
18  don't recall.
19     Q.  So in terms of personal knowledge about what
20  Maria was doing as a WMI administrator, her
21  performance, which individual today do you believe
22  has the most personal knowledge about that?
23     A.  Today that would be Kevin Randall with John
24  Wilkinson's passing.
25     Q.  So up until John Wilkinson's passing, John

44  (Pages 173 to 176)

Page 177

R. KOHN

1                R. KOHN
2  Wilkinson would have been the individual with the
3  most knowledge about Maria's day-to-day performance
4  in terms of what somebody saw, what somebody heard
5  and perceived through their senses, correct?
6     A. That makes sense.
7     Q. Now, was legal counsel consulted or
8  communicated with regarding decisions made
9  concerning Maria?
10    A. Absolutely. Internal counsel, Lauren Moody,
11  would have been involved in all those matters.
12    Q. That would have been at every material
13  decision made with regard to Maria, for instance,
14  when she was selected to be WMI administrator?
15    A. No.
16    Q. When she was selected for elimination?
17    A. Yes.
18    Q. How long before Maria was selected for
19  elimination did you begin communicated with Lauren
20  Moody? So when for the first time did you
21  communicate with Lauren Moody about Maria Suarez's
22  separation from employment?
23    A. I didn't. It would have been Kevin Randall
24  in conjunction with human resources that bubbled it
25  up to counsel.

Page 178

R. KOHN

1                R. KOHN
2    Q. Would she have had final approval over the
3  decision to let Ms. Suarez go?
4    A. I think the human resource department would
5  have vetted the concept, the idea, and would have
6  bubbled it up for clearance.
7    Q. Were any of those communications between the
8  human resources department and Ms. Moody written?
9    A. I would not have been privy to that.
10    MR. MOSER: Thank you so much for your
11  time. I have no further questions.
12    (Time Noted: 4:58 p.m.)
13
14
15
16
        _____
           ROY KOHN
17
18  Subscribed and sworn to before me
19  this    day of    2022.
20
21    _____
        Notary Public
22
23
24
25

Page 179

I N D E X

1              I N D E X
2
3  WITNESS     EXAMINATION BY     PAGE
4  Roy Kohn    Mr. Moser       7
5
6        EXHIBITS
7  PLAINTIFF'S  DESCRIPTION      PAGE
8  19     Organization Chart January 2016 15
9  20     Organization Chart October 2016 15
10  21    Organization Chart January 2017 15
11  22    Operations Chart     15
12  23    Organization Chart August 2018 15
13  24    Notes        37
14  25    Notes        37
15  26    Email Chain      37
16  27    Performance Improvement Plan  41
17  28    Email Chain      48
18  29    Response      48
19  30    Memo 9/2/16     100
20  31    Email Chain     169
21  32    Email        175
22
23
24
25

Page 180

C E R T I F I C A T E

1          C E R T I F I C A T E
2
3    I, KAREN BERESHEIM, hereby certify that the
4  Examination Before Trial of ROY KOHN was held before
5  me on this 22nd day of November, 2022; that said
6  witness was duly sworn before the commencement of
7  his testimony; that the testimony was taken
8  stenographically by myself and then transcribed by
9  myself; that the party was represented by counsel as
10  appears herein.
11    That the within transcript is a true record
12  of the Examination Before Trial of said witness;
13    That I am not connected by blood or marriage
14  with any of the parties; that I am not interested
15  directly or indirectly in the outcome of this
16  matter; that I am not in the employ of any of the
17  counsel.
18    IN WITNESS WHEREOF, I have hereunto set my
19  hand this 22nd day of November, 2022.
20
21    _____
22    KAREN BERESHEIM
23
24
25

45 (Pages 177 to 180)

November 22, 2022

```
                              Page 181
 1    ERRATA SHEET FOR: ROY KOHN
 2       ROY KOHN, being duly sworn, deposes and
 3    says: I have reviewed the transcript of my
 4    proceeding taken on 11/22/2022. The following
 5    changes are necessary to correct my testimony.
 6    _____
 7    PAGE LINE    CHANGE          REASON
 8    ----|----|--------------------|-------------
 9    ----|----|--------------------|-------------
10    ----|----|--------------------|-------------
11    ----|----|--------------------|-------------
12    ----|----|--------------------|-------------
13    ----|----|--------------------|-------------
14    ----|----|--------------------|-------------
15    ----|----|--------------------|-------------
16    ----|----|--------------------|-------------
17    ----|----|--------------------|-------------
18    ----|----|--------------------|-------------
19    ----|----|--------------------|-------------
20    ----|----|--------------------|-------------
21       Witness Signature:_____
22    Subscribed and sworn to, before me
23    this ___ day of _____, 20 ___.
24    _____    _____
25    (NOTARY PUBLIC)       MY COMMISSION EXPIRES
```

Lexitas Court Reporting
800-678-0166