EXHIBIT 19



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------x

MARIA SUAREZ,

Plaintiff,

-against-

Case No. 2:19-cv-07271-GRB-SIL

SOUTHERN GLAZER'S WINE AND SPIRITS, LLC,

Defendant.

--------------------------x

November 11, 2021
10:25 a.m.

Videotaped deposition of MARIA SUAREZ, taken by Defendant, pursuant to Order and stipulations between Counsel, at the offices of Constangy, Brooks, Smith & Prophete, LLP, 101 6th Avenue, New York, New York, before Jessica R. Taft, a Shorthand Reporter and Notary Public of the State of New York.



APPEARANCES:

MOSER LAW FIRM, P.C.
Attorneys for Plaintiff
5 E. Main Street
Huntington, New York 11743
BY: STEVEN MOSER, ESQ.

CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
Attorneys for Defendant
101 6th Avenue
New York, New York 10013
BY: ANJANETTE CABRERA, ESQ.

PRESENT:
ANDREW GEDACHT, Videographer
LAUREN O'CONNOR, audio only, in-house counsel for Defendant Southern Glazer's Wine and Spirits, LLC



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the deposition may be signed and sworn to before any officer authorized to administer an oath.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the deposition be waived.



THE VIDEOGRAPHER: Here begins media number one in the deposition of Maria Suarez in the matter of Maria Suarez v. Southern Glazer's Wine and Spirits of New York, LLC, in the U.S. District Court, Eastern District of New York, Case Number 219-CV-07271-GRB-SIL.

Today's date is November 11, 2021, the time is 10:52 (sic) a.m. This deposition is being taken at Constangy, Brooks, Smith & Prophete, LLP, 101 6th Avenue, New York, New York.

I'm Andrew Gedacht, the videographer, and the court reporter is Jessica Taft from Pirozzi and Hillman, New York, New York.

Counsel, please identify yourselves and state whom you represent.

MR. MOSER: Steven Moser for the plaintiff.

MS. CABRERA: Anjanette Cabrera

for Southern Glazer's Wine and Spirits.

MARIA SUAREZ,
the Witness herein, having first been duly sworn by the Notary Public, was examined and testified as follows:

MS. CABRERA: Before we get started, just for the record, on the, on the phone listening but won't be speaking or appearing is in-house counsel for the company, Lauren O'Connor.

EXAMINATION
BY MS. CABRERA:

Q. Good morning, Ms. Suarez.
A. Good morning.
Q. My name is Anjanette Cabrera, and I represent Southern Glazer's Wine and Spirits. And we are here today to take your deposition.
A. (Thereupon, the witness nods in the affirmative.)
Q. Before we begin the questioning, I just want to go over a couple of ground rules with you, okay?





A. (Thereupon, the witness nods in the affirmative.)
Q. So, do you understand that you're under oath today?
A. Yes.
Q. And you understand that that means that you are obligated to tell the truth?
A. Yes.

THE VIDEOGRAPHER: We are going off the record. The time is 10:27 a.m. This is the end of media number one.

(Thereupon, a discussion was held off the record.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:28 a.m. This is the start of media number two.

BY MS. CABRERA:

Q. So the most important person in the room today is the court reporter. Okay? We want to make sure that she can hear my question and we also want to make sure that she can hear your answer. So please make sure that all of your answers are verbal. Okay?





A. Okay.
Q. And also make sure that you can speak up so she can properly take down what you say and the videographer here can, can capture what it is that you are saying. Okay?
A. Okay.
Q. If you don't understand the question, please tell me, and I will do the best to rephrase it.
A. All right.
Q. Okay? If you simply answer the question, my assumption is going to be that you understood the question as I posed it.
Do you understand that?
A. Yes.
Q. I'm going to be giving you some documents to look at today. Okay? Um, we refer to them as exhibits. When I give them to you, I want you to take as much time as you feel you need to review the document before I start questioning you. Okay?
A. Yes.





Q. We were discussing -- before we got on the record, we were discussing a lunch break, okay? In addition to a lunch break, if you need to take a break, you just let us know. Okay? You can take as many breaks as you need. There is not a limit on your breaks. The only rule with regard to breaks is that you cannot take a break if there is a question pending. Okay?
A. Sure.
Q. So what that means, for example, is if I ask you a question, I will need you to answer that question and then you can take a break.
Is there any reason why you can't testify truthfully today?
A. No.
Q. Are you under the influence of any drugs or alcohol that would impair --
A. No.
Q. -- your ability?
What did you do to prepare for your deposition today?

A. I talked to my attorney.
Q. And to be clear, I don't want to know about anything you talked to your --
A. Yes.
Q. -- attorney about, okay?
Um, how long did you talk to your attorney?
A. Approximately one hour yesterday and maybe half an hour today.
Q. And did you review any documents?
A. I reviewed some documents this morning.
Q. And what were the documents that you reviewed?
A. It was the documents that I signed with my attorney previously. I don't remember the name of the, of the document.
Q. Do you remember if it was the complaint?
A. The complaint.
Q. Okay. Did you look at anything else besides the complaint?
A. No, I did not.





Q. Did you talk to anyone else beside your lawyer about your deposition today?
A. I text a friend that I was coming to the city this morning.
Q. And where do you live, Ms. Suarez?
A. Uniondale, Long Island.
Q. And what is your marital status?
A. Divorced.
Q. Do you have any children?
A. No.
Q. And what's your highest level of education? What's the last school you completed?
A. I completed six years of university in Ecuador, which is equivalent here to a bachelor's degree.
Q. Okay. Were you born in Ecuador?
A. Yes.
Q. When did you come to the United States?
A. In the year 2000, to live.
Q. Okay. And have you always lived in Uniondale?





A. Yes.
Q. Have you ever been involved in any sort of criminal case?
A. No.
Q. Aside from this case that we are going to talk about today, have you ever been involved in any civil litigation?
A. No.
Q. So you never sued anybody else?
A. No, I have not.
Q. Has anyone sued you?
A. No.
Q. Aside from your deposition testimony in the Sanjous matter, have you ever been a witness in a case?
A. I'm sorry, can we go back one question?
Q. Sure.
A. If anybody sued me?
Q. Yes.
A. Um, I think there was a civil case, but I don't remember, like, a long, long time ago when I was on vacation, vacation here in New York City. I had one





of those memberships to a gym.
Q. Okay.
A. And I think that ended in some -- I never attended. I don't know what happened, but, um, on my credit report appeared.
Q. Got it. Okay. Did they enter a judgment against you on your credit report?
A. Yes, I think so.
Q. Got it. Okay, okay. Thank you for clarifying that.
A. Yeah. It was hard to remember that at the start.
Q. Understood.
Um, and so my question, the next question I was asking you: Aside from your deposition in the Sanjous case, have you ever been a witness in a case before?
A. No, I have not.
Q. So that was your only experience?
A. Yes.
Q. Have you ever been involved in any proceeding with the Equal Employment Opportunity Commission?

Suarez

A. I had an interview with Ms. Selana. I don't know if that counts for involvement.

Q. Got it. Are you talking about -- I'm sorry. Explain to me who Ms. Selana, what you spoke to Ms. Selana about.

A. I don't have the records. It was a long time ago. But I responded to the questions that she asked me. I don't remember the specifics.

Q. Okay. Was it, in general, about the same, the same things about this case? Do you remember if that was the subject matter?

A. I think it was a complaint by Josie. But I'm sorry, I don't remember specifics.

Q. Okay. But Ms. Selana was with the Equal Opportunity Employment Commission?

MR. MOSER: Objection as to form.

BY MS. CABRERA:

Q. You can answer.

A. I don't know.



Suarez

Q. Okay. Do you remember when you spoke to her?

A. Maybe in 2013, 2014. I don't remember.

Q. Got it. Okay.

Have you ever been involved in a proceeding with the New York State Division of Human Rights?

A. No, I have not.

Q. And aside from this case here, aside from the letter that your attorney sent to Southern Glazer's, have you ever sent a demand letter to anyone?

A. No, I have not.

Q. Have you ever filed for bankruptcy?

A. No, never.

Q. Ms. Suarez, when did you begin working for Premier Wines?

A. April 2000.

Q. And what was your role at Premier Wines?

A. Payroll, payroll clerk, administrator. I'm not sure right now. I don't remember exactly the title.



Suarez

Q. Okay. Why don't you tell me what you did. What were your duties and responsibilities?

A. Processed all timecards, timesheets, entered hours, um, processed payments through ADP.

THE REPORTER: Did you say ADP or ADT?

THE WITNESS: ADP, sorry.

THE REPORTER: I just want to make sure I heard you correctly.

THE WITNESS: Processed timesheets, taxes, help processing commissions, sales commissions, um, process all payables, you know, from the payroll deductions.

BY MS. CABRERA:

Q. Okay.

A. Reporting to accounting payroll, all payroll, um, payroll-related, um, accounts, like, we did it daily and weekly and also monthly for the month's end.

Q. Okay. And did you earn a salary?

A. Yes.



Suarez

Q. And did you earn overtime in that position?

A. No, I did not.

Q. Did you have, um, anyone that was reporting to you in that position?

A. No, I didn't.

Q. And who did you report to?

A. Alicia Diaz. I think her title was director, director of HR at the moment, at that point.

Q. And did there come a time where your job changed?

A. Yes.

Q. And when was that?

A. It was in 2004, if I remember correctly. Um, they -- warehouse payroll or the personnel in the warehouse grew substantially.

Q. Okay.

A. Especially drivers and helpers. And we needed a person, or they needed a person to take care of only warehouse payroll.

Q. Okay.

Suarez

A. So I was working with the director of operations at that point. I was moved to the warehouse to work with the director of operations.

Q. And did you become an administrative assistant in payroll --

A. Yes.

Q. -- at that time?

And now was -- was your employer still Premier Wines or was it Southern Glazer's Wine and Spirits at that time?

A. I think it was Premier Wines, and, and shortly in December of 2004 it changed to Southern Wines.

Q. And when it changed to Southern Glazer's Wine and Spirits, did your position change or you remained as the administrative assistant in payroll for the warehouse?

A. I remained in that position.

Q. And where was that job located?

A. With Premier, I have an office next to the director of operations' office, um, in the main warehouse office. It was



Suarez

called just warehouse office.

Q. Okay.

A. And then when Southern took over in December 2004, I was moved to the Blue Room Number 2.

Q. Okay. And where was the main warehouse office located, what city?

A. What city?

Q. Yes.

A. Syosset.

Q. And just to take a step back, when you started with Premier Wines, was that also in Syosset?

A. Yes.

Q. Okay. So, you said you were moved to Blue Room Number 2, is that correct?

A. Yes.

Q. And what were your job duties?

A. Mainly payroll. But shortly I started, um, helping the sales force with questions about product, about inventory, but my title didn't change.

Q. And who were you reporting to



Suarez

directly?

A. First Mike Capalto and then, um, with Southern, a new director of operations came along. And I don't remember his name.

Q. And when you say that you were doing payroll, was it the same responsibilities that you explained to me that you had when you had the job with Premier Wines? Is that what you mean by doing payroll?

A. No. I did only hours and PTOs and, um, make everything, like, easier for the payroll department to take the warehouse information.

Q. And what do you mean by "hours"?

A. Process the time records. I printed the, the timesheets. You know, I processed the timesheets. At that point, there was no more timecards, so I processed the timesheets. I got the signatures from supervisors authorizing overtime, and I send the information to payroll to process the, the payments.

Q. Did you have to fill out a



Suarez

timesheet for yourself?

A. I don't remember.

Q. Do you remember if you were paid a salary or if you were paid on an hourly basis?

A. With Premier, I was paid a salary. I was hired for a 35-hour week, a salary person.

With Southern, many things changed, but I don't remember exactly. Um, I don't remember at what point I was made hourly. Um, I was asked to join the union. I never did, but I don't remember exactly when this happened. But for a few months I was not salary; I was paid by the hour.

Q. For a few months when Southern took over?

A. I think so.

Q. And -- well, strike.

Okay. And again, as the administrative assistant in payroll at the point that Southern took over, right -- so we're talking, I think you said it was around December 2004 -- did you have any

Suarez

direct reports reporting to you?
A. No, I did not.
Q. Okay. And did there come a time that your, that your job changed from administrative assistant and payroll?
A. I'm sorry? Repeat the question.
Q. Did there come a time where your job changed from administrative assistant and payroll?
A. I'm sorry, I don't understand the question.
Q. Okay. Were you promoted to inventory supervisor, inventory control manager?
A. In July 2007, I was promoted to inventory control manager. I'm sorry, inventory -- inventory manager warehouse. That was my title.
Q. Okay. Inventory manager warehouse, okay.
And where was that job located?
A. I just stayed at my desk in the Blue Room Number 2.
Q. And that was in Syosset, correct?



Suarez

A. Yes.
Q. And what were your job duties?
A. The first directive given to me was to fix the inventory.
We had at that point, I think, a good $10 million of inventory lost.
Q. And who were you reporting to at that time?
A. To John Wilkinson.
Q. And did you have any direct reports reporting to you?
A. Yes.
Q. And who were they?
A. I had one.
Q. And who was that?
A. Josie Sajoeus.
Q. Did there come a time -- I'm sorry.
A. In payroll. And I had six people from an agency working for me and with Josie.
Q. So, Josie was a Southern --
A. Employee.
Q. -- employee. And the other six were from a staffing agency?



Suarez

A. Yes, Robert Half.
Q. Robert Half?
A. Yes.
Q. Okay. In this role, were you responsible for managing inventory control?
A. Yes.
Q. Did you have the ability to hire Josie?
A. Josie was already hired, working for the previous inventory control manager.
Q. Did you have the authority to fire Josie?
A. Yes.
Q. Did you give Josie performance evaluations?
A. No. She was a union employee.
Q. Did you provide her with feedback on how she was doing her job?
A. Yes.
Q. Were you responsible for correcting her if she was doing her job incorrectly?
A. Yes.
Q. Were you performing office work



Suarez

at this time?
A. Yes, mostly.
Q. Mostly?
A. Uh-huh.
Q. And as the -- was the position renamed inventory control manager?
A. Inventory manager warehouse.
Q. Inventory manager warehouse.
Did you report to anyone besides John at this time?
A. I reported directly to him. But many times I got phone calls from the VP of operations, from the sales force, from marketing, and I actually -- I treated, like, everybody like my boss. I, I got results from, for them.
Q. And was it up to you to decide -- when you received these calls from different people --
A. Uh-huh.
Q. -- was it up to you to decide, you know, who you were going to prioritize first?
A. Yes.

