## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MARIA SUAREZ,

PLAINTIFF,

-against-      Case No.:
2:19-cv-07271-GRB-SIL

SOUTHERN GLAZER'S WINE AND SPIRITS OF NEW
YORK LLC,
DEFENDANTS.
----------------------------------------X

DATE:  November 21, 2022
TIME:  12:25 A.M.

DEPOSITION of the Defendant,
SOUTHERN GLAZER'S WINE AND SPIRITS OF NEW
YORK LLC, by a Witness, DINA WALD-MARGOLIS,
taken by the Plaintiff, pursuant to a
Agreement and to the Federal Rules of Civil
Procedure, held remotely via Zoom, before
Sandra Sierra, a Notary Public of the State
of New York.

## Page 2

1
2   A P P E A R A N C E S:
3
4   MOSER LAW FIRM PC
     Attorneys for the Plaintiff
5     MARIA SUAREZ
     3 School Street, Suite 207B
6     Glen Clove, New York 11542
     BY:  STEVEN MOSER, ESQ.
7     Smoser@moseremploymentlaw.com
8
9   CONSTANGY, BROOKS, SMITH & PROPHETE, LLP
     Attorneys for the Defendant
     SOUTHERN GLAZER'S WINE AND SPIRITS
10    OF NEW YORK LLC
     620 Eighth Avenue, 38th Floor
11    New York, New York 10018
     BY:  ANJANETTE CABRERA, ESQ.
12    Acabrera@constangy.com
13
14         *     *     *
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2   F E D E R A L   S T I P U L A T I O N S
3
4         IT IS HEREBY STIPULATED AND AGREED
5   By and between (among) counsel for the
6   respective parties herein, that filing and
7   sealing be and the same are hereby waived.
8
9         IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to the form
11  of the question, shall be reserved to the
12  time of the trial.
13
14        IT IS FURTHER STIPULATED AND AGREED
15  that the within deposition may be sworn to
16  and signed before any officer authorized to
17  administer an oath, with the same force and
18  effect as if signed and sworn to before the
19  Court.
20
21
22
23
24
25

## Page 4

1
2         IT IS HEREBY STIPULATED AND AGREED by
3   and between counsel for all parties present
4   that this deposition is being conducted by
5   Videoconference, that the Court Reporter,
6   all counsel, and the witness are all in
7   separate remote locations and participating
8   via Videoconference (LegalView/Zoom/WebEx)
9   meeting under the control of Lexitas Court
10  Reporting Service, that the officer
11  administering the oath to the witness need
12  witness shall be sworn in remotely by the
13  Court Reporter after confirming the
14  witness's identity, that this
15  Videoconference will not be recorded in any
16  manner, and that any recording without the
17  express written consent of all parties
18  shall be considered unauthorized, in
19  violation of law, and shall not be used for
20  any purpose in this litigation or
21  otherwise.
22
23
24
25

1 (Pages 1 to 4)

Page 5

1    IT IS FURTHER STIPULATED that
2  exhibits may be marked by the attorney
3  presenting the exhibit to the witness, and
4  that a copy of any exhibit presented to a
5  witness shall be emailed to or otherwise in
6  possession of all counsel prior to any
7  questioning of a witness regarding the
8  exhibit in question. All parties shall bear
9  their own costs in the conduct of this
10  deposition by Videoconference.
11
12
13       *       *       *
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1           D. WALD-MARGOLIS
2  D I N A   W A L D - M A R G O L I S,
3  called as a witness, having been first duly
4  sworn by a Notary Public of the State of
5  New York, was examined and testified as
6  follows:
7  EXAMINATION BY
8  MR. MOSER:
9    Q.   Please state your name for the
10  record.
11    A.   Dina Wald-Margolis.
12    Q.   What is your address?
13    A.   69-12 166th Street, Fresh
14  Meadows, New York 11365.
15    Q.   Good afternoon, Mrs. Margolis.
16  Should I address you as Wald-Margolis or
17  Margolis?
18    A.   Wald-Margolis.
19    Q.   Is that Mrs.?
20    A.   It is.
21    Q.   Okay.
22    A.   Either one is acceptable.
23    Q.   Okay.  Good afternoon, Mrs.
24  Wald-Margolis.  My name is Steven Moser.  I
25  am an attorney and I represent Maria Suarez

Page 7

1           D. WALD-MARGOLIS
2  in a case she is bringing against Southern
3  Glazer's Wine and Spirits.
4    I am here to ask some questions
5  of you today.  If you don't understand a
6  question of mine, please don't answer it.
7  Let me know and I will repeat or rephrase
8  it as many times as necessary.
9    If you would like to take a
10  break for any reason, please let me know.
11    Do you understand these
12  instructions?
13    A.   Yes.
14    Q.   Are you under the influence of
15  any narcotics or medication which would
16  affect your ability to testify truthfully
17  and accurately today?
18    A.   No.
19    Q.   I don't mean to insult you, but
20  are you under the influence of any alcohol?
21    A.   No.
22    Q.   Can you think of any reason why
23  you cannot testify truthfully and
24  accurately today?
25    A.   No.

Page 8

1           D. WALD-MARGOLIS
2    Q.   Have you ever been diagnosed
3  with any memory issues?
4    A.   No.
5    Q.   Do you understand that the oath
6  that you just took to tell the truth is the
7  same oath that you would take in court in
8  front of a judge and jury?
9    A.   Yes.
10    Q.   Are you represented by counsel
11  today?
12    A.   Yes.
13    Q.   Who is representing you?
14    A.   Angie.
15    Q.   Okay.  By "Angie," you mean
16  Anjanette Cabrera?
17    A.   Yes.
18    Q.   Have you received any
19  compensation or promise of compensation
20  from anyone to testify here today?
21    A.   Just the money that was in the
22  subpoena.
23    Q.   Have you received any
24  compensation or promise of compensation
25  from anyone to testify at trial?

2  (Pages 5 to 8)

Page 9

D. WALD-MARGOLIS

1
2     A.    No.
3     Q.    Are you being compensated for
4  your time today, other than the witness fee
5  that was included in the subpoena?
6     A.    No.
7     Q.    Do you have a Facebook profile?
8     A.    Yes.
9     Q.    And are you Facebook friends
10 with any current or former employees of
11 Southern Glazer Wine and Spirits?
12    A.    Yes.
13    Q.    With whom?
14    A.    Oh, boy.  Michelle Maya, Andrea
15 Melzer, Kim Gordon, Amy Silverberg, Nora
16 Reyes, Frank Bernitt.
17    Q.    What is the last name, please?
18    A.    Bernitt.
19    Q.    Do you know how to spell that?
20    A.    B-E-R -- B as in boy,
21 E-R-N-I-T-T.  And I can't recall if there
22 is any others.
23    Q.    Do you have any business or
24 personal relation -- other than as Facebook
25 friends, do you have any business or

Page 10

D. WALD-MARGOLIS

1
2  personal relationship with any current or
3  former employees of Southern Glazer's Wine
4  and Spirits?
5     A.    No.
6     Q.    Have you ever used your
7  Facebook profile to communicate about Maria
8  Suarez?
9     A.    No.
10    Q.    Have you ever used your
11 Facebook profile to communicate about your
12 employment with Southern Glazer's Wine and
13 Spirits?
14    A.    Can you restate the question?
15    Q.    Have you ever posted anything
16 about your work at Southern Glazer's Wine
17 and Spirits on your Facebook page or
18 profile?
19    A.    I don't recall.
20    Q.    Before testifying today, did
21 you do anything to prepare yourself?
22    A.    I met with Counsel.
23    Q.    And I don't want to know about
24 what you spoke about with Counsel, but did
25 you speak with Counsel to prepare for

Page 11

D. WALD-MARGOLIS

1
2  today?
3     A.    Yes.
4     Q.    For how long did you speak?
5     A.    I believe about an hour.
6     Q.    When was that?
7     A.    Friday.
8     Q.    When was the first time you
9  communicated with Counsel regarding this
10 case?  Again, I don't want to know what you
11 spoke about; that is privileged.  I want to
12 know when you spoke with Counsel for the
13 first time.
14    A.    Can you clarify the question?
15    Q.    Did you speak with Ms. Cabrera
16 on Friday or somebody else?
17    A.    Ms. Cabrera.
18    Q.    Before Friday, did you
19 communicate with Ms. Cabrera or with any
20 other counsel regarding this case?
21    A.    Yes.
22    Q.    When for the first time did you
23 communicate with Counsel about this case?
24    A.    When I was notified that I was
25 going to be called by you.

Page 12

D. WALD-MARGOLIS

1
2     Q.    Can you approximate the date?
3     A.    September or late August.
4  Early September, mid-September.
5     Q.    Okay.  So are you employed now?
6     A.    Yes.
7     Q.    Where are you employed?
8     A.    Skyline Windows.
9     Q.    For how long have you been
10 employed by Skyline?
11    A.    About three and three-quarter
12 years.
13    Q.    Is there anyone in the room
14 with you now?
15    A.    No, no person; my cats are.
16    Q.    Okay.  And what do you do for
17 Skyline?
18    A.    Director of human resources.
19    Q.    Where did you work before
20 Skyline?
21    A.    Logistic Care.
22    Q.    And how long did you work for
23 Logistic Care?
24    A.    Two and a half years.
25    Q.    What did you do for Logistic

3  (Pages 9 to 12)

Page 13

D. WALD-MARGOLIS

1
2  Care?
3      A.   Regional director of HR.
4      Q.   And as regional director of HR
5  for Logistic Care, how many employees were
6  you responsible for?
7      A.   I don't recall.
8      Q.   Is it 10, 15, 100, 1,000?
9      A.   Less than 1,000; maybe about
10  100 or more.
11      Q.   How many employees work at
12  Skyline?
13      A.   Four hundred.
14      Q.   Who do you report to at
15  Skyline?
16      A.   CEO.
17      Q.   Are you the most senior HR
18  person at Skyline?
19      A.   Yes.
20      Q.   Where did you work before
21  Logistic Care?
22      A.   Southern Glazer's Wine and
23  Spirits.
24      Q.   For the purposes of today, I am
25  going to refer to Southern Wine and Spirits

Page 14

D. WALD-MARGOLIS

1
2  and Southern Glazer's Wine and Spirits as
3  "Southern," do you understand that?
4      A.   Yes.
5      Q.   So if I use the term
6  "Southern," you will know what I am talking
7  about?
8      A.   Yes.
9      Q.   Do you know when the name
10  changed?
11      A.   No, I don't.
12      Q.   Is it Southern Glazer's Wine
13  and Spirits today?
14      A.   I have no knowledge.
15      Q.   Okay.  When you worked there,
16  was it Southern Glazer's Wine and Spirits
17  or Southern Wine and Spirits?
18      A.   Southern Wine and Spirits.
19      Q.   And how many years did you work
20  for Southern?
21      A.   I believe 11 or 12 years.
22  2005.
23      Q.   Let's see if we can refresh
24  your recollection.
25      A.   I started in January of '05, so

Page 15

D. WALD-MARGOLIS

1
2  11.
3      Q.   Bear with me one second.
4          When you were hired in 2005,
5  what was your job title?
6      A.   I believe it was an associate
7  director of HR.
8      Q.   Who did you report to?
9      A.   The director of HR.
10      Q.   Who was it at that time?
11      A.   Oh, boy.
12      Q.   Was it Beth Toohig or was it
13  someone else?
14      A.   It was someone else.
15      Q.   At some point, did your title
16  change?
17      A.   Yes.
18      Q.   When did it change?
19      A.   I don't recall.
20      Q.   What was your new title?
21      A.   I don't recall what it changed
22  to.  There were various changes.
23      Q.   Okay.  I am going to draw your
24  attention to 2010; do you recall what your
25  title was in 2010?

