UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Maria Suarez, | ) |
| | ) **PLAINTIFF'S RESPONSE** |
| Plaintiff(s), | ) **AND COUNTER-STATEMENT** |
| | ) **TO DEFENDANT'S 56.1** |
| -against- | ) **STATEMENT** |
| | ) |
| Southern Glazer's Wine and Spirits of New York, | ) **Case No.** |
| LLC, | ) **19-cv-07271(GRB)(LGD)** |
| | ) |
| Defendant(s). | ) |

## PRELIMINARY STATEMENT

The Local Rules require the moving party to submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The Defendant's Rule 56.1 Statement contains numerous statements of fact which the Defendant knows to be disputed. In addition, many of the statements are opinion and argument rather than fact.

The Defendant's 56.1 Statement Contains 70 numbered paragraphs, many of which contain multiple statements of fact. In order to respond, the Plaintiff, where appropriate, has renumbered the statement (e.g. 5, 5.1, 5.2, etc.) so as to ferret out each statement of fact.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## STATEMENT OF MATERIAL FACTS NOS. 1-49

1.        Southern Glazer's Wine and Spirits, LLC is a wholesale distributor of spirits, beer, wine, and related products.

**Response:** UNDISPUTED.

2.        Southern Glazer's Wine and Spirits, LLC is headquartered in Miami, Florida, and maintains two primary distribution warehouses in New York: one in Syosset and another upstate in Syracuse. See Declaration of Elizabeth Toohig ("Toohig" Decl.), ¶ 2.

**Response:** UNDISPUTED.

3.      On July 1, 2016, Southern Wine & Spirits of America, Inc. and Glazer's Inc. completed a transaction to form Southern Glazer's Wine and Spirits, LLC. See Toohig Decl., ¶ 3.

**Response:** UNDISPUTED.

3.1.      Southern Glazer's Wine and Spirits, LLC is the parent company of Defendant Southern Glazer's Wine and Spirits of New York, LLC (hereinafter "SGWS"). See Toohig Decl., ¶ 4.

**Response:** UNDISPUTED.

4.      SGWS is an equal opportunity employer and takes discrimination and retaliation, and allegations thereof, seriously. SGWS maintains policies prohibiting discrimination and retaliation in employment. See Employee Handbook (attached as Exhibit 1 to the Declaration of Anjanette Cabrera ("Cabrera Decl.")).

**Response:** DISPUTED IN PART. The Plaintiff DOES NOT DISPUTE that SGWS (also referred to as "Southern") has a handbook that prohibits discrimination. The remainder of this statement constitutes Southern' s opinion that it does not discriminate, and therefore is a statement of opinion, not fact, to which no response e is required and which is therefore DISPUTED.

4.      Plaintiff Maria Suarez ("Suarez") began working for SGWS in December 2004 as an administrative assistant in the payroll department. See Deposition Transcript of Maria Suarez ("Suarez Dep.")

**Response.** UNDISPUTED.

5.      In 2007, Suarez was promoted to Inventory Supervisor, later retitled Inventory Control Manager, in the company's Syosset warehouse. See Personnel Action Notice dated

October 10, 2007 (attached as Exhibit 2 to the Cabrera Decl.); and Suarez Dep. at 21:13-19 (attached as Exhibit 19 to Cabrera Decl.).

**Response:** DISPUTED.  Plaintiff was promoted to Inventory Control Manager in 2007.  *See* November 6, 2012 email and Southern Wine & Spirits Position Request form annexed to the Moser Declaration as Exhibit 1 (SGWS001488-001489).

6.        [Plaintiff] initially supervised one Inventory Control ("IC") Clerk, Josianne Sajous ("Sajous").

**Response:** UNDISPUTED.

7.1.        In January 2008, two additional IC Clerks joined the department, and Suarez hired an IC Clerk in February 2009.

**Response:** UNDISPUTED.

7.2.        Suarez supervised between three and four full-time IC Clerks while in the position of Inventory Supervisor/IC Manager[.]

**Response:** UNDISPUTED.

7.3.        Suarez supervised between three and four full-time IC Clerks. . .as WMI Administrator (explained further below). See Suarez Dep. at 22:11-17; 26:5-10; 28:7-20 (attached as Exhibit 19 to Cabrera Decl.); Deposition Transcript of Roy Kohn ("Kohn Dep.") at 30:17-20 (attached as Exhibit 14 to Cabrera Decl.); and Deposition Transcript of Barry Finkelstein ("Finkelstein Dep.") at 14:9-23 (attached as Exhibit 18 to Cabrera Decl.).

**Response.** DISPUTED. Suarez was stripped of her supervisory authority when she was reclassified from "Manager" to "Administrator." *See* Suarez Dep. 173:11-14; *see also* PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 17, *infra.*

8.      Throughout her tenure supervising the IC department, Suarez's manager, John Wilkinson ("Wilkinson"), rated Suarez as only an average "Performer" in her performance reviews. *See* Performance Evaluations (attached as Exhibit 3 to the Cabrera Decl.).

**Response.** Defendant has failed to provide a pinpoint cite to admissible evidence to support this statement. Therefore, no response is required. To the extent a response is required, the statement is DISPUTED.

## PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS NO. 8.

*SGWS violated its own policies by failing to provide the Plaintiff with performance evaluations covering 2014, 2015, 2016 and 2017.*

a.   As of May 2, 2013, Maria Suarez supervised four individuals – three women (Tatiana Herdocia, Ina Scott and Josianne Sajous) and one man (Justin Vegh). Suarez Dep. 26:9-10.

b.   On May 2, 2013, While reviewing payroll records for her department, Ms. Suarez noticed that the three women in her department were classified as "admin" (or "clerical") while the only male in her department was classified as "warehouse." *See* Suarez Decl. ¶ 1.

c.   That same day, Ms. Suarez sent an email to John Wilkinson stating that her "team was classified differently" and that while she was sure it was "just a mistake, [] it looks like they were classified by sex." Suarez Dep 157:24-158:12; *see also* email chain annexed to the Moser Declaration as Exhibit 2.

d.  The last performance appraisal signed by the Plaintiff was dated May 20, 2014.[1] This performance evaluation covers the Plaintiff's performance for the 2013 calendar year.[2]

e.  On May 22, 2014 (two days after Plaintiff received her 2013 performance appraisal), Tatiana Herdocia and Ina Scott filed a lawsuit against SGWS in the Eastern District of New York. *See Herdocia v. Southern Wine & Spirits of America, Inc.,* 14-cv-03196(JMA)(ARL)("the *Herdocia* lawsuit"). A copy of the *Herdocia* complaint is annexed to the Moser Declaration as Exhibit 3.

f.  The *Herdocia* lawsuit alleged that Southern had violated the U.S. Equal Pay Act (29 U.S.C. § 206(d)), and the New York Equal Pay Act (N.Y. Lab. Law § 194), by classifying them based upon sex. *See Herdocia* complaint (Ex. 3 to Moser Decl.).

g.  Plaintiff was not issued an annual performance evaluation covering the 2014 calendar year.[3]

h.  The failure to issue an annual performance evaluation for 2014 was in violation of SGWS's company-wide policy. *See* Randall Dep. 47:5-9.

i.  Wilkinson did not have a valid reason for failing to give Maria an annual performance evaluation covering 2014. *See* Randall Dep. 47:12-15.

j.  Josianne Sajous filed a lawsuit against Southern in the Eastern District of New York on filed on January 4, 2015, also alleging that employees were classified

---

[1] *See* Performance Evaluations (Exhibit 3 to the Cabrera Decl.), at 1-7; Suarez Declaration ¶¶ 2-3. The 2016 and 2017 performance evaluations (Exhibit 8 to the Cabrera Declaration) were not signed by the Plaintiff nor is there any evidence that she was furnished with these performance evaluations. *See* Suarez Decl. ¶¶ 6-7.
[2] *Id.*
[3] *See* Performance Evaluations and Suarez Decl. ¶ 3.

based upon sex. *See Sajous v. Southern Wine & Spirits of New York, Inc.,* 15- cv-03270(JS)(ARL) complaint annexed as Exhibit 4 to the Moser Declaration.

k.  Plaintiff was not issued an annual performance evaluation covering the 2015 calendar year.[4]

l.  The failure to issue an annual performance evaluation for 2015 was in direct violation of SGWS's company-wide policy. *See* Randall Dep. 47:5-9.

m.  Wilkinson did not have a valid reason for failing to give an annual performance evaluation covering 2015. *See* Randall Dep. 47:12-15.

n.  Defendant has produced what it contends are reviews covering the Plaintiff's performance in 2016 and 2017. *See* Exhibit 8 to Cabrera Declaration.

o.  The Plaintiff does not remember receiving the performance evaluations covering 2016 or 2017, and there is no evidence that they were ever furnished to her. *See* Suarez Decl. ¶ 4; Suarez Dep. 143:18-23; 146:14-18.[5]

p.  The failure to furnish annual performance evaluations in 2016 and 2017 was in direct violation of SGWS's uniform company-wide policy. *See* Randall Dep. 47:5-9.

q.  Wilkinson did not have a valid reason for failing to give Maria annual performance evaluations covering 2016 and 2017. *See* Randall Dep. 47:12-15.