Suarez

Q. And did you have to exercise independent judgment to make those decisions?
A. Yes.
Q. Did you train anyone?
A. Yes.
Q. And were you paid a salary for this position?
A. Yes.
Q. And again, I want to switch specifically to this position, okay? Did you work weekends?
A. Yes.
Q. And were you given additional compensation for working weekends?
A. I did not until 2017.
Q. And who did John report to at this time?
A. To the VP of operations, Greg Risley.
Q. And I think you said you had a total of seven people reporting to you, Josie and then six Robert Half --
A. At one point, ten people. But I ended up -- when I resolve all these issues



Suarez

of lost inventory that I, you know, took down in the beginning, it took me three months and then six months to resolve everything. I hired three more people. So my staff was four people, all Southern employees.
Q. And who were those four people?
A. After Josie, I hired Ena, then Tatyana and then Justin.
MS. CABRERA: Okay. I'm going to give you what has been marked as Exhibit 1.
(Thereupon, the document was marked Defendant's Exhibit 1 for identification, as of this date.)
BY MS. CABRERA:
Q. As I said in the beginning, I want you to take a look at it, okay? It is a document at the bottom Bates stamped 2618 to 2624. It's about six, seven pages. Please look at it and let me know when you are ready to proceed. Okay?
A. Okay, finished.
Q. Do you recognize Exhibit 1?



Suarez

A. Yes.
Q. Okay. And what do you recognize it to be?
A. It's a performance evaluation.
Q. And this is your performance evaluation, correct?
A. Yes.
Q. I'm going to ask you to turn to the last page, 707.
Is that your signature?
A. Yes, it is.
Q. And how was this given to you?
MR. MOSER: Objection as to form.
BY MS. CABRERA:
Q. Do you understand the question?
A. Yes. But I don't remember.
Q. Okay. Do you remember if you were given this evaluation as this piece of paper as I have given it to you today?
A. Or sent by email. I don't remember.
Q. And who gave it to you?
A. John Wilkinson.
Q. And did he have any discussion



Suarez

with you about it?
A. I don't remember. Probably.
Q. Going back to the direct reports that we were just talking about --
A. Uh-huh.
Q. -- I believe you said it went from Josie, one person, and then you hired three additional people, and you had a team of four.
With regard to those four people, can you describe what you had to do each day to manage them as your direct reports?
A. I assigned work to them. I review, I accepted or discarded their findings. And I trained them to analyze their part of the inventory. I divided inventory by, in alphabetical order, and I assigned items to be monitored by them.
Q. When you say that you divided inventory by alphabetical order, was that your -- that was the decision that you implemented?
A. Yes.
Q. And did you have the discretion

to implement whatever system you, you wanted?

A. Yes.

Q. And did -- anything else? I want to make sure I didn't cut you off.

Was there anything else you might do on a day-to-day basis to manage your direct reports at this time?

A. That was work-wise. Um, also, um, I trained them, trained them to be, um, very good in customer service. We reply and prioritize the inquiries from the sales force. And many times I assisted them in replying emails, communications. And also, you know, besides work, approve vacations, PTOs, hours, approval for time.

Q. Anything else?

A. No, that's all I can remember right now.

MS. CABRERA: I'm going to ask the witness to look at what has been marked as Exhibit 2.

(Thereupon, the document was marked Defendant's Exhibit 2 for





identification, as of this date.)

BY MS. CABRERA:

Q. Ms. Suarez, same thing. Take a look and let me know when you're ready. Okay?

A. Thank you.

Okay, I finished reading.

Q. Do you recognize Exhibit Number 2?

A. Yes, I do.

Q. And what do you recognize it to be?

A. A job evaluation.

Q. And who gave you this job evaluation?

A. John Wilkinson.

Q. And do you recall having a discussion with him about this evaluation?

A. No, I don't remember. It must have happened, but I don't remember.

Q. Understood.

Was it his practice to, to meet with you and talk about the evaluations when he gave them to you?

A. It was his practice to be running all the time. He was in a hurry all the





time. So, it could be that we talked about this while we were walking the warehouse. But I don't remember.

Q. In Exhibit Number 2, there are references to Sapphire. What is Sapphire?

A. It's a system, custom system for Southern.

Q. And what kind of system was it? What did it --

A. It was, um, overall system that it was used in accounting, in order processing, in payables and inventory as well.

Q. I ask you to turn to the last page of Exhibit Number 2. Actually, the second-to-last page. So, page six of seven at the bottom.

A. Yes.

Q. Is that your signature?

A. It is.

Q. Did you have any problems with this evaluation?

MR. MOSER: Objection as to form.

THE WITNESS: No. John always





wanted me to explain myself more, and maybe he thought it was stubbornness, but it was the language barrier that get in the way.

MS. CABRERA: Excuse me one second.

THE WITNESS: Uh-hmm.

MS. CABRERA: The mute button was on.

Lauren, are you there?

MS. O'CONNOR: Yes, I'm here.

MS. CABRERA: Okay, sorry about that.

MS. O'CONNOR: That's all right.

MS. CABRERA: Did you -- I'm going to ask the court reporter to repeat the last question and last answer.

(Thereupon, the record was read back by the reporter as recorded above.)

BY MS. CABRERA:

Q. And did you ever tell John that?

A. Yes.

Q. And what did he say when you told

Suarez

him that?

A. Sometimes he kid around and, and, um, make fun of my accent.

Q. And how would he make fun of your accent?

A. Repeating, like, the way I say words. Nothing -- I didn't feel anything derogatory about it. It's just kidding around.

Q. Okay. And in Exhibit Number 2, he makes some references to your staff. He refers to Maria and her staff.

Are those the four individuals we talked about, Josie, Ena --

A. 2011, yes.

Q. Okay. So then it's still Josie, Ena, Tatyana and Justin?

A. Yes.

MS. CABRERA: I'm going to ask that the witness be shown what has been marked as Exhibit Number 3.

(Thereupon, the document was marked Defendant's Exhibit 3 for identification, as of this date.)



Suarez

BY MS. CABRERA:

Q. Again, Ms. Suarez, as we have done with the prior two, take your time, and when you're ready let me know.

Are you ready?

A. Yes.

Q. Do you recognize Exhibit Number 3?

A. Yes, I do.

Q. And what do you recognize it to be?

A. This is a job evaluation.

Q. I ask you to turn to the last page, which is four of four at the bottom.

A. Yes.

Q. Is that your signature?

A. It is.

Q. And who gave you this evaluation?

A. John Wilkinson.

Q. And did you and John discuss this evaluation at all?

A. Most probably, but I don't remember exactly what they were.

Q. Was there anything in this evaluation that you disputed with John?

A. No, but, um, if you see the two



Suarez

previous evaluations, I was working a new system for recording inventory. And he thought that I needed to ask for more help, but nobody could help me. He thought that it was, um, I needed to think outside the box. But IT couldn't help me. Other states where this process was being worked on couldn't help me. So I needed to develop it by myself.

And when he says that that was the best year in inventories not only, um, accuracy but time, it is true because we finished, I finished working on the new system, the RF system. So, and maybe -- I don't remember, but maybe there was a glitch with unsellables that he is talking about here. But I'm pretty sure that was resolved because I don't remember any glitch with unsellables anymore.

So yes, I -- previously he thought that I was not asking for help, but I was asking for help. Nobody could help me. And I developed the RF system actually by myself. Um, there was one person in the



Suarez

IT department that helped me with, um, with the changes in the Sapphire system in order for this new process in inventory taking, communicate directly to the system using in, in, by Southern. And she did. Her name is Olga. I worked perfectly with her.

Um, so I didn't remember, but now I, I remember, like, why he previously said that I didn't ask for help or I was not thinking outside the box. But, yes, when they, this came, the RF system came, like, to be working and worked perfectly from the, from the first time, um, he realized that, you know, that we did it.

Q. What do you mean, "he realized that we did it"?

A. We did it, that we saved money, like paying overtime. Before that we had inventories not for weeks -- like entire week and weekends. Um, but after this was, um, in use, the RF inventory taking in use, actually it reduced the time to two days for the warehouse workers, Friday and Saturday. And Sunday I worked just with my

Suarez

team and maybe a couple of warehouse workers, up to five. So the payroll, the money, it was considerably, and the time, the preparation, everything. Even accounting, we didn't need to pay overtime for data entry people. Everything was done in the warehouse in two days.

Q. And, I'm sorry, what, what was the RF system?

A. The RF system was radio frequency hand-held devices that communicate the accounts directly to the Sapphire system being used by the company.

Q. Understood. Okay.

And was the system before that, did you have to write it down with pen, on pen and paper?

A. Pen and paper.

Q. And then what was written on pen and paper then had to be put into the system; that's why you needed data entry?

A. Yes.

Q. Understood. So the RF system took away the need for a data entry person



Suarez

to be putting that information in?

A. Yes, up to 30 people getting paid overtime.

Q. And when you say that you, you were not getting help, that you couldn't get help, did you mean that you couldn't get help in learning the RF system or implementing the RF system?

A. Both. I want to explain myself. Like, the RF system was there to be learned. You know, I, I didn't invent the RF system.

Q. Okay.

A. Sapphire, it was there. I didn't invent Sapphire. My work was to make the RF system working for our custom-made Sapphire system.

So, I had to -- it was a work in progress for over a year. Every time I have to test it myself because I had to learn by myself how it communicated. Olga created -- how do you say -- a fictional, a testing Sapphire system in order for me to play around. I had to learn and then



Suarez

implement, and then Olga helped me putting it to work.

Q. Okay. And did John recognize --

A. Yes.

Q. -- the value that you brought to the system?

A. Yes.

Q. I'm going to ask --

A. Everybody -- actually, I'm sorry. I'm talking out of place here?

Q. Was there something that you wanted to add to your answer?

A. Greg Risley was the most outspoken about it. He recognized the, the savings that the companies were having. Like, instead of having 300 people working seven days, including, you know, overtime and double time and a half, the reduction to Friday regular hours and to Saturday maybe half day, it was significant.

Q. And how did he recognize? I think you said he was the most outspoken. How did he recognize?

A. We, we had meetings, um, prior



Suarez

and after inventories, and both times he, he praised me, like, really nicely. He talked to me really nicely in front of everybody at the meeting.

Q. Who would be present at those meetings?

A. Accounting and operations.

Q. And who from accounting and operations?

A. From operations, the VP of operations, um, the director of operations, um, sometimes the warehouse manager and I.

From accounting, the controller, the inventory control manager. And that's all I remember right now.

Q. Were all of these people either managers or supervisors?

A. Managers and VPs, and the controller is the equivalent to a VP.

Q. And how frequent were these meetings?

A. We did physical inventory up to six times per year for seven to eight years. So they were really frequent, like,

Suarez

maybe every two months.

Q. Okay. And when you say "seven to eight years," what years are you talking about?

A. From 2007 to 2014 or '15, we did physical inventory up to six times per year. When I implemented the RF system, we didn't have that need anymore.

Q. What was the need that you didn't have anymore?

A. To make -- to have inventories every two months.

MS. CABRERA: Got it, okay.

I'm going to ask the witness be shown Exhibit Number 4.

THE WITNESS: Thank you.

(Thereupon, the document was marked Defendant's Exhibit 4 for identification, as of this date.)

BY MS. CABRERA:

Q. Are you ready to proceed?

A. Yes.

Q. Do you recognize Exhibit Number 4?

A. Yes.



Suarez

Q. And what do you recognize it to be?

A. It's a job performance evaluation.

Q. And who gave you this evaluation?

A. John Wilkinson.

Q. And turning your attention to the last page, is that your signature?

A. Yes, it is.

Q. And did you dispute anything in this evaluation with John?

A. I'm sorry. Dispute? This is how he sees me.

Q. Did you tell John that you disagreed with anything he put in your evaluation?

A. No, I never told him or that I disagreed with the way he saw me.

Q. I would like to draw your attention to page six of seven on Exhibit 4.

A. It's only five of five.

Q. On Exhibit Number -- 2114. Let me see the first page of what you are looking at.

A. Sure.



Suarez

MS. CABRERA: Is it 2113? Okay. Yes, sorry, I jumped to the next one.

Um, you can go to -- okay, you can strike the question.

I'm going to ask the witness be shown Exhibit Number 5.

THE WITNESS: Thank you.

(Thereupon, the document was marked Defendant's Exhibit 5 for identification, as of this date.)

THE WITNESS: Okay, I have read it.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 5?

A. Yes.

Q. And what do you recognize it to be?

A. Performance evaluation for 2014.

Q. I would ask you to look at the last page.

A. Yes.

Q. And is that your signature there?

A. It is.

Q. Okay. And I would ask you to look at page six of seven at the bottom.



Suarez

A. Yes.

Q. There is a box there that says: "Final Comments, Employee Comments. Please write any comments or information you wish to have documented as a part of this review."

Do you see that box?

A. Yes.

Q. Did you put anything in that box?

A. I don't remember ever seeing that box.

Q. I'm sorry?

A. Was it in the other reviews also? I don't remember ever seeing that box.

Q. You're saying when you received this evaluation --

A. No, I'm not saying anything. I just don't remember like...

Q. You don't dispute that that box is there?

A. No, I just don't remember ever seeing it.

Q. Were you aware that you could make comments to your performance evaluations?

A. This is 2014. Maybe in 2016 or

'17 I asked if I can write down something. But I don't remember knowing -- I just received this from John Wilkinson. I read it, I signed it. No, at this point, I don't think I was aware.

Q. Of what?

A. That I could make, um, I don't know, make comments on John's comments.

Q. Okay. I'm going to ask that -- actually, withdrawn.

Ms. Suarez, did you receive a performance review for 2015?

A. I don't remember having received a review for 2015.

Q. Did you give your direct reports performance reviews in 2015?

A. No, I did not. They are union.

Q. When did they become union?

A. From the beginning.

Q. So there was never any formal performance review process with your direct reports?

A. No. And scratch that from the beginning. I think they were hired first





and then they became union.

Q. What is the Warehouse Management Information system?

A. It's a new system that was implemented to make the operations more efficient.

Q. And did that replace the RF system --

A. Yes.

Q. -- in any way? It did, okay.

What about Sapphire, did it replace Sapphire as well?

A. No, it did not. It was implemented as an add-on to Sapphire, like, it was the RF inventory taking system.

Q. And what was different between the RF system and WMI?

A. The WMI was a more inclusive system. It worked in many instances without people involved at all. Scanners on the ceiling instead of a person scanning the product.

Um, not only the system was implemented, the warehouse had to be





expanded and new conveyor belts and scanning stations were applied, video scanning at the front of the trucks, you know, to count everything. It was a really a multimillion dollars improvement. The RF system was only my salary.

Q. I'm sorry?

A. The RF system only costed my salary, that's all.

Q. Oh. And so how did inventory control work under WMI?

A. The physical inventories once, twice, three times a year were replaced by daily cycle counts.

Q. Daily cycle counts?

A. Yes. Basically, that's how it affected me. I didn't have to resolve issues every two months, you know, or inventory preparation every two months. But I was simply, like, giving work to the cycle counters and receiving work or processing their work for them.

Q. And was that because the system was designed to catch errors in real time?





A. Yes.

Q. And how was it implemented?

A. How was it implemented? It was a huge operation. People, um, came to update the, the warehouse, to expand the warehouse, um, to construct new shelving, expand the receiving area. It was -- I think I would say, like, it took like two years, year and a half, two years to implement a new system.