Page 16

D. WALD-MARGOLIS

1
2      A.   I don't recall.
3      Q.   How about in 2013?
4      A.   I don't recall.
5      Q.   What was the last title that
6  you had at Southern?
7      A.   Talent acquisition.
8      Q.   For how long did you have that
9  title, approximately?
10      A.   I don't recall.
11      Q.   And do you recall what your
12  duties were in January 2013?
13      A.   No, I don't.
14      Q.   Did your duties change over the
15  course of your employment or did they more
16  or less remain the same?
17      A.   They changed.
18      Q.   Describe for me the duties that
19  you had when you first started?
20      A.   I was responsible for
21  establishing and coordinating the HR
22  operation and payroll in the New York
23  market.
24      Q.   As talent acquisition, towards
25  the end of your employment, can you

4 (Pages 13 to 16)

Page 17

D. WALD-MARGOLIS

1
2  describe what your job duties were then?
3      A.   Coordinating the statewide
4  recruitment for the various positions
5  within the New York State market.
6      Q.   When did you last work for
7  Southern again?
8      A.   June of 2016.
9      Q.   As talent acquisition, were you
10  responsible for hiring in the State of New
11  York?
12      A.   No.
13      Q.   What was your geographic area?
14      A.   New York.
15      Q.   Was it the New York Metro?  Was
16  it just the Syosset warehouse?
17      A.   State of New York.
18      Q.   And so that would include
19  Upstate New York?
20      A.   Yes.
21      Q.   And it would include all
22  locations that were physically in the State
23  of New York?
24      A.   Yes.
25      Q.   Would that also include

Page 18

D. WALD-MARGOLIS

1
2  locations in Northern New Jersey?
3      A.   No.
4      Q.   Are you familiar with the
5  Syosset warehouse?
6      A.   Yes.
7      Q.   For how long did you work at
8  the Syosset location of Southern?
9      A.   For my entire career.
10      Q.   Your office was always at
11  Underhill Boulevard in Syosset?
12      A.   Yes.
13      Q.   Were you involved in the hiring
14  of any managers at the Syosset facility?
15      A.   Can you restate the question?
16      Q.   Well, what was your role as
17  talent acquisition?
18      A.   It was my responsibility to
19  coordinate the job vacancies, post for
20  them, coordinate with the hiring manager
21  for the interviews, and then take the
22  direction from the hiring manager regarding
23  the selection of candidate of choice.
24      Q.   Are you reading from anything
25  right now?

Page 19

D. WALD-MARGOLIS

1
2      A.   No.
3      Q.   Okay.  You're very articulate.
4  That is a good thing.
5          So did you post any jobs for
6  any managers in 2016 at the Syosset
7  facility?
8      A.   No.
9      Q.   Were any managers hired at the
10  Syosset facility in 2016?
11      A.   I don't recall.
12      Q.   Do you recall the name of any
13  manager that you were involved in
14  recruiting?
15      A.   I don't recall.
16      Q.   Do you know someone by the name
17  of Peter Lazar?
18      A.   Not that I am aware of.
19      Q.   Are you familiar with the
20  records that are kept by Southern?  How it
21  recruits union employees?
22      A.   No, I am not.
23      Q.   How about when you were there?
24  When you were there, were you involved in
25  the recruitment of union employees?  When I

Page 20

D. WALD-MARGOLIS

1
2  say "recruitment," I mean the hiring,
3  interviewing, any of that process?
4      A.   Can you further explain the
5  question?
6      Q.   Okay.  Can you describe for me
7  if you had any role in hiring the union
8  employees when you worked at Southern?
9      A.   I did not make a hiring
10  decision for unionized employees.
11      Q.   Who made that decision?
12      A.   The hiring manager.
13      Q.   Are you familiar with what
14  would be the process to fill a union
15  position when you worked for Southern?
16      A.   I don't recall.
17      Q.   Do you recall anything about
18  the process?
19      A.   There was an electronic system
20  that was used to create requisitions and
21  post for positions.
22      Q.   What information was stored
23  electronically?
24      A.   The job description, shift is
25  what I can recall.

5 (Pages 17 to 20)

Page 21

```
 1          D. WALD-MARGOLIS
 2      Q.   Were you involved in the hiring
 3  of nonunion employees at the Syosset
 4  employees?
 5      A.   Talent acquisition handled all
 6  recruitment.
 7      Q.   Including the recruitment at
 8  the Syosset facility?
 9      A.   Yes.
10      Q.   When you were in talent
11  acquisition, did Southern keep records of
12  individuals that were hired?
13      A.   Yes.
14      Q.   Okay.  What records were kept
15  by Southern when you were working there
16  regarding the hiring process?
17      A.   The information was on their
18  recruiting profile platform.
19      Q.   What was the name of the
20  platform?
21      A.   To the best of my recollection,
22  I believe it was called "Tolleya"
23  (phonetic).
24      Q.   Are you very familiar with that
25  system?
```

Page 22

```
 1          D. WALD-MARGOLIS
 2      A.   Not now.
 3      Q.   For how many years did you work
 4  on that system when you worked at Southern?
 5      A.   From when they implemented it.
 6      Q.   Do you recall approximately
 7  when they implemented it?
 8      A.   I do not.
 9      Q.   Who did you report to as -- in
10  talent acquisition?
11      A.   Beth Toohig.
12      Q.   That is T-O-O-H-I-G?
13      A.   Yes.
14      Q.   For how long was Beth Toohig
15  your supervisor?
16      A.   I don't recall.
17      Q.   Can you approximate?
18      A.   I have no idea when she
19  started.
20      Q.   Do you know how many years she
21  worked at Southern?
22      A.   No.
23      Q.   Have you spoken with any
24  Southern employees about this case?
25      A.   No.
```

Page 23

```
 1          D. WALD-MARGOLIS
 2      Q.   Let's see if we can narrow down
 3  a time period here.  Hold on one second.
 4      MR. MOSER:  Do we have Exhibit
 5  14 premarked already.
 6      MS. HOLMS:  Let me take a look
 7  at that.  It has been marked.
 8      MR. MOSER:  I would like to
 9  present it to the witness.
10      MS. HOLMS:  Okay.  Let me get
11  that up.
12      Q.   Mrs. Wald-Margolis, do you see
13  the document on your screen?
14      A.   Yes, I can.
15      MR. MOSER:  Okay.  And does she
16  have the ability to scroll through
17  this on her own or should she have
18  the ability to scroll through it on
19  her own?
20      MS. HOLMS:  No.  Do you want me
21  to scroll through?
22      MR. MOSER:  Okay.  Let's do
23  this.  Let's mark it as Exhibit 14,
24  and then she can take some time to
25  look at it.  Let's go off the record
```

Page 24

```
 1          D. WALD-MARGOLIS
 2  for a second.
 3      (Whereupon, an off-the-record
 4      discussion was held.)
 5      Q.   Mrs. Wald-Margolis, would you
 6  like some time to take a look at this
 7  document?
 8      A.   I have seen the first page.
 9      MR. MOSER:  Okay.  So why don't
10  we go back and let her look at each
11  page until she has fairly reviewed
12  it.
13      Q.   The ball is in your court, Mrs.
14  Wald-Margolis.  You can instruct the person
15  to scroll up or down.
16      THE WITNESS:  Can you scroll to
17  the next page, please?
18      MS. HOLMS:  Absolutely.
19      THE WITNESS:  I am sorry, can
20  you please make that bigger.  Thank
21  you.  Next page, please.  Next page,
22  please.  If you scroll down, please.
23  Next page, please.  Next page,
24  please.  I am sorry, if you can go up
25  a little.  Okay, thank you.  I just
```

6 (Pages 21 to 24)

Page 25

```
 1            D. WALD-MARGOLIS
 2      didn't get to see that piece.  Okay,
 3      full scroll down, please.  Next page,
 4      please.  Next page, please.  Next
 5      page, please.  Thank you.
 6         Q.   Okay.  Mrs. Wald-Margolis, do
 7      you know what this document is?
 8         A.   It appears to be the
 9      requisition form.
10         Q.   For whom?
11         A.   I noted that the candidate's
12      name was Maria Suarez.
13         Q.   Can you tell from looking at
14      this document --
15            MR. MOSER:  Can I scroll
16         through it?  I can scroll through it,
17         right?  So, let's go down to the last
18         page, okay.
19         Q.   Can you tell from looking at
20      this when Maria Suarez began the
21      application process?
22         A.   The date listed is March 3rd,
23      2016.
24         Q.   Do you know when this job was
25      posted?
```

Page 26

```
 1            D. WALD-MARGOLIS
 2         A.   I do not.
 3         Q.   Would that be contained on
 4      another type of form?
 5         A.   I don't know.
 6            MR. MOSER:  Okay.  If you could
 7         just please scroll up.  Go back down
 8         a little.  Go all the way to the
 9         bottom.  We are going to work our way
10         up.  There we go.  Hold on, one more
11         page down.  Okay, good.
12         Q.   So when we see this notation on
13      *SGWS-1645 "Status changed to meet basic
14      qualifications."
15            Do you see that?
16         A.   Thank you for showing that.  I
17      see what you're speaking of.
18         Q.   To the right of that, it has
19      your name, right?
20         A.   Yes, my name is listed.
21         Q.   Can you tell me what this
22      information means?
23         A.   I don't recall.
24         Q.   Okay.
25            MS. CABRERA:  I am sorry,
```

Page 27

```
 1            D. WALD-MARGOLIS
 2      Steve.  I need -- we need to go off
 3      the record for one moment.  Can I
 4      take two minutes.
 5            MR. MOSER:  Okay.
 6            MS. CABRERA:  I apologize.
 7            (Whereupon, a brief break was
 8         taken.)
 9         Q.   So Mrs. Wald-Margolis, while
10      you were on break, did you communicate via
11      text message or any other means with
12      Counsel?
13         A.   No.
14         Q.   And if we look at the far right
15      column where it has your name, do you know
16      what that means?
17         A.   I don't recall.
18         Q.   So you don't remember if this
19      was intended to record actions that you
20      took?
21         A.   I don't recall the Tolleya
22      system.
23         Q.   And looking at this, do you
24      know whether this records actions that you
25      took?
```