***Plaintiff was not rated as an "average Performer."***

r.  There is no such rating as "average Performer'" in SGWS's employee rating system. *See* Performance Evaluations (Ex. 3 to Cabrera Decl.), at 1.

---

[4] *See* Performance Evaluations and Suarez Decl. ¶ 3.
[5] Unlike all other Performance Evaluations that have been furnished, the 2016 and 2017 evaluations are undated and unsigned.

s. The ratings given to Ms. Suarez when she was a manager included "Performer" and "High Performer". *See* Performance Evaluations (Ex. 3 to Cabrera Decl.).

t. More specifically, Wilkinson rated Maria Suarez as a "Performer" in 2010[6], 2011,[7] 2012,[8] and 2013.[9]

u. A "Performer" is described as follows:

All key job expectations are met and sometimes exceeded with normal direction and assistance. A [Performer is a] <u>solid performer who displays all the behaviors required for successful job performance.</u>[10]

v. Wilkinson rated Ms. Suarez as a "High Performer" in 2012. *See* Performance Evaluations, at 16.

w. A "High Performer" is described as an employee who "[o]ften exceeds and consistently meets all key performance expectations"; and whose "[a]ccomplishments and contributions are higher than required by the job." *See* Performance Evaluations, at 1.

9. Wilkinson acknowledged Suarez's work ethic, but noted areas for improvement. In particular, Wilkinson said Suarez needed to improve her communication skills and ability to collaborate with other departments in the company and other functions in the warehouse; to keep an open mind and be able to recognize the limits of her knowledge and identify when to ask for help, rather than allowing her ego or stubbornness to get in the way of efficiency and success; to improve her problem-solving skills; and to take more personal accountability for errors made by her and her team. *See* Performance Evaluations (attached as Exhibit 3 to the Cabrera Decl.).

---

[6] Performance Evaluations, at 28.
[7] Performance Evaluations, at 21.
[8] Performance Evaluations, at 11.
[9] Performance Evaluations, at 1.
[10] See Performance Evaluations, at 1 (emphasis added).

**Response.** The Defendant has failed to provide a pinpoint cite to the record, and this statement contains numerous arguments and opinions, to which no response is required. To the extent a response is required, Plaintiff DISPUTES this statement. *See* Performance Evaluations (Exhibit 3).

<u>**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS NO. 9.**</u>

    a.  In his evaluations, John Wilkinson praised the Plaintiff and her communication, noting, "Maria is honest and communicates very timely." Performance Evaluations, at 19.

    b.  "Maria will work and get the job done. She wants it right the first time and strives to make everything perfect." Performance Evaluations, at 21.

    c.  "Maria works well in a team setting." Performance Evaluations, at 16.

    d.  "Maria takes pride in the quality of her work and does what is right not what is easy." Performance Evaluations, at 11.

    e.  Maria "displays a positive, 'can do' attitude and has a sense of urgency." Performance Evaluations, at 5.

    f.  "Maria takes personal accountability for her own activities and results and seeks to assist with team results[.]" "She constantly monitors progress against goals: has a sense of urgency. She does not let obstacles get In the way of goal achievement." Performance Evaluations, at 5.

    g.  "Maria is reliable - shows up consistently; delivers on commitments." Performance Evaluations, at 4.

    h.  "Maria is very accurate with her work." Performance Evaluations, at 2.

10.     Despite identifying these issues and working with Suarez to improve them, year after year, the same concerns were raised with Suarez in her evaluations. See Performance Evaluations (attached as Exhibit 3 to the Cabrera Decl.).

**Response:** DISPUTED.

**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS NO. 10.**

a.  The most recent performance evaluation contained in Defendant's Exhibit 3 states, that "Maria works well with other departments. In the past she did struggle occasionally but has improved her approach over the past few years."[11]

b.  And,

Maria is recognized by others to be a subject matter expert and consistently tries to improve her department with new ideas. She regularly asks questions and seeks out learning opportunities to expand understanding of the function and business. . . She has a thorough understanding of the basic math required to perform the job and the ability to do complex calculations. She is very skilled in Excel and uses this to her advantage.

11.     Suarez admittedly never disputed her performance evaluations. See Suarez Dep. at 42:13-17 (attached as Exhibit 19 to Cabrera Decl.).

**Response:** UNDISPUTED.

12.     In early 2016, SGWS began implementing a new warehouse management system in the Syosset distribution warehouse. The system, Warehouse Management Information ("WMI"), had been implemented in several other warehouse locations by SGWS, including in Syracuse. See Deposition Transcript of Kevin Randall ("Randall Dep.") at 41:17-24 (attached as Exhibit 15 to Cabrera Decl.).

**Response:** UNDISPUTED.

---

[11] Performance Evaluations (Exhibit 3), at 5.

13.	On March 3, 2016, Suarez voluntarily applied for the WMI Administrator position.

**Response:** DISPUTED. Suarez did not "voluntarily apply." She was told by Kevin Randall to apply for the position. Suarez Dep. 53:15-16; 22-23. She was given "no alternative." Suarez Dep. 58:7-9.

13.1.	[The WMI Administrator position] was offered to her on May 4.

**Response:** UNDISPUTED.

13.2.	The Plaintiff "started [as the WMI Administrator] on May 9." See WMI Administrator Offer History and Offer Letter (attached as Exhibit 4 to the Cabrera Decl.); and WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.).

*Response:* UNDISPUTED. However, the system was not implemented until July 2016. *See* Johnson Dep. 40:9-40:11.

14.	The WMI Administrator's job functions were critical to SGWS' business because without proper inventory the company could not supply to its customers and upside-down inventory would negatively affect the company's financials. See Randall Dep. at 80:14-81:9 (attached as Exhibit 15 to Cabrera Decl.).

**Response:** DISPUTED. When Maria was given the title of "Administrator", the high-level functions which she had performed as the "Inventory Control Manager" were taken away from her. *See* PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS NO. 18.1**,** *infra*.

15.	Kevin Randall ("Randall") was the hiring manager for the WMI Administrator position that was offered to Suarez. See SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 11 (attached as Exhibit 13 to the Cabrera Decl.); and Randall Dep. at 62:4-6 (attached as Exhibit 15 to the Cabrera Decl.).

**Response.** UNDISPUTED

16.     Randall selected Suarez for this position because she "was [the] best fit for the inventory control counting piece where she had been placed." See Randall Dep. at 62:7-25; 63:2-8 (attached as Exhibit 15 to the Cabrera Decl.). Randall believed Suarez "was the most qualified person for this job" because "[s]he worked in the warehouse every day alongside of all of those people and her team and nothing in this new [WMI] world was going to change. That was all going to stay the same. It was just how [SGWS] reported to accounting and to corporate in [its] results…" See Randall Dep. at 82:19-83:7 (attached as Exhibit 15 to the Cabrera Decl.).

**Response.** DISPUTED. The motive for the employment decision is a question for the trier of fact.  Furthermore…

### PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 16.

a.  According to Randall, "After interviewing the two individuals Tonisha [Durant] had the <u>best qualification</u> to understand the <u>accounting piece</u>."[12]

b.  However, Randall never interviewed Maria Suarez;[13]

c.  Southern has not produced any documents showing how the decision to reclassify Maria from a Manager to an Administrator was made in early 2016, and Southern claims it is not withholding any such documents.[14]

d.  Maria Suarez has bachelors degrees in both Accounting and Economics, and before coming to the United States, was a CPA working for the Government of Ecuador in the Ministry of Production, Foreign Trade, Investment and Fishing. ("Ministerio de Producción, Comercio Exterior, Inversiones y Pesca). *See*

---

[12] Randall Dep. 62:25-63:8.
[13] *See* Suarez Declaration ¶ 5.
[14] *See* Moser Declaration ¶ 5.

Plaintiff's resume (SGWS001404), annexed to the Moser Declaration as Exhibit 5.

e. When Mr. Randall determined that Maria Suarez was not the best qualified to handle the "accounting piece", he was unaware of her qualifications. Randall Dep. 44:3-9.

f. Tonisha Durant, in contrast, does not have a degree in accounting and is not a CPA. *See* Tonisha Durant's resume (SGWS0001734-0001735), annexed to the Moser Declaration as Exhibit 6.

g. Because Southern, contrary to its own policy, had failed to furnish performance evaluations to Maria Suarez covering the years 2014 and 2015, there were no recent performance appraisals which could have been used to make employment decisions regarding Maria Suarez.

17. In this new position. . .Suarez enjoy[ed] an increased salary of $75,000[.]

**Response:** Although it is UNDISPUTED that Plaintiff's salary was $75,000 in 2016, she was deprived of the consistent salary increases that she had earned prior to the filing of the *Herdocia* lawsuit, as explained in PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 25, *infra.*

17.1. In this new position. . .she also increased her supervisory responsibilities when an additional IC Clerk was hired and added to her team at her request. See WMI Administrator Offer History and Offer Letter (attached as Exhibit 4 to the Cabrera Decl.); and Kohn Dep. at 90:13-15 (attached as Exhibit 14 to Cabrera Decl.) (stating that "[w]ith the [WMI] role came a pay increase; it came with more responsibility. She was given an additional cycle counter…").