Q. And when did -- do you recall when it started?

A. In July 2017.

Q. July 2017 was when it was fully --

A. Implemented.

Q. Okay. Do you know when it was first introduced to the warehouse?

A. In July 2017. You know, it was -- um, we saw the scanners, the videos, the conveyor belt, but it wasn't implemented; it wasn't introduced to the warehouse workers before that.

Q. When did you become aware that the Warehouse Management Information system

Suarez

would be replacing the RF system?
A. I don't remember, but prior to July 2017.
Q. If I, if I said that it was in early 2016, would you dispute that?
A. No. Actually, it was in January 2016 that Kevin Randall came from upstate New York to Metro New York in order to start implementation.
Q. Okay. And was there training in connection with this new system?
A. It was on, in July 2017. Um, people from upstate New York came to train the warehouse workers in Metro New York.
Q. And that happened in July of 2017 --
A. Yes.
Q. -- the training?
A. Yes.
Q. Okay.
A. The taking of the inventory with the new system, it was done both by warehouse workers from upstate New York that had the system already working there



Suarez

for years, um, along with warehouse workers in Syosset, you know, learning for their system.
Q. Okay. When did you receive training on the new system?
A. I don't remember the date. I was sent to upstate New York. I think it was for a week, to work along the warehouse -- I'm sorry, the system administrator up there.
Q. And do you remember that person's name?
A. Melissa, but I'm not sure.
Q. And was that before July 2017 that you went --
A. Yes.
Q. -- upstate?
A. Yes.
Q. Do you have any sense of how soon before July 2017 you went upstate?
A. Maybe a month prior to that, maybe in June.
Q. What was your title at that time when you went upstate for the training?
A. I don't remember when my title changed. Actually, I don't remember the



Suarez

date. So, it could have been, like, inventory control manager or WMI administrator. It could be either one.
Q. When you went to upstate New York for the training for one week, can you describe what that training was like?
A. It, it was learning how they, the cycle counters did the cycle counts. Like, it was, like, what my job was changing to.
So, maybe I had already the new title, like, I had already have in the new position.
I learned how the cycle counts were performed. I went with the cycle counters, observing them how they did the cycle counts. And I worked in the office, looking at the cycle counts, accepting cycle counts.
And I then watched how they start accepting the cycle counts, created adjustments sent to Sapphire. More or less it's how the RF system worked, but of course a complete new system.
Q. And how comfortable were you with



Suarez

the new system at the end of that week of your training?
A. Pretty confident.
Q. And how did you feel about Melissa as a trainer?
A. Oh, she is excellent.
MS. CABRERA: I'm going to ask the witness be shown what has been marked as Exhibit Number 5 (sic).
(Thereupon, the document was marked Defendant's Exhibit 6 for identification, as of this date.)
THE REPORTER: It is number six, not five.
MS. CABRERA: I'm sorry, the witness was given Exhibit Number 6, not Exhibit Number 5. Thank you.
THE WITNESS: Okay.
BY MS. CABRERA:
Q. Ms. Suarez, I'm going to direct your attention on Exhibit Number 6. If you look at the bottom right-hand corner, there are little numbers.
A. Uh-huh.

Suarez

Q. And I want you to turn to the second page which should have the numbers at the bottom, 000899. Let me know when you're there.
A. Okay.
Q. Have you ever seen Exhibit Number 6?
A. Yes. This was the posting for the position.
Q. And where did you see the posting for the position?
MR. MOSER: Objection as to form.
THE WITNESS: I don't remember if it was sent to me by email or it was sent a link. Um, when Kevin Randall told me to apply to this position, he told me that it had -- HR sent emails every Friday of positions available, but I didn't have the email anymore. I just used to delete those emails.
So, I asked HR how can I apply to this that Kevin told me that I need to apply to this position. And I don't remember if they sent me an attachment, attachment through email, or it was



Suarez

they sent me a link to apply.
BY MS. CABRERA:
Q. And did you get this position?
A. Yes.
Q. Okay. And so looking at the page where the bottom page number is 899, in the middle of the page it says "Core Responsibilities."
Do you see that?
A. Yes.
Q. Is what is listed below the core responsibilities, are those the responsibilities that you actually were performing when you got the WMI position?
A. Okay. I -- partially.
Q. And I was going to say I want us to go line by line, right? And if there is something there that you were not doing --
A. Uh-huh.
Q. -- tell me what that was, what that is. Okay?
A. Most of this I don't even understand.
Q. Okay.



Suarez

A. But yes, go ahead.
Q. Okay, so let's start.
Under "Core Responsibilities," it says "Strategy (50%)."
Do you understand what that means?
A. Yes.
Q. What does that mean? What did that mean?
A. That the applicant, you know, 50 percent of the, the, of the consideration of the applicant should be focused in this part of strategy.
Q. Was it your understanding that as part of the WMI position, that you would be spending 50 percent of your time on strategy?
A. No, that was not my understanding of the position.
Q. What about if you go further down, right, we are on this same page, it says "Execution (30%)"? Actually, strike my question. You can strike that.
What was your understanding of the responsibilities of the WMI administrator when you were applying for



Suarez

the position?
A. Well, when I was told to apply to the position, I was told as well that my, my responsibilities were going to be the same as I was, in my previous position as an inventory control manager. That nothing will change.
Q. Okay. So, your understanding was that your responsibilities would be the same?
A. Yes.
Q. Are those the responsibilities that you outlined for me earlier in the deposition?
A. Yes.
Q. Okay. And is it your position that those responsibilities are different than the responsibilities laid out in Exhibit Number 6?
A. Yes.
Q. How are they different?
MR. MOSER: Objection. Just for the record, the witness says she doesn't understand what most of these

mean. So, over my objection, she can answer.

THE WITNESS: Um, as I told Kevin Randall and John Wilkinson, that this position, it looks like it's more for an IT person than for an accountant. And I'm an accountant. And I could understand a system; I can train on a new system. I can understand and implement and train my people to working a new system. But I'm not by any means a programmer, a computer specialist.

BY MS. CABRERA:

Q. And what did they say to you in response?

A. That nothing will change, that don't even read this. That's what Kevin Randall's words were.

Q. He told you not to read the job description?

A. No, don't pay attention to it. When I said to him, like, it looks to me that this is for an IT person, a





programmer, not for an accountant, he said that nothing will change. Even inventory control manager, it's an accounting position. It has to -- um, we need to know how to work in a computer system, but we don't need to understand the computer system. I was given no alternative but to apply to this position.

Q. And what do you mean by you weren't given an alternative?

A. No alternative.

Q. Meaning you wouldn't have a different -- there was no other position for you, is that what you're saying?

A. That's what I'm saying, yes.

MS. CABRERA: We have to go off tape. The videographer has to change tapes. So if you want to take a break now --

THE WITNESS: Uh-huh.

MR. MOSER: He is going to change the tape?

THE VIDEOGRAPHER: We are going off the record. The time is 12:16 p.m.





This is the end of media number two.

(Brief break.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:29 p.m. This is the start of media number three.

BY MS. CABRERA:

Q. Ms. Suarez, I ask that you be shown what has been marked as Exhibit Number 7.

A. Uh-huh.

(Thereupon, the document was marked Defendant's Exhibit 7 for identification, as of this date.)

BY MS. CABRERA:

Q. Again, once you are done with that exhibit, please let me know when you are ready to proceed.

A. Okay, I have read the letter.

Q. Do you recognize number 7, Exhibit Number 7?

A. Yes. I didn't remember until now, but that's my signature.

Q. And what do you recognize Exhibit





Number 7 to be?

A. It looks like an official letter from HR, I guess to make official my new position.

Q. And this was the WMI administrator position, is that correct?

A. Yes.

Q. And so based on this letter, it looks like you started that position in May of 2016?

A. Yes.

Q. And is that your recollection of when you started?

A. I didn't remember until now, but yes.

Q. Going down to compensation, this is -- your annual salary rate will be 75,000 payable in weekly installments of 1442.31 each Friday. Was that an increase?

A. Yes.

Q. Where was the WMI administrator position located?

A. Syosset.

Q. And what were your job duties as

WMI administrator?

A. The same as before, I was told, but they started to change a little bit, a little by little after I took the position.

Q. Okay. How soon after you took the position did your responsibilities start to change?

A. As soon as -- the first time I realized was in July 2017. No, July 2016. I'm confused with the dates.

Q. Okay. So, let's go back to Exhibit Number 7, right? It's dated May 4th of 2016.

A. Yes.

Q. Correct? Okay.

And so, you believe that the first change was in July. From your recollection, was it, was it within months of getting the new position, or was it a year after getting the new position?

A. The question that you asked me before, when it was implemented, I said July 2017. But I was mistaken. It was July 2016.





Q. Okay. Okay.

A. Yes, I started to notice the difference in, in my job duties, like, I think it was July 2016.

Q. And tell me what was different.

A. I wasn't able to reconcile, reconciliate the physical inventory just taken. Other people, like programmers, just accepted the numbers. Like, I was not in the decision making of the numbers being taken. I was an accountant and, and, and not be able to, to approve the physical inventory. It was hard.

Q. What else changed?

A. I don't remember exactly when, but, um, other people started, like, um, to approve vacations and PTOs. Um, my team wasn't not my team anymore. And I would still give them work and review their work, but the decision making wasn't there anymore. Like I, I was always told what to do.

Q. Even with regard to your team?

A. Yes.





Q. What were you specifically told what to do with regard to your team?

A. One thing I remember, but I don't remember exactly the date, but for me it was a realization that I was not their boss anymore, is that I never approved vacation for physical inventory. During physical inventories everybody has to attend physical inventory. My team has to attend physical inventory. We are the physical inventory team. So, of course it's a sick day, that's different. But vacation, approve vacation for those days, no. And I don't remember if I wasn't there or if I was. But Ena didn't come to a physical inventory, and Tonisha had approved a vacation day for her.

Q. What were the dates of the physical inventory?

A. I'm sorry, I don't remember.

Q. Did they change, or was it something that was -- was it the same day, or was that something that changed?

A. There were not too many physical





inventories at that moment, so it's very easy to look in the vacation records for Ena and the physical inventories in Sapphire. So I don't remember if it was July 2016 or January 2017, um, but she got a vacation time approved during physical inventory.

Q. How often was physical inventory?

A. Um, it was replaced by daily cycle counts. So, July 2016, when the system went live, we took the final physical inventory. But in January 2017, we had auditors, so we had to perform selected physical inventory.

Q. What else changed about your role as WMI administrator from your prior role? You said --

A. Okay. The main thing, it was my not being able to analyze the inventory and to fix the inventory, to, um, um, to prioritize what I need to, to do to solve issues. Being told that my threshold for, for approving, um, adjustments was $500, that's, that's nothing.

Q. What was it before?
A. No threshold. I talked to accounting. I, I talked to the controller, I talked to the, um, to my superiors, and if I found $2,000 worth of inventory, I made adjustments. I sent an email.
Actually, there was a loss in the company, like, I don't remember exactly the date, but I reviewed the loss with the insurance company. I was in the decision making of how much was it, like, a hundred thousand dollars.
Q. And when was that?
A. Maybe 2010.
Q. I believe you said that -- you said, "My team was not my team anymore. I still gave them work and review work."
A. Yes.
Q. Did you still have the authority to fire one of the members of your team?
A. They were not under me anymore. I, I wasn't told anything. Once -- one day I looked at the -- I don't know if I'm saying this correctly, organigram (sic),





like the chart, the company chart, and they were put under John Wilkinson. They were not under me anymore. I don't remember exactly which day, the date.
Q. And where were you on that organizational chart?
A. Under John Wilkinson as well. So, me and my, my team, they were not subor -- subordinates to me anymore. It changed overnight.
Q. So you are saying when you looked at the organizational chart, you and -- and are we talking about Ena, Tatyana --
A. Yes.
Q. -- Josie and Justin?
They were on the same line as you?
A. Yes.
Q. And do you remember when you looked at the organizational chart?
A. I don't remember exact dates, but, you know, things started happening.
Q. It was -- I'm sorry.
A. It would be July 2016, it could be August 2016.





Q. So it was after you took the WMI position?
A. Yes, yes.
Q. Had you looked at the organizational chart when you were inventory control manager?
A. Oh, yes.
Q. And what did the organizational chart look like then?
A. John Wilkinson, my superior. And under me, my team.
Q. Anything else that changed?
A. That's all I can remember right now. But that's a huge change.
Q. So what did you do? What was your job?
A. Checking my, I guess, daily cycle counts and approving adjustments for up to $500.
Q. Anything else?
A. I don't think so, but I have...
Q. I'm sorry?
A. Um, that's all I can tell you right now. Like, I don't -- it changed.





Everything changed. But if you ask me the question, I can respond to you. If you ask me in general what else changed, that's all I remember, I can remember right now. I don't remember anything else.
Q. Okay. So, why don't you explain for us, then, what you, what you did do when you reported to work as a WMI administrator. Walk us through the day. What did you do at work?
A. I got there. Sometimes I helped closing the previous night operations. Um, sometimes it was already closed, so the work was there to give to my people. Um, I assigned the work to them, and I reviewed in the computer the work they did.
Many times I went and double check counts, and I didn't see the big picture anymore. I saw one case, two cases. I saw $500, $1,000. I didn't know, like, what the inventory was worth at the time, or how many cases were shipped or -- I didn't see inventory matters anymore.
Q. My question is: What did you do

Suarez

during the day at work as a WMI?

A. Oh, that was it.

Q. So, you went in, you went into your computer --

A. Sometimes I helped closing the last night of operations.

Q. Okay.

A. Sometimes it was already closed. I give work to my team. I double check their work and approve their work.

Q. Did you do anything else?

A. (Witness shakes head in the negative.)

Q. And how many hours a day did you work?

A. Eight.

Q. And that took up eight hours of your day?

A. Yes.

Q. I believe earlier you said you remembered that -- actually, withdrawn. Strike that question.

Before I move on, going back to the, your responsibilities as WMI



Suarez

administrator, when -- I believe you said you would go into the computer and you would see what work was there and you would distribute that to your team.

A. Yes.

Q. Did you decide who got what work?

A. No.

Q. How was that decided?

A. By the system.

Q. Explain that to me, please.

A. Um, in the position they were in the warehouse, they went out to the warehouse. The only thing I said to them, like, um, work is there. It's closed. We start counting. So I told one person to start in one part of the warehouse, another person to start in another part of the warehouse. And the system will give them -- we take them to the nearest location to count.

Q. And how did you decide who went to what side of the warehouse?

A. Most of the time they said, like, "I want to start here today," or, um, that



Suarez

wasn't important. The important part was to finish the counts.

Q. I understand whether it is important or not. But my question is: How did you decide who went to what part of the warehouse?

A. I'm sorry, I can't answer that question because actually I didn't decide. Like, the system -- let's say one day the system tells me that, um, the racks in the cooler room have the most issues in that day. So I assigned two people to start counting the cooler room.

Q. Okay.

A. So, it was no decision making. It was -- the work was given to us by the WMI system.

Q. So going off the example that you just gave -- right?

A. Uh-huh.

Q. -- you are saying the system told you you had to send two people to the cooler room to perform work. Is that what you are telling me?