Page 28

```
 1            D. WALD-MARGOLIS
 2         A.   I don't know.
 3            MR. MOSER:  Okay.  If you could
 4         keep scrolling up.
 5         Q.   Okay.  So you don't remember
 6      what any of the notations on this document
 7      mean and in that spreadsheet in which there
 8      were columns and your name was on the right
 9      side?
10         A.   That's correct.
11         Q.   For how long did you use the
12      Tolleya system?
13         A.   I don't recall.
14         Q.   Did you use it for more than a
15      year?
16         A.   I don't recall.
17         Q.   Do you know, can you give me
18      any approximation when they implemented it?
19         A.   I have no recollection of when
20      they implemented it.
21            MR. MOSER:  So let's move on to
22         the next -- let me see something
23         here.  Bear with me a second.
24            Let's present the witness with
25         the document to be marked 15.
```

Page 29

```
1            D. WALD-MARGOLIS
2       Q.   Mrs. Wald-Margolis, do you
3   recognize this document?
4       A.   No.
5       Q.   Do you know what any of the
6   information on this document means?
7       A.   Looks like it's the requisition
8   report.
9       Q.   For what?
10      A.   Whatever the title of the
11  position is.
12           MR. MOSER:  Okay.  So if we go
13      back to the first page.
14      Q.   Do you know what this first
15  line means, "Requisition filled"?
16      A.   Means that the requisition or
17  the position has been filled.
18      Q.   And what was the process for
19  creating a requisition in Southern?
20      A.   I don't recall.
21      Q.   How many requisitions did you
22  create when you were at Southern?
23      A.   I don't recall.
24      Q.   Was it more than one?
25      A.   Yes.
```

Page 30

```
1            D. WALD-MARGOLIS
2       Q.   Was it more than 100?
3       A.   I don't recall.
4       Q.   Can you give me any approximate
5   whatsoever of how many requisitions you
6   created?
7       A.   I can't.
8       Q.   Is that something that Southern
9   would have?
10      A.   I don't know.
11           MR. MOSER:  Okay.  Let's go
12      down.
13      Q.   Have you ever seen this
14  document before today?
15      A.   I am sorry.  There is a
16  feedback.
17      Q.   Okay.  Let me repeat it.
18           Have you seen this document
19  before today?
20      A.   I don't recall.
21      Q.   Do you know who Kevin Randall
22  is?
23      A.   I recall his name.
24      Q.   And other than recalling his
25  name, do you recall anything else?
```

Page 31

```
1            D. WALD-MARGOLIS
2       A.   I am sorry, there is a
3   feedback.  There is somebody that has an
4   echo.  It's very hard to hear.
5           MS. CABRERA:  Steve, do you
6       have a cell phone next to your
7       computer because sometimes that
8       interferes.  But, yeah, I hear it.
9           THE REPORTER:  I hear it, too.
10          MS. CABRERA:  It went away.
11      Q.   So, Mrs. Wald-Margolis, do you
12  remember who Kevin Randall was?
13      A.   He was in the operations role.
14      Q.   Can you be more specific?
15      A.   I don't recall his exact title,
16  if it was director or manager, but he was
17  on the operations side.
18           MR. MOSER:  Okay.  Let's close
19      this out.  And let's go to -- let me
20      see here.
21      Q.   Do you know who Tanisha Durant
22  is?
23      A.   I don't recall.
24      Q.   Do you remember the name
25  Tanisha Durant?
```

Page 32

```
1            D. WALD-MARGOLIS
2       A.   It sounds familiar.
3       Q.   Okay.  Other than the name
4   sounding familiar, you can't describe for
5   me who that is or give it any context?
6       A.   No, I cannot.
7           MR. MOSER:  Let's go to -- what
8       exhibit number are we up to now?  We
9       should be up to 16, correct?
10          MS. HOLMS:  16 would be the
11      next exhibit.
12          MR. MOSER:  16.
13          MS. HOLMS:  16 would be the
14      next exhibit.
15          MR. MOSER:  Let's go to what
16      will be marked 19.  This is a
17      document that is Bates-stamped from
18      prior litigation SWS-000240 to -- I
19      will tell you the last page --
20      SWS-000266.
21      Q.   Mrs. Wald-Margolis, do you
22  recognize the first page of this document?
23          THE WITNESS:  Can it be made
24      bigger?  Please?  Thank you.
25      A.   Yes, I recall it.
```

Page 33

D. WALD-MARGOLIS

1
2    Q.   Okay.  What is this?
3    A.   This is a printout of an e-mail
4  chain communication.
5    Q.   And does that e-mail chain end
6  at SWS-240?
7    A.   I can't tell you where it ends.
8  If that's the document that you are showing
9  me, yes, that does say 240 at the end.
10    Q.   If we look at SWS-240, is this
11  an e-mail that was sent from Maria Suarez
12  to John Wilkinson?
13    THE WITNESS:  Thank you for
14  enlarging that.
15    A.   This is a document of various
16  e-mail communications.
17    Q.   The one on the bottom that was
18  sent on Thursday, May 2nd, 2013, is this an
19  e-mail that was sent from Maria Suarez to
20  John Wilkinson?
21    A.   Can you clarify the timing of
22  the e-mail?
23    Q.   Well, it says here it was sent
24  on Thursday, May 2nd of 2013 at 11:37 a.m.
25  I am talking about that section of e-mail

Page 34

D. WALD-MARGOLIS

1
2  chain.  Was that e-mail sent from Maria
3  Suarez to John Wilkinson?
4    A.   The e-mail on the screen is not
5  11:37.
6    MS. HOLMS:  I need to scroll
7  down to page 2.
8    MR. MOSER:  Yes, it's the
9  second page.
10    A.   Can you please repeat your
11  question?
12    Q.   Yes.  This first step in the
13  chain, is this an e-mail that was sent from
14  Maria to John Wilkinson?
15    A.   As noted in the "To" and
16  "From," it was from Maria to John.
17    Q.   And then if we move up the next
18  step in the chain, is that an e-mail from
19  you to Maria Suarez?
20    A.   Can you please clarify your
21  questions?
22    Q.   If we look at SWS-240 at the
23  bottom half of the page, and this is dated
24  Thursday, May 2nd, 2013, at 1:30 p.m., is
25  this an e-mail that was sent from you to

Page 35

D. WALD-MARGOLIS

1
2  Maria Suarez?
3    A.   Yes.  The "To" and "From" is
4  from me to Maria.
5    Q.   Okay.  And did John Wilkinson
6  forward Maria's e-mail to you?
7    THE WITNESS:  Can the e-mail
8  chain be scrolled down?  Thank you.
9    A.   As noted in the document, it
10  was.
11    Q.   Okay.  And is it fair to say
12  that he forwarded this to you at 1:01 p.m.?
13    A.   As noted on the document, 1:01
14  p.m. is showing.
15    Q.   And when did you respond?
16    A.   As noted on the document,
17  Thursday, May 2nd, 2013, 1:30 p.m.
18    Q.   Did you send this e-mail?
19    A.   As noted in the e-mail, I am in
20  the "From."
21    Q.   Okay.  Did you send the e-mail?
22    A.   As noted, that's my name.
23    Q.   Okay.  Did you type this
24  information?
25    A.   Yes.

Page 36

D. WALD-MARGOLIS

1
2    Q.   Okay.  And I am going to read
3  this into the record.  This is your e-mail
4  from you to Maria Suarez dated May 2nd,
5  2013.  It says here:  "Thank you for
6  bringing this to our attention.  Allow me
7  to clarify how the employees are
8  classified.  All of them have the title of
9  inventory control clerk assigned to the
10  warehouse days department.  The subcategory
11  seems to be different for three out of the
12  four employees.  There are various reasons
13  why this may have happened, none of which I
14  guarantee you was based on gender."
15    How were you able to guarantee
16  that the classification was not based upon
17  gender at approximately 1:30 p.m.?
18    A.   Because no acts of
19  discriminatory practices were done.
20    Q.   So there was never any
21  discrimination at Southern?
22    A.   Based upon the classification
23  in this e-mail, no.
24    Q.   And can you be more specific as
25  to how you were able to guarantee that this

9 (Pages 33 to 36)

Page 37

D. WALD-MARGOLIS

1    D. WALD-MARGOLIS
2    was not based upon gender?
3        A.   I can't recall the specifics.
4        Q.   Okay.  But for whatever reason,
5    you were able to guarantee it, correct?
6        A.   Correct.
7        Q.   Okay.  That's before you
8    conducted any investigation; is that
9    correct?
10       MS. CABRERA:  Objection to the
11   form of the question.
12       Q.   At the time you sent this
13   e-mail at 1:30 p.m., had you conducted any
14   information into the claims that were made?
15       A.   I don't recall.
16       Q.   Do you recall whether you
17   looked up any information for any of these
18   employees before responding?
19       A.   I don't recall.
20       Q.   In your opinion, did Southern
21   Wine and Spirits take claims of
22   discrimination seriously?
23       A.   Yes.
24       Q.   And in your opinion, did
25   Southern Wine and Spirits thoroughly

Page 38

1    D. WALD-MARGOLIS
2    investigate any claim of discrimination?
3        A.   Can you be more specific?
4        Q.   Well, was there a process to be
5    filed if a claim of discrimination was
6    made?
7        A.   I believe there was.
8        Q.   What was that process?
9        A.   To the best of my recollection,
10   it would be reported through HR and/or to
11   corporate and then investigated.
12       Q.   And how would it be
13   investigated?
14       A.   By whoever was designated to
15   investigate it.
16       Q.   Were you designated to
17   investigate this particular complaint?
18       A.   Yes.
19       Q.   Do you recall when you began
20   your investigation?
21       A.   I don't recall.
22       MR. MOSER:  Let's look at the
23   next chain in the e-mail from May
24   2nd, 2013, at 1:54 p.m.
25       Q.   Is that an e-mail from Maria

Page 39

1    D. WALD-MARGOLIS
2    Suarez to you?
3        A.   Yes.  As noted, it was from
4    Maria to me.
5        Q.   When you received this e-mail,
6    was it your understanding that Maria Suarez
7    had communicated with her subordinates
8    regarding alleged discrimination?
9        MS. CABRERA:  Objection to the
10   form of the question.
11       You can answer.
12       THE WITNESS:  Yes.  I am just
13   rereading the e-mail.
14       A.   Can you repeat your question,
15   please?
16       Q.   Was it your understanding, when
17   you received this e-mail from Maria Suarez
18   at 1:54 p.m., that she had discussed the
19   different classification with her
20   employees?
21       A.   I can't recall what Maria spoke
22   to her staff.
23       Q.   Did you understand she had --
24   at least that she had spoken to her staff
25   about this particular topic?