**Response:** DISPUTED.

a.  The person with the most knowledge (other than the Plaintiff herself) of Maria's supervisory responsibilities was her manager John Wilkinson, who unfortunately died in 2019. Kohn Dep. 176:25-177:6.

b.  After John Wilkinson, the next person with the most personal knowledge Maria's supervisory role was Kevin Randall. *Id.*

c.  Kevin Randall has no personal knowledge of Maria's activities[15] and Roy Kohn knows even less than Kevin Randall (Kohn Dep. 176:25-177:6).

***When Plaintiff was reclassified from "Manager" to "Administrator" she was stripped of her supervisory authority:***

d.  The change from "Manager" to "Administrator" was not a promotion, but a "reclassification." *See* Personnel Action Notice (SGWS001485), annexed to the Moser Declaration as Exhibit 7 (describing the change as a "reclassification").

e.  John Wilkinson was deposed in one of the sex discrimination lawsuits filed against Southern on October 25, 2016. He testified:

> **Q. Who does [Maria Suarez] supervise now?**
>
> **A. Nobody.[16]**

f.  Ms Suarez' disciplinary authority was taken away in July 2016 when she was reclassified from a "Manager" to an "Administrator." Wilkinson Dep. 121:8-10; Toohig Dep. 92:17-93:18.

g.  Wilkinson couldn't explain the reasons why Maria's disciplinary authority was taken away. Wilkinson Dep. 121:8-10.

---

[15] Randall Dep. 84:8-19.
[16] *See* Wilkinson Deposition Transcript, annexed to the Moser Declaration as Exhibit 8, at 119:7-9.

   h. Wilkinson was "sure that [taking her authority away had] to do with separation of responsibilities[.]" Wilkinson Dep. 14-17.

   i. Roy Kohn, testifying as a 30(b)(6) witness, agreed that Ms. Suarez' disciplinary authority was taken away but offered a conflicting reason, explaining that "John [Wilkinson] absorbed some of [Maria's] other duties like imposing discipline on the union staff because at that time she was probably seen as not capable of doing it." Kohn Dep. 125:14-22.

18.   Suarez continued to report to the same manager, Wilkinson[.]

**Response:** UNDISPUTED.

18.1.  As WMI Administrator, "Suarez continued to [. . .] perform the same duties as in her prior position." See WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.); Randall Dep. at 38:11-25 (attached as Exhibit 15 to Cabrera Decl.); Suarez Dep. at 66:6-8 (attached as Exhibit 19 to Cabrera Decl.) (admitting that Wilkinson remained her manager); and Kohn Dep. at 89:7-11 (attached as Exhibit 14 to the Cabrera Decl.) ("The tasks involved in this WMI role were identical [to the former Inventory Control Manager role] with the exception of the scanning versus the manual application of the perpetual inventory from the past").

**Response:** DISPUTED. SGWS's statement that Ms. Suarez' job "didn't change" is simply incorrect.

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 18.1.**

   a. Ms. Suarez was told by Kevin Randall that when she is reclassified as an Administrator "[t]hat nothing will change." Suarez Dep. 56-7-8.

b. She was presented with a job description by Kevin Randall. *See* PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 24.

c. Suarez did not understand most of what was in the job description. *See* Suarez Dep. 54:21-24.

d. Maria Suarez was confused, telling Randall and Wilkinson "that this position, it looks like it's more for an IT person than for an accountant." Suarez Dep. 57:5-8.

e. Kevin Randall told her "That nothing will change" and "Don't even read" the job description. Suarez Dep. 57:18-20.

f. Once she was reclassified as an administrator, "Everything changed." Suarez Dep. 173:21-22.

g. Once she was reclassified she received a list of tasks not found in her job description. *See* Task List (SGWS001181), annexed to the Moser Decl. as Exhibit 9.

h. Once she was reclassified she didn't have access to the 'big picture" and was no longer involved in high level inventory matters. *See* Suarez Dep. 68:18-24.

a. When she was a Manager, Maria Suarez had disciplinary authority over her staff. *See* Toohig Dep. 92:17-21.

b. There were no known problems with Maria Suarez's discipline or supervision of her employees when she was a Manager. Toohig Dep. 105:4-6.

c. Once she was reclassified as an "Administrator", she was stripped of her managerial authority. *See* Suarez Dep. 173:11-14; *see also* PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACT NO. 17.1, *supra*.

d.  As a Manager, Maria Suarez had been involved in financial adjustments of up to $100,00.00. *See* Suarez Dep. 65:2-13.

e.  Once she was reclassified, Maria's threshold for approving "adjustments" was limited to $500, which was "nothing." *See* Suarez Dep. 64:19-25.

f.  After she was reclassified, her primary duties consisted of clerical tasks.  See email and task list (SGWS002247-002248), annexed to the Moser Decl. as Exhibit 9; Defendant's Statement of Material Fact No. 31, infra (admitting that "Her work was clerical in nature").

***As an Administrator, the Plaintiff was relegated to the clerical task of counting merchandise in the warehouse for most of the day.***

g.  Southern stores $2 Billion[17] worth of liquor and wine in its Syosset warehouse. Randall Dep. 8:25-9:6.

h.  The warehouse is approximately 375,000 square feet (more than 6 football fields) at ground level. Randall Dep. 8:25-9:6.

i.  There are pallet racks up to 25 feet off the ground, four or five levels high. Kohn Dep. 114-6-11.

j.  The warehouse is divided into "locations" where individual pallets or groups of merchandise are stored.  Durant Dep. 39:23-40:10

k.  There are 30,000 locations in the warehouse. Durant Dep. 39:15-17

l.  Before she was reclassified as an Administrator, Maria had managerial authority over Inventory Control Clerks/Cycle Counters ("Clerks"). *See* Toohig Dep. 92:17-21.

---

[17] Billion with a "B".

m. When Maria was reclassified as an Administrator, there were five Clerks. Durant Dep. 36:22-25.

n. Each of the clerks of which had an RF (radio frequency) Gun. Durant Dep. 22:7-10.

o. Each Clerk would count inventory at a location, and enter it into the RF Gun. The system would compare the Clerk's count to the inventory record. If the difference between the Clerks' count and the inventory record was less than $250.00, the system would automatically accept the count. *See* Johnson Dep. 18-20; Durant Dep. 36.

p. However, if the difference between the amount counted and the system inventory was greater than $250.00, the count would be automatically rejected by the system and would go into a "discrepancy" file. Durant Dep. 36.

q. If, after a recount, the variance was still in excess of $250.00, Maria only had authority to accept the Clerk's count if the difference was $500 or less per location. Kohn Dep. 107:13-17.

r. For each location where the variance was in excess of $500.00, Maria was supposed to walk to the particular location in the 375,000 square foot warehouse and count the product herself. Durant Dep. 37:23-25.

s. Roy Kohn confirmed that Maria's new job, as Administrator, was to "reconcile" "behind" the Clerks. Kohn Dep. 109:2-109:25. This meant that she needed to "take a walk on the [warehouse] floor and take a look at it, put eyes on it, get out there before you validate something and say yes." Kohn Dep. 109:2-109:25.

t.  It takes 2-3 hours to resolve only 60-100 discrepancies (about 30-33 per hour). Durant Dep. 42:23-43:8

u.  Durant estimated that when WMI was first implemented, there were approximately 500 discrepancies each day. Durant Dep. 36:22-37:11.

v.  In fact, when WMI was first implemented there were approximately 1,000 discrepancies each day, not 500.  *See* Suarez Decl. ¶ 7.

w.  Erroneous counts by the Clerks would result in an increased workload for Maria. Durant Dep. 38:2-5.

x.  Therefore, when Maria Suarez was reclassified as an Administrator, her workload was affected by Clerks who previously had been, but no longer were, accountable to her.

y.  If Maria had followed the process recommended by Kohn and Durant, it would have taken her 30-33 hours to resolve inventory discrepancies from just one day (about 150-165 hours each week).

z.  After her reclassification as an Administrator, Maria walked the warehouse floor, counting product behind the Clerks, for at least 8 hours a day. Suarez Dep. 68:12-69:20; 76:16-18.

aa. Maria did her best to make adjustments to inventory and to stay ahead of the avalanche of discrepancies.  *See* Suarez Decl. ¶ 8.

19.     The only duty that changed for Suarez and the rest of the IC department was that they were no longer required to manually count inventory due to the introduction of the WMI electronic scanner guns, which made the IC process much more efficient. See WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.); and

Kohn Dep. at 92:2- 7 (attached as Exhibit 14 to the Cabrera Decl.) ("The WMI administrator role differed from her pre WMI administrator role mainly by the manner in which she worked and her inventory control department worked. They no longer worked with a manual system with pencil and paper. They worked with computers.").