Suarez

A. No. The system sells me that most counts are in the cooler room, so I assign two people to the cooler room.

Q. And my question is: How -- who made the decision that it would be two people to go to the cooler room?

A. I'm not understanding your question. There was no decision making on how many people went to the cooler room or anything.

Q. I'm using your words and your example.

You said that you would look in the system and it would tell you that the cooler room was where people needed to go to work, and that you would send two people.

You had -- there were four people, correct? Was it still Ena, Tatyana -- we are talking about four people?

A. Uh-huh.

Q. So my question is: How was it decided that it would be two people that

Suarez

would go to the cooler room because the work needed to be done by two people? Who made that decision?

A. It would be my guess that by reading the numbers, I will make that decision. But I just tried to even out the number of counts by the number of people that I had. At that point, I think I had five people or six.

Q. And who decided of the people that you had, who made the decision about who would go do that work?

A. I guess I'm not explaining myself correctly. The system will give them the next location.

Q. Does the system say Ena is going to go to the cooler room, Tatyana is going to go to the cooler room? The system tells you who needs to go where?

A. I just said, like, it start by the four corners of the warehouse or start by the shipping section of the warehouse where it's most work. So the system will give them the next location, the next



Suarez

location. It could -- the system could give them a next locations to all of them, or if one person, like, step out and goes to the bathroom, at the moment that person comes back to the warehouse, the system will give them a different location. It's not my decision. The system will give them the nearest location in need to be cycle count.

Q. And that's after they already started at the first location, is that correct?

A. Yes.

Q. Okay. And who decides that where the different people are going to go? At the beginning, who made that decision?

A. At the beginning, I guess you want me to tell you that I make that decision. Yes, I asked them, "Josie, please start here, it looks like more counts are there." Yes.

Q. To be clear, I want you to tell me the truth about what happened.

A. Yes.



Suarez

Q. That is what I want to know.

A. I'm telling you the truth. The truth is that I didn't make decisions. I will ask the people working as cycle counters to start in different places of the warehouse. So the system will give -- it will be more productive so the system will give them equal number of cycle counts throughout the date -- throughout the day.

Q. So you assigned to the people where they were going to be working at the beginning of their shift, and then after, the system sort of directs.

A. Yes.

Q. Okay. Did you perform your work -- was it all on a computer or some sort of a device?

A. Yes, computer and warehouse. Before, also I used to work the warehouse looking for whatever discrepancies or checking, or double checking work.

Q. When you say "before," when are you -- what time period are you talking about?



Suarez

A. Before, I was talking my administrator.

Q. But as WMI administrator, you didn't do that anymore?

A. Yes.

Q. Yes, you did it or no, you didn't?

A. Yes, I did, both on the computer -- you said, like, how my work was performed.

Q. Uh-huh.

A. Both in the computer and physically walking the warehouse.

Q. And what were you looking for again, for discrepancies?

A. And double checking counts.

Q. And were -- those were the counts that were done by the cycle counters?

A. Yes.

Q. Earlier you mentioned, when I asked you about training for the WMI position, you mentioned someone named Melissa.

A. Yes.

Q. Was it Melissa Johnson?

Suarez

A. Is there another last name? I think she use a different last name.
Q. Anyone else? Did anyone else train you?
A. I asked a question to the programmers, to the people implementing the system. I asked for a textbook guide, something about the system. Um, I asked the other locations where the system was already implemented if they have some sort of manual or guide. But, um, no, they didn't, and I wasn't given anything. But I did ask questions to the programmers.
Q. Aside from the one week that you spent with Melissa upstate --
A. Yes.
Q. -- did she spend any other time training you?
A. Oh, yes. She came -- um, when the system was implemented, she came and she trained -- she came -- I think we got the whole cycle counters. So they not only worked with me, but they trained the cycle counters, my people.



Suarez

Q. And how many times did Melissa spend time training you in particular?
A. I think it was another time that she came to train me and John Wilkinson on closing the night operations.
Q. What is closing the night operations?
A. You know, when all the trucks are gone, like, like, we close the night operations, we, um, in order to start the new day, that's the WMI cycle ends with a shipping. So, it has to be done in our computer by a manager. Usually the night manager does it, but at the beginning of when they implemented the WMI system, the night manager didn't have a chance to do it. It was done, like, by noon the next day.
Q. Okay. Any other training sessions with Melissa?
A. I think she was there a couple of times, um, but I don't remember very well. I think that she was with me one more time, um, to show me or to try to be more



Suarez

efficient finishing all the counts that were in the system.
Q. So was that five different training sessions with Melissa?
MR. MOSER: Objection.
THE WITNESS: I think more like four, but I don't remember correctly. For me, it was in May or June 2006. Then in July she came -- when everything started, she came and stayed, like, maybe a month when the cycle counters were there for maybe a week. Um, then she came to train, I think not only me and John Wilkinson but other people, like the night managers. Um, and I think she came again, but I don't remember when or exactly how many times. I think there were four in total.
BY MS. CABRERA:
Q. And what did you learn from Melissa when she was training you?
A. Everything that she was telling me, yes.



Suarez

Q. And --
A. And she couldn't make it more efficient, the counts. That's why we hired two more cycle counters, because I couldn't finish all the counts that were in the system. Like, the counters couldn't finish all the counts that were in the system. And when she came, she trained me and my people, like, to be more efficient, but we ended up hiring two more cycle counters.
Q. What else did she train you on?
A. That's all I can remember right now.
Q. What about the week that you spent with her upstate, what did you learn from her at that time?
A. Like I said before, I worked with her -- I saw how she gave work to the cycle counters. I worked with her and the cycle counters in the warehouse. I saw how the cycle counts were performed. I went back and see how she approved the counts and how she assigned more cycle counts to the counters. And that was applied in, in

Suarez

Syosset as well.

Q. Is that everything that you learned from her in that week?

A. Yes, I think so.

MS. CABRERA: I'm going to ask the witness be shown what has been marked as Exhibit Number 8.

(Thereupon, the document was marked Defendant's Exhibit 8 for identification, as of this date.)

THE WITNESS: Okay, I have read it.

BY MS. CABRERA:

Q. So Exhibit Number 8 appears to be an email string. So I'm going to start from the bottom up. Okay?

At the bottom there appears to be an email from you to John Wilkinson.

A. Yes.

Q. Do you remember sending him this email?

A. I didn't until now that I read it.

Q. And so can you explain what was going on here?



Suarez

A. It says sitting with Daniel. I don't remember Daniel, but there was one person that want me, that want me to learn how he did his job in some other state. This wasn't in, in upstate New York.

Q. Okay.

A. I think it was how he did his work in California, if I remember correctly. So, he want me to go behind my cycle counters every single count. And I wanted to learn more. Like, I had already learned that from Melissa. I want to learn more about the system. And I found it counter- productive going behind my cycle counters when Melissa showed me how to check the counts and if I see any discrepancy or I thought that they were incorrect, go and check by myself. I didn't have to go and be behind my cycle counters.

First of all, there were cycle counters, four cycle counters and only one me. So, yeah, and I guess he complained to John Wilkinson and I explained myself to



Suarez

John Wilkinson.

Q. So is this why you sent him, John, this email?

A. It must be. Maybe there is another email before this.

Q. On the second line, the address is -- you address what you just shared, right?

A. Uh-huh.

Q. That he wanted you to cherry pick or count behind cycle counters. You say also that "I am wasting man hours putting Justin to recount behind the others."

A. Yes, because he wanted me -- the way I was doing it up to now, then, is the way Melissa showed me how she did it upstate. I don't remember how many -- I think she had three people upstate. She put two people doing basic counts and one person behind those two people to recount or to double check. And I'm double checking only one people, one person.

He told me, if I remember correctly, that the way I was putting



Suarez

Justin behind the other three cycle counters, I was wasting man hours, that that should be my, my position; I should be going behind my cycle counters.

Q. And did John discuss this with you?

A. Um, must be either, um, um, um, a previous email or a phone conversation. It must be a previous email because I replied to him with an email.

Q. And where do you see that you are replying to him with an email?

A. Because that subject doesn't sound like me, "sitting with Daniel."

Q. How did you and John communicate? Was it via email? Did you talk on the phone? Did you talk in person?

A. By this time, it was not much communication. Until 2014 or the end of 2013, I think we communicated by phone, like, three, four times a day. He was -- he was always asking me questions.

Q. Do you remember talking to John about this specific email?

A. No, I don't.

Suarez

MS. CABRERA: I'm going to ask that the witness be given what has been marked as Exhibit Number 9.

(Thereupon, the document was marked Defendant's Exhibit 9 for identification, as of this date.)

THE WITNESS: Okay, I have read it.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 9?

A. Yes.

Q. And what do you recognize this to be?

A. Yes, this is an email that John sent to me -- a memorandum that John Wilkinson sent to me. I think it was given to me in person. I think Beth, the HR director, was there at that moment.

Q. So if you look at the first page, right --

A. Uh-huh.

Q. -- at the top it says to Maria, from Elizabeth Toohig.

Was Elizabeth the HR person?



Suarez

A. Yes.

Q. The email says: "I have attached the performance expectations we reviewed on Friday."

A. Yes. So she was there and we talked about it and she sent a signed copy to me afterwards.

Q. So was this an in-person meeting?

A. Yes.

Q. And where did this meeting occur?

A. In John Wilkinson's office.

Q. How long did the meeting last?

A. I don't remember.

Q. Was it an hour or more or less?

A. Yes, it could be an hour. But it could be more or less. I don't remember.

Q. Well, what did you talk about at the meeting?

A. I think this -- when I told them that, you know, I, we weren't able to finish all the counts. Not only that the waves from previous night operations were open until, like, the afternoon, so we couldn't start counting the counts in the



Suarez

system until then, but, um, I wasn't able to, to review all the counts. I wasn't able to, um, and I explained to them that, um, I didn't -- they told me about, um -- this is what I remember.

Q. Sure.

A. Negative adjustments. I didn't, I didn't wipe out inventory out of the system. I just prevented; I put it aside. We call it the off-premise packet. I put it aside in order for the sales force not, not to see it so they couldn't order -- they couldn't be back-ordered, so we didn't have customers' complaints.

We -- but this time we had a lot of customer complaints. You know, product was not being shipped, product is lost. Um, the warehouse workers are still learning the, all the functions. Product get lost in the system from the receiving platform to the location. All sort of things are happening right now.

The night operations, like I told you before, is not being closed until the



Suarez

afternoon the following day. Until then, customers can't enter orders. Customer service is doing nothing, can't enter orders.

So, um, Steven from upstate, he, he was John Wilkinson's counterpart in upstate New York. Um, he came with a solution how to assign counts to the cycle counters in order to start counting, not waiting for, um, the system, um, to give us count, but, you know, put the counters to work.

Q. And is that the attachment --

A. Yes.

Q. -- that is the page, the cycle counters position?

A. Yes, and this actually worked.

Q. And what about -- I want to direct your attention to the first paragraph of the memo and the last three lines. It says: "It was repeatedly brought to my attention that you spent very little time at the WMI desk interacting with the experts and was uncooperative during training and indicating that you

Suarez

were confident you had master the new process for inventory control."

What was your -- let me ask you a question. What was your response to John about that?

A. I don't remember what was my response to John. But I think this is about the other memo that you showed me before, "sitting with Daniel."

Actually, I was following -- I don't remember Daniel. But I remember, like, the situation a little bit, like where I explained to John on the previous memorandum. Um, but I was doing what Melissa was training me to do. And actually the system -- but at this point, waiting for the system to give us work is, is, it was out of control and it's not that I mastered the system. It's just that everything that was told to me, I learned it.

Q. So you disagreed with you being described as uncooperative?

A. Yes, I disagree.



Suarez

Q. I'm going to ask you to turn to the second page of the memorandum.

A. Yes.

Q. One, two, three lines down, in the middle, it says: "Melissa Johnson, Danny Layman and Manny Porras will continue to offer you training and guidance."

Were those -- does that refresh your recollection as to the names of the people who came to the warehouse to train?

A. I remember Melissa very well. I don't remember Danny. I guess that's the same Daniel from the other memorandum. And I don't remember Manny Porras. Maybe those are the programmers that I asked for a manual or a guide. Maybe -- I'm sorry, I don't remember, but I did talk to the programmers.

Q. And is this your signature?

A. Yes.

Q. And how did this meeting end?

A. I don't remember. I guess I went back to my job.

Q. When it ended, did you feel that



Suarez

John had listened to your explanations about what was happening?

A. I don't remember how I felt. I don't remember John listening to my explanations. I, of course I did explain myself. Um, Beth was there every time I had a meeting. I think by this point it was my second meeting with Beth present, or the first. I don't remember.

I will always offer to work better. Like, when I was offered these directions from Steve from upstate, I was very grateful. I was very grateful every time Melissa was there to train me and be faster, more productive. She was a great help. And she realized that things were really bad when we just started. And she told me then when they started in upstate, it was very difficult as well.

Q. Do you know how long upstate had already been using the WMI?

A. More than five years. So she was an expert.

Q. Direct -- the first page, the



Suarez

email, is dated Tuesday, September 6th of 2016.

A. Uh-huh.

Q. Was this before or after you gave your deposition testimony in the Sanjous case?

A. I, I don't have the, the dates in front of me, but I think it's before.

MS. CABRERA: We are out of premarked exhibits. Can you go off the record for a minute?

THE VIDEOGRAPHER: Sure.

We are going off the record. The time is 1:30 p.m. This is the end of media number three.

(Brief break.)

THE VIDEOGRAPHER: We are back on the record. The time is 1:38 p.m. This is the start of media number four.

MS. CABRERA: I ask the witness be given what has been marked as Exhibit Number 10.

(Thereupon, the document was marked Defendant's Exhibit 10 for

Suarez

identification, as of this date.)

THE WITNESS: Thank you.

BY MS. CABRERA:

Q. Ms. Suarez, take a look at Exhibit Number 10, and as we have been doing, let me know when you're ready proceed. Okay?

A. Okay.

Q. Exhibit Number 10 appears to be an email string. So at the bottom it looks like an email was sent to you from scans@southernwine with the attachment that's page two. Is that correct?

A. Yes. Some sort of text, is my guess, because it looks like I'm responding to an email.

Q. Understood.

A. Okay.

Q. Looking at the second page at the top, there's some handwritten notes.

A. Yes.

Q. Do you know who put those notes there?

A. It looks like my handwriting.



Suarez

Q. Okay. And then sort of to what you were getting at, right at the top, you are writing to John?

A. Uh-huh.

Q. So can you just explain for us what was going on here, what happened?

A. It looks like I wanted to explain myself that, um, it's not because I was lacking in effort or, or my work ethic wasn't there anymore. It was just because the amount of errors that were in the system were amounting to like -- Melissa was helping and she was an expert and she couldn't clear everything that was there.

Q. So, did you feel that you were being held responsible for something that was not in your control?

A. Maybe I felt that -- that John was thinking that I wasn't making an effort.

Q. And the second page here, right, the attachment that you --

A. Yes.

Q. -- received, what is this? Can



Suarez

you explain to us what this is?