Page 40

1    D. WALD-MARGOLIS
2        A.   Yes.  Based upon her e-mail,
3    she said she spoke to her team about the
4    topic.
5        Q.   If we look at May 2nd, 2013, at
6    2:33 p.m., you respond to her:  "Sure,
7    please let me know how this came about so I
8    can address all aspects."
9        What did you mean by that
10   question?
11       A.   Maria presented to John a
12   statement of information, which I needed to
13   gain a better understanding as to what she
14   was speaking of to understand, as I noted
15   in the e-mail, all of the aspects to be
16   able to meet with her team and address it.
17       Q.   Okay.  So what did you need to
18   know?  When you say "how this came about,"
19   what are you referring to?
20       A.   The allegation that Maria
21   presented.
22       Q.   So you wanted to know how --
23   can you be more specific as to what you
24   were asking for?
25       A.   To understand what Maria was

10  (Pages 37 to 40)

Page 41

1          D. WALD-MARGOLIS
2    looking at, see from her side what she was
3    speaking of, and what had been communicated
4    to her team to then be able to speak with
5    them.
6          Q.   Okay.  So at least in part, you
7    wanted to know what Maria told her
8    subordinates; is that fair to say?
9          A.   Correct.
10         Q.   And why did you want to know
11   what Maria told her subordinates?
12         A.   That is what goes into the
13   course of an investigation.
14         Q.   Did she ever tell you what she
15   had told her subordinates?
16         A.   I don't recall.
17         Q.   Do you have any knowledge today
18   what she told her subordinates?
19         A.   I don't recall.
20         MR. MOSER:  Let's bring up --
21         A.   Before we bring that up, may I
22   have a moment, please.
23         Q.   Sure.  Take your time.  Do you
24   need a minute?
25         A.   Like a couple moments to get

Page 42

1          D. WALD-MARGOLIS
2    some water.
3          Q.   Okay.
4          MS. CABRERA:  Let's take a
5    ten-minute break now.  Steven, we
6    will be back in ten minutes.
7          MR. MOSER:  Fine.
8          (Whereupon, a brief break was
9    taken.)
10         MR. MOSER:  Sandra and Pamela,
11   is there a way for me to manipulate
12   separately a document and show it to
13   the witness?
14         MS. HOLMS:  If I can hand over
15   sharing to you.  Now you can screen
16   share.
17         MR. MOSER:  Okay.
18         Q.   I am scrolling to the page that
19   is Bates-stamped SWS-00242 of Exhibit 16.
20         Do you recognize the
21   handwriting on this document?
22         A.   Yes.
23         Q.   Whose handwriting is it?
24         A.   It's mine.
25         Q.   Okay.  And can you just please

Page 43

1          D. WALD-MARGOLIS
2    read out loud, starting from the top
3    because, again, I think I can decipher what
4    it means, but it would be better to be read
5    from the person who actually wrote it.
6          A.   If you can make it a little
7    smaller because the screen of pictures...
8          Q.   Okay.  Is that too small?  Is
9    that okay?
10         A.   That should be okay.
11         "5/16" -- excuse me, "5/6/15,
12   Dina, Tatiana, Ena, and Josie, rates of pay
13   within the departments S/B" -- for "should
14   be" -- "part of warehouse.  Can't get top
15   pay.  Ena and Tatiana S/B" -- should be --
16   "making more money.  Feel that has" -- can
17   you move the cursor?
18         Q.   Okay.
19         A.   Thank you.  "Minority/women.
20   Justin being paid more.  How can Justin be
21   classified as WHSE" -- for "warehouse" --
22   "if he was last one hired.  Had worked 40
23   hours as nonunion and decreased to 35 hours
24   with union and without compensation for
25   lost hours.  Ronnie was their contact who

Page 44

1          D. WALD-MARGOLIS
2    said medical insurance (free with union)
3    was the compensation equivalent.  Ronnie
4    told them he spoke with management and
5    management denied compensation for loss of
6    hours due to cost factor" -- if you will
7    kindly scroll up.  Thank you.
8          "Spoke with Frank from union.
9    He said they would have to go tonight and
10   throw cases.  How can union say that.  Who
11   would do their job.  They trained Justin so
12   why he's making more.  Inventory job
13   description was given to HR while ago."
14         Q.   Okay.  Are these notes of a
15   meeting you had with them?
16         A.   Yes.
17         Q.   Was this an in-person meeting?
18         A.   Yes.
19         Q.   Do you recognize the
20   handwriting on this document?
21         MR. MOSER:  And this is, just
22   for the record, this is page
23   Bates-stamped SWS-00243.
24         A.   Yes.  I recognize the
25   handwriting.

Page 45

D. WALD-MARGOLIS
1
2    Q.   Is that your handwriting?
3    A.   Yes, it is.
4    Q.   Is this a document that you
5  created?
6    A.   I don't know who created the
7  document.
8    Q.   You don't recall if you created
9  it or somebody else did?
10    A.   That's correct.
11    Q.   Okay.  If you were responsible
12  for investigating it, should you have been
13  the one to prepare this information?
14    A.   Can you restate your question?
15    Q.   Well, typically, if you were
16  the one conducting the investigation into
17  the allegations, would you also be the one
18  preparing documents relating to it?
19    A.   If this was the document that
20  was provided by Maria to me in the course
21  of investigation, then, no, I wouldn't have
22  prepared it.
23    Q.   Do you know whether this was
24  prepared by Maria or someone else?
25    A.   I don't recall.

Page 46

D. WALD-MARGOLIS
1
2    Q.   And if you could please read
3  into the record your handwriting?
4    A.   If you could kindly shrink it
5  just a little bit.
6    Q.   Okay.
7    A.   Thank you.  "5/14/13, reviewed
8  with Beth, approved to respond with
9  information on WC" -- standing for
10  "Workers' Comp text" -- "if Catherine
11  confirms this was issue we discovered in
12  the winter.  Not a corp issue, look into
13  wages.  5/15/13 Catherine confirmed WC" --
14  for "Workers' Compensation" -- "text would
15  be part of the OSHA review being done by
16  Mike Muñoz."
17    Q.   What does Workers' Compensation
18  text or WC text refer to?
19    A.   As noted in the last column of
20  the document on the far right, that is the
21  Workers' Comp text.  That is the Workers'
22  Compensation for Workers' Compensation
23  Insurance classification of a position.
24    Q.   And under the collective
25  bargaining agreement that was in effect

Page 47

D. WALD-MARGOLIS
1
2  between Local 1 and Southern Glazer's Wine
3  and Southern Wine and Spirits at the time
4  this document was created, were there two
5  classifications of employees?
6    A.   I don't know when this document
7  was created.
8    Q.   So let's go back to 5/14/13.
9    A.   Those are the dates of my
10  notes.
11    Q.   Yes.  On the dates that your
12  notes were created, were there two broad
13  classifications of employees in Local 1?
14    A.   Yes.  Within the collective
15  bargaining agreement.
16    Q.   And those classifications were
17  clerical and warehouse, correct?
18    A.   Correct.
19    Q.   This *WCCC text does not refer
20  to their classification under the
21  collective bargaining agreement?
22    A.   Correct; it does not.
23    Q.   And how do you know that?
24    A.   Because it's called Workers'
25  Compensation and related to the billing for

Page 48

D. WALD-MARGOLIS
1
2  Workers' Compensation.
3    Q.   Were there any other underlying
4  documents that would have been used or
5  could have been used to create this
6  document?
7    A.   I don't know the origin of that
8  document.
9    Q.   Did you ever review any
10  underlying documents to verify where this
11  WCCC text column came from?
12    A.   Yes.
13    Q.   What did you review?
14    A.   As noted in my notes, Catherine
15  was the CFO.  That's Catherine Spend was
16  the CFO.  We identified across the board
17  that there were various issues with
18  misclassifications even as noted on the WCC
19  text.  You will see it says "Upstate" and
20  these were not Upstate New York employees.
21    Q.   Did you personally review the
22  underlying records to determine whether or
23  not these were actually the Workers'
24  Compensation classifications?
25    A.   No.

12  (Pages 45 to 48)

Page 49

```
 1              D. WALD-MARGOLIS
 2       Q.    Where did you get the
 3  information that these were actually
 4  Workers' Compensation classifications and
 5  did not relate to classifications under the
 6  collective bargaining agreement?
 7       A.    This was -- as noted in the
 8  notes that this was part of the --
 9  Catherine confirmed this was the issue that
10  was discovered over the winter.  There were
11  various classification issues that impacted
12  the Workers' Compensation classifications,
13  which impacted the insurance, which was
14  going to be corrected in a one-time deal in
15  January.
16          MR. MOSER:  And so can you read
17       back the question for the witness.
18          (Whereupon, the referred to
19       question was read back by the
20       Reporter.)
21       A.    So what's the question?
22       Q.    Where did you get the
23  information that these classifications
24  refer to Workers' Compensation and not the
25  collective bargaining agreement?
```

Page 50

```
 1              D. WALD-MARGOLIS
 2       A.    Because this has nothing to do
 3  with the collective bargaining agreement.
 4  This was a corporate issue of
 5  misclassifications within the position
 6  characteristics.
 7       Q.    Did you get that information
 8  verbally from Catherine?
 9       A.    This was a -- yes, from --
10  verbally from Catherine, and it was known
11  across the board to all of Southern's HR
12  and finance team.
13       Q.    But in this particular
14  instance, the only information that you had
15  that this particular classification related
16  to Workers' Compensation and not the
17  collective bargaining agreement was the
18  document itself and something verbal that
19  you got from Catherine; is that correct?
20          MS. CABRERA:  Objection to the
21       form of the question.
22       A.    The issues regarding errors in
23  classifications for positions, Workers'
24  Comp, and location as noted Upstate, when
25  these were not Upstate positions, was known
```

Page 51

```
 1              D. WALD-MARGOLIS
 2  across the country.
 3       Q.    So the time sheets, right, that
 4  Maria was looking at, do they have Workers'
 5  Compensation classifications on them?
 6       A.    I don't recall.
 7       Q.    Were you involved in processing
 8  payroll?
 9       A.    I was not.
10       Q.    Were you ever involved in
11  processing payroll?
12       A.    I was not.
13       Q.    How many different pay stubs
14  did you have the opportunity to review when
15  you were at Southern?
16       A.    None.
17       Q.    Okay.  Did you get pay stubs
18  for yourself?
19       A.    I am sure I did.
20       Q.    Did your pay stubs have your
21  Workers' Compensation classification on
22  them?
23       A.    I don't recall.
24       Q.    Okay.  So you don't know if any
25  of your pay stubs had your Workers'
```

Page 52

```
 1              D. WALD-MARGOLIS
 2  Compensation classification on them?
 3       A.    I don't recall what my pay
 4  stubs looked like.
 5       Q.    So the information could have
 6  been there; it could not have been there;
 7  we don't know.  Is that fair to say?
 8       A.    I don't know what was there,
 9  so...
10       Q.    You're not saying that it
11  wasn't on there, you're saying you don't
12  know if it was on there; is that correct?
13       A.    Correct.
14       Q.    I am going to draw your
15  attention to SWS-244 and 245.  If we look
16  at 244, is this an e-mail from you to
17  Josienne, Ena Scott, and Tatiana Herdozia.
18       A.    Can you clarify the date and
19  time --
20       Q.    Sure.
21       A.    -- of the e-mail?
22       Q.    I am looking at an e-mail --
23  for clarification SWS-244 -- an e-mail
24  dated May 15, 2013, at 7:03 p.m.
25          Did you send this e-mail to
```