**Response.** DISPUTED. Plaintiff incorporates by reference PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS NO. 17.1 AND 18.1, *supra.*

20.     Suarez continued to direct the work of the IC clerks. See Kohn Dep. at 58:14-18 (attached as Exhibit 14 to the Cabrera Decl.) ("[Suarez] assigned work to the cycle counters while she was the warehouse inventory manager in a manual system and after she became the WMI administrator. It was [Suarez'] job to assign work to the counters."); see also Suarez Dep. at 74:15- 5 (attached as Exhibit 19 to Cabrera Decl.) (admitting that she made the decision to direct the IC Clerks' work while employed as the WMI Administrator); Deposition Transcript of Melissa Johnson ("Johnson Dep.") at 8:19-23 (attached as Exhibit 16 to Cabrera Decl.) (duties of the WMI Administrator were "[t]o ensure that the system was correct at all times and to direct the cycle counters to their job duties each day."); and WMI Administrator History and Job Description (attached as Exhibit 5 to the Cabrera Decl.) (stating that the WMI Administrator is to "Provide Leadership...").

**Response.** DISPUTED.

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 20.**

*The work of the Clerks was determined by the system.*

a.  Maria Suarez would not make decisions. *See* Suarez Dep. 73:14-75:15.

b.  She would simply ask the Clerks to start counting at one location. *See* Suarez Dep. 73:14-75:15.

c. After the Clerks completed their first count the system would take over completely and them what location to count next until the end of their workday. *See* Suarez Dep. 73:14-75:15.

d. Plaintiff also incorporates by reference herein PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS NO. 17.1, *supra.*

21.     Suarez also applied for a position as WMI Inventory Control Manager.

**Response.** DISPUTED.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 21.

a. When Kevin Randall and John Wilkinson told Maria to apply for the WMI Administrator position, they also told that the decision had been made to make Tonisha Durant the Inventory Control Manager in the warehouse, and therefore she would not be able to apply for the position. *See* Suarez Decl. ¶ 6.

b. The Inventory Control Manager position was officially "created" on April 1, 2016, after Maria had already applied for the Administrator position. *See* WMI Inventory Control Manager History (SGWS000891-000894), annexed to the Cabrera Decl. as Exhibit 12.

21.1.     SGWS hired Tonisha Durant ("Durant") for the WMI Inventory Control Manager position on May 4, 2016. See WMI Inventory Control Manager History (attached as Exhibit 12 to the Cabrera Decl.).

**Response:** UNDISPUTED.

21.2.     Randall selected Durant for this position because it was within the accounting department and Durant's previous position was also in the accounting department. Durant was

the best fit and most qualified for this position. See Randall Dep. at 62:7-63:8 (attached as Exhibit 15 to the Cabrera Decl.).

**Response.** The true motive for the employment decisions is a question for the trier of fact and this is statement is therefore DISPUTED. Plaintiff incorporates by reference PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 16, *supra*.

21.3.     Durant's role "did not change. Her role came from the accounting [department] where she used to work and she applied to this position to become the Inventory Control Manager. She is the communicator between the accounting and the warehouse. She remained that constant." *See* Randall Dep. at 75:9-19 (attached as Exhibit 15 to the Cabrera Decl.).

**Response.** DISPUTED. Tonisha Durant actually assumed the Plaintiff's Role.    The Plaintiff's role as Inventory Control Manager was to be the communicator between the warehouse and the accounting department.  *See* Suarez Decl. ¶ 9.

22.     Suarez was classified as an exempt employee.

**Response:** .Plaintiff DOES NOT DISPUTE that Southern paid her a salary, even after removing her supervisory authority and discretion, but states that she was not properly classified as an exempt employee, because the defendant has conceded that she performed clerical duties. *See* Defendant's Statement of Material Fact No. 31, *infra* (admitting that "Her work was clerical in nature").

23.     During the relevant time period, Suarez' salary was as follows:

2011: Supervisor, Inventory Control ($61,305)

2012: Inventory Control Manager ($63,385)

2013: Inventory Control Manager ($66,555)

2014: Inventory Control Manager ($68,635)

2015: Inventory Control Manager ($70,715)

2016: Inventory Control Manager ($72,130)

2016: WMI Administrator ($75,000)

2017: WMI Administrator ($75,000)

*See* Payroll Records (attached as Exhibit 23 to the Cabrera Decl.).

**Response:** .UNDISPUTED.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 23.[18]

a. From 2011 until 2014 (the year in which the *Herdocia* lawsuit was filed), Plaintiff's average annual salary increase was 3.83%.

b. From 2015 until 2018 (after the *Herdocia* lawsuit was filed) the Plaintiff's average annual salary increase was 2.25%.

c. If Plaintiff had received the same salary increases after the women in her department filed their sex discrimination lawsuits as she had been receiving previously, Maria's salary in 2016 would have been $73,979.29.

d. Plaintiff's total compensation in 2016 was $73,780.00[19].

e. If Plaintiff had received the same salary increases after the women in her department filed their sex discrimination lawsuits as she had been receiving previously, her salary in 2017 would have been $76,812.70.

f. Her salary in 2017 was $75,000.00.

g. If Plaintiff had received the same salary increases after the women in her department filed their sex discrimination lawsuits as she had been receiving previously, her salary in 2018 would have been $79,754.62.

---

[18] These facts are supported by the Moser Declaration ¶ 8.
[19] The weighted average: $72,130 from January 1, 2016 until May 9, 2016, and $75,000 from May 10, 2016 until December 31, 2016.

h.  Plaintiff's salary in 2018 was <u>$75,000</u>.

These facts are summarized in the following table:

| Year | Salary | Actual % Increase | Average Annual % Increase[20] | Projected Salary[21] |
|------|--------|-------------------|-------------------------------|----------------------|
| 2011 | $ 61,305.00 | | | |
| 2012 | $ 63,385.00 | 3.39% | 3.83% | |
| 2013 | $ 66,555.00 | 5.00% | 3.83% | |
| 2014 | $ 68,635.00 | 3.13% | 3.83% | |
| 2015 | $ 70,715.00 | 3.03% | 2.25% | $ 71,250.40 |
| 2016 | $ 73,780.00 | 4.33% | 2.25% | $ 73,979.29 |
| 2017 | $ 75,000.00 | 1.65% | 2.25% | $ 76,812.70 |
| 2018 | $ 75,000.00 | 0.00% | 2.25% | $ 79,754.62 |

The following graph compares the Plaintiff's actual salary v. her projected salary.



24.     As WMI Administrator, Suarez was responsible for configuring, operating, overseeing, and analyzing the WMI to achieve project objectives; ensuring smooth start-up and

---

[20] Calculated before and after *Herdocia* lawsuit was filed.
[21] Based upon average % increase prior to filing of *Herdocia* lawsuit.

transition by providing leadership and training to IC clerks; and driving the WMI application process. See WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.).

**Response.** DISPUTED.  The job description only states that the Administrator would "assist" as follows:

> The candidate will _assist_ to configure, operate, train, oversee & analyze our WM (&Operations) functions to achieve project objectives; ensure smooth start-up & transition by providing leadership and training to the local staff. Southern Wine Corporate will drive the WM application process.

See WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.).

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 24.**

    a. Maria Suarez did not understand most of what was in the Administrator job description. _See_ Suarez Dep. 54:21-24.

    b. Kevin Randall told her to disregard and to not even read the job description. Suarez Dep. 57:18-20.

    c. Once Maria's title was changed she was required to manually count inventory for most of the day, something that she had not been required to do before and which became a large part of her job. _See_ PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 17.1., _supra._

25.    After the transition to the WMI, Suarez was still responsible for directing the work of the IC clerks. _See_ WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.); and Randall Dep. at 63:9-24 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 30:14-17 (attached as Exhibit 14 to the Cabrera Decl.) ("Don't be misled by the title of [WMI] administrator. The inventory control clerks reported through [Suarez]. Her voice was heard when she talked about them.").

**Response.** DISPUTED. The Plaintiff incorporates by reference PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NOS. 17.1; 18.1, AND 25, *supra.*

26.        As WMI Administrator, Suarez continued to have influence on evaluating how IC clerks performed their jobs and decisions on changes in their status. The only thing that changed from her prior job as Inventory Control Manager was the use of the WMI. See Randall Dep. at 63:9-24 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 34:14-18; 36:15-23; 37:2- 5 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "managed the inventory control department, a recognized department. Her voice was heard and respected if she made recommendations for discipline and this group of inventory and cycle counters reported to her. She was responsible for them" and Suarez "asked for an additional cycle counter at one point" approximately one year to 18 months prior to her department (Fall 2016), and "Wilkinson agreed to hire an additional cycle counter.").

**Response.** DISPUTED. The Plaintiff incorporates by reference herein PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NOS. 17.1; 18.1, AND 25, *supra.*

27.        Suarez continued to have supervisory authority over the IC clerks until she separated from SGWS. See Randall Dep. at 67:24-68:3 (attached as Exhibit 15 to the Cabrera Decl.).