A. I think, um, this was made by Melissa. This is how she worked in upstate. That's what she usually does. Like, but the errors she finds in upstate system, she told me it was two or three errors. Like, ours was mounting to thousands of errors.

Q. So was this -- was the attachment a to-do list for you to follow?

A. Yes. And I worked with her, like, for I guess a couple of weeks doing this.

Q. Okay.

A. Or maybe a week. I don't remember exactly, but she was there.

Q. When you say you were working with her on this, were you working with her on putting together the attachment --

A. No.

Q. -- or she gave this to you and you were working with it?

A. Yes.

Q. And communicating with her?



Suarez

A. It's like Steven from upstate, she -- he gave me guides for the cycle counters to work. She gave me days to follow how -- this is how she worked upstate, I understood at that point.

Q. Okay.

A. And I was trying to copy her, whatever she did upstate.

Q. Got it. So, these were all the tasks that you needed to do?

A. Yes.

MS. CABRERA: Okay. I'm going to ask the witness be shown Exhibit Number 11.

(Thereupon, the document was marked Defendant's Exhibit 11 for identification, as of this date.)

THE WITNESS: Thank you very much. Yes, I do remember this.

BY MS. CABRERA:

Q. Can you explain to me what was going on here?

A. They wrote me up.

Q. And why did they write you up?

Suarez

A. They wrote me up because after I had worked for ten years Saturdays and Sundays by myself, one Saturday I couldn't work.

Q. Let's, let's go through the document together. Okay?

So, in the middle there is, there is a box in the middle and it says: "June, July and then October through December" --

A. Uh-huh.

Q. -- "is the busiest time of year for Southern Glazer's Wine and Spirits. All management employees are required to work at least one weekend shift or as needed. As the WMI Administrator you were required to work any shift either Saturday, October 29th or Sunday, October 30th and you failed to report to work on both days."

And I think you just said, right, after ten years, you couldn't work a Saturday, and that was why you got written up, is that correct?

A. Yes.

Q. According to this warning, you



Suarez

had the option of either working the Saturday or the Sunday. Is that correct?

A. It was never a schedule. It was never a choice. On Friday, like, um, it wasn't even John Wilkinson. Kevin Randall came to the Blue Room where I was working, Blue Room Number 1, and told me that I -- he heard, I guess through Barry Finkelstein -- it's just my guess, but he told me that he heard that I wasn't coming the next day to work, Saturday. This was Friday.

Q. Okay.

A. And I said to him, "As you know, my parents are here. I'm picking them up tonight from the airport. And I can't leave them alone, especially it's the first day." And, and that was it.

And he said I didn't appreciate my job. And I tried to explain, I tried to reason with him, to reason with him that I have been working Saturdays and Sundays, no complaints, never. No complaints, no remuneration. And I needed to pick up my



Suarez

parents, elderly parents, from the airport.

And he said I didn't appreciate my job. And the following Monday, I guess, I get this write-up. It's not that I didn't show, something that it was scheduled and I didn't show. It was never scheduled. It was never told to me.

Um, I don't know what else to say. They didn't tell me anything about it, and it wasn't scheduled so it's not that I didn't show up. And these dates that I was required to work Saturday or Sunday, I wrote down never scheduled because it is true. And I told Beth and John right there that this was never scheduled.

Q. Who gave you this warning?

A. John and Beth were there in John's office.

Q. And when they gave you this warning, did they question you at all?

A. Question me, like, why I couldn't come into work?

Q. Did they pose any questions to



Suarez

you about you not coming to work that weekend?

A. I don't remember. I, I only remember me being upset, um, especially when Beth asked me if I have sport event or concert tickets to justify my not coming to work that Saturday, and I told her that I could show her airplane tickets for my parents, yes, I was very upset.

Q. Do you know why she was asking you about concert tickets or sport tickets?

A. It's only my guess that some other managers or supervisors in the warehouse didn't come to work that Saturday and they showed event tickets, or they told somebody that they had a football game or something. It's only my guess. I, I don't, I don't know for sure what happened or why she asked me those questions.

MS. CABRERA: Okay. I'm going to ask the witness be shown what has been marked as Exhibit Number 12.

(Thereupon, the document was marked Defendant's Exhibit 12 for

identification, as of this date.)

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 12?

A. I haven't...

Q. Would you like to take a minute?

A. Yes. Can we take our break right now?

Q. Yes. Is that what you would like to do?

A. Yes.

Q. How long do we want to take?

MS. CABRERA: Let's go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 1:52 p.m. This is the end of media number four.

(Brief break.)

THE VIDEOGRAPHER: We are back on the record. The time is 2:47 p.m. This is the start of media number five.

BY MS. CABRERA:

Q. Thank you.

Ms. Suarez, you understand that you are still under oath, right?





A. Yes.

Q. Okay. Before we took our break, I gave you Exhibit Number 12 to review. So if you could please put Exhibit Number 12 in front of you and let me know when you have had the opportunity to review it.

A. Yes.

Q. Do you recognize Exhibit Number 12?

A. Yes.

Q. The bottom looks to be an email from you to NYM-inventory control. Do you see that?

A. Yes.

Q. And so, can you explain for me what this is that, that you sent to NYM-inventory control?

A. I was supposed to send my adjustments to that group.

Q. And is this something you did daily?

A. A few times a day.

Q. And then above there is a response from Eric Meyer. Do you see that?

A. Yes.





Q. Do you know who Eric Meyer is?

A. Yes, I remember him.

Q. What was his job?

A. I'm not sure. He was from Florida, I understood. He was from the corporate offices.

Q. I want you to read -- you don't have to read it out loud but sort of read it to yourself, Eric's message.

A. Yes.

Q. And what I want to know from his message is if there is anything incorrect about what he is saying.

A. No.

Q. Okay.

A. Actually, he told me, and Melissa told me that we were having the same issues upstate had when they started with WMI. All these adjustments, every cycle count is one adjustment. Every, um, um, every moment our warehouse man scans one case or a scanner scans one case, it's an adjustment.

So accounting was having trouble





analyzing all these adjustments daily. And what he said is true, it's true, and I tried to complying as much as possible especially with large amounts. And here is only one example, but there were so many other instances and with smaller amounts.

MS. CABRERA: Okay. I'm going to ask that the witness be given what has been marked as Exhibit 13.

(Thereupon, the document was marked Defendant's Exhibit 13 for identification, as of this date.)

THE WITNESS: Thank you.

Okay, I read it.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 13?

A. Yes.

Q. And what do you recognize about it?

A. It was a memo sent by John Wilkinson to me.

Q. And did you -- and did you meet with John in person about this memo?

A. I don't remember, but I must have because my signature is there.

Suarez

Q. And the first line, it says that "This memo serves as a follow up to our conversation on December 16, 2016."

Did you have a conversation with John on December 16th of 2016?

A. I don't remember having one, but I must have.

Q. Well, when you received this memo and it says, "This memo serves as a follow up to our conversation" --

A. Yes.

Q. -- "on December 16" --

A. So that's why I say I must have meet with him on that date, yes.

Q. So you don't remember it and you don't dispute that --

A. That's correct.

Q. Understood, thank you.

Um, does the memo accurately reflect what you talked about on December 16th of 2016?

MR. MOSER: Objection.

THE WITNESS: I don't remember, but, um, all these points are in



Suarez

accordance with the tasks given by Melissa, this attachment over here (indicating). So I started working on that since October 26th.

BY MS. CABRERA:

Q. Okay. So, you're saying that -- I just want to make sure I understand what you're saying, okay?

A. Uh-huh.

Q. So if I'm wrong, you can tell me I'm wrong.

Um, so are you saying that the tasks that are being addressed in Exhibit 13 are the ones that were attached to Exhibit 10?

A. Yes.

Q. Okay. Um, and then I'm going to ask you to turn -- well, actually, on the second page, in the middle of the page, there is a paragraph that starts: "At the end of every day."

A. Yes.

Q. Okay. The last line in that paragraph says: "Please submit a proposal



Suarez

for the daily checklist by December 30, 2016."

Did you do that? Did you prepare a proposal for the daily checklist?

A. I don't remember. I don't remember what was asked or what kind of daily checklist is asked, was asked.

Q. Okay.

A. I guess all the counts or all the discrepancies or issues that were in the system against the things that were corrected that day. But it's only a guess at this point.

Q. And then starting at the bottom of page two and continuing on to page three --

A. Uh-huh.

Q. -- there are three bullet points that list your responsibilities as WMI administrator.

A. Yes.

Q. Did John list any responsibilities in this document that you believed were not your responsibilities?

A. No, I don't think so, and I was doing all that.



Suarez

Q. And at the bottom of the page there is a signature. Is that your signature on the left?

A. Yes.

Q. After you received this document, did you meet with John weekly?

A. I meet with him and Tonisha Durant a few times. I don't remember if it was weekly.

MS. CABRERA: I'm going to ask the witness be given what has been marked as Exhibit Number 14.

(Thereupon, the document was marked Defendant's Exhibit 14 for identification, as of this date.)

THE WITNESS: Okay, I have read it.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 14?

A. Yes, I think this was before or at the same time as the previous memo.

Q. Are you saying that you got, you got it together, this, with the memo?

A. Yes.

Suarez

Q. I'm going to ask that you turn to the last page.

A. Uh-huh.

Q. Um, in the box where it says "Employee Statement," the box checked off says: "I disagree with employer's statement. Please explain below." And below, it was written in "reviewing document."

A. Yes.

Q. Is that your note in there, "reviewing document"?

A. Yes.

Q. Okay. Can you tell me today what it is that you disagree with in Exhibit Number 14? And, and just so that I want to make sure we get everything, that we start from the beginning.

A. Yes.

Q. So start from the first page and you can walk me through each paragraph and tell me, you know, where there is something that you disagree with.

A. There must be an email in



Suarez

response to this, um, to John Wilkinson and/or, or to Beth or Tonisha or to all of them.

Q. Okay.

A. I, I explained every single point. This was October, November and December. There was so many mistakes, errors made, but not by the system but the people managing or working in the system.

I was trying to do my best, and that's what I explained to John. But when I have thousands of issues every day and I'm supposed to double check the cycle counters' work and be in the warehouse floor constantly, which I did, um, we needed more help. And I did ask Tonisha to take some of these issues, and she did help. She did sometimes closings, she did sometimes -- everything that was to be done in the computer, she helped, so I had more time to be on the floor.

Everybody helped and, and if there were issues, they were resolved in January because in January everything



Suarez

calmed down, and while I prepare for inventory all the issues were resolved.

Q. When you say that Tonisha helped, was that before or after you got Exhibit Number 14?

A. I think she always helped.

Q. Okay. Looking at the first paragraph, okay, it says: "On September 2, 2016 you and I met with," HR, "Human Resources to review performance expectations in your new role as WMI Administrator. I explained at the time that you had not been cooperative with the WMI subject matter experts that had been brought in for training and initial set up."

Did you discuss that with John, this continued issue that you --

A. It wasn't a continued --

Q. Let me just finish.

A. Sorry.

Q. Let me rephrase.

He keeps bringing it up.

A. Uh-huh.



Suarez

Q. Okay? And so my question to you is -- here we are, this is now January, right?

A. Yes.

Q. It's about six months into the implementation. Okay. And he is still saying that you have not been cooperative with the WMI subject matter experts.

Did you discuss that with him?

A. I don't remember, but I must have. At this point, there were no more people from other places in the warehouse, so he went back to the original email, I guess, about Daniel. Um, I don't remember the subject, "siting with Daniel," which is Exhibit 8.

And, as I said before, all these bullet points on the memorandum is, it was already addressed by Melissa giving me the tasks, the weekly and daily tasks to perform.

And if we go back to December 2016, I'm pretty sure we can find thousands of errors. And, like I explained to, to John, if you can only pinpoint a few

Suarez

of them, my performance is excellent because I'm solving all these thousands of errors, and you can only find maybe six errors that I wasn't able to solve.

That was my explanation. And Tonisha was there, Beth was there, and I think there is an email explaining every single point here.

Q. Okay. But I'm asking you today to explain it to me.

A. I don't remember. I don't even remember these -- um, this is very technical.

Q. Okay. Well, let me try to ask this question differently, Ms. Suarez.

This is -- Exhibit Number 14 is about maybe the fourth or fifth time John is referring to you as being uncooperative with the people who are helping, okay, who helped, right?

A. Uh-huh.

Q. My question to you is: What did you say to John in response to that issue? Specifically that issue, that's all I want to talk about. The issue about you being



Suarez

uncooperative with the trainers, what did you say to him?

A. I don't remember very well right now. There must be an email answering his memo from me to him, but I'm -- all I can tell you right now, that all these three or four times he is referring to the same issue with Daniel. I don't think Melissa can say that I was uncooperative and I didn't cooperate with her, um, that I didn't do what she told me to do, that I didn't follow her assignments, daily and weekly assignments. Um, I can only guess right now that every time he refers to that, he goes back to the email, "sitting with Daniel."

Q. Okay. Even though -- and each time he refers to it, he refers in plural; he says "experts."

MR. MOSER: Object.

BY MS. CABRERA:

Q. He doesn't say "expert." You still think he is just talking about Daniel?



Suarez

A. I don't remember the -- he listed three names. I only remember Melissa. I don't remember the other two names.

Q. The second paragraph says: "Additionally it was agreed that Melissa Johnson from Upstate would spend another week with you training on WMI administration. The training took placed (sic) the week of October 24th."

Did that happen, did Melissa spend another week with you?

A. Yes. This is -- we already went through this. That's, that's when she gave me the weekly and daily tasks.

Q. Okay. I believe that's Exhibit 10. Let's make sure we're right.

A. Yes.

Q. So it was during that week that she gave you those, that additional list?

A. Yes.

Q. Okay. His last, the last paragraph on this page says -- the second line says: "At no time have you requested assistance or informed me that you are not



Suarez

completing the tasks expected of you."

What was your response to John about that?

A. I don't remember what my reply to him was. But I did request assistance, and Melissa was helping me from upstate doing some tasks, and Tonisha was helping me as well, and I must have requested their help.

Q. Do you know why John was thinking that you were not asking any help?

A. If I know why? I don't know. He needed to write this memorandum, put something on it.

Q. So, you're saying that he wrote something false in this memorandum? Is that what you're telling me?

A. I did ask for help. If I got help, it's because I requested help.

Q. So you think John knew that you were asking for help and he lied in this document?

A. I don't know what he was thinking.

MS. CABRERA: I would ask the witness be shown what's marked as

Suarez

Exhibit Number 15.

(Thereupon, the document was marked Defendant's Exhibit 15 for identification, as of this date.)

THE WITNESS: Okay.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 15?

A. Yes.

Q. So Exhibit Number 15 looks like it's an email from John Wilkinson to you with a copy to Elizabeth Toohig from Human Resources.

There are eight items listed in this, in Exhibit Number 15.

My question to you is: With each one of these items, does John, did John incorrectly state anything on any of these items? And you can take them one at a time.