Page 53

D. WALD-MARGOLIS

1
2   Josienne Sajous, Ena Scott, and Tatiana
3   Herdozia?
4       A.   Yes.  As noted, it was from me
5   to Josienne, Ena, and Tatiana.
6       Q.   This was with regard to the
7   concerns they raised at the May 6th
8   meeting?
9       A.   Allow me the opportunity to
10  read it so I understand it.
11      Q.   Sure.
12      A.   I can't confirm this was in
13  response to the, I believe you said, May
14  6th meeting.
15      Q.   Well, when we look at the
16  subject --
17      A.   Yes, I am sorry.  Yes.  Sorry.
18  That is correct.  The subject line says
19  "May 6th meeting."
20      Q.   Okay.  When we look at the
21  spreadsheet that is here, how did you
22  create this spreadsheet?
23      A.   I don't recall.
24      Q.   You ran a report from the
25  system.  Did you ever make a printout of

Page 54

D. WALD-MARGOLIS

1
2   that actual report from the system itself?
3       A.   This would be the report from
4   the system.
5       Q.   Did you type this into a
6   document or is this an actual report?
7       A.   This was from an actual report.
8       Q.   I know it was from an actual
9   report.  Is this the actual report or is
10  this information that was compiled from the
11  actual report?
12      A.   This is the report.
13      Q.   Okay.  And there is no heading
14  on it.  There is no -- there is no -- it's
15  just -- when you print the report, it shows
16  up just like this?
17      A.   This was from the report that
18  was generated.
19      Q.   My question is:  This is the
20  report itself when you printed out -- did
21  you print out the report?
22      A.   I don't know if I printed the
23  report.
24      Q.   Is this the way the report
25  looks when you ran it?

Page 55

D. WALD-MARGOLIS

1
2       A.   That is a cut and paste from
3   the report.
4       Q.   Is the report an Excel
5   spreadsheet?
6       A.   To the best of my recollection,
7   yes.
8       Q.   As of the time that you wrote
9   this e-mail, did you believe that there was
10  any discrimination against women in the
11  warehouse classification?
12      A.   No.
13      Q.   At the time that you wrote this
14  e-mail, had you reviewed any documents
15  other than the report that you ran?
16      A.   I don't recall.
17      Q.   As of this day, did you find
18  any information which would suggest that
19  Justin Veigh was actually hired as a
20  warehouseman under the collective
21  bargaining agreement?
22      A.   I don't recall.
23      Q.   If you had found evidence that
24  he was actually classified a warehouseman,
25  would you have included it in this e-mail?

Page 56

D. WALD-MARGOLIS

1
2       A.   Any findings that would be
3   relative to this investigation or response
4   would have been communicated.
5           MR. MOSER:  Could you read back
6       the question, please.
7           (Whereupon, the referred to
8       question was read back by the
9       Reporter.)
10      A.   If he was, but he wasn't.
11      Q.   Okay.  So as of the date that
12  you sent it, you did not find any evidence
13  that he was actually classified as a
14  warehouseman under the collective
15  bargaining agreement.  Is that fair to say?
16      A.   Sorry, can you repeat that?
17      Q.   As of the date that you sent
18  this e-mail, is it fair to say that you had
19  not found any evidence that Justin Veigh
20  was actually hired as a warehouseman under
21  the terms of the collective bargaining
22  agreement?
23      A.   Yes.
24      Q.   Okay.  Let's move down to
25  SWS-249.

14  (Pages 53 to 56)

Page 57

```
 1          D. WALD-MARGOLIS
 2      Is this an e-mail chain between
 3  you and Ena Scott and Tatiana Herdozia?
 4      A.  Yes, it is.
 5      Q.  Okay.  Is this your
 6  handwriting?
 7      A.  Yes, it is.
 8      Q.  Can you please read your
 9  handwriting into the record?
10      A.  "Confirmed with Beth okay to
11  meet with them.  Agreed that Muñoz to
12  conduct job analysis to determine if
13  position warehouse or clerical."
14      Q.  And what did you mean by this
15  note?
16      A.  Muñoz is referencing Michael
17  Muñoz, who is the director of safety who
18  handles Workers' Compensation
19  classifications.
20      Q.  This review that Mr. Muñoz
21  would have been doing would have been
22  solely with regard to the Workers'
23  Compensation classification, correct?
24      A.  Correct.
25      Q.  And let's go to SWS-250.
```

Page 58

```
 1          D. WALD-MARGOLIS
 2      Is this your handwriting?
 3      A.  Yes, it is.
 4      Q.  Could you please read that into
 5  the record?
 6      A.  "May 30th, 2013, Tatiana and
 7  Ena, 2:10 to 2:40, status of breaks.  Told
 8  AO" -- meaning "as of" -- "12/2008, they
 9  were part of the union and Justin was hired
10  in winter of 2009.  First annual increase
11  11/2009, which is why everyone at same
12  rate.  They started at time of adjustment
13  in 2010.  Justin was included in the
14  increase to account for the change from 35
15  hours to 40 hours and since he was hired
16  after being unionized, he shouldn't have
17  received increase.  Thankful for Muñoz'
18  reviewing job function with them and fast
19  response.  Should have spoken with DJM" --
20  standing for "Dina J. Margolis" -- "a long
21  time ago and not listened to Ronnie."
22      Q.  When we look at the middle of
23  the page, there is a star there.  Is that
24  information that you relate to them or is
25  that information that they relate to you?
```

Page 59

```
 1          D. WALD-MARGOLIS
 2      A.  It's their statement.  They
 3  started at time of adjustment.
 4      Q.  Okay.  Thank you.  Let's look
 5  at SWS-251.
 6      Is this an e-mail from you to
 7  Josienne Sajous?
 8      A.  Can you confirm the dates?
 9      Q.  Dated June 3, 2013.
10      A.  And the time?
11      Q.  At 5:10 p.m.
12      A.  Yes.  As noted, it is from me
13  to Josienne.
14      Q.  Is this in response to an
15  e-mail that you received from Josienne
16  Sajous on Monday June 3, 2013, at 11:07
17  a.m.?
18      A.  I am sorry, if you start just
19  in one location and either go slowly up or
20  go down so I can track it, please.
21      Q.  That e-mail that you sent was
22  responding to an e-mail from Josienne
23  Sajous on Monday, June 3rd, 2013, at 11:07
24  a.m.?
25      A.  If you can scroll down, so I
```

Page 60

```
 1          D. WALD-MARGOLIS
 2  can confirm that is the first or the last
 3  of the pages.  Okay, if you will scroll up,
 4  please.
 5      Q.  Sure.
 6      A.  Can you scroll up, please.
 7      Q.  Sure.
 8      A.  So, yes, the 5/10 e-mail is the
 9  response to the e-mail she had sent.
10      Q.  Let's go down to SWS-000258.
11      Could you tell me what this
12  document is?
13      A.  We are all looking at the same
14  e-mail.  This is an e-mail from me to
15  Josienne on Wednesday, June 19, 2019, at
16  9:13 a.m.
17      Q.  And were you responding to an
18  e-mail from her?
19      A.  Can you scroll up, please.
20  Yes, it has the same subject line.
21      Q.  Now, she says here, "I want to
22  be classified as warehouse and earn
23  warehouse pay."
24      Do you know what she means by
25  that?
```

15 (Pages 57 to 60)

Page 61

```
 1          D. WALD-MARGOLIS
 2      A.   I don't recall.
 3      Q.   Is warehouse different than
 4  clerical pay under the CBA?
 5      A.   I don't recall.
 6      Q.   And when you responded to this
 7  e-mail on June 19, 2013, had you done any
 8  research into whether or not these
 9  particular women -- when I say "these
10  women," I mean Ena Scott, Tatiana Herdozia,
11  and Josienne Sajous -- whether they could
12  have been reclassified or should have been
13  reclassified as "warehouse" under the
14  contract?
15      A.   I don't recall.
16      Q.   If we go to SWS-000262, what is
17  this document?
18      A.   It's a memo that is dated June
19  20th, 2013, from me to Beth Toohig.
20      Q.   And what is this document?  Is
21  this the result of your investigation?
22          MS. CABRERA:  Objection to the
23      form of the question.
24      Q.   What is this document?
25      A.   Can you scroll down?
```

Page 62

```
 1          D. WALD-MARGOLIS
 2      Q.   Sure.
 3      A.   It's just a one-page document.
 4      Q.   There are several pages.  You
 5  want me to continue scrolling down?  I can.
 6      A.   Yes.  I would appreciate it
 7  just to be able to look at this.  Okay.
 8  Next page.  Next page, please.  Next page,
 9  please.  Next page, please.
10      Q.   That is the end.
11      A.   Okay.  So, yes, this would be
12  the investigation recap.
13      Q.   Did you prepare this document?
14      A.   Yes.
15      Q.   Okay.  And as of the date you
16  prepared this document, did you find any
17  evidence to suggest that Justin Veigh had
18  been hired as a warehouseman under the
19  terms of the collective bargaining
20  agreement?
21      A.   I would have to reread the
22  notes.
23      Q.   Well, let's go to the
24  conclusions -- which notes?
25      A.   The investigation, the memo.
```

Page 63

```
 1          D. WALD-MARGOLIS
 2      Q.   Okay.  Just tell me when you
 3  want me to scroll down?
 4      A.   Scroll, please.
 5          Can you repeat your questions,
 6  please?
 7      Q.   As of the date you wrote this
 8  report, had you found any evidence to
 9  suggest that Justin Veigh was hired as a
10  warehouseman?  By "hired as warehouseman,"
11  I mean hired as an individual classified as
12  a warehouseman under the terms of the
13  collective bargaining agreement?
14      A.   No.
15      Q.   Okay.  If you had found any
16  evidence to suggest that Justin Veigh had
17  been hired or at any time was a
18  warehouse-classified employee, would you
19  have included that in your report?
20      A.   Yes.
21      Q.   Did you thoroughly review all
22  relevant documents before preparing this
23  report?
24      A.   Yes.
25      Q.   And did you follow all
```

Page 64

```
 1          D. WALD-MARGOLIS
 2  procedures and guidelines set by Southern
 3  for investigating claims of discrimination?
 4      A.   Yes.
 5      Q.   I am going to show you what has
 6  been marked as -- what will be marked as
 7  Exhibit 17, Plaintiff's Exhibit 17, and I
 8  would like you to take a look at this
 9  document.
10          MS. HOLMS:  17 is not showing.
11          MR. MOSER:  What do you mean
12      "is not showing"?
13          MS. HOLMS:  Well, I am still
14      looking at Exhibit 17.
15          MR. MOSER:  Oh, because I have
16      to do a different screen share.  Hold
17      on.  Okay.
18          MS. HOLMS:  There we go.
19      Actually, that is 21.  Did you want
20      17 or 21?
21          MR. MOSER:  This was the
22      original numbering on it, but this
23      will be 17.
24          MS. HOLMS:  Let me get clarity
25      on the way the numbers of the
```