**Response.** DISPUTED. The Plaintiff incorporates by reference herein PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NOS. 17.1; 18.1, AND 25, *supra.*

28.        Per the job description for the WMI Administrator position, Suarez had discretion over her responsibilities of strategy, execution, and building capabilities. For instance, with respect to strategy, Suarez had discretion over identifying operational opportunities to improve

organizational efficiencies. See WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.).

**Response.** Plaintiff DOES NOT DISPUTE that the job description says "Identify Operational opportunities improved organizational efficiencies and provide/recommend innovative solutions to help achieve the business goals." To the extent that the defendant contends that the Plaintiff actually had the duties listed in the job description, this statement is DISPUTED.

The Plaintiff incorporates by reference herein PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NOS. 17.1; 18.1, AND 25, *supra.*

**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACT NO. 28.**

On December 5, 2016, Roy Kohn ordered that any remaining discretion the Plaintiff might have had to be taken away when he wrote:

> I need Maria to immediately stop making adjustments to the WMi and Sapphire inventories. The damaged this has caused is insurmountable. *I realize that if she cannot make adjustments that her functions and capacity to do her job will be limited or totally negated*, but she has again created a significant financial impairment for the company.

*See* Toohig Emails, annexed to the Cabrera Decl. as Exhibit 29, (SGWS002088)(emphasis added).

29. Suarez exercised discretion and independent judgment over her strategy, execution, and building capabilities responsibilities as WMI Administrator. For example, with respect to execution, Suarez had discretion and independent judgment over implementing operations to ensure continuous improvement measures and initiatives. See Kohn Dep. at 95:4-96:7 (attached as Exhibit 14 to the Cabrera Decl.) (explaining Suarez's discretion with regard to different variances with the WMI program): and Finkelstein Dep. at 41-44; 47:6-15 (attached as

Exhibit 18 to Cabrera Decl.) (explaining WMI Administrator's responsibilities regarding analyzing inventory reports).

**Response.** DISPUTED. The Plaintiff incorporates by reference herein PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NOS. 17.1; 18.1, 25, AND 28, *supra.*

30.        Suarez performed under only general supervision from Wilkinson her duties in the IC department. Those duties involved specialized training, experience, and knowledge of physical inventory and inventory control. That was even more so true with the WMI system. See Kohn Dep. at 95:4-96:7; 96:15-20 (attached as Exhibit 14 to the Cabrera Decl.) ("I know that when we talk about her role as WMI administrator, I think people hear the word administrator. Perhaps you hear administrator as something less than in the management ranks, but it is not. It is someone that is administering the inventory and its value.").

**Response** DISPUTED. The Plaintiff incorporates by reference herein PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NOS. 17.1; 18.1, 25, AND 28, *supra.*

31.        Suarez was not performing manual work. Her work was clerical in nature. See WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.); Kohn Dep. at 34:22-23 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "was more clerical, less physical in her function."); and Randall Dep.at 100:4-101:8 (attached as Exhibit 15 to Cabrera Decl.) (stating that Suarez could not perform manual work because this was a unionized work-force and nonunion workers were prohibited from performing manual tasks).

**Response:** UNDISPUTED. The plaintiff agrees that her work was "clerical" in nature and that she was a "clerical and other worker" as defined in NYLL 190(7) which states,

> "Clerical and other worker" includes all employees not included in subdivisions four, five and six of this section [relating to railroad workers, manual workers, and commissioned salespeople], except any person employed in a bona fide executive, administrative or professional capacity[.]

32.     Suarez never disputed her job duties or responsibilities as WMI Administrator during her tenure with SGWS. See Johnson Dep. at 79:16-20 (attached as Exhibit 16 to Cabrera Decl.); and Deposition Transcript of Tonisha Durant ("Durant Dep.") at 52:2-9 (attached as Exhibit 17 to Cabrera Decl.) (Q: "In the meetings that you had with [Wilkinson] and [Suarez], the one-on- one meetings that you were asked about, did [Suarez] ever say these tasks are not in my job description?" A: "No." Q: "Did she ever say to [Wilkinson], Hey, you took away my direct report, so I can't get all of this done?" A: "No."); and Suarez Dep. at 74:15-5 (attached as Exhibit 19 to Cabrera Decl.) (Suarez admitting that she directed the IC Clerks' work while employed as the WMI Administrator).

**Response:** UNDISPUTED, but immaterial. Not confronting your boss does not necessarily mean that you agree with your boss.  Moreover, an employee who expresses a difference of opinion could be labeled as "belligerent" or "obstinate." *See* Defendant's Statement of Material Fact 35, *infra* (explaining how Roy Kohn accused Maria of being "belligerent" and "obstinate.").

33.     To ensure a smooth transition to WMI and to set employees like Suarez up for success, SGWS brought in multiple personnel from other locations where WMI had been implemented to help train Syosset personnel on the WMI system. See Kohn Dep. at 29:3-7 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "was given an extraordinary amount of attention to help her get through her learning curve and try to find a place that was going to make her more functional for the company."); and Johnson Dep. at 14:1-16:25 (attached as Exhibit 16 to Cabrera Decl.) (Melissa Johnson assisted with the initial WMI Training which was called "Go Live" and was done by the WMI Implementation Team in July 2016).

**Response:** Plaintiff DOES NOT DISPUTE that Southern offered training. Plaintiff DISPUTES that Southern's motive was to set her up for success, and believes she was actually

being set-up for failure. The employer's motives are a question of fact to be decided by the trier of fact.

<u>**PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACT NO. 33.**</u>

      ***Southern provided very little training to Maria***

      d.   In May 2016 (about two months before the system was implemented) Maria was sent to upstate New York to "shadow" Melissa Johnson for three days. Johnson Dep. 36:25-37:18.

      e.   Also, Kevin Randall and John Wilkinson told Maria to sit in on WMI meetings for several hours a day over the course of several weeks. Suarez Decl. ¶ 10.

      f.   The focus of these meetings was information technology. There was no training targeted to Maria's role as WMI Administrator. Suarez Decl. ¶ 11.

      g.   Randall and Wilkinson told her that when she sat in on the meetings she should bring her laptop and continue doing her regular job as Inventory Control Manager. Suarez Decl. ¶ 12. She did as she was told. Suarez Decl. ¶ 12.

34.      Unfortunately, Suarez rejected the assistance provided by the multiple WMI subject matter experts the company brought in to assist with the training of and transition to the new system, and the performance concerns identified by Wilkinson over the years only worsened once Suarez took the role of WMI Administrator. See Kohn Dep. at 29:7-9 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "was belligerent and being quite obstinate in taking advice from the experts in the company.").

**Response:** Although Southern accused Maria of having a poor attitude and performance, this statement is a statement of opinion, not fact, and is therefore DISPUTED. Moreover, Roy Kohn does not have personal knowledge upon which to base his accusations.[22]

**PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 34.**

      a.  According to Melissa Johnson (the individual who sat with Maria when the system went "live" Plaintiff) Maria was cooperative. Johnson Dep. 51:25-52:2.

      b.  Maria seemed "very eager." Johnson Dep. 38:24-39:2

      c.  Maria did not have an "I know better" attitude. Johnson Dep. 52:3-5.

      d.  Maria "had the knowledge and capabilities of doing everything she was given." Johnson Dep. 52:9-11.

      e.  Ms. Johnson considered Maria trustworthy. Johnson Dep. 55:24-25;

      f.  Ms. Johnson considered Maria to be honest, and does not remember Maria ever saying something that was untrue. Johnson Dep. 55:21-56:4.

35.     During WMI training, Suarez spent very little time with the training team, and when she did, she was obstinate. See August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.).

**Response:** This is not a statement of fact, but one of opinion, and one not supported by personal knowledge. Therefore, a response is not required. To the extent that a response is required, the Plaintiff DISPUTES this statement.

---

[22] The person with the most knowledge (other than the Plaintiff herself) of Maria's day to day activities was her manager John Wilkinson, who unfortunately died in 2019. Kohn Dep. 176:25-177:6. After John Wilkinson, the next person with the most personal knowledge Maria's day to day activities was Kevin Randall. Kohn Dep. 176:25-177:6. Kevin Randall has no personal knowledge of Maria's activities (Randall Dep. 84:8-19) and Roy Kohn knows even less than Kevin Randall (Kohn Dep. 176:25-177:6).

    a.  On August 17, 2016, after meeting with one of Southern's "trainers" Maria

sent an email to her boss, John Wilkinson, as follows:

> I just want you to know that he didn't teach me anything, had nothing
> to show to me, just wanted to tell me than I am supposed to be on a
> cherry picker[23] counting behind the cycle counters, also that I am
> wasting man hours putting Justin to recount behind the others. I take
> orders from my boss, <u>you tell me what to do.</u>[24]

    b.  Wilkinson did not reply to this email. Instead, John Wilkinson forwarded it to

his boss, Kevin Randall. [25] Kevin Randall in turn forwarded it to his boss, Roy

Kohn.[26]

36.    This continued lack of cooperation and Suarez's poor attitude led to numerous

follow-up sessions with multiple trainers, including Melissa Johnson ("Johnson") from upstate

New York. See Johnson Dep. at 37:4-11 (attached as Exhibit 16 to Cabrera Decl.) (Suarez "came

to the Syracuse facility to shadow [Johnson] for three days").