A. No, I don't remember very well every instance. But, um, he acknowledged that everything is going in the right way, is being resolved and that upstate and Tonisha are helping me, so -- and him



Suarez

himself, he said he's helping me with other warehouse managers to resolve all the issues from the previous year because the end of the year is very hectic.

Q. So it's true that that was occurring, that others were helping --

A. Yes.

Q. -- and John was helping?

A. Yes, as per my request.

Q. It also looks like there are some items that were not completed, but he's saying that they are -- that it's okay, that they understand some things are changing and that's okay. Do you see that?

A. Yes. The number of issues that were carried over from the previous year, from 2016, were so numerous that it was impossible for one person to fix all the issues. So, that's why Melissa and Tonisha were helping me, John Wilkinson was helping me, and he acknowledged that the amount of issues was, um, unmanageable at that point. But they were being resolved.

Q. And if you look at number six,



Suarez

item number six, it says: "Wave management is being handled by Jen Moore from day bills and Barry F" -- is that Finkelstein?

A. Yes.

Q. -- "is doing the closing of wave management on night bills. Tonisha and I agreed that you should once again take this responsibility over on February 1st of 2017."

So, was wave management something that you were doing and they had asked someone else to cover that?

A. Yes.

Q. And do you know why they asked them to cover it?

A. Like everything else, to help me a little bit, you know. Everything had to do with cycle counts. Every single issue, it had to be resolved by a cycle count. So, um, and I have to double check my counters' tasks, and that mean that I have less time to cover all the other issues that were a carryover from the previous year.

Q. So you saw this as -- when, when



Suarez

wave management is being given to Jen Moore, right, that was to help you. Is that your understanding of why that was done?

A. Yes.

Q. Did you take wave management over in February?

A. I don't remember.

But before that, wave management is the closing of the previous night operations. I think I was doing it in December and at the beginning of January just because the production didn't finish until the following morning. So the night manager was already gone when they, when everything was shipped. So that's why I was doing it. And maybe, um, in February, I was only, like, to check that everything was closed properly because I don't think that in February the production will keep going until the following day.

Q. And Barry Finkelstein, what was his position?

A. At that point, he was warehouse

Suarez

manager.

Q. So at this point, was he referring to the night manager wasn't even doing it, Barry had stepped in to do it?

A. Yes.

Q. Ms. Suarez, do you remember how John would go about scheduling these meetings with you?

A. No, I don't remember at this moment.

MS. CABRERA: I ask this be marked as 16.

(Thereupon, the document was marked Defendant's Exhibit 16 for identification, as of this date.)

THE WITNESS: Okay.

BY MS. CABRERA:

Q. Does exhibit -- withdrawn.

Do you recognize Exhibit Number 16?

A. Yes.

Q. And what do you recognize it as?

A. That's a meeting scheduling. That's a system that it got to all of us through email.



Suarez

Q. Does this refresh your recollection --

A. Yes.

Q. -- as to how John would schedule meetings?

A. Yes. I don't think he scheduled all the meetings this way, though.

MS. CABRERA: I ask this be marked as 17.

(Thereupon, the document was marked Defendant's Exhibit 17 for identification, as of this date.)

BY MS. CABRERA:

Q. Before you look at Exhibit 17, Ms. Suarez, do you recall how else he would schedule a meeting if he didn't send you an invite?

A. Phone call is my guess. I don't remember.

Q. Okay. I'm sorry, you can look at 17 and let me know when you're ready.

A. Okay.

Q. My question on Exhibit Number 17 is: Is this an accurate recap of your



Suarez

meeting?

A. Yes, um, I don't remember specifics, but it looks accurate.

MS. CABRERA: I will have this marked as Exhibit Number 18.

(Thereupon, the document was marked Defendant's Exhibit 18 for identification, as of this date.)

BY MS. CABRERA:

Q. Do you recognize number 18?

A. Yes.

Q. And what is number 18?

A. Another meeting schedule.

Q. I had asked you earlier if after the December 2016 meeting, if you recalled how frequently you met with John. And you did not recall.

So I just want to know if Exhibit 18 refreshes your recollection as to having a meeting on February 14, 2017.

A. Yes. It looks like we met four weeks in a row.

MS. CABRERA: Mark this as 19.

(Thereupon, the document was



Suarez

marked Defendant's Exhibit 19 for identification, as of this date.)

THE WITNESS: Okay, finished reading.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 19?

A. Yes.

Q. And what do you recognize this to be?

A. We had a meeting on 3/8/2017, and then he mailed me a review for that day.

Q. And is this an accurate review of the meeting that you had?

A. Yes. As it is stated here, I was on vacation, and, and the review was for, like, how Tonisha handled all the issues while I was away.

Q. Number 9 says: "Emails -- These were kept up to date by Ena Scott while you were out on vacation and she will continue to assist as needed."

Did Ena continue to help you with emails?

A. I don't remember, but I think so.

Suarez

The emails, the inquiries by customer service and the sales force was taken away from us for, since July 2016 until, I guess, Tonisha do this job on the weeks I was away. It looks like she realized that we needed to continue to replying emails through my department.

MS. CABRERA: Got it. Okay.

Can I have this marked as number 20, please?

(Thereupon, the document was marked Defendant's Exhibit 20 for identification, as of this date.)

THE WITNESS: Okay.

BY MS. CABRERA:

Q. So, I apologize because Exhibit 20 appears to be two emails sent on the same day. It looks like the second one was the first one, though. Okay?

A. Um, the second page, although it has a different date, is the same one that -- on Exhibit 17, it looks like it was sent on March 8th and then again on March 21st.



Suarez

Q. Yes. And then -- and that was sent again on March 21 at 10:01 p.m. And then the next email was sent at 10:04 p.m. So that's what I meant they were -- the second page should have been in front of the first page.

A. Yes, but, like, if you see, this more than a month after the meetings. So he sent on 3/21 on a meeting on 2/14 and a meeting of 2/7.

Q. Well, we --

A. But the 2/7 was already sent.

Q. If you look at the top --

A. Uh-huh.

Q. -- right, of Exhibit 20, the first page --

A. Yes.

Q. -- it says: "This is to review what we met about and discussed with Tonisha today."

A. Yes.

Q. And so, are you telling me that what he listed here was not discussed on March 21st of 2017?



Suarez

A. No, it was discussed on 2/14/2017. Or the subject is incorrect.

Q. Well, that's what I'm trying to ask you. One of them is incorrect, right?

A. Yes.

Q. It's either the subject matter is incorrect or his first line saying "This is to review what we met about and discussed" --

A. I think the subject is correct because, um, that's management and he talks about from 2/1 to 2/7. So...

Q. So, that tells you that this was the recap from your 2/14 meeting?

A. Yes.

Q. Okay. And that was Exhibit Number 18, is that correct, the meeting invite?

A. Yes.

Q. And so is this an accurate recap of that meeting?

A. Yes, I think so.

MS. CABRERA: I ask this be marked Exhibit 21.

(Thereupon, the document was



Suarez

marked Defendant's Exhibit 21 for identification, as of this date.)

THE WITNESS: Okay.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 21?

A. Yes. It is the same as Exhibit 19.

Q. And when you say, "It is the same as Exhibit 19," what do you mean exactly?

A. That the meeting date is different, but the review is the same.

Q. Well, we will put that aside. You can keep Exhibit 19 to the side.

A. Okay.

Q. Before we -- you can, like, leave it on the side. I will ask you some questions about that.

Um, but first, Exhibit 21, was this -- is this an accurate recap of your meeting?

A. Yes.

Q. Drawing your attention to item number six, it says: "Wave management -- great shape." Do you see that?

A. Yes.

Suarez

Q. And that was one of the things that others were helping, and then they gave you that responsibility back, is that correct?

A. Yes, but I don't remember if they were still helping with it or I was doing it. It looks like after my vacation, I was doing everything again.

Q. Going back to -- withdrawn.

Jen Moore was one of the people that was covering that before, correct?

A. I don't remember. I think it was Barry more doing that, but I could be mistaken.

Q. Could it have been -- I'm going to ask you to pull Exhibit Number 15, please.

A. Okay.

Q. And I will direct your attention to item number six, and let me know if that refreshes your recollection as to who was covering wave management.

A. Yes.

Q. My question is: What was Jen Moore's title?



Suarez

A. Administrative assistant.

Q. Okay.

A. But she is doing the day bills. Barry was doing the closing for the, the night waves.

Q. And when you took it over, you were doing the night closing, or you were doing both?

A. I think I was doing both. And then the night managers -- like, this goes back to on November and December that we were helping the night manager. The wave management for operations, for night operation, is supposed to be closed by the night manager. So, Jennifer was closing the waves for day bills. Day bills is only a few.

Q. Okay.

A. And I don't know if I was doing that or not at this point. I think I went back to doing the day bill closing.

MS. CABRERA: I ask that this be marked as Exhibit 22.

(Thereupon, the document was



Suarez

marked Defendant's Exhibit 22 for identification, as of this date.)

THE WITNESS: Okay.

BY MS. CABRERA:

Q. Do you recognize the emails in Exhibit 22?

A. Yes.

Q. It appears --

A. Yes.

Q. -- these are two, these are two different emails. So starting on the last page, so starting backwards, it looks like it was sent on Thursday, April 13th, and then the first line says: "This is to review what we met about and discussed with Tonisha today April 7th."

And there are 11 items listed, correct? Is that correct?

A. Yes, but something is wrong.

Q. I'm going to ask you a question, okay? And then it appears the email in front of it was also sent on Thursday, March 13, 12 minutes later. And at the top it also says: "This is to review what we



Suarez

met about and discussed with Tonisha today April 7th." Is that correct?

A. Yes.

Q. So, did he send you these two emails on the same day?

A. It looks like. But the first email, the one that was sent at 6 p.m., um, it listed the same review as Exhibit 19, yes, for three -- for March 8th.

Q. Well, during these meetings, aren't you reviewing the same issues?

A. Yes.

Q. In fact, it looks like the second email he sent you on the 12th --

A. Uh-huh.

Q. -- it seems like he took some things off the list, is that correct?

A. Yes.

Q. It also appears that he corrected item number 9. Do you see that?

A. (Thereupon, the witness nods in the affirmative.)

Q. So at 6 o'clock --

A. Yes.

Suarez

Q. -- he is indicating that the reconciliation report is currently two and a half pages long. But then 12 minutes later, he said it's currently one page long, 45 items.

A. (Thereupon, the witness nods in the affirmative.)

Q. Do you know -- withdrawn.

Was that a result of you communicating with John about what he had listed at 6 o'clock?

A. Probably, but I don't remember at this moment.

Q. And is this an accurate recap of your meeting with him on April 7th?

A. The second email, the one at 6:12?

Q. Yes.

A. Yes, I think so.

MS. CABRERA: I would ask that this be marked as Exhibit Number 23.

(Thereupon, the document was marked Defendant's Exhibit 23 for identification, as of this date.)

BY MS. CABRERA:



Suarez

Q. Are you ready?

A. Yes.

Q. Do you recognize Exhibit Number 23?

A. Yes.

Q. What do you recognize it as?

A. It looks likes a recap of another meeting, although it's a similar as other recaps.

Q. Well, this recap seems to be saying that you've resolved most of the issues, doesn't it?

A. Yes.

Q. In fact, in areas where things may not be completely done, in here John seems to be including the reasons that you provided for why they were not done.

A. Yes. As you pointed out before, we reviewed the same issues every week, it looks like every week.

Q. But this recap is a lot shorter than all the other recaps, right?

A. Okay, yes.

Q. And on the first page of 23, it looks like it's an email exchange where



Suarez

John is emailing you, asking if you were coming, and you respond, is that correct?

A. Yes.

Q. Did that happen sometimes, that you didn't see the invite?

A. I don't think there was an invite this time.

Q. Okay. So when you say, "I didn't see the invite, I will be right there," you weren't sure if there had been an invite sent?

A. Yes, I guess that's why I emailed that like I didn't see it. I didn't know that there was a meeting.

MS. CABRERA: Mark this 24.

(Thereupon, the document was marked Defendant's Exhibit 24 for identification, as of this date.)

THE WITNESS: Okay, I remember this.

BY MS. CABRERA:

Q. So you recognize Exhibit Number 24?

A. Yes.

Q. And what do you recognize it to be?



Suarez

A. It was a write-up about, um, an error in the system. They said it was caused by me. It was not. And I got it like a month later from when this happened. So it was hard to backtrack and really pinpoint what happened.

Q. Well, I want to direct your attention to the first paragraph on the first page.

A. Yes.

Q. Where -- it says: "On November 7, 2017, you processed 34 counts in error. You did not notify anyone of this error until you received an email from Tonisha Durant, Inventory Control Manager on 11/8 inquiring of the reason why you consumed 90 cases of Whispering Angel. It wasn't until receipt of that email did you advise of the error you made the day before and that you would be conducting a full sku cycle count to balance the inventory."

I want to talk about this paragraph alone. Okay?

A. Yes.

Suarez

Q. What is incorrect about that paragraph?

A. Um, I think I was the one who emailed Tonisha and not the other way around. It must be in my email there. Um, I think that I saw some emails and I sent Tonisha an email, um, about this specific matter. I think there was a few screens open while I was processing cycle counts that caused the error. I don't remember exactly what happened. Um, but I did explain what happened. And I think it was my email to her and not the other way around.

Q. Okay. So when he says "On November 7, 2017, you processed 34 counts in error," was that true or not?

A. I don't remember right now.

Q. And sitting here today, your recollection is that it was you that notified Tonisha, and not the other way around?

A. To the best of my recollection, yes, that's the way it was.



Suarez

Q. I'm going to ask you to turn to the second page, please.

A. Uh-huh.

Q. Um, in the box where it says, "I disagree with Employer's statement," is that your handwriting?

A. Yes.

Q. Can you please read into the record everything that you wrote there, please?

A. Communication goes both ways. Issues need to be corrected immediately. It would have been much better to know about how my mistakes affected others within a reasonable time not a month later. Some of the wording is mistaken, orders were shortshipped because the product was not in the proper location and not because of my error. Bill and hold, cannot be back ordered.

Q. Does that refresh your recollection as to whether or not it was you that emailed Tonisha first or she -- you emailed her or she emailed you about



Suarez

the error?

A. I think I called her or emailed her as to -- that's the way I remember.

Q. Well, why didn't you put that in your statement here?

A. Oh, because this is not about my mistake or not mistake. This is about the write-up.

Q. Excuse me?

A. The write-up says that my mistake cost the company $13,000 error, and I was trying to explain, or I was trying -- I was trying to make the statement that, you know, it will have been best to know, like, immediately what happened so we can backtrack and know what really happened.

Um, at that moment, one month later, it's difficult to backtrack one month of -- like, November, it's very busy, and it's difficult to know exactly what happened.

Q. Well, what I'm trying to understand is, you took the time to explain what happened in this employee statement.



Suarez

And all over page one, John is saying that the issue was not the error, but the issue was your lack of communication. That's what it says all over here.

A. Uh-huh.

Q. So my question is: Why wouldn't you say: I'm the one who emailed her, not she emailed me? Why would you not say that?

A. I don't know. I will have to, to check the emails to know exactly what happened. The way I remember is that I emailed or called her.