16 (Pages 61 to 64)

Page 65

```
 1            D. WALD-MARGOLIS
 2   exhibits are being marked.  So far, I
 3   marked 14, 15, 19.  Now this one,
 4   although it reads "to be marked 21,"
 5   you want to mark it 17?
 6        MR. MOSER:  No, it was 14, 15,
 7   and 19 was supposed to be 16.  So,
 8   it's 14, 15, 16.
 9        MS. HOLMS:  Okay.  Okay.
10   Great.
11        MR. MOSER:  We're going in
12   numerical order.
13        MS. HOLMS:  Okay.
14     Q.   Mrs. Wald-Margolis, let me know
15   when you would like me to scroll down?
16     A.   If you can shrink it just a
17   little bit.  And if there is a question to
18   this document, can you please repeat your
19   question?
20     Q.   I just want to have a chance to
21   review it first, then I would have a
22   question for you.
23     A.   Okay.  Just scroll down,
24   please.  Is there more to this document?
25     Q.   No.  This is a one-page
```

Page 66

```
 1            D. WALD-MARGOLIS
 2   document.
 3     A.   Okay.
 4        MS. CABRERA:  Before any
 5   questions are asked, I am going to
 6   note my objection for the record.
 7   This does not appear to be a document
 8   that has been exchanged in discovery
 9   as well as portions of the prior
10   exhibit, and so we will be moving to
11   strike all exhibits used in this
12   deposition that are not a part of
13   this case.
14        But go ahead.  Ask your
15   questions.
16     Q.   Do you recognize this document?
17     A.   No, I don't.
18     Q.   Does your handwriting appear on
19   this document anywhere?
20     A.   Can you scroll down.  No, it
21   does not.
22     Q.   There is a signature on here.
23   Do you recognize that signature as Greg
24   Frezie (phonetic)?
25        MS. CABRERA:  Objection.
```

Page 67

```
 1            D. WALD-MARGOLIS
 2     Q.   Do you recognize that
 3   signature?
 4     A.   No, I do not.
 5     Q.   Did you review this document
 6   before coming to the conclusions in your
 7   investigation that you just reviewed?
 8     A.   I don't recall.
 9     Q.   Is it fair to say that Southern
10   takes claims of discrimination seriously?
11     A.   I am sorry.  Can you repeat
12   that?
13     Q.   Is it fair to say that Southern
14   takes claims of discrimination in the
15   workplace seriously?
16     A.   I am not employed at Southern
17   now.  I can't answer.
18     Q.   At the time period that you
19   were employed there, did you believe that
20   Southern took claims of discrimination in
21   the workplace seriously?
22     A.   Yes.
23     Q.   In your opinion, did Southern
24   thoroughly investigate any claim of
25   discrimination that was made while you were
```

Page 68

```
 1            D. WALD-MARGOLIS
 2   employed there?
 3     A.   Yes.
 4     Q.   And in your opinion, did
 5   Southern take remedial steps, if necessary,
 6   to eliminate discrimination in the
 7   workplace, if necessary?
 8     A.   I don't know.
 9     Q.   When you conducted these
10   investigations, are you conducting the
11   investigation in any way to protect
12   Southern?
13     A.   The investigation is to provide
14   the outcome.
15     Q.   Okay.  Your paycheck is signed
16   by somebody at Southern, correct?
17     A.   Not currently.
18     Q.   When you were working there,
19   you were receiving a paycheck from
20   Southern?
21     A.   Correct.
22     Q.   Did you feel any pressure to
23   ever report that there was no
24   discrimination when you believed there was
25   discrimination?
```

17 (Pages 65 to 68)

Page 69

D. WALD-MARGOLIS

1
2    A.   No.
3    Q.   When you did this particular
4    investigation, did you ever look into the
5    composition of the warehouse classification
6    at the warehouse?
7    A.   Can you restate your question?
8    Q.   When you prepared this report
9    or this memo of your investigation, which
10   begins on SWS-262, had you looked into the
11   gender makeup of the warehouse
12   classification?
13   A.   I don't recall.
14   Q.   Had you looked into the gender
15   makeup of the clerical classification at
16   the time you wrote this?
17   A.   I don't recall.
18   Q.   Is that something that should
19   have been done before preparing this
20   report?
21   A.   If it was in the course and
22   scope of the nature of the investigation,
23   then it would have been looked into.
24   Q.   So you would have looked into
25   the gender composition of the warehouse,

Page 70

D. WALD-MARGOLIS

1    correct?
2    MS. CABRERA:  Objection.
3    Q.   Would you have looked into the
4    gender composition of the warehouse with
5    regard to these claims that these women
6    were classified differently based on sex?
7    A.   I don't recall.
8    Q.   I know you don't recall if you
9    did, but is that something that you would
10   have done?
11   A.   Yes.
12   Q.   Do you recall anything about
13   the gender makeup of the warehouse
14   classification?
15   A.   I don't recall.
16   Q.   Do you recall anything about
17   the gender makeup of the clerical
18   classification?
19   A.   I don't recall.
20   Q.   Now, these three women, Ena
21   Scott, Tatiana Herdozia, and Josienne
22   Sajous, did they eventually file a federal
23   lawsuit against Southern?
24   A.   I don't know.
25

Page 71

D. WALD-MARGOLIS

1
2    Q.   These three women, did any of
3    them ever file any EEO charges with the
4    EEOC?
5    A.   I don't recall.
6    Q.   So would that be something that
7    you would have known if they had filed
8    federal complaints alleging discrimination?
9    A.   I don't recall.
10   Q.   So you don't know if they did
11   or you don't recall one way or the other?
12   A.   I don't recall.
13   Q.   Okay.  So they could have filed
14   a federal complaint; they could not have.
15   We don't know?
16   A.   Correct.
17   Q.   And they could have filed
18   charges with the EEOC against Southern;
19   they could not have.  We don't know?
20   A.   I don't know.
21   Q.   Okay.  And was there any
22   investigation beyond your investigation
23   into these claims?
24   A.   I don't know.
25   Q.   Did you ever speak -- and I

Page 72

D. WALD-MARGOLIS

1
2    don't want to know what you said to them --
3    did you ever speak to an individual by the
4    name of Keith Forel?
5    A.   The name I don't even recall.
6    Q.   Did you question Maria about
7    what had happened that these women came to
8    learn about the fact that they believed
9    they have classified differently?
10   A.   I don't recall.
11   Q.   Did you ever report to anyone
12   anything about Maria's involvement in these
13   allegations of discrimination?
14   A.   Can you restate your question?
15   Q.   Did you ever have any
16   conversations with anyone at Southern about
17   Maria's involvement in these claims of
18   discrimination?
19   A.   I don't recall.
20   Q.   Did you meet with Maria as part
21   of your investigation?
22   A.   I don't recall.
23   Q.   Now, the way you performed this
24   investigation, is that consistent with the
25   way Southern would investigate other claims

18  (Pages 69 to 72)

Page 73

```
 1              D. WALD-MARGOLIS
 2   of discrimination or retaliation?
 3        A.   That's my understanding.
 4        Q.   Okay.  Is that a "yes"?
 5        A.   To the best of my knowledge,
 6   yes.
 7        Q.   Okay.  And at any point during
 8   your employment with Southern after May
 9   5th, 2016, did you speak with Maria?
10        A.   No.
11        Q.   So let me clarify that because
12   I think I have the date wrong.  If we go
13   back to May of 2013, did you speak with
14   Maria in May of 2013?
15        A.   Can you make that a little
16   bigger, please?
17        Q.   Sure.
18        A.   Thank you.  I may have spoken
19   to Maria in May of 2013.
20        Q.   Do you recall any conversation
21   that you had with Maria about the job
22   classifications of her subordinates?
23        A.   I recall meeting with Maria
24   about this.
25        Q.   Can you tell me everything that
```

Page 74

```
 1              D. WALD-MARGOLIS
 2   you remember about that particular meeting?
 3        A.   I recall meeting with her.  It
 4   was the communication of the women who
 5   reported to her and how they felt that they
 6   were treated differently based upon the
 7   classification that was stated as the
 8   Workers' Compensation code and that I would
 9   be following up with the employees
10   directly.
11        Q.   So in 2013, were there regular
12   meetings that you attended at Southern?
13        A.   Is Angie back on?
14        Q.   Oh, sorry, yeah.  Your attorney
15   is not here.  I withdraw the question.  My
16   apologies.
17             MS. CABRERA:  I am here.
18             MR. MOSER:  Okay.  Great.
19        Q.   So let me just repeat the
20   question.  In 2013, did you attend meetings
21   at Southern on a regular basis?
22        A.   Can you clarify your question?
23        Q.   Well, did you meet with other
24   employees in the conference room or
25   individually on an ongoing basis?
```

Page 75

```
 1              D. WALD-MARGOLIS
 2        A.   I don't recall.
 3        Q.   Do you know if there's a
 4   monthly meeting or a weekly meeting that
 5   you attended?
 6        A.   I don't recall.
 7        Q.   Do you recall approximately how
 8   many meetings you attended on a yearly
 9   basis in 2013?
10        A.   I don't recall.
11        Q.   At any time between -- from the
12   beginning of 2014 until the end of your
13   employment, do you remember having any
14   regular --
15        A.   Hold on, my cat is about to
16   jump on my computer.  I am sorry.
17        Q.   That is fine.  From January
18   2014 until you separated from employment
19   with Southern, do you recall if you
20   attended any business meetings regularly at
21   Southern?
22        A.   I don't recall.
23        Q.   Did you meet with any attorneys
24   at Southern regarding Maria Suarez at any
25   time?
```

Page 76

```
 1              D. WALD-MARGOLIS
 2        A.   Not that I recall.
 3        Q.   Did you meet with any attorney
 4   of Southern regarding Ena Scott, Tatiana
 5   Herdozia, or Josienne Sajous?
 6        A.   I don't recall.
 7        Q.   Were you ever present at any
 8   meeting in which the management of Southern
 9   discussed the claims made by either Ena
10   Scott, Tatiana Herdozia, or Josienne
11   Sajous?
12        A.   I don't recall.
13        Q.   Do you believe that Maria was
14   to blame for these women believing they
15   were discriminated against?
16        A.   No.
17        Q.   And do you think that Maria was
18   responsible for the fact that these women
19   made claims of discrimination against
20   Southern?
21        A.   I am unaware that they made
22   claims against...
23        Q.   I am not talking about a formal
24   charge.  I am talking about the claims that
25   were memorialized in the e-mails they have
```

19 (Pages 73 to 76)