**Response:** The statement accusing Maria of being uncooperative and of having a poor

attitude is one of opinion, not fact, to which no response is required. The balance of the

statement is unsupported by the citation and therefore DISPUTED. The portion of the Johnson

Deposition transcript cited by Defendant refers to 3 days of training that were provided to Maria

Suarez in upstate New York in the *beginning of 2016, months b*efore she became the WMI

Administrator. Johnson Dep. 36:25-37:18. Johnson further testified that she could not predict

how Maria would perform once WMI was implemented "because [Maria] hadn't even used the

system yet." Johnson Dep. 37:19-24.

---

[23] A cherry picker is a hydraulic crane with a platform at one end for raising and lowering people, to work
at heights.
[24] See August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.)
[25] See August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.).
[26] See August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.).

37.     Johnson noticed that Suarez needed "more knowledge of the [WMI] system" so she "created a daily/weekly report of what needed to be done each day and each week." *See* Johnson Dep. at 40:23-41:8 (attached as Exhibit 16 to Cabrera Decl.); and Daily/Weekly Task Report (attached as Exhibit 22 to the Cabrera Decl.).

**Response:** UNDISPUTED. However, the Daily/Weekly Task sheet which describes the Plaintiff's duties as "Administrator" bears little or no relationship to the Plaintiff's job description. *See* Daily/Weekly Task Report (attached as Exhibit 22 to the Cabrera Decl.), and WMI Administrator Job Description (attached as Exhibit 5 to the Cabrera Decl.).

38.     However, Suarez still could not understand the WMI system[.]

**Response:** This is not a fact, but an opinion. This opinion is unsupported by reference to admissible evidence and is therefore DISPUTED. The portion of the Johnson Transcript cited contains no statement as to whether Maria understood the WMI system.

38.1.    Johnson returned to train Suarez in Syosset on two more occasions for one week at a time, in October 2016 and January 2017, respectively. See Johnson Dep. at 45:12-22 (attached as Exhibit 16 to Cabrera Decl.).

**Response:** UNDISPUTED.

39.     But Suarez began making significant, costly errors almost immediately. For instance, she made negative adjustments to inventory without verifying or researching discrepancies and without communicating the discrepancies to others. See Kohn Dep. at 104:15-18 (attached as Exhibit 14 to the Cabrera Decl.) (Suarez "wrote off things and did not communicate them well in excess of $500. There was one particular day she wrote off $1,700,000 and didn't tell anyone and left it alone.").

**Response:** DISPUTED.

**Counter-Statement of Material Fact No. 39.**

    a. The Plaintiff never "wrote off" $1.7 million in inventory, nor did she have the ability to do so (even if she had wanted to).[27]

    b. Mr. Kohn is referring to a "discrepancy report" printed on or about December 3, 2016 showing that there was an inventory discrepancy of $1.7 million (in other words, the discrepancy was less than 1/10th of a percent (% 0.085).[28]

    c. On December 5, 2016, Roy Kohn sent numerous emails to Cory Cooper, the East-Coast Vice President of Human Resources for Southern, before Maria was even approached regarding the alleged discrepancy.[29]

    d. By the end of that same day, and before Maria had even been spoken to about the discrepancy report, Elizabeth Toohig had already drafted an "aggressive proposal of termination". *See* SGWS002070-002074, annexed to the Moser Declaration as Exhibit 10; Suarez Decl. ¶ 14.

    e. This letter, which is dated <u>December 5, 2016</u> (a full 1 ½ years before Maria was fired), concluded as follows:

> Despite retraining and offers by [John Wilkinson], Eric, Tonisha and Melissa to assist you, basic responsibilities of your role as WMI Administrator are going ignored or are being done incorrectly causing a financial burden to the Company and creating increase in work load to the managers listed above. Due to these facts your employment with Southern Glazer's Wine and Spirits is terminated effective immediately.[30]

40.     This had a significant impact on the warehouse's financials and required extensive mitigation efforts by other employees. See Kohn Dep. at 104:19-23 (attached as Exhibit 14 to the Cabrera Decl.).

---

[27] *See* Suarez Decl. ¶ 13.
[28] Calculated by dividing $1.7M by $2B.
[29] *See* SGWS002070-002074, annexed to the Moser Declaration as Exhibit 10.
[30] *See* SGWS002070-002074, annexed to the Moser Declaration as Exhibit 10.

**Response:** DISPUTED. The "This" that was referred to by Mr. Kohn never occurred. *See* PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 39, *supra.*

41.     After several significant errors by Suarez, and after several meetings between Wilkinson and Suarez, Wilkinson and Vice President of Human Resources Elizabeth Toohig ("Toohig") issued Suarez a WMI Administrator Performance Expectations Memo in September 2016 to counsel her on the issues that had been identified and to offer additional support and training. See September 2016 WMI Administrator Performance Expectations Memo (attached as Exhibit 6 to the Cabrera Decl.).

**Response:** Plaintiff does not dispute that in early September 2016, just one month before her scheduled deposition in the *Sajous* case, Southern issued a memo to the Plaintiff titled "WMI Administrator Performance." In the memo, John Wilkinson criticized the Plaintiff's performance and described her as "uncooperative." This was the first such Memo she had ever received in her entire career at Southern.[31]   The remainder of the statement is DISPUTED because it is unsupported by a citation to evidence in admissible form.

42.     To facilitate Suarez's verification of inventory discrepancies and communication of the same, Wilkinson moved Suarez to an office located on the warehouse floor to be closer to the inventory and her team. This office was also used by warehouse managers who needed to have the same type of oversight during their shifts. See Randall Dep. at 69:21-70:18 (attached as Exhibit 15 to the Cabrera Decl.).

**Response:** DISPUTED IN PART. Plaintiff DOES NOT DISPUTE that Approximately one week after she testified in the *Sajous* case, John Wilkinson entered her office and told her "get your things together, you are moving." She loaded her docking station, monitor, papers and personal belonging onto her office chair and pushed the chair in front of her, following John

---

[31] *See* Suarez Declaration ¶ 15.

Wilkinson. He relocated her to the blue room (a common space used by warehouse supervisors and warehousemen located on the warehouse floor).[32] Randall's statement as to Wilkinson's reasons for taking away the Plaintiff's office are clearly speculative and not based upon personal knowledge, and therefore the alleged "reason" is DISPUTED. *See* Randall Dep. 70:9-70:11 (speculating that Wilkinson "probably" moved the plaintiff out of her office to be "closer to her people.").

43.     But Suarez continued to reject the guidance and instructions from her managers and the employees who successfully manage WMI in other SGWS locations. She continued to make errors that were costly to the company and increased the workload of multiple employees in the IC department and other warehouse functions. Due to her continued and increased performance deficiencies, the company placed Suarez on a performance improvement plan ("PIP") in January 2017. See January 2017 Performance Improvement Plan (attached as Exhibit 7 to the Cabrera Decl.); and January 2017 Email (attached as Exhibit 28 to the Cabrera Decl.).

**Response:** Plaintiff does not dispute that she was placed on a performance improvement plan in January 2017. The remainder of the statement is DISPUTED because it is unsupported by a citation to evidence in admissible form and constitutes opinion.

44.     Despite the additional training and coaching, Suarez continued to make similar errors throughout 2017, resulting in a Final Written Warning in December 2017. See 2016 and 2017 Performance Reviews (attached as Exhibit 8 to the Cabrera Decl.); and January 2017 Written Warning and December 2017 Final Written Warning (attached as Exhibit 9 to the Cabrera Decl.); and March 2017 Email (attached as Exhibit 21 to the Cabrera Decl.).

---

[32] *See* Suarez Declaration ¶ 16.

**Response:** Plaintiff DOES NOT DISPUTE that she was given a Final Written Warning in December 2017. The remainder of the statement is DISPUTED because it is unsupported by a citation to evidence in admissible form.

45.      Before and after issuing the PIPs and warnings to Suarez, Toohig conducted an independent investigation into Suarez' performance, including all attending performance meetings between Wilkinson and Suarez, editing the PIPs, and being included on all emails regarding Suarez' performance. *See* Toohig Decl., ¶ 13; and Toohig Emails (attached as Exhibit 29 to the Cabrera Decl.)

**Response.**   Plaintiff DOES NOT DISPUTE that at some point in time, Southern opened an "investigation" file on Maria Suarez. See SGWS 001953 (in which Toohig directs a member of her team to save Maria Suarez's "previous discipline in. . .the investigation file.").

46.      Toohig also had conversations with Johnson about Suarez' performance and Suarez' continued need for training on the WMI system. See Toohig Decl., ¶ 14.