Q. But you're not sure?

A. That's all I can remember right now.

Q. Okay. All right. So that's the best -- that's your explanation as to why you did not correct John and tell him that it was you who alerted Tonisha to the error and not that it was her that alerted you to the error?

A. I think that's why, my way of saying that I didn't get the email from

Suarez

Tonisha. It was me who emailed her because I don't think -- I remember seeing something and calling or emailing Tonisha right away. This was early in the morning. This was the moment I walked into the company. And about some lost product the night before.

Q. Okay.

A. And I think I emailed Tonisha something about it or called Tonisha something about it and -- but nobody emailed me about the supposed error that I had.

Q. Well, what I'm trying to understand --

A. Until a month later.

Q. Okay. What I'm trying to understand is that we are sitting here almost four years --

A. Yes.

Q. -- after this. And you seem to remember that you may have been the one to send the email. So why is it that a month after you did not make that the first thing



Suarez

that you wrote here when, when the warning again is not about the error, but they are blaming you for not notifying anyone?

So you are telling me -- you are sitting here saying to me that you took the time to give an explanation, but at no point did you say, Hey, I was the one who emailed. You wrote everything else, but you didn't correct him on the issue that you were being written up for. Is that what you are telling me today?

A. You are saying that my wording was not correct? Um, I don't, I don't -- that's the way I felt at that moment. I don't remember very well, but I, I think maybe my wording is not correct. Communication goes both ways. Maybe that's my way of saying what you just saying right now, that I was, I didn't receive any communication, that I was the one who communicated.

Q. Well, but then you go on to say: "It would have been much better to know about how my mistakes affected others



Suarez

within a reasonable time not a month later."

So, you seem to be acknowledging that it was your mistake, but your issue is that they didn't tell you until a month later.

A. Maybe I'm acknowledging that it could have been a mistake.

MS. CABRERA: Okay. I'm going to ask that this be marked as Exhibit Number 25.

(Thereupon, the document was marked Defendant's Exhibit 25 for identification, as of this date.)

THE WITNESS: Okay.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 25?

A. No. I think it's the first time I'm reading it.

Q. Did you receive a performance appraisal from John in 2016?

A. I don't remember receiving one.

Q. Okay. I would like to draw your attention to the second page, two of five,



Suarez

toward the bottom of the page just above the heading where it says "Inspiring Others."

A. Uh-huh.

Q. There is a -- it says "Comments by John Wilkinson." Okay. And it reads: "Maria strives for excellence and sets high standards for herself and her staff."

Is that a true statement?

A. It is.

Q. If you turn to page three of five, same area of the page under "Comments by John Wilkinson," it says: "Maria is very organized and plans very well. She's very effective at scheduling her staff and managing the processes that they need to perform on a daily basis."

Was that an accurate statement by John?

A. Yes.

Q. If you turn to the --

A. But --

Q. -- following page, page four of five, under "Talent Building," there is a

section that starts a little closer to the top of the page. It says "Talent Building," and he rated you as a solid performer, and under that he says: "Maria teaches her staff new skills and works with them so they are more productive. She builds talent through matter of fact style of teaching. While she builds the talent and makes her staff and others more valuable she does not do it through coaching. She removes growth barriers for her team members educating them on processes from analytical research. She delegates assignments to her staff's strengths and helps them to be more successful. Maria could offer more praise and learn coaching techniques to help improve her staff's productivity."

Was that an accurate statement by John?

A. All these look like accurate statements, but on my performance before when I was inventory control manager, um -- this is 2016. Maybe includes some of the





time that I was still inventory control manager. Um, I don't remember seeing this, so I can't say. But I consider that a true statement.

MS. CABRERA: I would ask this be marked as Exhibit Number 26.

(Thereupon, the document was marked Defendant's Exhibit 26 for identification, as of this date.)

THE WITNESS: Thank you.

Okay.

BY MS. CABRERA:

Q. Do you recognize Exhibit Number 26?

A. No, I do not.

Q. And did anyone ever give this to you?

A. I don't remember seeing it.

Q. Did anyone ever discuss a 2017 end-of-year performance with you without a document?

A. No, I don't remember discussing it.

Q. I'm going to direct your attention to the second page. They are saying, section bullet -- well, it's in





bold. It says "Integrity." Okay?

The second sentence there says: "She does manage her team and they appear to follow her lead."

Do you see that?

A. Yes.

Q. And so here in -- and this is for the year 2017. John is still referring to you managing a team, right?

MR. MOSER: Objection. The witness has already testified with regard to this in the preceding document that she doesn't even recall seeing them. Um, there's a whole bunch of assumptions that are being made because neither of these documents has been authenticated as even coming from John Wilkinson. So, just note my objection for the record.

MS. CABRERA: So, that's great. I would just ask counsel that you refrain from speaking objections as per the Federal Rules of Civil Procedure and you can just make your general





objection. Thank you.

BY MS. CABRERA:

Q. So, Ms. Suarez, my question to you is: On the second page of this document, it appears that John is still referring to you managing a team. Is that what you see on the second page of this document?

A. That's what it reads here.

Q. I'm going to ask you to pull Exhibit Number 7, please.

A. Yes.

Q. From the time that you received Exhibit Number 7, and it's dated May 4, 2016, up through 2017, covering that time period, did you ever receive a letter like Exhibit Number 7 changing your job title?

A. No, I did not.

Q. And at any point was your salary changed?

A. No, it wasn't.

MS. CABRERA: I believe we are going to -- we need to take -- the videographer is going to need a break,

Suarez

and this is a good point for us to take a break. So, do you want to take, like, ten minutes?

MR. MOSER: Sounds good.

THE VIDEOGRAPHER: We are going off the record. The time is 4:26 p.m. This is the end of media number five.

(Brief break.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:46 p.m. This is the start of media number six.

BY MS. CABRERA:

Q. Ms. Suarez, did there come a time that your employment ended?

A. Yes.

Q. And when was that?

A. April 2018.

Q. And who told you that your employment was ending?

A. Kevin Randall.

Q. And what did he say?

A. That my position was being eliminated.

Q. Did he tell you why?



Suarez

A. He said that the position was being eliminated all over. The WMI administrator was going to be eliminated all over United States.

Q. I'm sorry, all over?

A. The United States.

Q. The United States?

A. Yes.

Q. Got it. Okay.

And how much notice were you given?

A. None.

Q. Was the termination effective immediately?

A. Yes.

Q. And were you offered a severance package?

A. Yes.

Q. Did you accept it?

A. Not -- no.

Q. Why not?

A. First, the calculation that the HR person present at that moment explained to me was done incorrectly, was done from



Suarez

2004 to 2018, and I explained that my employment started in April 2000, the year 2000. And then I was advised by this HR person to talk to, to get legal counseling, and I did.

Q. Okay. And at that point, did your attorney communicate with the company?

A. Yes, I think so.

Q. Okay. Ms. Suarez, I want to draw your attention to your deposition testimony in the Sanjous versus Southern Glazer's Wine and Spirits case. Okay?

Were you deposed in that case?

A. Yes, I was.

Q. And if I told you that your deposition was on October 7th of 2016, do you have any reason to dispute that date?

A. No, I don't have any reason.

Q. Were you given a copy of your deposition transcript?

A. No, I was not.

Q. And who told you that you were going to be deposed in that case?

A. HR director, Elizabeth.



Suarez

Q. Elizabeth? Okay.

And did you prepare for that deposition?

A. Yes.

Q. And how did you prepare?

A. Um, the company attorney, um, met with me the day before for approximately one hour.

Q. And when you say "the company attorney," do you know if it was an attorney that actually worked for the company, or was it an attorney that was hired by the company?

A. I don't know for sure, but he repeated -- he said a couple of times, "I work for the company, not for you."

Q. Okay. Do you remember his name?

A. No, I don't.

Q. Okay. And, um, you said you met for an hour the day before?

A. Yes.

Q. Who was in the room when you met?

A. Only the both of us.

Q. And how long was your deposition?

A. I don't remember the length.
Q. Was it shorter than this today?
A. Yes, a lot shorter.
Q. Did you speak with anyone after the deposition?
MR. MOSER: Objection.
MS. CABRERA: Withdrawn. I'm going to rephrase that question.
BY MS. CABRERA:
Q. Did you speak with anyone at Southern Glazer's about the deposition?
A. No, I did not.
Q. Did anyone speak to you about -- did anyone from Southern Glazer's speak to you about the deposition, your deposition testimony?
A. No. There was only one comment, but nobody spoke directly to me.
Q. And what was the one comment?
A. John Wilkinson to Barry, I think he was talking about his deposition.
Q. Oh, okay. So he didn't make a comment about your deposition?
A. I took it that it was directed to





me.
Q. Tell me why you thought it was directed to you.
A. Because he said, "That's the way you do it. If you are loyal to the company, that's the way you do it. You say 'I don't remember, I don't know.'"
Q. And when in relation to your deposition did he make that comment? Was it before or after?
A. After. He was deposed after me.
Q. And do you have any personal knowledge as to whether John saw your deposition transcript?
A. No, I don't.
Q. And what did you, what did you testify to at your deposition?
A. Um, basically, I was deposed about Josie's duties.
Q. Okay. And what did you say about Josie's duties?
A. That she worked in the warehouse, that she wore safety shoes, safety vest, that she performed warehouseman duties or





tasks, that she replaced and did a great job, um, in the receiving area as a checker.
Q. And do you believe that the testimony that you gave was bad for the company?
A. It was -- it was supposed as was recommended to say by the attorney the previous day.
Q. What did the attorney recommend that you say the previous day?
A. "I don't know. I don't remember."
Q. And the previous attorney told you to say that even when you did know and even when you did remember?
A. He didn't even ask me if I knew.
Q. Okay. Um, okay. So can you tell me what was bad about what you testified to?
A. I don't know if it was bad or not. It was just that it was not what the attorney trained me to say.
MS. CABRERA: Understood. Okay. Understood.





Okay. I'm going to be -- I'm going to ask that the witness be shown Exhibit Number 27.
(Thereupon, the document was marked Defendant's Exhibit 27 for identification, as of this date.)
BY MS. CABRERA:
Q. Ms. Suarez, I'm going to ask forgiveness from your counsel slightly in the essence of time, okay? I'm representing to you that Exhibit Number 27 is the complaint that you filed in this matter. Okay?
A. Okay.
Q. And so I'm going to ask you to just take a look at that. I'm going to ask you some, some very specific questions.
A. Okay.
MS. CABRERA: So if it's okay with counsel, if we can sort of go through it together, or do you want to give her time to go through the document?
MR. MOSER: You can go through it

Suarez

with her --

MS. CABRERA: Okay.

MR. MOSER: -- and address certain -- might be better to address certain points.

MS. CABRERA: I think so, okay.

BY MS. CABRERA:

Q. Okay. So, do you have any reason to believe that this is not the complaint that you filed in this case?

A. No, I don't.

Q. Okay. So I'm going to direct your attention to page number five, paragraph number 33. And it says: "Ms. Suarez believed that the women in her department should be classified as 'warehouse' employees and brought this to the attention of her direct supervisor, John Wilkinson."

My question is: How did you bring it to his attention?

A. I sent an email.

Q. And if you go down to paragraph 37, it says: "That same day, Ms. Suarez



Suarez

sent an email to John Wilkinson stating that her 'team was classified differently by payroll' and while she was sure it was 'just a mistake, it looks like they were classified by sex.'"

Is that how you notified him?

A. Yes, I remember this being correct, yes.

Q. And so that's the email that you sent to notify him of this issue?

A. Yes.

Q. And did you -- actually, withdrawn.

Paragraph number 38 says: "Wilkinson forwarded the email to Dina Wald-Margolis of Southern's Human Resources Department at approximately 1:00 PM on May 2, 2013."

My question is: How did you know that? How did you know that John had sent the, your email to human resources?

A. I, I didn't know at the time, but if -- I guess Dina told me or, or she emailed me, and I saw John forwarding the, my email to her.



Suarez

Q. Okay. And is that why it appears on 39: "At approximately 1:30 PM on May 23, Ms. Wald-Margolis emailed Ms. Suarez. Ms. Wald-Margolis agreed that 'the subcategory seems to be different for 3 out of the 4 employees,' but, 'guaranteed' that the different classification was not 'based on gender.'" Is that correct?

A. As far as I remember right now, yes, it is correct.

Q. Did you and Ms. Wald-Margolis have any discussion, or was it all via email?

A. I think she called me over the phone.

Q. Okay. And what do you recall about that, about a conversation with her? What do you recall her telling you during that conversation?

A. I don't remember specifics, but I remember she asking me if I think it will be good for her to meet with the women in my department, and she did meet with them.

Q. And were you present when she met



Suarez

with them?

A. No, I was not.

Q. Did they talk to you about her meeting with them?

A. No, they did not.

Q. I'm going to ask you to look at paragraph 40.

A. Uh-huh.

Q. It says: "After May 2, 2013, Wald-Margolis met with the three female Inventory Control Clerks and unsuccessfully attempted to convince them that they were not being discriminated against based on sex."

How do you know what she told them?

A. I don't know, but I guess my attorney knows.

Q. So you don't have personal knowledge about what...

A. What was said, no.

Q. -- she said to them? No, okay.

I'm going to draw your attention to paragraph 51, and that's on page eight. And it says: "Once the lawsuits were

Suarez

filed, the Defendants engaged in a pattern of discrimination and retaliation against the Plaintiff."

And my question to you is: The paragraphs that come after that, from 52 all the way to... from 52 all the way through paragraph 89, okay, are those all of the reasons why you believe that you were discriminated and retaliated against? And take your time. You know, go through them. I want you to.

But what I, what I want to know is if there is anything missing here, okay, if there is anything that maybe you forgot to put in here.

A. Up to what number you said?
Q. What number are you up to?
A. 82.
Q. Yeah, all the way down to 89.
A. Yes.
Q. So my question is: Does that -- do those paragraphs contain everything that you believe was done to you in retaliation and you were being discriminated against?



Suarez

A. Yes, as far as I can remember right now, yes. Although, um, number 78, I think we corrected those days afterwards.
Q. Got it.
A. I think it was the weekend of the Saturday, 29, not --
Q. Got it.
A. -- the week of November 4th.
Q. Okay. Um, I'm going to ask you just some questions about some of these, some of these things.

In paragraph 77, you state that on that particular Saturday, you had a pre-approved vacation. Who had approved your vacation?
A. Kevin Randall. But not for that day, right? I had an approved vacation for the week of -- I think it started on November 3rd. I have -- in order to respond accurately, I need to, to see the, um, the calendar. I...
Q. Okay. Let me, let me ask it to you this way, then --
A. Okay.



Suarez

Q. -- without having to look at a calendar. Okay?

When you did not work that weekend, the October 29th, October 30th weekend --
A. That Saturday.
Q. Correct, that Saturday.
A. The 29th.
Q. Did you have a pre-approved vacation for that day?
A. No, for the following week.
Q. Understood. So you were starting vacation Monday? Was that right?
A. No. I'm sorry, I don't remember exactly right now.
Q. That's okay. I'm trying to remember it more in the sequence of events, right? You said you picked up your parents on Saturday?
A. On Friday night, like midnight into Saturday morning.
Q. Okay. And so was your plan to be on vacation while your parents were in town?