Page 77

```
 1          D. WALD-MARGOLIS
 2   seen so far.
 3       A.   Oh, okay.  Can you repeat your
 4   question?
 5       Q.   My question is --
 6          MR. MOSER:  Could you read back
 7       the question for the witness.
 8          (Whereupon, the referred to
 9       question was read back by the
10       Reporter.)
11       A.   No, I don't.
12       Q.   Okay.  Were you involved at all
13   in the decision to change Maria's
14   classification in 2014?
15       A.   No.
16       Q.   And who was involved in that
17   decision?
18       A.   Whomever the hiring manager
19   would have been.
20       Q.   Would that have been Kevin
21   Randall?
22       A.   Possibly.
23          MR. MOSER:  I need to take a
24       one-minute break.
25          (Whereupon, a short recess was
```

Page 78

```
 1          D. WALD-MARGOLIS
 2       taken.)
 3       Q.   Now, why did your employment
 4   with Southern end?
 5       A.   Resigned.
 6       Q.   Why did you resign?
 7       A.   Another opportunity.
 8       Q.   When did you begin searching
 9   for another opportunity?
10       A.   Probably April or May of 2016.
11       Q.   And why did you begin looking
12   for another opportunity?
13       A.   Personal choice.
14       Q.   And what was that personal
15   choice motivated by?
16       A.   Just time to move on from
17   Southern.
18       Q.   You had worked with Southern
19   for how many years at that point?
20       A.   I believe we agreed it was 11.
21       Q.   Okay.  What was your salary at
22   that point in time?
23       A.   I don't recall.
24       Q.   Was there any lapse in the
25   employment between the time that you
```

Page 79

```
 1          D. WALD-MARGOLIS
 2   resigned from Southern and your new job?
 3       A.   Not that I recall.
 4       Q.   Did you get an increase in
 5   salary when you got your new job?
 6       A.   I don't believe so.
 7       Q.   Did you have to work fewer
 8   hours when you got the new job?
 9       A.   No.
10       Q.   Did you have to work more hours
11   when you got your new job?
12       A.   It was the same.  It was
13   comparable.
14       Q.   So it was the same pay.  Was it
15   the same hours?  Was it the same
16   responsibility?
17       A.   It was no longer in talent
18   acquisition.
19       Q.   Okay.  Was the stress of the
20   job more or less the same?
21       A.   Probably more.
22       Q.   More stress after you left?
23       A.   Yes.
24       Q.   Why was it more stressful?
25       A.   Because it was building up an
```

Page 80

```
 1          D. WALD-MARGOLIS
 2   HR department.
 3       Q.   Was there anything that
 4   precipitated your decision to move on?
 5       A.   Personal choices.
 6       Q.   Can you remember any of those
 7   personal reasons or choices why you wanted
 8   to move on?
 9       A.   It was a catalyst of my
10   father's death.
11       Q.   Okay.  I apologize.
12          And was there some type of
13   falling out between you and anyone at
14   Southern?
15       A.   Not that I am aware.
16       Q.   So can you explain for me --
17   and I don't need to know all the detail.
18   Can you explain to me what motivated your
19   decision or why you decided to leave
20   Southern after 11 years?
21       A.   It was a very personal decision
22   predicated on my father's passing that it
23   was time to move on.
24       Q.   Were there any other reasons
25   why you moved on?
```

Page 81

D. WALD-MARGOLIS

1
2    A.   None that I am aware of.
3    Q.   Do you think that you were
4  being treated fairly by Southern?
5    A.   Yeah.
6    Q.   Did you feel as though you had
7  friends at Southern?
8    A.   I am sorry, you broke up on
9  that.
10    Q.   Did you believe you had friends
11  at Southern?
12    A.   Yes.
13    Q.   Did anyone at Southern ever ask
14  you to do or say anything that you believed
15  betrayed your ideals?
16    A.   No.
17    Q.   At least at the time that you
18  were employed at Southern, did they keep
19  records of who was considered for a
20  particular position?
21    A.   Within Tolleya.
22    Q.   Correct.  Right.  And did they
23  also keep records of who was interviewed
24  for a particular position?
25    A.   To the best of my knowledge,

Page 82

D. WALD-MARGOLIS

1
2  it's -- it was in Tolleya, recorded all of
3  it.
4    Q.   Okay.  So that information
5  would have been recorded in Tolleya if
6  there was an interview; is that correct?
7    A.   That is my understanding.
8    Q.   And did Southern also record
9  who was hired for a particular position?
10    A.   Yes.
11    Q.   Did Southern keep records of
12  who had managerial authority?
13    A.   I don't know.
14    Q.   Well, does every single
15  employee at Southern have a direct report?
16  And I am not talking about now.  I am
17  talking about the time that you worked
18  there.  Did every single employee at
19  Southern report to someone?
20    A.   Yes.
21    Q.   Was that direct report listed
22  anywhere in their employee file?
23    A.   Yes.
24    Q.   Where was it listed?
25    A.   Whatever system they had.

Page 83

D. WALD-MARGOLIS

1
2    Q.   Let's say you supervised -- I
3  don't know -- Charlie Chaplin, right.  If
4  we looked at Charlie's file, it would show
5  that you were his manager?
6    A.   The electronic system would,
7  yes.
8    Q.   Have you ever seen anybody at
9  Southern with more than one manager?
10    A.   I don't recall.
11    Q.   Can you think of anybody who
12  had more than one manager?
13    A.   I don't recall.
14    Q.   Did you ever have more than one
15  manager?
16    A.   Not at any one time.
17    Q.   And was it Southern's policy
18  that each employee would have one manager
19  at one time?
20    A.   I don't know.
21    Q.   Do you know what the difference
22  between a manager and a supervisor is?
23    A.   Yes.
24    Q.   What is the difference between
25  a manager and a supervisor?

Page 84

D. WALD-MARGOLIS

1
2    A.   A supervisor would report to a
3  manager with the supervisor having
4  different responsibilities than a manager.
5    Q.   At Southern, how were those
6  responsibilities different?
7    A.   I don't know.
8    Q.   But is it fair to say that the
9  responsibilities of a supervisor and of a
10  manager were different?
11    A.   Yes.
12    Q.   Is it fair to say that a
13  supervisor always reported to a manager?
14    A.   I don't know.
15    Q.   The individuals that were
16  supervised by a supervisor, who did they
17  report to?  Did they report to the
18  supervisor's manager?
19    A.   They could.  I don't know.  I
20  don't recall how departments were set up
21  and reporting structures.
22    Q.   But if somebody had managerial
23  authority that would be something that
24  would be reflected in the records of
25  Southern; is that fair to say?

21  (Pages 81 to 84)

Page 85

D. WALD-MARGOLIS

1
2    A.  Yes.
3    Q.  Okay.  And let's talk about
4  union employees just for a second.  What
5  role did managers have in managing union
6  employees?  Let's talk about Local 1?
7    A.  Can you be more specific,
8  please?
9    Q.  Well, what role did managers
10  have in managing employees of Local 1?
11  Could they terminate them?
12    MS. CABRERA:  Objection to the
13    form of the question.
14    A.  Managers could fire and hire.
15    Q.  Could supervisors hire and
16  fire?
17    A.  I don't recall.
18    Q.  Do you recall any supervisor
19  who hired and fired any individual?
20    A.  I don't recall.
21    Q.  Did supervisors interview
22  candidates?
23    A.  I don't recall.
24    Q.  When you were at Southern, were
25  there employee files?

Page 86

D. WALD-MARGOLIS

1
2    A.  Yes.
3    Q.  Okay.  What type of information
4  was kept in the employee file?
5    A.  Employment application, résumé,
6  an offer letter, letters of discipline or
7  commendation or performance review, tax
8  forms, change of emergency contacts.
9    Q.  How about job descriptions?
10    A.  I don't know.
11    Q.  Does Southern have a job
12  description for every employee?
13    A.  I don't know.
14    Q.  What is the purpose of a job
15  description?
16    A.  A job description defines the
17  essential functions which are to be
18  completed by the person in that role and
19  the scope of the function to be completed.
20  Might even include education and
21  requirements to meet the needs of the
22  position and any ADA-required physical
23  components to the position:  Lifting,
24  pulling, pushing, squatting.
25    Q.  Did you have investigative or

Page 87

D. WALD-MARGOLIS

1
2  investigation files at Southern?
3    A.  Yes.
4    Q.  What were the investigation
5  files for?
6    A.  If there was a matter that was
7  to be investigated, there is --
8    Q.  Were there investigation files
9  for matters, were there investigation files
10  for employees, or a combination?
11    A.  An investigation file was
12  created if there was a matter to
13  investigate.
14    Q.  Okay.  Would that matter
15  involve an employee?
16    A.  Yes.
17    Q.  And what was the purpose of the
18  investigation file?
19    A.  It contained the investigation
20  information.
21    Q.  Did it say what the employee
22  was being investigated for?
23    A.  It might.  It could.
24    Q.  If an employee was being
25  investigated for something, would it say

Page 88

D. WALD-MARGOLIS

1
2  what they were being investigated for?
3    A.  It would depend upon who
4  conducted the investigation.
5    Q.  Did you ever conduct
6  investigations?
7    A.  Yes.
8    Q.  Did you ever conduct an
9  investigation into Maria Suarez?
10    A.  No.
11    Q.  Did anyone at Southern ever
12  conduct an investigation into Maria Suarez?
13    A.  I don't know.
14    Q.  Did you ever see an
15  investigation file for Maria Suarez?
16    A.  No.
17    Q.  Do you have knowledge whether
18  an investigation file for Maria Suarez
19  exists or doesn't exist?
20    A.  I do not.
21    Q.  Where are the investigation
22  files kept?
23    A.  I don't know.
24    Q.  Who has access to the
25  investigation files or who had access when

22  (Pages 85 to 88)

Page 89

D. WALD-MARGOLIS

1    you were there?
2        A.   HR department.  The director
3    and the -- whomever was conducting the
4    investigation.
5        Q.   So Beth Toohig, when she was
6    director of human resources, she would have
7    access to the investigation files?
8        A.   That's correct.
9        Q.   And who typically would conduct
10   an investigation other than Beth Toohig?
11       A.   Whomever the business partner
12   or assigned person was.
13       Q.   And the business partner or
14   assigned person, who were they?
15       A.   It could have been Michelle
16   Meyer or Andrea Metzger.
17       Q.   Could it have been anybody else
18   besides Elizabeth Toohig, Michelle Meyer,
19   or Andrea Metzger?
20       A.   While I was employed there,
21   there was another person, Halley Burns.
22       Q.   Anyone else?
23       A.   Those are the only people while
24   I was employed.

Page 90

D. WALD-MARGOLIS

1        Q.   Was Halley Burns an employee of
2    Southern?
3        A.   Yes.
4        Q.   Were Michelle and Andrea
5    Metzger employees of Southern?
6        A.   Yes.
7        Q.   Who assisted these individuals
8    in the investigations?
9        A.   I don't -- I have no knowledge.
10       Q.   Did attorneys sometimes assist
11   these individuals in their investigations?
12       A.   I don't know.
13       Q.   Did attorneys ever come to the
14   human resource department of Southern Wine
15   and Spirits?
16       A.   Yes.
17       Q.   For what reason would they
18   come?  I don't want to know about what was
19   discussed.  I don't want to know what they
20   said.  I want to know why they came to the
21   HR department?
22       A.   They conducted compliance
23   training and they would come to discuss
24   matters relating to the company.