**Response.** UNDISPUTED.

47.      Toohig conducted this independent investigation to make her own determination regarding the expectations and whether Suarez' performance issues were significant enough to place her on a PIP. See Toohig Decl., ¶ 15.

**Response:** Maria Suarez DOES NOT DISPUTE that she was being "investigated" by Ms. Toohig. *See* SGWS001953 (of Exhibit 29 to the Cabrera Declaration)(in which Toohig directs a member of her team to save Maria Suarez's "previous discipline. . .the investigation file.").

48.      Toohig reviewed all employment issues related to Suarez to ensure that she was being treated fairly, that there was no disparate treatment, and to make sure that Suarez was being held to an appropriate standard that correlated with her job duties and responsibilities as

the WMI Administrator. See Toohig Decl., ¶ 16. Toohig sought to ensure that there were no external factors influencing employment decisions regarding Suarez. See Toohig Decl., ¶ 17.

**Response:** Plaintiff DOES NOT DISPUTE that Ms. Toohig reviewed all employment issues related to Suarez." Nor DOES PLAINTIFF DISPUTE that Toohig was of the opinion that Maria "was being treated fairly, that there was no disparate treatment", and that "there were no external factors" which influenced Southern's employment decisions. Toohig's motives for the investigation and her conclusory opinion are not proper subject for a statement of undisputed fact and are therefore DISPUTED.[33]

49.     Based on Suarez' continued performance issues during the relevant time period, which were documented on numerous occasions, Toohig believed the PIP and employment decisions made regarding Suarez were in line with the needs of the business. See Toohig Decl., ¶ 18.

**Response** Whether Southern discriminated or retaliated against Maria, or otherwise had a legitimate non-discriminatory reason for its employment decisions is an ultimate issue for trier of fact and is therefore DISPUTED.[34] Toohig's "belief" is not a statement of fact, but of opinion, and is therefore DISPUTED.

### SOUTHERN'S "REDUCTION IN FORCE"

50.     In early 2018, SGWS began a national initiative to reduce operating costs by increasing efficiency, eliminating positions, and streamlining its processes. See SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to

---

[33] Whether Southern discriminated or retaliated against Maria is an ultimate issue for the jury. In the case of a lay witness, even though Rule 704 generally authorizes the admission of opinion testimony on an ultimate issue, the Rule makes clear that the proffered testimony must also be "otherwise admissible" under Rule 701. Ms. Toohig's opinion is that Southern did not retaliate or discriminate against the Plaintiff. However, an opinion is not appropriate material for a Rule 56.1 Statement of Fact.

the Cabrera Decl.); Randall Dep. at 51:25-52:5 (attached as Exhibit 15 to the Cabrera Decl.); and

Kohn Dep. at 141:8-16 (attached as Exhibit 14 to the Cabrera Decl.).

**Response.** DISPUTED:

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 50.

    a.  Southern is the largest wine and spirits distributor in the United States.[35]

    b.  As of December 2022, Southern was the 11th largest private company in the United States.[36]

    c.  In early 2018, Roy Kohn received orders to eliminate 26 out of the 1,500 employees working in New York. Kohn Dep. 143:3-12; Randall Dep. 51:7-24.[37]

    d.  According to Kevin Randall, Kohn told him pick any 5 people from his department to eliminate. Although this was a "cost savings" initiative, *Randall was not told how much money he was supposed to save:*

| | |
|---|---|
| Q. | [T]his was an initiative to save money? |
| A. | Yes. Yes, I believe so. What else could it be? |
| Q. | Were there any instructions as to how much money you had to save? |
| A. | No. |
| Q. | You just had to eliminate any five people; is that fair to say? |
| A. | That was my assignment. |
| Q. | It could have been anyone at the company? |
| A. | Yes. |

Randall Dep. 60:7-19.

    e.  Before Maria was terminated, Southern's Metro New York operation was already profitable. Randall Dep. 54:9-14;

    f.  The stated purpose of firing 5 people was to generate even more profit for Sothern's owners, the Chaplin family. Randall Dep. 54:9-14; 54:17-18.

---

[35] https://www.forbes.com/companies/southern-glazers/?sh=33ad7806f3a5
[36] https://www.forbes.com/companies/southern-glazers/?sh=33ad7806f3a5
[37] Defendant has failed to provide any documentation regarding these "orders."

g. Despite the fact that Randall eliminated 5 people under his command, the remaining managers, including Randall himself, received pay increases in 2018; therefore, the payroll went up in 2018. Randall Dep. 59:2-22.

h. Kevin Randall *didn't keep any records regarding how he made his decision to select Maria*. Randall Dep. 65:3-5.

i. Roy Kohn doesn't think there are any documents which showing how Maria was selected for termination. Kohn Dep. 144:12-15.

j. Elizabeth Toohig testified that records were kept regarding the selection process, including "spreadsheets as to the numbers and the dollars, the positions that were going, the reasons, and justifications" as well as a list of employees with demographic information. "All of that would have been submitted to legal." Toohig Dep. 22:20-23:9.

k. Southern has not produced any documents showing how Maria was selected for termination, and Southern's counsel claim that none have been withheld.[38]

l. Although Southern claims that this was a "reduction in force" program, it has not produced any documents concerning the reduction in force. The most it has produced is a list of 26 people who were fired. [39]

m. Kevin Randall claims that he considered Maria's performance when he selected her for termination. Randall Dep. 59:6-11.

n. Roy Kohn (Randall's boss) had input into Randall's selection of Maria. Randall Dep. 64:24-65:2.

---

[38] *See* Moser Declaration ¶ 6.
[39] *See* Moser Declaration ¶ 7.

o. According to Roy Kohn, "Maria had performance issues many years throughout her tenure at Southern" and these performance issues "started well before" she was reassigned from Manager to Administrator. *See* Kohn Dep. 120-121.

p. However, the only documents produced by Southern that show Maria's performance before her reassignment from "Manager" to "Administrator" are the performance evaluations from 2010-2014, according to which she met or exceeded her job expectations, and displayed all the behaviors required for successful job performance.[40]

51. In April 2018, 26 employees in New York were selected for lay-off as part of the program. See NYRIF List (attached as Exhibit 10 to the Cabrera Decl.).

**Response:** Plaintiff does not dispute that Defendants picked out 26 people for termination in early 2018. Plaintiff DISPUTES that the selections were part of an impartial "reduction in force" program as no documents concerning alleged program have been produced, except for a list of 26 people who were terminated.[41]

52. 5 out of the 26 employees were part of the operations group. See Kohn Dep. at 141:16-17 (attached as Exhibit 14 to the Cabrera Decl.).

**Response.** UNDISPUTED.

53. The selection criteria for the state-wide reduction in force program included job performance, position elimination, ability to perform the tasks required of those still employed, and suitability for the positions remaining after the reorganization. See SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera

---

[40] See Performance Evaluations, at 1 (emphasis added) and Plaintiff's Counter-Statement of Material Facts No. 8, *supra.*
[41] *See* Moser Declaration ¶ 7.

Decl.); Randall Dep. at 59:6-11 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 141:8-142:11 (attached as Exhibit 14 to the Cabrera Decl.).

**Response:** Plaintiff DISPUTES the existence of a "reduction in force" program as no documents concerning the alleged program have been produced.[42]  Plaintiff disputes the proffered reasons for selecting the Plaintiff as no documents concerning how she was selected for termination have been produced.[43]

54.     The reduction of the 5 operations employees was primarily led by Kevin Randall ("Randall"), but he received input from others, including Roy Kohn, then Vice President of Operations of New York, Toohig, and Wilkinson. See SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 15 (attached as Exhibit 13 to the Cabrera Decl.); Randall Dep. At 64:24-65:2 (attached as Exhibit 15 to the Cabrera Decl.); and Deposition Transcript of Elizabeth Toohig ("Toohig Dep.") at 21:21-25; 31:2-25 (attached as Exhibit 24 to Cabrera Decl.) (The reduction in force "was an intense process, lots of meetings, lots of conversations. We [SGWS] don't take eliminating peoples' roles lightly. It was a lot of conversations.").

**Response:** Plaintiff disputes the existence of a bona-fide "reduction in force" program as no documents concerning said program exist or have been produced.  Plaintiff further disputes that selecting maria "was an intense process" with "lots of meetings" and "lots of conversations" as no documents concerning the process, conversations, or meetings exist or have been produced.

55.     Suarez was among those selected for the program based on the foregoing criteria. See SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera Decl.); and Randall Dep. at 59:6-11; 64:13-23 (attached as Exhibit 15 to the Cabrera Decl.). Randall also relied upon input from Wilkinson. See Randall Dep. at 65:19-

---

[42] *See* Moser Declaration ¶ 6.
[43] *See* Moser Declaration ¶ 7.

23 (attached as Exhibit 15 to the Cabrera Decl.); and Kohn Dep. at 156:18-25-7 (attached as Exhibit 14 to the Cabrera Decl.).