Suarez

A. Yes.
Q. Okay.
A. Actually, we had a trip -- Kevin Randall was aware of the reason, the special reason he approved my vacation, that, um, we have a, block out days for vacation approval beginning in October to December.
Q. Okay.
A. But he approved because of the special reason I have. Like, I had my parents and we were planning a trip.
Q. Okay.
A. So, um, yes. Although the vacation was scheduled for the following week, he knew that I was picking my parents from the airport, up from, you know, midnight from Friday to Saturday.
Q. Understood. Okay.

Um, as a part of -- when you took -- when you started to perform the WMI administrator position --
A. Uh-huh.
Q. -- did you -- were you filling

Suarez

out timesheets at that point?

A. No, I did not.

Q. Do you have any personal knowledge as to whether anyone else, anyone on your team, had received a performance evaluation for 2005?

A. For 2005?

Q. Yes.

A. There was no inventory control team in 2005.

Q. Well, paragraph 55, you say: "Southern did not furnish the Plaintiff with a performance evaluation covering 2015."

I'm sorry, I'm saying 2005. I'm saying 2005; it is 2015. In 2015, okay, you indicated --

A. No, I don't know.

Q. Okay. You don't know if others received performance evaluations? Okay.

A. (Witness shakes head in the negative.)

MS. CABRERA: I'm going to ask that the witness be given what has been



Suarez

marked as 28.

(Thereupon, the document was marked Defendant's Exhibit 28 for identification, as of this date.)

BY MS. CABRERA:

Q. Ms. Suarez, I'm going to represent to you that Exhibit Number 28 are the responses to interrogatories that we received from your attorney.

A. Okay.

Q. Before today, have you reviewed these?

A. Yes, I did.

Q. Okay. I'm going to direct your attention to page number seven, number 11. It says: "Larry," last name unknown.

My question is: Is this Larry Callahan?

A. Yes.

Q. And who is Larry Callahan?

A. He was the night manager.

Q. And then the next paragraph, 12, um, Selena Seabrooks, is this the person from the EEOC that you said was asking you



Suarez

questions?

A. I believe so.

Q. Okay. I want to ask you to turn to page nine. Interrogatory number five asks that you identify all the employers that you have been employed with since Southern Glazer's. I just want to confirm if you listed four employers, if these are all the employers that you have had.

A. Yes.

Q. And, and so for Lyft, it says from September 2018 to the present.

So are you currently still working as a Lyft driver?

A. No, not right now.

Q. When did you stop working as a Lyft driver?

A. I think at the beginning of the year. I had problems with my insurance.

Q. And is that the -- is it safe to say the same for Uber?

A. Yes.

Q. What about Macy's?

A. I ended my job there in August



Suarez

this year.

Q. And why did you end your job there?

A. Because I, I finally put together my resume, and I'm looking for a job based on my background and education.

Q. Okay. Why didn't you look for a job based on your background and education before this summer?

A. It was very hard to put together my resume. I was mistreated and fired for no reason. Putting in a resume 18 years of experience in Southern, I couldn't face it. So I went to jobs where the only things they asked to me were my driver's license and Social Security number.

Q. And in putting your resume together in the summer, right, have you started looking serious for something?

A. Yes.

Q. Okay. And how have you conducted that search? Tell me what you have been doing to try to find a job.

A. Through Robert Half, recruiters.

Suarez

Q. Okay.
A. And I have one current offer, and, and I have one good possibility, like, pending. And I have -- I had a few interviews, but nothing has been finalized, finalized yet.
Q. Okay. I think that covers -- so, in interrogatory number six, right, we asked you to give the names of everyone that you have made an application. Okay? And here you listed Uber, Lyft and Walmart. But this is dated May of 2021.
A. (Thereupon, the witness nods in the affirmative.)
Q. So it sounds like what you are saying to me, that's changed since May of 2021, is that correct?
A. Yes.
MS. CABRERA: I would just ask counsel to supplement interrogatories so that we have an accurate record of Ms. Suarez's mitigation efforts.
BY MS. CABRERA:
Q. I will direct your attention to



Suarez

interrogatory number 16. And there we asked for you to identify anyone you may have seen with regard to any emotional pain and suffering. And the response was "None," that you had not seen anyone. I just want to confirm if that is still the case today.
A. It is. It is. I haven't seen a professional here in the United States. But in Ecuador, I seek counseling from my aunt who is a psychiatrist.
Q. She is a psychiatrist?
A. Yes, she is.
Q. Did she prescribe you any medication?
A. No, she did not.
Q. I would like to draw your attention to interrogatory number 18, and it is on page 18 at the top.
A. Yes.
Q. We just asked if you kept any notes, diaries, journals or other records of conversations related to your allegations.



Suarez

Your response was: "Yes. Plaintiff kept a paper calendar. Plaintiff is not in possession of same as she was specifically instructed by John Wilkinson at the time of her termination that she could not take her calendar with her. Plaintiff left the paper calendar in the possession of Defendant."
A. And also I --
Q. I'm sorry, let me ask you the question.
When you say "paper calendar," can you, can you describe what you're talking about specifically?
A. Yeah, the desktop calendar for that year.
Q. Got it.
A. And also I have maybe six or seven books from previous years. Everything related, work related.
Q. Okay. And do you remember what it was that you wrote on the calendars?
A. Work in progress. Meetings. Reviews of, you know, issues, inventory



Suarez

issues. Everything work related. And also I kept a digital calendar in my laptop, that it was left at Southern also.
MS. CABRERA: Got it.
I would ask the plaintiff to look at Exhibit 29.
(Thereupon, the document was marked Defendant's Exhibit 29 for identification, as of this date.)
THE WITNESS: Yes. Do you have a question about this?
BY MS. CABRERA:
Q. Have you seen this document before?
A. I have.
Q. In this case, you're alleging that the company owes you overtime, is that correct?
A. Yes.
Q. And on Exhibit 29, it indicates that the amount of overtime is $25,994.84. Do you see that?
A. Yes, everything to -- 2017 to 2018, yes, I see that.
Q. And so how do you -- how did you

calculate this number? How did you come to $25,994?

MR. MOSER: Objection as to form.

THE WITNESS: I did not make the calculations. If I did, I should have added ten years working Saturdays and Sundays with no overtime pay.

BY MS. CABRERA:

Q. Well --

A. But as my attorney said, I was classified as a manager, so I didn't get overtime pay. But it changed. I wasn't a manager anymore. I was an administrator.

Q. So, it is your position that between January 1st of 2017 and up until the date of your termination, that you were no longer a manager, you were an administrator; is that what this calculation is based on?

A. I think from May 2016 I was no longer a manager. Everything changed.

Q. Okay. And so from May 2016 to April 6th of 2018, how much overtime do you allege the company owes you?





A. I will have to make the calculations. I don't know from the top of my head right now.

Q. Okay. Can you share how many hours you think are owed to you?

A. I would say 16 hours per week, although I was looking -- I was remembering by the meeting, um, meeting scheduling that you just gave to me --

Q. Uh-huh.

A. -- that all the meetings were scheduled at 7 p.m., 8:30 p.m. I didn't remember that. I didn't say that, I didn't tell that to my attorney. That was, like, way before or after the 6:30 p.m. hour that I was told that I have to work until.

Q. Okay. So, what are you saying? Were you saying that you would add that to the 16 hours?

A. (Thereupon, the witness nods in the affirmative.)

Q. You would add the half an hour of each one of those meetings, you should add that to the 16 hours?





A. Maybe an hour. And there was two meetings scheduled at 8:30 p.m.

Q. And you said 16 hours per week. Does that cover the weekend?

A. Yes.

Q. And you were working both days every weekend?

A. No. Just Saturdays. Nobody worked on Sundays.

Q. Got it.

A. Only me for ten years.

Q. Okay.

A. Prior to the WMI administrator position.

Q. And so when you say 16 hours a week, where is the 16 hours coming from? I'm just trying to understand.

A. One hour or two per day and Saturday.

Q. Okay. Ms. Suarez, have you suffered emotional distress as a result of your termination?

A. Yes.

Q. Can you describe for me the





symptoms of your emotional distress?

A. Being unable to work on my resume made me cry and depressed every time. Not being -- you know, not being, like, successful in the eyes of my parents, my relatives, my friends, was very hard to me.

It is very hard for an immigrant to get a job in an office. Everybody comes here and cleans houses. It was very special when my parents, my family, everybody know that I was not cleaning houses. I was working in an office. And that was taken away from me. I couldn't face it. I couldn't face going to a job and apply for a management position.

I did changes in my life. I shared my house just to make my mortgage payments. I couldn't face it. I couldn't. It is still hard.

Q. Aside from not being able to, to put yourself in a position to go for a similar job, were there any other effects on your daily life as a, as a result of everything you have shared here today that

Suarez

happened at Southern Glazer's?

A. I don't know. Like what? Oh, like, changes in my daily life. Going to work in a car for Uber is a huge change.

Q. Okay.

A. Going to Walmart and being invisible is a huge change. And I wanted to be invisible.

Q. You wanted --

A. And I wanted to be invisible.

Q. Invisible, okay.

A. Yes, those are huge changes. That's not the way I was. I hope I could be the same I was, confident, knowledgeable, firm in my decisions, being able to make decisions. That was taken away from me, and it put doubts in everything I had accomplished until then.

MS. CABRERA: I have no further questions.

MR. MOSER: I just have a couple.

EXAMINATION

BY MR. MOSER:

Q. I want to draw your attention to



Suarez

Exhibits 25 and 26, if you could take a look at them together.

Is your signature -- let's talk first about Exhibit 25.

Is your signature on this document?

A. No, it's not.

Q. How about on 26, is your signature on that document?

A. No, it's not.

Q. Do you recall seeing either one of these documents before today?

A. No, I didn't.

Q. Um, counsel asked you several questions about whether these particular reviews were accurate with regard to your duties as WMI administrator. Um, are these accurate reviews as to your duties as WMI administrator?

MS. CABRERA: Objection.

You can answer, but I believe that mischaracterizes my question.

THE WITNESS: The ones that were pointed out were not because it talks



Suarez

about me as a manager and my teamwork and for me was, which was not longer a reality once I was given the WMI administration position.

BY MR. MOSER:

Q. At the time that you had the WMI administrator position, was there an inventory control manager at Southern?

A. In accounting there was.

Q. And who was that?

A. Tonisha Durant.

Q. Before you became WMI administrator, what was your title?

A. Inventory manager warehouse.

Q. If the references to your abilities as a manager had been made to your work when you were the inventory --

A. Manager.

Q. -- manager warehouse, would they be accurate in terms of your management style and abilities?

A. Yes.

MR. MOSER: I have no further questions.



Suarez

MS. CABRERA: I'm thinking.

THE REPORTER: No problem.

FURTHER EXAMINATION

BY MS. CABRERA:

Q. I want to direct your attention to Exhibit 25, please, page 3 of 5.

A. Uh-huh.

Q. At the bottom, where it says: "Comments by John Wilkinson, Maria is very organized and plans very well. She's very effective at scheduling her staff and managing the processes that they need to perform on a daily basis."

So are you, are you telling us here today that this is a lie, that this is false, this is a false statement about you in 2016?

A. For the first part of 2016, I think it's true.

MS. CABRERA: I have no further questions.

THE VIDEOGRAPHER: The time is 5:38 p.m. We are going off the record. This is the end of media number eight

Suarez

in today's deposition of Maria Suarez. Thank you.

THE REPORTER: Do you want a copy of the transcript?

MR. MOSER: Yes. Yes.

(Time noted: 5:38 p.m.)



Suarez

November 11, 2021

ERRATA

PAGE/LINE CHANGE/REASON

______________________________________________



Suarez

_______________________

MARIA SUAREZ

Subscribed and sworn to before me this day of 2021

____________________________



CERTIFICATE

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK)

I, Jessica R. Taft, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That MARIA SUAREZ, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

_____________________________

JESSICA R. TAFT, RPR, CM

November 11, 2021

INDEX


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Maria Suarez | Ms. Cabrera | 5 |
| | Mr. Moser | 177 |
| | Ms. Cabrera | 180 |

| DEFENDANT'S | PAGE | |
|---|---|---|
| Exhibit 1 | 26 | Document Bates stamped SGWS 002618 through 2624 |
| Exhibit 2 | 29 | Launch for Maria Suarez, SGWS 002626 through 2632 |
| Exhibit 3 | 33 | Launch for Maria Suarez, SGWS 002634 through 2637 |
| Exhibit 4 | 41 | Launch for Maria Suarez, SGWS 002639 through 2643 |
| Exhibit 5 | 43 | Launch for Maria Suarez, SGWS 002645 through 2651 |
| Exhibit 6 | 52 | Job posting, SGWS 000897 through 900 |
| Exhibit 7 | 59 | Documents SGWS 002655 through 2656 |
| Exhibit 8 | 81 | Email string, SGWS 001927 |
| Exhibit 9 | 85 | Email, SGWS 002244; memo, SGWS 002245 through 2248 |




November 11, 2021

INDEX (continued)


| DEFENDANT'S | PAGE | |
|---|---|---|
| Exhibit 10 | 92 | Email string, SGWS 002221 through 2222 |
| Exhibit 11 | 96 | Document SGWS 002686 |
| Exhibit 12 | 100 | Email SGWS 002060 |
| Exhibit 13 | 104 | Memo SGWS 002661 through 2663 |
| Exhibit 14 | 108 | Document SGWS 002674 through 2676 |
| Exhibit 15 | 117 | Email, SGWS 001983 |
| Exhibit 16 | 121 | Email, meeting schedule, SGWS 002527 |
| Exhibit 17 | 122 | Emails, SGWS 002378 through 2379, and SGWS 002339 |
| Exhibit 18 | 123 | Email, meeting schedule, SGWS 002377 |
| Exhibit 19 | 123 | Emails, SGWS 002376 and SGWS 002337 |
| Exhibit 20 | 125 | Emails, SGWS 001974 through 1975 |
| Exhibit 21 | 127 | Emails, SGWS 002375 and SGWS 002333 |
| Exhibit 22 | 130 | Emails, SGWS 002334, SGWS 002331 through 2332 |




November 11, 2021

INDEX (continued)


| DEFENDANT'S | PAGE | |
|---|---|---|
| Exhibit 23 | 133 | Emails, SGWS 002328 through 2329 |
| Exhibit 24 | 135 | Document, SGWS 002678 through 2679 |
| Exhibit 25 | 143 | Performance review, SGWS 002665 through 2669 |
| Exhibit 26 | 146 | 2017 end-of-year performance, SGWS 002671 through 2672 |
| Exhibit 27 | 156 | Complaint |
| Exhibit 28 | 166 | Responses to interrogatories |
| Exhibit 29 | 172 | Overtime document |

REQUEST: 169