Page 91

D. WALD-MARGOLIS

1        Q.   Was it a privately owned
2    company?
3        A.   I don't know.
4        Q.   Did your reason for leaving
5    have anything to do with the fact that
6    Southern sells alcohol?
7        A.   No.
8        Q.   Let's go back to 2016.  During
9    that last year that you were at Southern,
10   you were in recruitment?
11       A.   Yes.
12       Q.   Why had you been put into
13   recruitment?
14       A.   There was a statewide position
15   that I had applied for.
16       Q.   Do you recall any of the duties
17   that you had while you were in recruitment?
18       A.   It was talent acquisition.  I
19   believe it was a manager-based position for
20   the State of New York.
21       Q.   Okay.  And were you involved in
22   the promotion of any individuals within
23   Southern?
24       A.   I was not a decision maker.

Page 92

D. WALD-MARGOLIS

1        Q.   Were you involved at all in the
2    promotion of individuals in Southern?
3        A.   So the responsibilities were
4    ensuring that the jobs were posted,
5    applications were funneled through for
6    interviews, and processed based on the
7    decisions that were made upon these
8    interviews.
9        Q.   And did you have that
10   responsibility for the entire State of New
11   York?
12       A.   Yes.
13       Q.   If Maria Suarez had been
14   reclassified and her duties changed, let's
15   say, in May of 2016, is that something you
16   would have been involved in?
17       A.   If she had applied for another
18   position.
19       Q.   So if she applied for the
20   position, you would have been involved in
21   that?
22       A.   Can you clarify your question?
23       Q.   If anyone in the State of New
24   York applied for a managerial position at

Page 93

D. WALD-MARGOLIS
1
2    Southern, would you have been involved in
3    that?
4        A.   I need a better understanding
5    of what "involved" is.
6        Q.   Well, did you have any role in
7    it at all?
8        A.   From a process standpoint, not
9    a decision-based.
10       Q.   From the process standpoint,
11   what was your role?
12       A.   To ensure the position was
13   posted, applicants were processed through
14   to the hiring manager, and dispositioned
15   accordingly.
16       Q.   And who determined what the job
17   description would be?
18       A.   I don't know.
19       Q.   Did you actually create the job
20   posting?
21       A.   Yes.
22       Q.   And describe for me how you
23   would create the job posting?
24       A.   It was through the -- if I am
25   remembering it correctly, through the

Page 94

D. WALD-MARGOLIS
1
2    Tolleya system. There was a job
3    description that got uploaded or created
4    and a job posting went out.
5        Q.   How did you know which jobs to
6    actually post?
7        A.   It would be either from the
8    directors of the operations or sales, the
9    operational lines based upon approved
10   requisition process, also through the
11   Tolleya system.
12       Q.   So whose responsibility was it
13   to prepare the actual job description?
14       A.   That would be the hiring
15   manager.
16       Q.   And how would the hiring
17   manager prepare the job description?
18       A.   I don't know.
19       Q.   Would you actually create the
20   job description in Tolleya?  Meaning,
21   generate it?
22       A.   If I recall correctly, it was
23   an upload.
24       Q.   Okay.  That would be from
25   information or directions that you got from

Page 95

D. WALD-MARGOLIS
1
2    somebody else?
3        A.   Correct.
4        Q.   Okay.  Did you have the
5    authority to create a job description
6    without approval from someone else?
7        A.   No.
8        Q.   Is it fair to say that every
9    job description that you actually created
10   was approved by someone else?
11       A.   Yes.
12       Q.   And who within the State of New
13   York had the authority to approve job
14   descriptions?
15       A.   The hiring managers which were
16   department heads, as well as the heads of
17   the operational divisions.
18       Q.   So you create job descriptions,
19   is that fair to say, and then there is a
20   hiring process, correct?
21       A.   To the best of my recollection,
22   there is a requisition process.
23       Q.   And there's levels of approval
24   for that candidate to get the job; is that
25   fair to say?

Page 96

D. WALD-MARGOLIS
1
2        A.   The requisition, which is a
3    request to fill a vacancy, starts the
4    process, which has the job description
5    attached to it.  So there is an approval to
6    recruit for that position, and once the
7    requisition and authorization to hire for
8    that role has been processed, the position
9    can be posted for applicants to apply to.
10       Q.   And then once individuals
11   apply, what is the next step in the
12   process?
13       A.   There's the communication to
14   the hiring manager of here's the
15   applicants.
16       Q.   Who makes the selection as to
17   which applicants to interview?
18       A.   Hiring manager.
19       Q.   Who makes the decision as to
20   which applicant to hire?
21       A.   I don't know directly.
22       Q.   At some point, would the hire
23   have to be approved by different
24   individuals other than the hiring manager?
25       A.   I don't know.

24  (Pages 93 to 96)

Page 97

1           D. WALD-MARGOLIS
2       Q.   Did Roy Cohen ever have to
3   approve the hiring of any individual?
4       A.   I don't know.
5           MR. MOSER:  Just bear with me
6   one second.
7           MS. CABRERA:  If you're going
8   to be much longer, I need a break.
9           MR. MOSER:  I am almost done.
10  I will be done in ten minutes.  I
11  don't know.  Is that enough?
12          MS. CABRERA:  Okay.  Just if
13  you're going to go beyond that, I am
14  going to need a break.
15          MR. MOSER:  Gotcha.
16      Q.   Were the job descriptions used
17  as a basis for evaluating the employee's
18  performance?
19      A.   I don't know.
20      Q.   Did you ever review any
21  performance evaluations?
22      A.   In my tenure at Skyline, yes, I
23  did.
24      Q.   How about at Southern?
25      A.   Oh, wrong company.  Yes, at

Page 98

1           D. WALD-MARGOLIS
2   Southern.
3       Q.   What was the purpose of your
4   review?
5       A.   As a member of the HR team, we
6   would review the information provided by
7   the direct manager for content.
8       Q.   And what do you mean when
9   reviewing "for content"?  Can you be more
10  specific?
11      A.   To make sure that they
12  addressed the questions and performance
13  concerns, if there were any; that the goals
14  were smart-based goals in order to address
15  any deficiencies or commendations.
16      Q.   Do you know whether employees
17  were reviewed based upon their ability to
18  perform what was in their job descriptions?
19      A.   I don't know.
20      Q.   When we looked at --
21          MR. MOSER:  I don't think we
22  have this marked yet, so this will be
23  one last document.  Hold on.  I don't
24  believe I marked this yet.  What are
25  we up to, 18?

Page 99

1           D. WALD-MARGOLIS
2           MS. HOLMS:  This will be 18.
3           MR. MOSER:  We are up to 18.
4           MS. HOLMS:  Yes.
5       Q.   I am going to draw your
6   attention to *SGWS-00892, the second page
7   here.
8           Do you see this last line where
9   it says "April 1, 2016"?  Do you know what
10  this language means:  "Created from
11  duplication of"?
12      A.   By the wording of the note,
13  it's a duplicate.  Meaning, it was copied
14  from that other requisition number of 3085.
15      Q.   And is this something you would
16  have done on your own or something you
17  would have done with directions from
18  somebody else?
19      A.   If you scroll down below that,
20  please.
21      Q.   Sure.
22      A.   Keep scrolling down.  I don't
23  know what that one is, I am sorry.  Okay.
24  Can you scroll up, please.  So the creation
25  of a requisition is at the direction of.

Page 100

1           D. WALD-MARGOLIS
2   That means that somebody wants a position
3   filled.  So if the job description already
4   existed in the system, this Tolleya system,
5   you would just duplicate it, and then
6   change the characteristics to the New York
7   location, the New York Metro location, or
8   Upstate.  So that is what it meant.
9       Q.   Okay.
10          MR. MOSER:  I have no further
11  questions.  Thank you very much for
12  your time.
13          MS. CABRERA:  Thank you.
14          (Whereupon, Plaintiff's
15  Exhibits 14 through 18 were marked
16  for identification as of this date by
17  the Exhibit tech.)
18          (Whereupon, at 3:18 P.M., the
19  Examination of this witness was
20  concluded.)
21
22          ∘     ∘     ∘     ∘
23
24
25

25  (Pages 97 to 100)

Page 101

D E C L A R A T I O N

I hereby certify that having been
first duly sworn to testify to the truth, I
gave the above testimony.

I FURTHER CERTIFY that the foregoing
transcript is a true and correct transcript
of the testimony given by me at the time
and place specified hereinbefore.

_____

DINA WALD-MARGOLIS

Subscribed and sworn to before me
this _____ day of _____ 20___.

_____

NOTARY PUBLIC

---

Page 102

E X H I B I T S

PLAINTIFF'S EXHIBITS

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 14 | Requisition form | 100 |
| 15 | Requisition Form | 100 |
| 16 | E-Mail | 100 |
| 17 | Hire Notice | 100 |
| 18 | Inventory control | 100 |

(Exhibits retained by Counsel.)

I N D E X

| EXAMINATION BY | PAGE |
|---|---|
| MR. MOSER | 6 |

---

Page 103

INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION AND/OR DOCUMENTS        PAGE
(None)

QUESTIONS MARKED FOR RULINGS
PAGE LINE QUESTION
(None)

---

Page 104

C E R T I F I C A T E

STATE OF NEW YORK      )
                 : SS.:
COUNTY OF KINGS        )

I, SANDRA SIERRA, a Notary Public for
and within the State of New York, do hereby
certify:
    That the witness whose examination is
hereinbefore set forth was duly sworn and
that such examination is a true record of
the testimony given by that witness.
    I further certify that I am not
related to any of the parties to this
action by blood or by marriage and that I
am in no way interested in the outcome of
this matter.
    IN WITNESS WHEREOF, I have hereunto
set my hand this 13th day of November 2022.

_____
SANDRA SIERRA

Page 105

1      ERRATA SHEET FOR: DINA WALD-MARGOLIS
2        DINA WALD-MARGOLIS, being duly sworn, deposes
3      and says: I have reviewed the transcript of my
4      proceeding taken on 11/21/2022. The following
5      changes are necessary to correct my testimony.
6      _____
7      PAGE LINE    CHANGE           REASON
8      ----|----|---------------------|---------------
9      ----|----|---------------------|---------------
10     ----|----|---------------------|---------------
11     ----|----|---------------------|---------------
12     ----|----|---------------------|---------------
13     ----|----|---------------------|---------------
14     ----|----|---------------------|---------------
15     ----|----|---------------------|---------------
16     ----|----|---------------------|---------------
17     ----|----|---------------------|---------------
18     ----|----|---------------------|---------------
19     ----|----|---------------------|---------------
20     ----|----|---------------------|---------------
21        Witness Signature:_____
22     Subscribed and sworn to, before me
23     this ___ day of _____, 20 ___.
24     _____
25     (NOTARY PUBLIC)        MY COMMISSION EXPIRES

Lexitas Court Reporting
800-678-0166