**Response:** Plaintiff disputes the stated reasons for selecting the Plaintiff for termination as the Defendant has not produced any documents showing how she was selected or that a reduction in force program even existed.[44]

56.        In terms of job performance, Suarez had chronic performance issues including errors with cycle counting and failure to communicate those errors, and these issues were documented over and over again. See January 2017 Performance Improvement Plan (attached as Exhibit 7 to the Cabrera Decl.); 2016 and 2017 Performance Reviews (attached as Exhibit 8 to the Cabrera Decl.); January 2017 Written Warning and December 2017 Final Written Warning (attached as Exhibit 9 to the Cabrera Decl.) and Toohig Emails (attached as Exhibit 29 to the Cabrera Decl.).

**Response:** DISPUTED IN PART.   Plaintiff does not dispute that after the *Herdocia* lawsuit was filed Southern did not issue her a performance evaluation for two years (2014 & 2015).[45] Then, without having the benefit of a recent performance evaluation, Southern reclassified her from a "Manager" to an "Administrator" in 2016.[46]  She was given a confusing job description that she was told to disregard.[47]  After Southern reclassified her as an "Adminisrator", Southern consistently and aggressively documented many performance isssues, and actually wanted to terminate the Plaintiff in December 2016, less than 6 months after WMI was implemented, and

---

[44] *See* Moser Declaration ¶ 7.
[45] *See* PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS NO. 8(i) and 8(m).
[46] *See* PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS NO. 17.1(d).
[47] *See* Suarez Dep. 57:18-20.

even though she had not had received an annual performance appraisal since May 2014, before the *Herdocia* lawsuit was commenced.[48]

57.      She was also obstinate during the WMI training and transition process, which likewise was well documented. See August 2016 Email Thread (attached as Exhibit 20 to the Cabrera Decl.); Kohn Dep. at 142:7-11 (attached as Exhibit 14 to the Cabrera Decl.) (discussing Suarez' "belligerent difficult attitude with the 40 folks who came to help with the Go Live process."); and Toohig Emails (attached as Exhibit 29 to the Cabrera Decl.).

**Response:** This is not a statement of fact, but of opinion, to which no response is required. To the extent that a response is required, Plaintiff DISPUTES this statement, and incorporates by reference herein PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACT NO. 35 (concerning her attitude), and 24 (concerning Roy Kohn's lack of personal knowledge).

58.      In terms of position elimination, SGWS found that there were overlapping job functions between the WMI Administrator position (occupied by Suarez) and the WMI Inventory Control Manager position (occupied by Durant) and it decided to eliminate the former position. The remaining duties were assigned to Finkelstein. See SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response Nos. 4 and 5 (attached as Exhibit 13 to the Cabrera Decl.); Kohn Dep. at 142:2-6 (attached as Exhibit 14 to the Cabrera Decl.) ("Suarez' work went to Tonisha Durant and Barry Finkelstein. It [her position] was not backfilled."); and Toohig Dep. at 31:13-20 (attached as Exhibit 24 to Cabrera Decl.) (reviewing "the job descriptions, where the job responsibilities, whether or not they were going to be reassigned to someone else, or whether they were actually being eliminated and no longer necessary.").

**Response:** Plaintiff DISPUTES the stated reasons for selecting the Plaintiff for termination as the Defendant has not produced any documents showing how she was selected, and as

---

[48] *See* Defendant's Statements 39, 40 and 56 and Plaintiff's Responses thereto, *supra.*

whether the Defendant had a legitimate non-discriminatory reason for terminating the Plaintiff is a question for the trier of fact.

59.     SGWS terminated Suarez's employment and eliminated her position, effective April 6, 2018. See Termination Letter (attached as Exhibit 11 to the Cabrera Decl.); and SGWS' Responses to Plaintiff's First Set of Interrogatories, at Response No. 4 (attached as Exhibit 13 to the Cabrera Decl.).

**Response:** UNDISPUTED.

60.     SGWS offered Suarez a severance package, but she declined. See Suarez Dep. at 150:17-21 (attached as Exhibit 19 to Cabrera Decl.).

**Response:** UNDISPUTED.

61.     In May 2013, Suarez directed a question to Wilkinson about whether the female IC clerks had been improperly classified as clerical employees instead of warehouse employees. Wilkinson escalated Suarez' question to former Associate Director of Human Resources Dina Wald Margolis ("Wald Margolis"). See Toohig Dep. at 43:2-44:25 (attached as Exhibit 24 to Cabrera Decl.); and Dina Wald Margolis's Deposition Testimony ("Wald Margolis Dep.") at 34:2- 45:25 (attached as Exhibit 27 to the Cabrera Decl.).

**Response:** UNDISPUTED.

62.     Given Suarez's managerial authority over the IC Clerks, it was "a legitimate question to ask" and "there was nothing inappropriate" about Suarez's question about employee classification. See Toohig Dep. at 45:17-22 (attached as Exhibit 24 to Cabrera Decl.).

**Response:** UNDISPUTED.

63.     In fact, it was Suarez's "responsibility" to "identify[] an issue." See Toohig Dep. at 120:3-11 (attached as Exhibit 24 to Cabrera Decl.).

**Response:** UNDISPUTED.

64.      SGWS investigated the classification and determined that "it had been a clerical error." See Toohig Dep. at 46:2-9 (attached as Exhibit 24 to Cabrera Decl.); and Wald Margolis Dep. at 63:21-24 (attached as Exhibit 27 to the Cabrera Decl.) (Wald Margolis did a thorough investigation into Suarez's question).

**Response:** UNDISPUTED.

65.      SGWS immediately corrected the clerical issue in the system and all of the IC Clerks were classified the same way. See Toohig Dep. at 120:8-15 (attached as Exhibit 24 to Cabrera Decl.).

**Response:** UNDISPUTED, but irrelevant as to whether the Plaintiff engage in protected activity.

66.      In connection with these issues, Sajous filed a charge with the Equal Employment Opportunity Commission in 2013. After the EEOC dismissed Sajous' charge based on a no-probable cause finding, Sajous filed a lawsuit in January 2015 alleging gender discrimination and violations of the Equal Pay Act. See Sajous v. Southern Wine & Spirits of New York, Inc., 15-cv- 03270-JS-ARL (E.D.N.Y.).

**Response:** UNDISPUTED.

67.      In October 2016—one month after Suarez received the WMI Administrator Performance Expectations Memo—she provided a deposition in the Sajous litigation. See Suarez' Deposition Testimony in Sajous Matter (attached as Exhibit 25 to the Cabrera Decl.); and September 2016 WMI Administrator Performance Expectations Memo (attached as Exhibit 6 to the Cabrera Decl.).

**Response:** UNDISPUTED.

68.     Suarez testified that it was her personal opinion—not the company's position—that the IC Clerks she supervised should be classified as warehouse workers and that she held this opinion simply because "they work in the warehouse." When Suarez was asked if she believed the Union's reason for denying the IC Clerks the warehouse classification was because they were women, Suarez responded "I wouldn't know." She confirmed in the Sajous deposition that she never participated in any discussions about the reasoning for her department's classification as clerical rather than warehouse and that she never even asked anyone the reason for the classification. See Suarez' Deposition Testimony in Sajous Matter at 19:24-20:23, 46:4-9, 51:2-6, 61:16-62:25 (attached as Exhibit 25 to the Cabrera Decl.).

**Response:** UNDISPUTED.

69.     Suarez also confirmed that the IC department employees were not the only SGWS employees who worked in the warehouse who were classified as clerical rather than warehouse employees, and that some of those other employees were men). See Suarez' Deposition Testimony in Sajous Matter at 19:24-20:23, 46:4-9, 51:2-6, 61:16-62:25 (attached as Exhibit 25 to the Cabrera Decl.).

**Response:** UNDISPUTED.

70.     Suarez' testimony was not damaging to SGWS. See Toohig Dep. at 120:3-11 (attached as Exhibit 24 to Cabrera Decl.) (Q: "Do you believe that [Suarez] was retaliated against because the women in her department sued the company?" A: "No." Q: "What is that opinion based upon?" A: "I believe [Suarez] did her responsibility by identifying an issues that we [SGWS] immediately corrected. I don't believe it was [Suarez] fault that [the IC Clerks] sed the company."); and Wald Margolis Dep. at 76:13-77:11 (attached as Exhibit 27 to the Cabrera Decl.) (Q: "Did you believe that [Suarez] was to blame for these women believing they were

discriminated against?" A: "No." Q: "And do you think that [Suarez] was responsible for the fact that these women made claims of discrimination against [SGWS]?" A: "No, I don't.").

**Response:** DISPUTED. This is a statement of opinion, rather than fact to which a response is not required. However, to the extent that a response is required, this is DISPUTED. See Suarez' Deposition Testimony in Sajous Matter (annexed to the Cabrera Declaration as Exhibit 19).

Dated: Huntington, New York
       March 9, 2023

MOSER LAW FIRM, P.C.

*Steven John Moser*
Steven John Moser (SM6628)
5 East Main Street
Huntington, New York 11743
steven.moser@moserlawfirm.com
(631) 824-0200

TO:    All Counsel of Record (Via ECF)